W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel
Department of Justice, Civil Division
318 South Sixth Street, Room 244
Springfield, Illinois 62701
Telephone:     (202) 514-3495
Facsimile:     (217) 492-4888
E-mail:          scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

DONALD J. TRUMP, President of the
United States; WILLIAM P. BARR,
Attorney General of the United States;
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| THE STATE OF OREGON, *et al.*, | Case No. 6:18-cv-01959-MC |
| Plaintiffs, | |
| v. | **DEFENDANTS' MOTION TO DISMISS; MEMORANDUM OF LAW** |
| DONALD J. TRUMP, President of the United States, *et al.*, | Request for Oral Argument |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

MOTION TO DISMISS ........................................................................................................1

LEGAL MEMORANDUM ....................................................................................................1

INTRODUCTION .................................................................................................................1

STATUTORY AND ADMINISTRATIVE BACKGROUND ............................................6

    I.     The Immigration and Nationality Act .....................................................6

    II.    USDOJ Office of Justice Programs and the Byrne JAG Program ............9

    III.   Plaintiffs' Non-Cooperation with Immigration Enforcement.................13

         A.    Oregon Statutes.................................................................13

         B.    Portland Police Directive ..................................................14

ARGUMENT .......................................................................................................................15

    I.     Plaintiffs Lack Standing to Challenge the Constitutionality
         of Section 1373 or 1644 or of the Byrne JAG Conditions, and
         Their Challenge Is Constitutionally Unripe ...........................................15

    II.    Sections 1373 and 1644 Are Consistent with the Tenth Amendment .................17

    III.   The Access and Notice Conditions Are Authorized by Statute
         and Do Not Violate the Separation of Powers .........................................23

    IV.   Plaintiffs Are Not Entitled to Mandamus Relief.....................................28

CONCLUSION ....................................................................................................................30

# TABLE OF AUTHORITIES

## CONSTITUTION

U.S. Const. art. III, § 2, cl. 1 ........................................................................ 15

## CASES

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) .......................................... 16

*Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979 (3d Cir. 1986) .................. 24

*Arizona v. United States*, 567 U.S. 387 (2012) .............................. 2, 19, 22

*Clinton v. City of New York*, 524 U.S. 417 (1998) ...................................... 24

*Conservation Force v. Salazar*, 646 F.3d 1240 (9th Cir. 2011) .................... 15

*Coons v. Lew*, 762 F.3d 891 (9th Cir. 2014) ............................................. 16

*Courthouse News Serv. v. Planet*, 750 F.3d 776 (9th Cir. 2014) .................. 15

*DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275 (D.C. Cir. 1989) ................... 5, 24

*Food Service Dynamics, Inc. v. Bergland*, 465 F. Supp. 1178 (E.D.N.Y. 1979) ........ 29

*Gifford Pinchot All. v. Butruille*, 742 F. Supp. 1077 (D. Or. 1990) ............... 28

*Haw. Cty. Green Party v. Clinton*, 14 F. Supp. 2d 1198 (D. Haw. 1998) ............ 16

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981) .......... 22, 23

*Johnson v. Consumerinfo.com, Inc.*, 745 F.3d 1019 (9th Cir. 2014) ................ 25

*Kildare v. Saenz*, 325 F.3d 1078 (9th Cir. 2003) .................................... 5, 28

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ........................... 15

*Louisiana Mun. Police Emps.' Ret. Sys. v. Wynn*, 829 F.3d 1048 (9th Cir. 2016) ....... 15

*Murphy v. NCAA*, 138 S. Ct. 1461 (2018) ............................ 4, 18, 20, 21, 22

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ....................... 18

*Navarro v. Block,* 250 F.3d 729 (9th Cir. 2001) ...................................... 15

*New York v. United States*, 505 U.S. 144 (1992) ..................................................... 4, 18

*Norton v. S. Utah Wilderness, All.*, 542 U.S. 55 (2004) ........................................ 29, 30

*Or. Bureau of Labor & Indus. ex rel. Richardson v. U.S. W. Commc'ns, Inc.*,
    288 F.3d 414 (9th Cir. 2002) ........................................................................... 15

*Pittston Coal Grp. v. Sebben*, 488 U.S. 105 (1988) ................................................... 28

*Printz v. United States*, 521 U.S. 898 (1997) ...................................................... 18, 21

*Prometheus Radio Project v. FCC*, 824 F.3d 33 (3d. Cir. 2016) ................................ 30

*Reno v. Condon*, 528 U.S. 141 (2000) ........................................................................ 21

*South Dakota v. Dole*, 483 U.S. 203 (1987) ................................................. 18, 20, 24

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ..................................... 16

*Stone v. INS*, 514 U.S. 386 (1995) ............................................................................. 26

*Texas v. United States*, 523 U.S. 296 (1998) ............................................................. 16

*United States v. Wenner*, 351 F.3d 969 (9th Cir. 2003) ............................................. 25

## STATUTES

8 U.S.C. § 1227(a)(2) ..................................................................................................... 6

8 U.S.C. § 1226(c) ................................................................................... 2, 3, 6, 9, 19

8 U.S.C. § 1228(b) ......................................................................................................... 7

8 U.S.C. § 1229 .............................................................................................................. 7

8 U.S.C. § 1231(a) ......................................................................................................... 7

8 U.S.C. § 1231(a)(1) ...................................................................................... 2, 3, 8, 19

8 U.S.C. § 1231(a)(2) ................................................................................................ 3, 19

8 U.S.C. § 1231(a)(4) ...................................................................................... 2, 8, 19

8 U.S.C. § 1252c ............................................................................................................. 8

8 U.S.C. § 1306 .............................................................................................................. 7

8 U.S.C. § 1324(a)(1)(A) .................................................................................. 7

8 U.S.C. § 1324(c) ............................................................................................ 8

8 U.S.C. § 1357(g) ............................................................................................ 8

8 U.S.C. § 1366 ................................................................................................. 7

8 U.S.C. § 1373(a) ............................................................................................ 17

8 U.S.C. §§ 1101 *et seq.* ................................................................................... 6

25 U.S.C. § 1644(b) .......................................................................................... 26

28 U.S.C. § 510 ................................................................................................. 25

34 U.S.C. §§ 10101 *et seq.* .............................................................................. 9

34 U.S.C. § 10102(a)(2) ................................................................................. 5, 9

34 U.S.C. § 10102(a)(4) ................................................................................. 5, 9

34 U.S.C. § 10102(a)(6) ..................................................................... 5, 9, 25, 29

34 U.S.C. §§ 10151-58 ...................................................................................... 9

34 U.S.C. § 10151 ............................................................................................. 2

34 U.S.C. § 10152(a)(1) ............................................................................. 5, 9, 29

34 U.S.C. § 10153(A)(4) .................................................................................. 27

34 U.S.C. § 10153(A)(5)(C) ............................................................................ 27

34 U.S.C. § 10154 ...................................................................................... 17, 30

34 U.S.C. § 10444(7) ....................................................................................... 25

34 U.S.C. §§ 10101 ........................................................................................... 9

34 U.S.C. §§ 10202(c)(1)(B) ........................................................................... 10

34 U.S.C § 10151 .......................................................................................... 2, 9

34 U.S.C § 10152(a)(1) ..................................................................................... 9

34 U.S.C § 10153(a) ........................................................................................... 10, 30

34 U.S.C § 10156 ..................................................................................................... 9

34 U.S.C § 10251(a)(1) ............................................................................................ 9

42 U.S.C. § 713(a)(1)(C) ........................................................................................ 26

42 U.S.C. § 1395*l*(t)(2)(E) ..................................................................................... 26

42 U.S.C. § 5779(a) ................................................................................................ 21

49 U.S.C. app. § 1305(a)(1) (1988) ....................................................................... 22

42 U.S.C. § 3712(a)(6) (2000) ......................................................................... 25, 29

Pub. L. No. 90-351, 82 Stat. 197 (1968) ................................................................. 9

Pub. L. No. 109-162, 119 Stat. 2960 (2006) ............................................... 2, 5, 24, 25

Pub. L. No. 115-31, 131 Stat. 135 (2017) .............................................................. 29

Or. Rev. Stat. § 180.805(1) ................................................................................ 3, 13

Or. Rev. Stat. § 181A.820 .................................................................................. 3, 14

## REGULATION

28 C.F.R. Part 18 .................................................................................................. 17

## OTHER AUTHORITIES

Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015) ............................... 10,

H.R. Rep. No. 109-233 (2005) .............................................................................. 25

## MOTION TO DISMISS

Undersigned counsel for the defendants certifies, pursuant to Local Rule 7-1(a), that he conferred with counsel for the plaintiffs in a good-faith effort to resolve the dispute reflected herein.  The parties discussed each of the defenses set forth below.

The defendants, by their undersigned counsel, hereby move to dismiss this action under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  This motion is based on the following Legal Memorandum, Defendants' Request for Judicial Notice, the other evidence and records on file in this action, and any other written or oral evidence or argument that may be presented at or before the time this motion is heard by the Court.

## LEGAL MEMORANDUM

## INTRODUCTION

This case asks the Court to determine whether the U.S. Department of Justice ("USDOJ" or "Department") can require, as a condition of certain federal law enforcement grants, that state and local government grant recipients (1) confirm compliance with certain federal statutes that they are already required (under the terms of those statutes) not to violate, and (2) cooperate in providing certain information needed for federal law enforcement.   Section 1373 of Title 8, U.S. Code, bars state and local governments from prohibiting or restricting the exchange of "information regarding the . . . citizenship or immigration status" of any individual with federal immigration authorities. Section 1644 of Title 8 sets forth a similar bar in relation to information regarding aliens in the United States.  Other provisions of Title 8 – contained in the Immigration of Nationality Act ("INA") – contemplate that federal, state, and local authorities will cooperate on immigration enforcement and that federal authorities will take custody of certain aliens upon their release from state or local custody.

Defs' Motion to Dismiss; Memo.

The Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program") provides federal funds for state and local law enforcement. *See* Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006) (codified at 34 U.S.C § 10151). These funds serve to aid both state/local and cooperative law enforcement priorities. In furtherance of the INA and the statutes governing the Byrne JAG Program, USDOJ requires Byrne JAG grantees to comply with Sections 1373 and 1644 as a condition of receiving federal funds. Also, Byrne JAG grants are conditioned on giving federal immigration authorities access to correctional facilities to meet with aliens and on notifying federal authorities "as early as practicable" before the scheduled release of an alien from custody.

The call for intergovernmental law enforcement cooperation embodied in these conditions follows from a recognition that "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona v. United States*, 567 U.S. 387, 411 (2012). That cooperation is particularly important in relation to aliens who commit crimes and end up in state or local criminal custody. In deference to a state or local jurisdiction's significant interest in local policing and punishment of criminals, the INA generally permits such jurisdictions to evaluate those it arrests for state or local crime, and when charged, to have them serve their entire sentence before being subject to federal detention for initiation of removal proceedings or, if the alien has an outstanding removal order, removal from the United States. Except in limited circumstances, the Department of Homeland Security "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment," and the alien's removal period "begins on . . . the date the alien is released from [state or local criminal] detention." 8 U.S.C. §§ 1231(a)(1)(B)(iii), (a)(4)(A); *see id.* § 1226(c)(1) (requiring that federal immigration authorities take custody of a criminal alien "when the alien is released" from criminal custody). But in delaying removal of these individuals until state and local jurisdictions' criminal justice interests

are served, Congress did not intend that these criminal aliens would altogether evade federal immigration authorities. *See id.* § 1226(c)(1) (requiring detention of "criminal aliens" pending removal proceedings); § 1231(a)(2) (mandating detention during 90-day removal period for all aliens against whom a final order of removal has been entered); § 1231(a)(1)(B)(iii) (providing that "[i]f the alien is detained or confined (except under an immigration process)," the 90-day period presumptively runs from the date on which "the alien is released from detention or confinement"). Thus, these provisions and others contemplate that federal immigration officials will have access to information regarding the whereabouts, custody, and release status of aliens in state and criminal custody so they can perform the federal function of considering whether removal is appropriate.

Notwithstanding this federal scheme, the State of Oregon ("State") and the City of Portland ("City") have adopted laws and policies that frustrate the federal government's ability to locate aliens who have committed crimes and to remove them from the country. Specifically, the State has enacted statutes that prohibit any "public body" from disclosing any person's address, workplace, contact information, or other information "for the purpose of enforcement of federal immigration laws," and that prohibit any state or local law enforcement agency from using any funds, equipment, or personnel to "detect[]" or apprehend any alien for violation of federal immigration laws. Or. Rev. Stat. §§ 180.805(1), 181A.820(1), (2). The City has issued a directive to its police force prohibiting any assistance to federal officials in the enforcement of immigration law and denying federal immigration authorities access to any police facility, without a court order, to detain an alien. *See* Portland Police Bureau, Directive 810.10, Policy § 1 & Procedure § 3.4 (Attachment 1 hereto, Ex. G).

Plaintiffs allege that they have applied for Byrne JAG grants for Fiscal Years 2017 and 2018 but that they have, pursuant to an injunction in another case, received only Portland's award

for FY 2017.  Dkt. No. 3 ¶¶ 54-55, 58-59.  They seek a declaratory judgment that Sections 1373 and 1644 violate the Tenth Amendment and that the access and notice conditions in the Byrne JAG Program are *ultra vires* and violate the constitutional Separation of Powers.  Under the circumstances presented, however, neither these statutes nor the award conditions has had any effect on the plaintiffs.  OJP has not otherwise acted on their Byrne JAG applications, and the injunction to which plaintiffs refer has prevented attaching the challenged conditions to the City's award.  Thus, plaintiffs lack standing to challenge Section 1373, Section 1644, or the award conditions, and their claims are unripe.

As for the merits, Sections 1373 and 1644 do not "compel [the plaintiffs] to enact or administer a federal regulatory program" or to "enact or refrain from enacting state law" or a local ordinance as needed to sustain a Tenth Amendment challenge.  *See New York v. United States*, 505 U.S. 144, 188 (1992); *Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018).  This case involves conditions on grants that Oregon and Portland are free to accept or reject, and, in any event, merely protecting the exchange of information with federal authorities in relation to the enforcement of immigration law – an arena in which the Federal Government takes full responsibility for regulation of and enforcement against individuals – does not compel state and local governments to administer a federal program.

Plaintiffs' challenge to the access and notice conditions is also without merit.  Congress has expressly authorized the Assistant Attorney General ("AAG") for USDOJ's Office of Justice Programs ("OJP") to impose the challenged conditions.  In the very same enactment that created the Byrne JAG Program in 2006, Congress delegated to the AAG the authority to "plac[e] special conditions on all grants," to "determin[e] priority purposes for formula grants," and to "maintain liaison with . . . State [and local] governments in matters relating to criminal justice."

*See* Pub. L. No. 109-162, Title XI, § 1152, 119 Stat. 3113 (2006) (codified at 34 U.S.C.

§ 10102(a)(2), (a)(4), (a)(6)).  The Department thus has ample authority to impose the challenged

conditions, and their imposition does not violate the constitutional separation of powers.  *See*

*DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding statutory

delegation to the Executive to impose terms and conditions on federal spending programs).

Finally, plaintiffs request a writ of mandamus requiring the Department to provide the

pending grant awards.  The claims described above are far from "clear and certain," however.

*Kildare v. Saenz*, 325 F.3d 1078, 1084 (9th Cir. 2003).  Also, the process of awarding Byrne

JAG grants is not merely "ministerial," *id.*, as the governing statute provides that the Department

"may" make grants from Congress's appropriations pursuant to the statutory formula, and there

is no time limit for issuing the grants.  34 U.S.C. § 10152(a)(1).  And a writ of mandamus

requiring payment of the pending awards would inappropriately invade the administrative

process of assessing compliance with all of the requirements for Byrne JAG awards.

In addition to restricting cooperative federal enforcement efforts through its own, local

laws and policies, Oregon and Portland now seek to replicate these restrictions with respect to

federal prerogatives, asking the Court to enjoin the Department of Justice from imposing

immigration-related law enforcement conditions on the receipt of *federal funds*.  Plaintiffs'

position would, in essence, disregard powers and functions vested by federal statute in the

Federal Government and allow the plaintiffs, rather than the Federal Government, to determine

the priority purposes and special conditions associated with federal grants that Congress has

authorized the Federal Government to impose.  Plaintiffs' position contravenes clear statutory

language authorizing the Attorney General to place conditions on Byrne JAG funding, and

ignores the close relationship between the challenged conditions and federal law enforcement

prerogatives.

For these reasons, plaintiffs' First Amended Complaint and all of its claims should be dismissed with prejudice.

## STATUTORY AND ADMINISTRATIVE BACKGROUND

### I.    The Immigration and Nationality Act

Enforcement of the immigration laws, including and especially the investigation and appre-hension of criminal aliens, is quintessentially a law enforcement function.  Through the INA, 8 U.S.C. §§ 1101 *et seq*., Congress granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States.  These responsibil-ities are assigned to law enforcement agencies, as the INA authorizes the Department of Homeland Security ("DHS"), USDOJ, and other Executive agencies to administer and enforce the immigra-tion laws.  The INA gives the Executive Branch considerable authority and discretion to conduct and direct immigration enforcement pursuant to federal policy objectives.  *See Arizona*, 567 U.S. at 396.

Several outcomes and federal agency responsibilities under the INA turn on the existence and timing of local or state criminal proceedings against aliens.  For example, the INA provides that aliens who have committed certain classes of crimes – whether federal, state, or local – may be placed in removal proceedings and shall be removed from the United States upon order of an immigration judge or the Secretary of Homeland Security.  *See, e.g*., 8 U.S.C. § 1227(a)(2) (listing numerous criminal offenses that subject an alien to removal proceedings, including human smuggling, aggravated felonies, controlled substance convictions, certain firearms offenses, crimes of domestic violence, stalking, violation of a protective order, crimes against children, and human trafficking); *see also id*. § 1226(c) (stating that immigration authorities "shall" take certain

removable aliens into custody "when the alien is released" from state or local custody); *id*. § 1229 (initiation of removal proceedings before an immigration judge); *id*. § 1231(a) (detention and removal of aliens ordered removed); *id*. § 1228(b) (expedited removal of aliens who are not permanent residents and who are convicted of aggravated felonies). Congress has mandated that the Attorney General must report to the House and Senate judiciary committees every twelve months on "the number of illegal aliens convicted of felonies in any Federal or State court [during the preceding year]" and "the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies" – "stating the number incarcerated for each type of offense." *Id*. § 1366(1), (2).

The connection between immigration law and criminal law is also reflected in the fact that the INA contains a number of criminal provisions related to immigration. For example, the statute imposes criminal penalties on an alien for failing to register with federal authorities, for failing to notify federal authorities of a change of address, and for providing fraudulent statements or counterfeit photographs on a registration application. *Id*. §§ 1306(a), (b), (c), (d). Additionally, the INA imposes criminal penalties on any person who conceals, harbors, or shields an alien from detection "in any place, including any building or any means of transportation," "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law." *Id*. § 1324(a)(1)(A)(iii). It also imposes penalties for "engag[ing] in any conspiracy to commit any of the preceding acts" and for "aid[ing] or abet[ting] the commission of any of [those] acts." *Id*. § 1324(a)(1)(A)(v).

Coordination between federal officials and state and local officials on immigration enforcement is a recurrent theme throughout the INA. For example, state and local officers are authorized to make arrests for violation of the INA's prohibitions against smuggling, transporting,

or harboring aliens, *id*. § 1324(c), and to arrest certain felons who have unlawfully returned to the

United States, *id*. § 1252c; *see id*. § 1357(g) (authorizing formal cooperative agreements under

which trained and qualified state and local officers may perform specified functions of a federal

immigration officer in relation to the investigation, apprehension, or detention of aliens).

Consistent with this coordination and with the importance of state and local criminal proceedings

under the INA, certain provisions of federal immigration law protect the transfer of information

regarding aliens between and among federal officials and state and local government entities.

Section 1373(a) of Title 8 provides that "a Federal, State, or local government entity or official

may not prohibit, or in any way restrict, any government entity or official from sending to, or

receiving from [federal immigration authorities] information regarding the citizenship or

immigration status, lawful or unlawful, of any individual." Section 1644 of Title 8 contains

substantially the same proscription, although it applies only to information regarding "an alien in

the United States." Section 1373(b) also states that no person or agency may prohibit or restrict a

federal, state, or local government entity from "[m]aintaining such information" or from

"[e]xchanging such information with any other Federal, State, or local government entity." By the

same token, the INA requires federal immigration authorities to "cooperate with the States" to

ensure that state and local officials have information to assist them in making arrests under the

INA. *Id*. § 1252c(b).

   The INA allows state and local governments to prosecute and punish individuals who are in

this country illegally and commit crimes, before the Federal Government takes immigration

measures regarding such aliens. Thus, the INA specifies that, except in limited circumstances,

federal authorities "may not remove an alien who is sentenced to imprisonment until the alien is

released from imprisonment." *Id*. § 1231(a)(4); *see id*. § 1231(a)(1)(B)(iii) (removal period

"begins on . . . the date the alien is released from [state or local criminal] detention"). The statutes also specify that immigration detention for removal proceedings must begin only "*when the alien is released*" from criminal custody. *Id.* § 1226(c)(1) (emphasis added).

## II.    USDOJ Office of Justice Programs and the Byrne JAG Program

Title I of the Omnibus Crime Control and Safe Streets Act established the Office of Justice Programs, and provides for OJP to be headed by an Assistant Attorney General. *See* Pub. L. No. 90-351, 82 Stat. 197 (1968), *codified as amended at* 34 U.S.C. §§ 10101 *et seq.* Congress gave the AAG certain "[s]pecific, general and delegated powers," including the power to "maintain liaison with . . . State [and local] governments in matters relating to criminal justice." 34 U.S.C. § 10102(a)(2), (4). Notably, the statute also authorizes the AAG to "exercise such other powers and functions as may be vested in [him] pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants, and determining priority purposes for formula grants*." *Id.* § 10102(a)(6) (emphasis added).

The same title of the Omnibus Crime Control and Safe Streets Act also established the predecessor to the Byrne JAG Program. *See generally* 34 U.S.C. §§ 10151-58. Under this program, OJP is authorized to "make grants to States and units of local government . . . to provide additional personnel, equipment . . . and information systems for criminal justice, including for any one or more of [certain enumerated] programs." *Id.* § 10152(a)(1). In the same title, "criminal justice" is defined broadly to include various activities of the police, the courts, and "related agencies." *Id.* § 10251(a)(1).

The Byrne JAG Program provides statutory "formula grants" – that is, grants that, when awarded, must follow a statutory formula for calculating the amount, based on population, the rate of violent crime, and other factors, that may be awarded to eligible entities. *Id.* §§ 10152(a)(1),

10156.  By statute, in order to request a Byrne JAG grant, the chief executive officer of a State or unit of local government must submit an application "in such form as the Attorney General may require," *id.* § 10153(a), and the application must include, among other things, "[a] certification, made in a form acceptable to the Attorney General . . . that . . . the applicant will comply with . . . all . . . applicable Federal laws," *id.* § 10153(a)(5)(D).  The application must also contain several assurances, including "[a]n assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," and that "there has been appropriate coordination with affected agencies."  *Id.* § 10153(a)(4), (5)(C).

OJP has historically included a variety of conditions in Byrne JAG award documents.  For example, OJP has imposed, without objection, conditions related to information sharing and privacy protection, research using human subjects, and training.  *See* Defs' Request for Judicial Notice (Attachment 1 hereto) ("RJN"), Ex. A ¶¶ 27, 30, 33-34 (Oregon 2016 Byrne JAG award); RJN, Ex. B ¶¶ 26, 29, 32-33 (Portland 2016 Byrne JAG award).  Other special conditions that the Assistant Attorney General has historically imposed have been inspired by Executive Branch prerogatives, and in some instances resulted in *subsequent* congressional codification.  One such condition, which prohibits use of Byrne JAG funds to purchase military style equipment, relates in part to an Executive Order issued by President Obama in 2015.  RJN, Ex. A ¶ 43; RJN, Ex. B ¶ 49; *see also* Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015).  Since 2012, other conditions have required that recipients (a) comply with specific national standards when purchasing body armor and (b) institute a "mandatory wear" policy for any purchased armor.  RJN, Ex. A ¶¶ 39-40; RJN, Ex. B ¶¶ 38-39.  While those conditions have now been codified by Congress, *see* 34 U.S.C. §§ 10202(c)(1)(B), (C), they originated as exercises of USDOJ's

authority to impose special conditions.  As a further example of the AAG's routine exercise of this authority, the AAG recently imposed an "American-made" requirement for body armor purchases, something Congress did not choose to codify last year.  RJN, Ex. A ¶ 39; RJN, Ex. B ¶ 38.  In recent years, the number of conditions attached to Byrne JAG Grants has typically numbered in the several dozen.  *See* RJN, Exs. A, B.  The conditions attached to Byrne JAG grants have varied over time, depending on national law enforcement necessities and USDOJ priorities.

For the Fiscal Year ("FY") 2017 grant cycle, OJP included three Byrne JAG conditions requiring confirmation of compliance with 8 U.S.C. § 1373 – a federal statute that recipients should otherwise already (under the terms of that statute) be obliged to obey – and modest cooperation with federal law enforcement prerogatives in the immigration setting.  Specifically, the FY 2017 conditions require grantees, within the "program or activity" to be funded under the award:

- To certify compliance with 8 U.S.C. § 1373 and to maintain compliance with the statute during the period of the award, RJN, Ex. C (California 2017 Byrne JAG award) ¶¶ 52-53; RJN, Ex. D (Portland 2017 Byrne JAG award) ¶¶ 52-53 (the "2017 compliance condition");

- To have a statute, ordinance, or policy "designed to ensure that agents of the United States acting under color of federal law in fact are given to access" to the grantee's correctional facilities "for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States," RJN, Ex. C ¶ 55; RJN, Ex. D ¶ 55 (the "2017 access condition"); and

- To have a statute, ordinance, or policy designed to ensure that, when the grantee's correctional facility "receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and – as early as practicable . . . – provide the requested notice to DHS," *id*. (the "2017 notice condition").

Under the respective "Rules of Construction" sections within each of the above FY 2017 conditions, the award documents make clear that nothing in the access or notice condition requires a grantee to detain "any individual in custody beyond the date and time the individual would have been released in the absence of this condition." RJN, Ex. C ¶¶ 55, 56; RJN, Ex. D ¶¶ 55, 56. The documents also make clear that these conditions impose no requirements in relation to any requests by federal immigration authorities to detain aliens, and that the notice condition requires "only as much advance notice as practicable" before the release of an alien. *Id.* Finally, the conditions allow awarded funds to be used for costs incurred in implementing the conditions. *Id.*

OJP adopted similar conditions for the FY 2018 Byrne JAG Program, but added 8 U.S.C. § 1644 (a statute similar to Section 1373) to the required compliance certification. The FY 2018 conditions require recipients, within the funded "program or activity":

- To certify compliance with 8 U.S.C. §§ 1373 and 1644 and to maintain compliance with those statutes during the period of the award, RJN, Ex. E (California 2018 Byrne JAG award) ¶¶ 41-42; RJN, Ex. F (San Francisco 2018 Byrne JAG award) ¶¶ 41-42 (the "2018 compliance condition");

- Consistent with federal law enforcement statutes and regulations – including 8 U.S.C.

§ 1357(a)(1) and 8 C.F.R. § 287.5(a)(1) – not to interfere with the exercise of federal authority by impeding the access of immigration officials to any correctional facility to meet with an alien for such an interrogation, RJN, Ex. E ¶ 45, Ex. F ¶ 45 (the "2018 access condition");

- Consistent with federal law enforcement statutes – including 8 U.S.C. §§ 1231(a) and 1226(c)(1), the statutes requiring federal immigration officials to take custody of a criminal alien "when the alien is released" from state or local custody – not to interfere with the removal process by failing to notify immigration officials "as early as practicable" regarding the scheduled release date and time of an alien in the grantee's custody when requested by immigration officials, RJN, Ex. E ¶ 46, Ex. F ¶ 46 (the "2018 notice condition")

The FY 2018 awards contain Rules of Construction similar to those in the FY 2017 awards.

## III.    Plaintiffs' Non-Cooperation with Immigration Enforcement

### A.    Oregon Statutes

Oregon law expressly prohibits any "public body" from disclosing any of several types of information regarding any individual "for the purpose of enforcement of federal immigration laws," including the person's address, workplace, hours of work, or "contact information, including telephone number, electronic mail address or social media account information," "[e]xcept as required by state or federal law."   Or. Rev. Stat. § 180.805(1).  Oregon law also prohibits any law enforcement agency in the State from using "agency moneys, equipment or personnel for the purpose of detecting or apprehending persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws," except that state agencies may verify the immigration status of a criminal

arrestee or request "criminal investigation information" from federal immigration authorities. *Id.*
§ 181A.820(1), (2).

    **B.**    **Portland Police Directive**

    The Portland Police Bureau directs the actions of its personnel through its "Directives
Manual."  *See* Directives Manual, https://www.portlandoregon.gov/police/65886 (last visited
Mar. 4, 2019); *see also* Police Bureau Seeks Public's Input on Directives, Aug. 16, 2018,
https://www.portlandoregon.gov/police/news/read.cfm?id=189268 ("The Portland Police Bureau
directs member action through the establishment of policy, procedure, and rule, as found within
Directives.") (last visited Mar. 4, 2019).  That includes Directive 810.10, which is entitled
"Immigration Enforcement and Diplomatic Immunity."  *See* RJN, Ex. G.

    Directive 810.10 "establishes procedures that direct member actions when managing
[Department of Homeland Security ("DHS")] requests for support, assistance, and information."
RJN, Ex. G, Policy § 1.  The Directive specifically prohibits Portland police personnel from
assisting DHS in relation to the enforcement of federal immigration laws, *id.*, Procedure § 3.1,
and from complying with any federal immigration detainer request or administrative warrant, *id.*
§ 2.3.  The Directive also provides that Portland police "shall grant access to restricted areas in a
Bureau facility only if [DHS] agents are acting pursuant to a judicial order," and not to execute
an immigration detainer or administrative warrant.  *Id.* § 3.4.  Finally, the Directive mirrors
Section 180.805(1) of the Oregon statutes by prohibiting the disclosure of an individual's
address, place of employment, or contact information "for the purpose of enforcing federal
immigration laws."  *Id.* § 6.2.

## ARGUMENT

Defendants move for dismissal of this action under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. A motion under Rule 12(b)(1) challenges the subject matter jurisdiction of the court to reach a claim. "A 'facial' attack [on jurisdiction] asserts that a complaint's allegations are themselves insufficient to invoke jurisdiction," *Courthouse News Serv. v. Planet*, 750 F.3d 776, 780 n.3 (9th Cir. 2014), while a factual challenge to jurisdiction "relies on affidavits or any other evidence properly before the court to contest the truth of the complaint's allegations," *id.* at 780 (citation omitted). A motion under Rule 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001). Dismissal under this rule is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (internal citation omitted). Under both 12(b)(1) and 12(b)(6), the court "may take judicial notice of matters of public record." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citation omitted); *see Louisiana Mun. Police Emps.' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1063 (9th Cir. 2016).

As shown below, all of plaintiffs' claims should be dismissed with prejudice under these standards.

## I.      Plaintiffs Lack Standing to Challenge the Constitutionality of Section 1373 or 1644 of the Byrne JAG Conditions, and Their Challenge Is Constitutionally Unripe

Under Article III of the Constitution, the jurisdiction of the federal courts extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Matters outside this rubric are "non-justiciable." *Or. Bureau of Labor & Indus. ex rel. Richardson v. U.S. W. Commc'ns, Inc*., 288 F.3d 414, 416 (9th Cir. 2002). Two principles of justiciability are involved here: standing and ripeness.

"While standing is concerned with *who* is a proper party to litigate a particular matter, the doctrines of mootness and ripeness determine *when* that litigation may occur." *Haw. Cty. Green Party v. Clinton*, 14 F. Supp. 2d 1198, 1201 (D. Haw. 1998). Where a plaintiff lacks standing or its claims are unripe, the court lacks jurisdiction.

To satisfy the "irreducible constitutional minimum" of standing, a plaintiff must demonstrate an "injury in fact," a "fairly traceable" causal connection between the injury and defendant's conduct, and redressability. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998). Constitutional justiciability also requires that a dispute be ripe for judicial consideration. In a challenge to governmental action, that means the challenged action must have been "formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). In other words, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted).[1]

The plaintiffs in this action do not allege, and could not allege, that 8 U.S.C. § 1373, 8 U.S.C. § 1644, or the access or notice conditions in the Byrne JAG Program have had any effect on them. Although each of the plaintiffs has applied for a Byrne JAG grant and Portland has received its 2017 award pursuant to a court injunction in another case,[2] OJP has not otherwise acted on the plaintiffs' applications and has not denied either application, and neither of the plaintiffs has yet been asked to certify compliance with Sections 1373 or 1644 or with the access or

---

[1] These considerations do not involve merely "prudential ripeness," which asks, in contrast, about the "fitness" of the issues presented for judicial review and whether withholding review would subject the parties to "hardship." *See Coons v. Lew*, 762 F.3d 891, 900 (9th Cir. 2014).

[2] OJP provided Portland's FY 2017 Byrne JAG award on October 10, 2018, pursuant to a nationwide preliminary injunction entered in *City of Evanston v. Sessions*, No: 1:18-cv-04853 (N.D. Ill. Aug. 9, 2018), *stay of injunction lifted sub nom. United States Conference of Mayors v. Sessions*, No. 18-2734 (7th Cir. Aug. 29, 2018). The injunction, however, prohibited attaching the conditions.

notice condition in connection with any program or activity receiving federal funds under the

award.  Moreover, if OJP denies either of the plaintiffs' applications, they would have an

opportunity to challenge that denial administratively, *see* 34 U.S.C. § 10154; *see generally* 28

C.F.R. Part 18, followed, if necessary, by judicial review.  As the situation currently stands,

however, plaintiffs' challenges to these statutes and the award conditions is premature.  Plaintiffs

have not suffered any "concrete" injury as a result of Section 1373, Section 1644, or the access or

notice condition, and their challenge "rests upon contingent future events."[3]  Therefore, plaintiffs'

First Amended Complaint should be dismissed for lack of standing and ripeness.

## II.    Sections 1373 and 1644 Are Consistent with the Tenth Amendment

Plaintiffs' First Claim for Relief alleges that Sections 1373 and 1644 of Title 8, on their

face, violate the "anti-commandeering principle" of the Tenth Amendment.  Dkt. No. 3 ¶ 80.  As

described above, Section 1373 provides that a state and local government "entity or official may

not prohibit, or in any way restrict, any government entity or official" from exchanging with

federal immigration authorities "information regarding the citizenship or immigration status,

lawful or unlawful, of any individual."  8 U.S.C. § 1373(a).  Similarly, Section 1644 provides

that "no State or local government entity may be prohibited, or in any way restricted," from

exchanging with immigration authorities "information regarding the immigration status, lawful

or unlawful, of an alien in the United States."

As a threshold – but dispositive – matter, the Tenth Amendment and its interpreting case

law are wholly inapposite here, where plaintiffs are essentially challenging conditions on a

*voluntary federal grant*.  *See* Dkt. No. 3 ¶ 89 ("Because Sections 1373 and 1644 violate the

---

[3] The same is true of plaintiffs' prayer for an injunction against "any other conditions relating to federal immigration laws or policy."  Dkt. No. 3 at 32.  Plaintiffs do not allege any such conditions, much less show that they have been affected by them.

Tenth Amendment, *Defendants cannot require the State of Oregon and the City to certify compliance with these unconstitutional statutes*.") (emphasis added).  It is well-established that "a perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants."  *South Dakota v. Dole*, 483 U.S. 203, 210 (1987).  Instead, the only pertinent constitutional question presented is whether the grant conditions are a valid exercise of the Spending Clause power.  In that context, the Federal Government "may offer funds to the States, and may condition those offers on compliance with specified conditions.  These offers may well induce the States to adopt policies that the Federal Government itself could not impose."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012).  Because Oregon and Portland may "adopt the simple expedient of not yielding to what she urges is federal coercion," *Dole*, 483 U.S. at 210, by declining to participate in the Byrne JAG Program, the Spending Clause, not the Tenth Amendment, provides the proper rubric for analyzing plaintiffs' challenge to Sections 1373 and 1644 – and the commandeering theory has no purchase here.

In any event, these statutes are entirely consistent with the Tenth Amendment.  They do not require jurisdictions to enforce a federal regulatory scheme, as in *Printz v. United States*, 521 U.S. 898 (1997).  Nor do they require jurisdictions to regulate in a particular area, as in *New York v. United States*, 505 U.S. 144 (1992), and *Murphy v. NCAA*, 138 S. Ct. 1461 (2018).  Rather, Sections 1373 and 1644 constitute a permissible information-sharing requirement that preempts state and local governments from affirmatively hindering the Federal Government's enforcement of the immigration laws against individual aliens.

As described above, Congress allows state and local governments to carry out criminal proceedings and penalties against aliens before the Federal Government takes any appropriate

measures under the immigration laws.  Sections 1373 and 1644 address the effect of state and

local criminal custody on this congressional scheme.  The INA provides that federal immigration

authorities "may not remove an alien who is sentenced to imprisonment until the alien is released

from imprisonment."  8 U.S.C. § 1231(a)(4)(A).  But within 90 days of "the date the alien is

released from detention or confinement," federal authorities "shall remove" an alien subject to a

final order of removal.  *Id.* § 1231(a)(1)(A), (B)(iii).  During this removal period, immigration

authorities "shall detain" the alien, and, if the alien has a qualifying criminal history, "[u]nder no

circumstance[s]" shall such authorities release the alien during the removal period.  *Id.*

§ 1231(a)(2).  Similarly, when an alien is not yet subject to a final order of removal, immigration

authorities may execute a warrant to arrest and detain the alien when he is released from state or

local criminal custody and, if the alien has a qualifying criminal history, federal authorities

"shall" take the alien into custody "when the alien is released," *id.* § 1226(c).

In this context, a requirement that state and local authorities give federal immigration

authorities information regarding immigration status (such as an alien prisoner's release date,

which is essential to determining when and how the alien can be removed) – or the statutes'

narrower requirement that States and localities *may not restrict* their officers from sharing such

information with immigration authorities – merely prevents state and local governments from

using their congressionally permitted criminal authority over aliens in a manner that frustrates

the operation of the parallel federal regulatory scheme for potential removal or detention upon

aliens' release from state or local custody.

Even if Congress had not enacted Sections 1373 and 1644, a prohibition against

frustrating the federal scheme would follow from basic principles of obstacle preemption.  *See*

*Arizona v. United States*, 567 U.S. 387, 399 (2012).  Congress did not create a scheme in which

the Federal Government shall take custody of aliens upon their release from state or local criminal custody without having any mechanism for ascertaining when the alien would be released. The INA's allowance for the completion of state or local criminal custody before removal is premised on the assumption that the Federal Government will be able to learn such aliens' release dates and seamlessly take them into federal custody in a safe and orderly manner.

Plaintiffs assert that the Supreme Court's decision in *Murphy v. NCAA*, 138 S. Ct. 1461 (2018), supports their Tenth Amendment challenge, Dkt. No. 3 ¶ 81, but *Murphy* is contrary to plaintiffs' position. First and most fundamentally, *Murphy* is inapposite here, because – unlike *Murphy* – this case concerns conditions on a *voluntary federal grant*. It is beyond dispute that "a perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *S. Dakota v. Dole*, 483 U.S. 203, 210 (1987). Thus, the Supreme Court has routinely held that conditioning the receipt of federal funds on whether a state or local jurisdiction complies with a federal statute or takes some other action does not violate the Tenth Amendment, so long as the "State could . . . adopt the simple expedient of not yielding to what she urges is federal coercion." *Id.*

But even if this Court were somehow to evaluate the facial constitutionality of Sections 1373 and 1644, *Murphy* would support their legality, for several reasons. First, the statute addressed in *Murphy* – the Professional and Amateur Sports Protection Act of 1992 ("PASPA") – was a clear effort to avoid accountability and require States themselves to regulate sports betting in the manner Congress wished. *See* 138 S. Ct. at 1478. PASPA directly compelled States to prohibit sports gambling, which (unlike immigration) is not a field that the Federal Government regulates comprehensively. In contrast, Sections 1373 and 1644 constitute an information-sharing component of the overall removal scheme, in which the Federal Government

takes full responsibility for regulation of and enforcement against individuals.

Second (and relatedly), the Supreme Court has explained elsewhere that its precedents on "commandeering" do not apply in the same way when access to information is at issue – a principle that *Murphy* does not in any way undermine.  Simply put, the Constitution does not prohibit federal enactments that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[ ] the States as the owners of data bases." *Reno v. Condon*, 528 U.S. 141, 151 (2000).  In *Printz v. United States*, although the Court held that federal law could not require local law-enforcement officers to perform background checks to validate the legality of gun sales, it distinguished statutes that "require only the provision of information to the Federal Government," as they "do not involve . . . the forced participation of the States' executive in the actual administration of a federal program."  521 U.S. at 918.

The Court's Tenth Amendment cases are not properly read to invalidate reporting requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice."  *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)).  This is because information-access requirements like those enacted in Sections 1373 and 1644 do not "regulate the States' sovereign authority to regulate their own citizens," *Murphy*, 138 S. Ct. at 1479 (citation omitted), but rather ensure federal access to information regarding federally regulated individuals – non-citizens who have violated the immigration laws of the United States – that is critical for the Federal Government to regulate those individuals.  Thus, since Sections 1373 and 1644 merely secure information needed to carry out a federal statutory scheme, it does not present any legitimate concern regarding a deflection of political responsibility.  Further, these statutes ensure that the Federal Government has the information it needs to "regulate individuals, not States."  *Murphy*, 138 S. Ct. at 1476.

Further, *Murphy* expressly did not disturb the bedrock principle that state and local laws that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]." 138 S. Ct. at 1479. That principle could not save the statute at issue in *Murphy*, which did not "impose any federal restrictions on private actors," but instead sought to prohibit States from authorizing sports gambling schemes. *Id.* at 1481. By contrast, where, as here, both federal and state/local sovereigns regulate private individuals, the issue is not whether the Federal Government has commandeered a state or local government, but whether the state or local scheme is preempted insofar as it poses an obstacle to the effectuation of the federal scheme. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289-90 (1981) (It "is incorrect" to "assume that the Tenth Amendment limits congressional power to pre-empt or displace state regulation of private activities affecting interstate commerce."). As the Supreme Court admonished in *Murphy,* "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States" – even in a non-evenhanded way – but in substance merely prevent the States from obstructing federal regulation of private parties. 138 S. Ct. at 1480; *see id.* (discussing 49 U.S.C. app. § 1305(a)(1) (1988)). That is exactly what Sections 1373 and 1644 do: they preempt States and localities from hindering the INA's regulation of aliens, an area in which the Federal Government has "broad, undoubted power." *Arizona v. United States*, 567 U.S. 387, 394 (2012).

Indeed, especially given its exclusive authority over immigration, Congress could have provided for immediate removal of aliens regardless of pending state or local criminal prosecutions or punishment. Allowing state or local custody to continue while requiring those governments to help with (or at least not to interfere with) an orderly transfer to federal officials at the end of such custody does not in any sense "commandeer" the State or locality into

enforcing federal law, but merely places conditions on the state/local government's exercise of its own regulatory authority. *See Hodel*, 452 U.S. at 290-91 ("We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role."). In sum, so long as Congress is expressly (or implicitly) preempting a State or locality from interfering with federal regulation of private parties in a field where the Federal Government has broad authority, such preemption does not impermissibly regulate the State or locality directly.

Rather than merely standing on the sidelines, the plaintiffs have affirmatively restricted the lawful right of potentially otherwise-willing state and local officials to provide the minimal cooperation needed for federal officials to exercise their duties. Furthermore, plaintiffs refuse to help with the problems created by their own exercise of regulatory authority over persons who are simultaneously subject to federal regulatory authority. By affirmatively asserting criminal custody over aliens whom the Federal Government seeks to detain and remove, plaintiffs' scheme would impair the exercise of the parallel federal scheme unless plaintiffs terminate custody in a manner that does not hinder the Federal Government's assumption of custody. It is precisely when two regulatory schemes collide in this fashion that the Supremacy Clause authorizes Congress to prohibit a state or local government from using its authority to create an obstacle to the functioning of the federal scheme.

III.    **The Access and Notice Conditions Are Authorized by Statute and Do Not Violate the Separation of Powers**

In their Second Claim for Relief, plaintiffs allege that the access and notice conditions in the Byrne JAG Program for FY 2017 and FY 2018 are *ultra vires* and violate the constitutional

Separation of Powers by "usurp[ing] powers that belong to Congress."  Dkt. No. 3 ¶¶ 101, 102.[4]

As a preliminary matter, plaintiffs cannot dispute that Congress may, consistent with the separation

of powers, properly delegate to the Executive Branch the authority to attach conditions on agency

spending.  *See*, *e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 488 (1998) ("Congress has

frequently delegated the President the authority to spend, or not to spend, particular sums of

money."); *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 983 (3d Cir. 1986)

("Congress appropriates funds for a wide variety of purposes and delegates to executive branch

officials the authority to make certain decisions regarding how those funds are to be spent.");

*DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding conditions on

spending imposed by President where statute authorized President to set certain "terms and

conditions as he may determine").  Accordingly, plaintiffs' assertion that "the authority to

condition the receipt of federal funds lies exclusively with Congress," *see* Dkt. No. 3 ¶ 83, is

wholly beside the point.  Rather, the relevant question is whether Congress has *delegated* sufficient

authority to USDOJ to impose these conditions, in order to promote intergovernmental law

enforcement cooperation.

  An examination of the relevant statutory framework for the Byrne JAG Program

inexorably provides an affirmative response to that question.  The current version of the Byrne

JAG Program was created in 2006, when the USDOJ Reauthorization Act merged two earlier

programs.  Pub. L. No. 109-162.  Before the 2006 amendments, the governing statute provided

only that the AAG for OJP was authorized to "exercise such other powers and functions as may

---

[4] Plaintiffs also allege, in connection with their Second Claim for Relief, that defendants' imposition of the conditions "invad[es] Congress's spending authority" and thus violates the Spending Clause.  Dkt. No. 3 ¶¶ 83, 101.  Plaintiffs do not, however, allege that the conditions violate the limitations on the constitutional spending power set forth in *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the

Attorney General."  42 U.S.C. § 3712(a)(6) (2000).  But crucially, in the USDOJ Reauthorization

Act – the same law that created the current version of the Byrne JAG Program – Congress

expressly amended this provision "by inserting 'including placing special conditions on all

grants, and determining priority purposes for formula grants' before the period at the end."

USDOJ Reauthorization Act, Pub. L. No. 109-162, § 1152(b), 119 Stat. at 3113 (codified at 34

U.S.C. § 10102(a)(6)).  And confirming the amendment's plain text, the House Judiciary

Committee report accompanying the Act explained that the amendment would "allow[] the

Assistant Attorney General to place special conditions on all grants and to determine priority

purposes for formula grants."  H.R. Rep. No. 109-233, at 101 (2005).[5]

    This context confirms that Congress intended the "special conditions" and "priority

purposes" language to confer distinctive and meaningful power.  Any other reading would fail to

explain why Congress added that language, if not to confer the authority described.  Another law

already authorized the Attorney General to delegate the performance of his functions.  *See* 28

U.S.C. § 510.  Thus, a contrary understanding would directly contravene the "fundamental canon

of statutory construction that a statute should not be construed so as to render any of its provi-

sions mere surplusage."  *United States v. Wenner*, 351 F.3d 969, 975 (9th Cir. 2003); *see*, *e.g.*,

*Johnson v. Consumerinfo.com*, *Inc.*, 745 F.3d 1019, 1022 (9th Cir. 2014) ("'When Congress acts

to amend a statute, we presume it intends its amendment to have real and substantial effect.'")

---

[5] By contrast, the organic statute for the head of a separate USDOJ grant-making
component, enacted in 2002, continues to contain substantially the same, more limited language
as Section 10102 earlier contained, without the additional "special conditions" and "priority
purposes" powers that Congress elected to bestow with respect to OJP.  *See* 34 U.S.C.
§ 10444(7) (providing only that Director of Violence Against Women Office "[e]xercis[es] such
other powers and functions as may be vested in the Director pursuant to this subchapter or by
delegation of the Attorney General").

(quoting *Stone v. INS*, 514 U.S. 386, 397 (1995)).

Further, in keeping with the canon against surplusage, Section 10102(a)(6) conveys *independent* authority for the AAG to "determine priority purposes for formula grants." Congress's express formulation plainly indicates an intent to allow the AAG to exercise a degree of discretion over *formula* grants in particular. Such discretion must, if this language is to be afforded any meaningful legal effect, encompass at least the minimal authority (1) to articulate broad priorities for a given Fiscal Year's grant program, (2) to include, on program application forms, inquiries regarding the designated priority purpose, and (3) to impose eligibility conditions reflecting the priority purpose. In other words, under a plain reading of the statute, the authority to "determine priority purposes" necessarily includes the authority to *prioritize* federal grant monies for those state and local jurisdictions that assist in furthering relevant federal *purposes*.[6] Additionally, because States and localities would decline to participate in – and thus, effectively annul – the Byrne JAG Program if this authority were invoked to impose unreasonable conditions, any arguable risk of overreach that might otherwise inhere in this authority has a built-in structural check.

The AAG has relied on the "special conditions" authority to impose several other conditions in the Byrne JAG Program, including information technology requirements, RJN, Ex. A ¶¶ 26-27; RJN, Ex. B ¶¶ 26-27, protections for human research subjects, RJN, Ex. A ¶ 29;

---

[6] Similar delegations of discretionary authority over the terms and conditions of federal grants are common. *See, e.g.*, 42 U.S.C. § 713(a)(1)(C) (providing for HHS grants for personal responsibility education, to be paid upon satisfaction of certain statutory requirements *and* "*such additional requirements as the Secretary may specify*"); *id.* § 1395*l*(t)(2)(E) (providing that HHS Secretary may make certain adjustments to Medicare spending as well as "other adjustments as determined to be necessary to ensure equitable payments"); 25 U.S.C. § 1644(b) (authorizing Secretary of Interior to "place conditions as deemed necessary to effect the purpose of this section in any grant or contract which the Secretary makes with any Indian tribe or tribal organization pursuant to this section.").

RJN, Ex. B ¶ 29, restrictions on the purchase of certain military-style equipment, RJN, Ex. A ¶¶ 45-50; RJN, Ex. B ¶¶ 45-50, requirements regarding body armor purchases, RJN, Ex. A ¶¶ 38-39; RJN, Ex. B ¶¶ 38-39, and training requirements, RJN, Ex. A ¶¶ 32-33; RJN, Ex. B ¶¶ 32-33.  Neither Congress nor any grant recipient, including the plaintiffs here, has ever questioned any of these special conditions.

Further, in agreeing to the access and notice conditions, Byrne JAG applicants simply agree that their law-enforcement activities will not impair the Federal Government's law-enforcement activities against suspected or convicted criminals.  As discussed earlier, the structure of the INA contemplates that States and localities may arrest, prosecute, and incarcerate for criminal offenses aliens who may be removable and, indeed, aliens as to whom a removal order has already been issued, but that federal custody of such aliens will commence upon their release from state or local custody.  It is crucial to this cooperative law-enforcement framework that States and localities respond to requests for release-date information and permit federal agents to engage in voluntary interviews before releasing aliens from custody.

The propriety of the access and notice special conditions is underscored by the provisions in the Byrne JAG statute that authorize the Attorney General to "reasonably require" "program-matic" information about the program, 34 U.S.C. § 10153(A)(4), and to demand "appropriate coordination" with affected agencies, *id.* § 10153(A)(5)(C).  Notice of an alien's release from local custody constitutes reasonable information about the law-enforcement and corrections programs funded by the grants.  And access to an alien in state or local custody constitutes appropriate coordination with federal immigration authorities affected by those programs' custody over the alien.  Moreover, "appropriate coordination" among law enforcement agencies requires protecting sensitive law enforcement information shared among agencies.

Page 27 - Defs' Motion to Dismiss; Memo.

Thus, the challenged grant conditions – which merely promote intergovernmental law enforcement cooperation, so that grantee policies do not impair federal policies – fit comfortably within the delegated power of Section 10102(a)(6).  Pursuant to this authority, the AAG may prioritize formula grants, like the Byrne JAG Program, for jurisdictions that cooperate with federal authorities in achieving federal law enforcement priorities, including removal of criminal aliens under immigration law.

## IV.    Plaintiffs Are Not Entitled to Mandamus Relief

Finally, plaintiffs' Third Claim for Relief seeks a writ of mandamus under 28 U.S.C. § 1361 compelling defendants to "provide Plaintiffs with Byrne JAG funds for FY 2017 forward without attaching any unconstitutional or otherwise unlawful conditions."  Dkt. No. 3 at 32.  That statute provides jurisdiction for a district court to "compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  The Supreme Court, the Court of Appeals, and this Court have emphasized that mandamus is an "extraordinary remedy." *See Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 121 (1988); *Kildare v. Saenz*, 325 F.3d 1078, 1084 (9th Cir. 2003); *Gifford Pinchot All. v. Butruille*, 742 F. Supp. 1077, 1082 (D. Or. 1990). Thus, mandamus relief is available "only if:  (1) the individual's claim is clear and certain; (2) the official's duty is nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt, and (3) no other adequate remedy is available."  *Kildare*, 325 F.3d at 1084.

The plaintiffs cannot satisfy these standards.[7]  First, as shown above, plaintiffs' claim is far from "clear and certain" on its merits.  Sections 1373 and 1644 of Title 8 do not "commandeer" the plaintiffs, and the access and notice conditions cleanly fit within the AAG's  authority to "plac[e]

---

[7] Even if plaintiffs could qualify for some measure of mandamus relief, the relief they request is too broad.  The Byrne JAG conditions for all future years cannot be known, and it would be meaningless (and unwarranted) to enjoin the defendants from imposing any "unconstitutional or otherwise unlawful conditions" in the future.

special conditions on all grants" and to "determin[e] priority purposes for formula grants."  34

U.S.C. § 10102(a)(6).  Second, the making of Byrne JAG awards is not merely "ministerial."

The governing statute says, "From amounts made available to carry out this part, the Attorney

General *may*, in accordance with the formula established under section 10156 of this title, make

grants to States and units of local government."  *Id*. § 10152(a)(1) (emphasis added).  Moreover,

the statute does not set any deadline for the Department to issue decisions on Byrne JAG

applications, and the annual appropriations for the Program do not expire at the end of the Fiscal

Year but remain legally available for obligation until the funds are expended, without regard to

fiscal year limitation.  *See, e.g*., Department of Justice Appropriations Act, 2017, "State and

Local Law Enforcement Assistance," Pub. L. No. 115-31, 131 Stat. 135, 202-03 (stating that FY

2017 funds "remain available until expended").  Accordingly, the pendency of a decision on

plaintiffs' Byrne JAG applications does not reflect any omission by the Department to perform a

clear, mandatory duty.  *Cf. Food Service Dynamics, Inc. v. Bergland*, 465 F. Supp. 1178, 1181-

82 (E.D.N.Y. 1979) (denying request for mandamus relief where propriety of disbursing federal

funds to state program was in question due to uncertainty over how funds were being used).

Third and finally, a writ of mandamus would be unnecessary to give the plaintiffs all

appropriate relief if the challenged conditions were found impermissible.  Mandamus relief

requiring payment of the pending awards would override OJP's discretion in applying *all* of the

Byrne JAG award requirements.  In contrast, the "principal purpose . . . of the traditional

limitations upon mandamus . . . is to protect agencies from undue judicial interference with their

lawful discretion."  *Norton v. S. Utah Wilderness All*., 542 U.S. 55, 66 (2004).  Accordingly,

even "when an agency is compelled by law to act within a certain time period [which is not the

case here], but the manner of its action is left to the agency's discretion, a court can compel the

agency to act, but has no power to specify what the action must be."  *Id.* at 65; *see Prometheus Radio Project v. FCC*, 824 F.3d 33, 49 (3d. Cir. 2016) ("We do not intend to prejudge the outcome of this analysis; we only order that it must be completed.").  Regardless of this Court's decision regarding the propriety of the challenged conditions, the Court should not insert itself into the Department's review process, effectively superseding the Department's statutory authority to determine whether the application criteria have been met.  *See* 34 U.S.C. § 10154 ("The Attorney General shall not finally disapprove any application . . . without first affording the applicant reasonable notice of any deficiencies in the application and opportunity for correction and reconsideration."); *see also id.* § 10153(a) ("To *request* a grant under this part," a jurisdiction "shall submit an application to the Attorney General . . . *in such form as the Attorney General may require.*") (emphasis added); *id.* § 10153(a)(5) (requiring that grant applications include a "certification, made *in a form acceptable to the Attorney General*") (emphasis added).

## CONCLUSION

Accordingly, the Court should dismiss plaintiffs' First Amended Complaint and all of its claims with prejudice.

Dated:  March 5, 2019

<div style="margin-left:40%">

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BILLY J. WILLIAMS
United States Attorney

JOHN R. TYLER
Assistant Branch Director

s/ W. Scott Simpson
_____
W. SCOTT SIMPSON (Va. Bar #27487)

</div>

Department of Justice, Civil Division
318 South Sixth Street, Room 244
Springfield, Illinois 62701
Telephone:  (202) 514-3495
Facsimile:  (217) 492-4888
E-mail:       scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

DONALD J. TRUMP, President of the
United States; WILLIAM P. BARR,
Attorney General of the United States;
UNITED STATES OF AMERICA