ELLEN F. ROSENBLUM
Attorney General
MARC ABRAMS  #890149
Assistant Attorney-in-Charge
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
Telephone: (503) 947-4700
Fax: (503) 947-4791
Email:  marc.abrams@doj.state.or.us
        Additional attorneys listed on signature page

Attorneys for Plaintiffs State of Oregon, Governor Kate Brown, and Attorney General Ellen
Rosenblum

TRACY P. REEVE  #891123
City Attorney
DENIS M. VANNIER  #044406
Senior Deputy City Attorney
Portland Office of the City Attorney
1221 SW Fourth Avenue, Suite 430
Portland, OR 97204
Telephone: (503) 823-4047
Fax: (503) 823-3089
Email:  Denis.Vannier@portlandoregon.gov

Attorneys for Plaintiff City of Portland

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| THE STATE OF OREGON, KATE BROWN, Governor; ELLEN ROSENBLUM, Attorney General; and THE CITY OF PORTLAND, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, President of the United States, *in his* official capacity; MATTHEW G. WHITAKER, Acting Attorney General of the United States, in his official capacity; and the UNITED STATES OF AMERICA, <br><br> Defendants. | Case No.  6:18-cv-01959-MC <br><br> **PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

I.      L.R. 7-1 CERTIFICATION ................................................................................... 1

II.     COMBINED MOTION AND RESPONSE ......................................................... 1

III.    MEMORANDUM OF LAW .............................................................................. 1

IV.     FACTUAL BACKGROUND ............................................................................. 2

        A.      The Byrne JAG program provides federal funds for local law enforcement .......... 2

        B.      Defendants added new requirements for the Byrne JAG Program in 2017 ........... 3

                1.      Defendants added the Compliance Condition ............................................. 4

                2.      Defendants added the Access and Notice Conditions ................................. 5

        C.      Defendants withheld Byrne JAG funds starting in FY 2017. ................................. 6

                1.      Defendants withheld Byrne JAG funds from the State of Oregon. ............ 7

                2.      Defendants threaten criminal prosecutions. ............................................... 7

                3.      Defendants demand further explanations from the State of Oregon ........... 8

                4.      For FY 2017, Defendants focused on ORS 181A.8201 and
                        180.805 ....................................................................................................... 8

        D.      Defendants added new conditions for FY 2018 Byrne JAG funds ....................... 12

                1.      Defendants withheld Byrne JAG funds from Oregon for FY 2018. ......... 14

                2.      Defendants withheld Byrne JAG funds from the City. ............................. 15

V.      LEGAL STANDARD ...................................................................................... 16

VI.     ARGUMENT ................................................................................................... 16

        A.      Plaintiffs have standing to raise their claims. ...................................................... 18

        B.      The Compliance Condition relies on statutes that violate the Tenth
                Amendment ........................................................................................................... 21

                1.      Under the Tenth Amendment, Defendants may not dictate what a
                        state or local government may or may not do. ......................................... 22

                2.      Sections 1373 and 1644 are invalid under the Tenth Amendment. .......... 23

                3.      Because Sections 1373 and 1644 are invalid, so too is any
                        condition requiring compliance with them. .............................................. 30

        C.      The Access and Notice conditions violate separation-of-powers principles ........ 31

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

|  | 1. | Congress alone is vested with legislative and spending authority. | 32 |
|  | 2. | Congress did not delegate authority to create the challenged conditions. | 33 |
| D. | | The Access and Notice Conditions also fail under the Spending Clause. | 38 |
| E. | | Plaintiffs are entitled to declaratory, mandamus, and injunctive Relief. | 39 |
|  | 1. | Plaintiffs are entitled to mandamus relief. | 40 |
|  | 2. | Plaintiffs are entitled to permanent injunctive relief, with nationwide scope. | 41 |
| VII. | | CONCLUSION | 43 |

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

## TABLE OF AUTHORITIES

**Cases**

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 126 S. Ct. 2455, 165 L.Ed.2d 526 (2006) ................................................................................................ 33

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) ....................................................... 43

*City & Cty. of San Francisco v. Sessions*, 18-cv-05146-WHO, 2019 WL 1024404 (N.D. Cal. Mar. 4, 2019) ..................................................................................................... 2

*City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018) 1, 17, 18, 21, 24, 25, 26, 27, 28, 29, 31, 33, 34, 35, 37, 39, 40, 41, 42

*City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018) ...... 1, 17, 21, 24, 26, 27, 28, 31

*City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018), *reh'g en banc granted in part, opinion vac'd in part*, 17-2991, 2018 WL 4268817 (June 4, 2018), *reh'g vac'd*, 17-2991, 2018 WL 4268814 (Aug. 10, 2018) ........................... 1, 17, 32, 33, 34, 35, 36, 37, 38

*City of Evanston v. Sessions*, No. 18-cv 4853, Docket No. 23 (N.D. Ill. Aug. 9, 2018) ............. 15

*City of Los Angeles v. McLaughlin*, 865 F.2d 1084 (9th Cir. 1989) ............................................. 40

*City of Los Angeles v. Whitaker*, No. 2:18-cv-07347-R-JC (C.D. Cal. Feb. 15, 2019) ............... 43

*City of Philadelphia v. Attorney Gen. of United States of Am.*, 916 F.3d 276 (3d Cir. 2019) ...................................................................................... 2, 17, 33, 34, 35, 36, 37, 38, 43

*City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 639 (E.D. Pa. 2017) .................. 32, 35, 39

*City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018)1, 17, 18, 21, 24, 26, 28, 29, 34, 35, 39

*City of Seattle v. Trump*, 2017 WL 4700144 (W.D. Wash. Oct. 19, 2017) ................................. 18

*Clinton v. City of New York*, 524 U.S. 417, 118 S. Ct. 2091, 141 L.Ed.2d 393 (1998)............... 33

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 126 S. Ct. 1837 (2006).................................... 42

*FMC v. Seatrain Lines, Inc.,* 411 U.S. 726 (1973) ....................................................................... 36

*Fullilove v. Klutznick*, 448 U.S. 448, 100 S. Ct. 2758 (1980) ...................................................... 32

*Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 101 S. Ct. 2352 (1981)................................................................................................................. 30

*Hoye v. City of Oakland*, 653 F.3d 835 (9th Cir. 2011)................................................................. 25

*I.N.S. v. Chadha*, 462 U.S. 919, 103 S. Ct. 2764, 77 L.Ed.2d 317 (1983) .................................. 33

*In re A Community Voice*, 878 F.3d 779 (9th Cir. 2017)............................................................... 41

Page iii

*In re Aiken Cty.*, 725 F.3d 255 (D.C. Cir. 2013) ........................................................... 33

*Kildare v. Saenz*, 325 F.3d 1078 (9th Cir. 2003) ......................................................... 40

*Massachusetts v. E.P.A.*, 549 U.S. 497, 127 S. Ct. 1438 (2007) ................................. 19

*McCarthy v. Madigan*, 503 U.S. 140 (1992) ............................................................... 20

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) ...................................... 42

*Morales v. Trans World Airlines, Inc.*, 504 US 374 S. Ct. 2031 (1992) ........................ 29

*Murphy v. Nat'l Collegiate Athletic Ass'n*, __ U.S. __, 138 S. Ct. 1461 (2018) .. 22, 23, 24, 28, 29

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 132 S. Ct. 2566 (2012) ........... 23

*New York v. United States*, 505 U.S. 144, 112 S. Ct. 2408 (1992) .............................. 23

*Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015) ........ 18

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ................................................................................................................. 33

*Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365 (1997) ........................... 23, 27, 28

*Reno v. Condon*, 528 U.S. 141 (2000) ......................................................................... 28

*S.E.C. v. Sloan*, 436 U.S. 103 (1978) .......................................................................... 36

*State of Nevada v. Skinner*, 884 F.2d 445 (9th Cir. 1989) ...................................... 32, 39

*States of New York v. Dept. of Justice*, 343 F. Supp. 3d 213 (S.D.N.Y. 2018) 1, 17, 24, 25, 26, 27, 29, 31, 34, 35, 37, 39, 40, 41, 42

*Telecomms. Research & Action Ctr. (TRAC) v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ................. 41

*Texas v. United States*, 787 F.3d 733 (5th Cir 2015) .................................................. 19

*United States Conference of Mayors v. Sessions*, No. 18-2734, Docket No. 13 (7th Cir. Aug. 29, 2018) ............................................................................................................ 15

*United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018) ........................... 24

*Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253 (4th Cir. 2011) .......................... 19

**Statutes**

Or. Rev. Stat. § 131.005 ............................................................................................... 10

Or. Rev. Stat. § 180.210 ................................................................................................. 4

Or. Rev. Stat. § 180.805 ................................................................... 9, 10, 11, 12, 25, 29

Or. Rev. Stat. § 181A.820 ........................................................... 9, 10, 11, 12, 16, 25, 29

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

**United States Code**

18 U.S.C. 1015, 1422 to 1429 or 1505 ............................................................ 9

28 U.S.C. § 1361 ........................................................................................ 40

28 U.S.C. 2201(a) ...................................................................................... 40

34 U.S.C. § 10102 .................................................................................. 35, 36

34 U.S.C. § 10102(a)(6) ...................................................................... 35, 36, 37

34 U.S.C. § 10152(a)(1) .......................................................................... 6, 40

34 U.S.C. § 10153(A)(4) ............................................................................. 37

34 U.S.C. § 10153(a)(5) ............................................................................. 38

34 U.S.C. § 10153(A)(5)(C) ......................................................................... 37

34 U.S.C. § 10153(a)(5)(D) ..................................................................... 31, 38

34 U.S.C. § 10156(a)(1) ............................................................................. 34

34 U.S.C. § 10228 ................................................................................... 38

34 U.S.C. § 10446(e)(3) ............................................................................. 36

34 U.S.C. §§ 10151-10158 ........................................................................... 2

42 U.S.C. § 1997e .................................................................................... 20

8 U.S.C. § 1226(c) ................................................................................... 30

8 U.S.C. § 1324 ....................................................................................... 7

8 U.S.C. § 1324(a) ................................................................................... 14

8 U.S.C. § 1373 .................. 4, 5, 7, 8, 12, 13, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31

8 U.S.C. § 1373(a) ........................................................................... 12, 21, 24

8 U.S.C. § 1373(b) ........................................................................... 21, 24, 29

8 U.S.C. § 1644 .................................. 12, 13, 19, 20, 21, 22, 23, 25, 26, 27, 28, 29, 30, 31

8 U.S.C. §§ 1231(a) ............................................................................. 29, 30

**Rules and Regulations**

Fed. R. Civ. P. 56(a) ............................................................................ 1, 16

L.R. 7-1 ............................................................................................... 1

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

**Constitutional Provisions**

U.S. Const. amend. X ............................................................................ 2, 22, 24, 27, 29, 30

U.S. Const. art. I, § 8, cl. 1 ............................................................................................... 32

U.S. Const. art. II ............................................................................................................. 32

U.S. Const. art. II, § 3 ...................................................................................................... 32

U.S. Const. art. III ..................................................................................................... 18, 21

**Other**

Consolidated Appropriations Act of 2017, Pub. L. No. 115-31, 131 Stat. 135, 203 ..................... 2

Portland City Code ("PCC") Ch. 3.10 .......................................................................... 4

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417 (2017) ....................................................................................................... 43

Title II of the Immigration and Nationality Act............................................................... 9

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

# I. L.R. 7-1 CERTIFICATION

In compliance with LR 7-1, the parties conferred by telephone on February 28, 2019. The parties made a good faith effort to resolve the dispute, but were unable to do so.

# II. COMBINED MOTION AND RESPONSE

Plaintiffs (the State of Oregon, Governor Kate Brown, Attorney General Ellen Rosenblum, and the City of Portland) move for summary judgment on all claims under Fed. R. Civ. P. 56(a) because this case presents no genuine dispute as to any material fact, and Plaintiffs are entitled to judgment as a matter of law.  For the same reasons, Plaintiffs object to and ask this court to deny Defendants' Motion to Dismiss (Docket No. 14).

In support of Plaintiffs' motion and its response to Defendants' motion, Plaintiffs relies on the following memorandum together with the Declaration of Michael Schmidt ("Schmidt Dec."), the Declaration of Timothy D. Smith ("Smith Dec."), the Declaration of Peenesh Shah ("Shah Dec."), the Declaration of Veronica Nordeen ("Nordeen Dec."), the supporting exhibits, and the other evidence and records on file in this matter.

# III. MEMORANDUM OF LAW

"[T]his case is fundamentally about the separation of powers among the branches of our government and the interplay of dual sovereign authorities in our federalist system." *See States of New York v. Dept. of Justice*, 343 F. Supp. 3d 213, 226 (S.D.N.Y. 2018).  Because this case implicates such fundamental principles, the specific questions it presents are relatively straightforward — every court to have considered them has resolved them against the federal government.  *See, e.g., id.*; *City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018); *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018), *reh'g en banc granted in part, opinion vac'd in part*, 17-2991, 2018 WL 4268817 (June 4, 2018), *reh'g vac'd*, 17-2991, 2018 WL 4268814 (Aug. 10, 2018); *City of*

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

*Philadelphia v. Attorney Gen. of United States of Am.*, 916 F.3d 276 (3d Cir. 2019); *City & Cty. of San Francisco v. Sessions*, 18-cv-05146-WHO, 2019 WL 1024404 (N.D. Cal. Mar. 4, 2019).

More specifically, those principles prevent federal executive-branch officials from withholding funds that Plaintiffs are entitled to receive under the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program.  In short, Congress has not delegated authority for Defendants to impose conditions on the receipt of those funds, and the only laws that might otherwise support those conditions are invalid under the Tenth Amendment because they reflect an impermissible attempt by the federal government to commandeer state resources.

## IV. FACTUAL BACKGROUND

The Byrne JAG program is administered by the Office of Justice Programs ("OJP"), a subdivision of the United States Department of Justice ("USDOJ").  34 U.S.C. §§ 10151-10158. Plaintiffs have received funds under the Byrne JAG program since 2005.  Plaintiffs both received Byrne JAG funds as recently as fiscal year ("FY") 2016. Defendants' Request for Judicial Notice (Docket No. 15), Exhs. A-B.  But starting in FY 2017, Plaintiffs have encountered obstacles based on conditions that Defendants have attached to the receipt of Byrne JAG funds.

**A.     The Byrne JAG program provides federal funds for local law enforcement.**

The Byrne JAG program supports state and local law enforcement efforts by providing an additional source of funding for personnel, equipment, training, and other criminal justice needs. Docket No. 14 at 8, 15-16; *see* 34 U.S.C § 10152(a)(1).  The program's purposes include supporting law enforcement programs, reducing recidivism, conducting crime prevention and education programs for at-risk youth, and supporting programs for crime victims and witnesses. *Id*.  For FY 2017, Congress appropriated $396 million for the Byrne JAG program.  Consolidated Appropriations Act of 2017, Pub. L. No. 115-31, 131 Stat. 135, 203.  For FY 2018, Congress appropriated $ 415.5 million for the Byrne JAG program. Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, 132 Stat. 348.

The State of Oregon had, until 2017, received Byrne JAG funds every year since the program's creation in 2005.  Schmidt Dec. ¶ 6; *see* Docket No. 15, Exh. A.  The State of Oregon has used Byrne JAG funds to support drug treatment and enforcement programs, mental health programs, technology improvement programs and other efforts.  Schmidt Dec. ¶ 9.  With respect to the FY 2017 Byrne JAG award, the State of Oregon planned to use the grants to support specialty courts designed to address root causes of criminal activity and to provide statewide assistance to local crime victims.  Schmidt Dec. ¶¶ 12, 15, Exh. 4 at 2, 7-8, 16-17.  For FY 2018, the State of Oregon plans to use Byrne JAG funds to support specialty court programs that target non-violent felony offenders in an integrated, systemic approach to reduce drug use and recidivism while increasing public safety.  Schmidt Dec. ¶ 22, Exh. 12 at 1-2, 8-14, 20-21.

The City of Portland — which is a qualifying unit of local government eligible to receive funds under the Byrne JAG programs — had, until 2017, also received Byrne JAG funds every year since the program's creation in 2005.  Nordeen Dec. ¶ 2; *see* Docket No. 15, Exhs. B, D.  The City has used Byrne JAG funds, among other things, to purchase bulletproof vests and special-threat plates, tactical medical kits, GPS systems, and to fund a victims' advocate in the Sex Crimes Unit.  Nordeen Dec. ¶ 3.  The City, as authorized by the Byrne JAG statutes, has passed funds over to its sub recipients Multnomah County and the City of Gresham, who have used those Byrne JAG funds to support, among other things, a Neighborhood Deputy District Attorney, police equipment, and a parole and probation officer.  *Id.* ¶ 4.

**B.    Defendants added new requirements for the Byrne JAG Program in 2017.**

In March 2016, Defendants "notified recipients of Byrne JAG grants of the requirement ¶Defendants announced they were seeking state and municipal applications for FY 2017 Byrne JAG funds.  Schmidt Dec. ¶¶ 13-14, Exhs. 1-3; Nordeen Dec. ¶ 5, Exh. 1.  In this solicitation, Defendants announced new requirements — including the three immigration-related conditions that are the subject of this action — for every state and municipality receiving FY 2017 Byrne JAG funds.  Docket No. 14 at 17-18; Schmidt Dec. ¶¶ 13-14, Exhs. 1-3; Nordeen Dec. ¶ 5, Exh.

1. This brief refers to those conditions, discussed below, as the "Compliance Condition," the "Access Condition", and the "Notice Condition." Despite these new requirements, Defendants expected "to issue award notifications by September 30, 2017." Schmidt Dec. ¶ 13, Exh. 1 at 31; Nordeen Dec. ¶ 5, Exh. 1 at 29.

Defendants also "announced that it will take all lawful steps to claw back any funds awarded to a jurisdiction that violates its grant agreement, including the conditions to comply with Section 1373." Schmidt Dec. ¶ 14, Exh. 3.

### 1.    Defendants added the Compliance Condition.

In the FY 2017 Byrne JAG solicitation for state applicants, Defendants specifically announced that, "in order [to] validly to accept an FY 2017 [Byrne] JAG award, the chief legal officer of the applicant State must properly execute, and the State must submit, the specific certification regarding compliance with 8 U.S.C. § 1373 attached to this solicitation as Appendix II." Schmidt Dec. ¶ 13, Exh. 1 at 1, 23-24, 39-42; *see also* Docket No. 14 at 17-18. Similarly for local government applicants, Defendants announced that, "in order [to] validly to accept a Fiscal Year (FY) 2017 JAG award, the chief legal officer of the applicant unit of local government must properly execute, and the unit of local government must submit, the specific certification regarding compliance with 8 U.S.C. § 1373 attached to this solicitation as Appendix II." Nordeen Dec. ¶ 5, Exh. 1 at 1, 22-23, 37-38; Docket No. 14 at 17-18. The Oregon Attorney General is the State of Oregon's chief legal officer, and the Portland City Attorney is the City's chief legal officer. ORS 180.210; Portland City Code ("PCC") Ch. 3.10.

Section 1373 prohibits state and local governments from restricting government officials or entities from communicating information regarding immigration status to the federal immigration authority. It states in relevant part:

> (a) In General. Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional Authority of Government Entities.  Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

8 U.S.C. § 1373.

## 2.    Defendants added the Access and Notice Conditions.

Defendants' FY 2017 state and local government solicitations also announced the introduction of two additional "express conditions" relating to immigration enforcement — the Access Condition and the Notice Condition.  Docket No. 14 at 17-18; Schmidt Dec. ¶ 13, Exh. 1 at 9, Exhs. 2-3; *see also* Docket No. 15 at 65.

Pursuant to the Access Condition, Defendants require recipients of Byrne JAG funds to "permit personnel of the U.S. Department of Homeland Security ("DHS") to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States."  Schmidt Dec. ¶¶ 13-14, Exh. 3; Docket No. 14 at 17; Docket No. 15 at 65.

Pursuant to the Notice Condition, Defendants require recipients of Byrne JAG funds to "provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act."  Schmidt Dec. ¶¶ 13-14, Exh. 3; Docket No. 14 at 18; Docket No. 15 at 65.

**C.    Defendants withheld Byrne JAG funds starting in FY 2017.**

In response to the Byrne JAG FY 2017 State Solicitation, the Oregon Criminal Justice

Commission (OCJC), which is the Oregon state agency that receives and administers Byrne JAG

funds, responded to Defendants' FY 2017 solicitation before the deadline on August 23, 2017.

Schmidt Dec. ¶¶ 4-5, 15, Exh. 4 at 1.  OCJC's application proposed to use Byrne JAG funds to

achieve the criminal justice goals articulated in the authorizing statute, *see* 34 U.S.C.

§ 10152(a)(1), and OCJC's approach satisfied all other lawfully imposed requirements.  *Id*. at

¶¶ 15-16, Exhs. 4-5. OCJC expected to receive an award notification from Defendants no later

than September 30, 2017.  Schmidt Dec. ¶ 13, Exh. 1 at 31 (Defendants expect "to issue award

notifications by September 30, 2017.")

Similarly, the City responded to Defendants' FY 2017 solicitation on or before the

deadline of September 5, 2017.  Nordeen Dec. ¶ 6.  The City's application proposed to use Byrne

JAG funds to achieve the criminal justice goals articulated in the authorizing statute and satisfied

all other lawfully imposed requirements.  *Id. at* ¶ 6, Exh. 2 at 17.

Defendants acknowledge that Plaintiffs have each applied for a Byrne JAG.  Docket No.

14 at 22 ("each of plaintiffs has applied for a Byrne JAG grant.").  In addition, according to the

FY 2017 Byrne JAG solicitation, Defendants anticipated issuing Byrne JAG award notifications

by September 30, 2017.  Schmidt Dec. ¶ 13, Exh. 1 at 31; Nordeen Dec. ¶ 5, Exh. 1 at 29 ("OJP

expects to issue award notifications by September 30, 2017.").

On November 15, 2017, the OCJC hosted an on-site monitoring visit from a USDOJ staff

member.  The USDOJ staff member sought information regarding the status of OCJC's

programs.  Following the site visit, the USDOJ staff member confirmed in writing that "[n]o

programmatic or administrative issues requiring formal resolution were identified during the site

visit."  The USDOJ staff member also confirmed that OCJC's JAG programs "appear to be

progressing according to the plans presented in the approved applications, and are in compliance

with Federal, OJP, and [Bureau of Justice Assistance] guidelines for this grant."  Schmidt Dec. ¶

Page 6 -    **PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
DEFENDANTS' MOTION TO DISMISS**                    9478194 v9

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

16, Exh. 5. Similarly, the City reached out to OJP representatives multiple times beginning in the fall of 2017 and have received no indication of any defects or problems with the City's FY 2017 application. Nordeen Dec. ¶ 15, Exhs. 6-7.

Despite this positive response, Defendants have not issued awards or disbursed funds on the State of Oregon's FY 2017 application or on the State of Oregon's or the City's subsequent applications.    Docket No. 14 at 10 ("OJP has not otherwise acted on their Byrne JAG applications"); *id*. at 22-23 (same); Schmidt Dec. ¶¶ 21, 23.

### 1.    Defendants withheld Byrne JAG funds from the State of Oregon.

Rather than issuing an award to the State of Oregon, Defendants' correspondence with the State of Oregon regarding Oregon's 2017 Byrne JAG application indicates that Defendants seek to override Oregon policy designed to encourage all residents to interact with state and local government agencies, including law enforcement. *See* Schmidt Dec. ¶¶ 17-22, Exhs. 6-10. Specifically, the USDOJ's correspondence with OCJC suggests that Oregon law conflicts with 8 U.S.C. § 1373.

To start, on November 15, 2017, CJC received a letter from the USDOJ. Schmidt Dec. ¶ 17, Exh. 6. The USDOJ asked the CJC to address "whether Oregon has laws, policies, or practices that violate [8 U.S.C. § 1373]." *Id*. On December 7, 2017, CJC answered USDOJ's questions and assured the USDOJ that the "State of Oregon does not restrict state entities or officials from providing information regarding citizenship or immigration status to the Department of Homeland Security." *Id*., Exh. 7. A month later, Defendants raised the stakes.

### 2.    Defendants threaten criminal prosecutions.

In January 2018, United States Secretary for Homeland Security Kirsten Nielsen stated that, at her department's request, the USDOJ was exploring commencing criminal prosecutions under 8 U.S.C. § 1324 against state and local elected officials of jurisdictions that do not actively assist federal immigration enforcement. Smith Dec. ¶¶ 5-6, Exhs. 3-4 ("In an oversight hearing before the Senate Judiciary Committee on January 16, 2018, Secretary Kirstjen Nielsen

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

confirmed that '[t]he Department of Justice is reviewing what avenues might be available [to the Department of Homeland Security to charge elected officials such as these].").

In January 2018, then-acting Director of the U.S. Immigration and Customs Enforcement ("ICE") Tom Homan, similarly stated, "we gotta start charging some of these politicians with crimes" and "hold back their funding."  Smith Dec. ¶¶ 3-6, Exhs. 1-4.

### 3.    Defendants demand further explanations from the State of Oregon.

On January 24, 2018, the CJC received a second letter from the USDOJ.  Schmidt Dec. ¶ 18, Exh. 8.  The USDOJ advised that after reviewing CJC's December 7, 2017 letter, "the [USDOJ] remains concerned that your jurisdiction's laws, policies, or practices may violate Section 1373, or at a minimum, that they may be interpreted or applied in a manner inconsistent with Section 1373."  USDOJ then requested documents from CJC related to its concerns.  *Id.*

On February 23, 2018, CJC again responded to the USDOJ and produced responsive documents.  Schmidt Dec. ¶ 19, Exh. 9.  CJC assured the USDOJ that "Oregon law enforcement agencies are not violating 8 U.S.C. § 1373."  *Id.*, Exh. 4 at 4.

On April 17, 2018, CJC received an email from the USDOJ providing an update regarding the State of Oregon's FY 2017 JAG application.  Schmidt Dec. ¶ 20, Exh. 10.  In part, the USDOJ explained that it had "not awarded its FY 2017 Byrne JAG grants due to the issuance of a nationwide injunction by a U.S. District Court on September 15, 2017," but that in the meantime "state and local applicants for Byrne JAG grants under the FY 2017 program may obligate and expend their own funds on allowable JAG projects after the start date of October 1, 2016.  Once the grants are awarded, FY 2017 Byrne JAG funds received, if any, may be used for reimbursement of those expenditures."  *Id.*

### 4.    For FY 2017, Defendants focused on ORS 181A.8201 and 180.805.

To date, Defendants have provided no other explanation for why they have failed to act on the State's 2017 Byrne JAG applications, and Defendants' motion to dismiss similarly offers

no real explanation.  Instead, the USDOJ's correspondence with the OCJC simply focused on

ORS 181A.820 and 180.805.

Under ORS 181A.820, enacted in 1987, Oregon law enforcement agencies may not

expend money for the purpose of detecting or apprehending persons whose only violation of law

is that they are persons of foreign citizenship present in the United States in violation of federal

immigration laws.  ORS 181A.820 provides:

> (1) No law enforcement agency of the State of Oregon or of any political subdivision of the state shall use agency moneys, equipment or personnel for the purpose of detecting or apprehending persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws.

> (2) Notwithstanding subsection (1) of this Section, a law enforcement agency may exchange information with the United States Bureau of Immigration and Customs Enforcement, the United States Bureau of Citizenship and Immigration Services and the United States Bureau of Customs and Border Protection in order to:

>> (a) Verify the immigration status of a person if the person is arrested for any criminal offense; or

>> (b) Request criminal investigation information with reference to persons named in records of the United States Bureau of Immigration and Customs Enforcement, the United States Bureau of Citizenship and Immigration Services or the United States Bureau of Customs and Border Protection.

> (3) Notwithstanding subSection (1) of this Section, a law enforcement agency may arrest any person who:

>> (a) Is charged by the United States with a criminal violation of federal immigration laws under Title II of the Immigration and Nationality Act or 18 U.S.C. 1015, 1422 to 1429 or 1505; and

>> (b) Is subject to arrest for the crime pursuant to a warrant of arrest issued by a federal magistrate.

> (4) For purposes of subSection (1) of this Section, the Bureau of Labor and Industries is not a law enforcement agency.

(5) As used in this Section, "warrant of arrest" has the meaning given that term in ORS 131.005.

ORS 181A.820.

Defendants' correspondence also refers to ORS 180.805, enacted in 2017.  That law provides, in pertinent part, as follows:

(1) Except as required by state or federal law, a public body may not disclose, for the purpose of enforcement of federal immigration laws, the following information concerning any person, whether current or otherwise:

(a) The person's address;

(b) The person's workplace or hours of work;

(c) The person's school or school hours;

(d) The person's contact information, including telephone number, electronic mail address or social media account information;

(e) The identity of known associates or relatives of the person;

(f) The date, time or location of the person's hearings, proceedings or appointments with the public body that are not matters of public record; or

(g) Information described in paragraphs (a) through (f) of this subSection with respect to known relatives or associates of the person.

\*\*\*

(3)(a) If a public body collects information concerning a person's citizenship or immigration status, the public body may decline to disclose the information unless disclosure is required by:

(A) State or federal law;

(B) A court order; or

(C) A warrant authorized by a court.

\*\*\*

(5) Nothing in this Section prohibits any public body from complying with a federal immigration authority as required by federal law.

*** 

ORS 180.805.

Those laws reflect Oregon's policy judgment regarding how best to police, protect, and serve all residents, including foreign-born residents. Shah Dec. ¶¶ 1-6, Exhs. 1-4 (legislative history for ORS 181A.820 and ORS 180.805). The State of Oregon enacted the foregoing statutes as an exercise of the State's police power to achieve those goals and to regulate the health, welfare, and public safety of its residents. *Id*., Exh. 3, Exh. 4 at 3, 5, 20-21, 24-27, 32-33, 35-36, 39-41, 47, and 54. Those laws are instrumental to building the trust necessary to ensure that victims report crimes to law enforcement and that perpetrators are apprehended. *Id*. Building that trust can be difficult in immigrant communities. *Id*., Exh. 1 at 1-4; Exh. 2 at 1-3, Exh. 3, Exh. 4 at 39-41. When local and state officials engage in immigration enforcement, as Defendants contemplate, vulnerable victims and witnesses are less likely to come forward to report crimes, creating a danger to all Oregon residents. *Id*. The Oregon legislature enacted ORS 180.805 in response to precisely those concerns. *Id*. at ¶¶ 3-4, Exh. 1-2.

Moreover, those laws ensure that state and local resources are devoted to fulfilling state and local policing responsibilities, rather than being directed to the federal responsibility of enforcing immigration law. As State Representative Rocky Barilla explained when testifying to the Oregon State Senate in support of the bill that became ORS 181A.820 (formerly ORS 181.850), that law sought to remedy specific problems created by local enforcement of immigration laws, including the "increased fiscal impact on cities and counties," the "exacerbate[ion]" of "the jail overcrowding problem," and the "increased litigation and insurance costs against cities and counties for false arrests by local police." Shah Dec. ¶ 6, Exh. 4 at 39.

The USDOJ's correspondence regarding the State of Oregon's FY 2017 application did not explain why USDOJ believes that ORS 181A.820 and ORS 180.805 conflict with 8 U.S.C. § 1373(a). Instead, Defendants' correspondence implies that they view the cited state laws as putting the State of Oregon in violation of the Compliance, Access or Notice Conditions. Defendants have never offered any other explanation for their failure to release Oregon's Byrne

Page 11 -  **PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' MOTION TO DISMISS**     9478194 v9

JAG funds.  And in communications with the City, OJP has not once indicated why the City's Byrne JAG funds are being withheld. Nordeen Dec. ¶ 15, Exhs. 6-7. The State of Oregon does not concede that any such violation results from ORS 181A.820 and ORS 180.805.  But regardless of compliance with or violation of those conditions, the State of Oregon disputes Defendants' authority to impose those conditions in the first place.

To date, the State of Oregon has not received the FY 2017 grant totaling $2,034,945 that Congress has appropriated in law enforcement funding to the State of Oregon and its political subdivisions pursuant to the Byrne JAG program.

**D.    Defendants added new conditions for FY 2018 Byrne JAG funds.**

On July 20, 2018, Defendants announced that they would impose additional immigration-related conditions on jurisdictions seeking FY 2018 Byrne JAG funding.  Schmidt Dec. ¶ 22, Exh. 11 at 1, 10, 27-28; Nordeen Dec. ¶ 11, Exh. 4 at 1, 10, 27-28; Docket No. 14 at 18-19.  Two of those conditions are materially identical to the Access and Notice Conditions discussed above. Docket No. 14 at 18-19; Schmidt Dec. ¶ 22, Exh. 11 at 1, 35-37, 42-43; Nordeen Dec. ¶ 11, Exh. 4 at 36-37, 42-43; Docket No. 15 at 120-21.  Defendants expanded the Compliance Condition to incorporate a certification regarding 8 U.S.C. § 1644 in addition to § 1373.  Docket No. 14 at 18-19; Docket No. 15 at 116-19; Schmidt Dec. ¶ 22, Exh. 11 at 1, 42-43; Nordeen Dec. ¶ 11, Exh. 4 at 42-43.  Indeed, the FY 2018 Byrne JAG solicitation specifically requires the jurisdictions' chief legal officer to certify compliance with both 8 U.S.C. § 1373 and 8 U.S.C. § 1644.  *Id.*; Schmidt Dec. ¶ 22, Exh. 11 at 1, 42-43; Nordeen Dec. ¶ 11, Exh. 4 at 42-43; *see also* Docket No. 15 at 62-64.

Like Section 1373, Section 1644 bars state and local government officials or entities from restricting how they communicate information regarding immigration status to the federal immigration authority.  Section 1644 states:

> Notwithstanding any other provision of Federal, State, or local law, no
> State or local government entity may be prohibited, or in any way restricted, from
> sending to or receiving from the Immigration and Naturalization Service

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

information regarding the immigration status, lawful or unlawful, of an alien in
the United States.

8 U.S.C. § 1644.

In addition to the expanded Compliance Condition certification, the 2018 application also
requires applicants to respond to questions related to the Compliance Condition:

> (1)    Does your jurisdiction have any laws, policies, or practices related
> to whether, when, or how employees may communicate with DHS or ICE?

> (2)    Is your jurisdiction subject to any laws from a superior political
> entity (e.g., a state law that binds a city) that meet the description in question 1?

> (3)    If yes to either:

> - Please provide a copy of each law or policy;
> - Please describe each practice; and
> - Please explain how the law, policy or practice complies with
>   Section 1373

Schmidt Dec. ¶ 22, Exh. 11 at 27-28, 52; Nordeen Dec. ¶ 11, Exh. 4 at 52.  Answers, and
potentially additional material, "must be provided by the applicant as part of the JAG
application," as a condition of receiving Byrne JAG funds.  Schmidt Dec. ¶ 22, Exh. 11 at 27-28,
52; Nordeen Dec. ¶ 11, Exh. 4 at 27-28, 52; *see also* Schmidt Dec. Exh. 12 at 33-34 (State of
Oregon's response to the questions above).

The FY 2018 Byrne JAG application also states that the "reasonable costs" of complying
with the Notice and Access Conditions, including the costs of "honoring any duly authorized
requests from DHS that is encompassed by these conditions, will be allowable costs under the
award."  Schmidt Dec. ¶ 22, Exh. 11 at 37; Nordeen Dec. ¶ 11, Exh. 4 at 37; *see* Docket No. 15
at 120-21.

In addition, the FY 2018 Byrne JAG  solicitations also purport to condition awards on the
jurisdiction's chief legal officer  certifying that the jurisdiction will not "violate, or aid or abet
any violation of, 8 U.S.C. § 1324(a) (forbidding any 'person,' in 'knowing or in reckless
disregard of the fact that an alien has come to, entered, or remains in the United States in
violation of law,' to 'conceal, harbor, or shield from detection, or attempt to conceal, harbor, or

Page 13 -    **PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
DEFENDANTS' MOTION TO DISMISS**            9478194 v9

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

shield from detection, such alien in any place, including any building or any means to aid or abet in the commission of the preceding acts')."  Schmidt Dec. ¶ 22, Exh. 11 at 1, 37, 44-45; Nordeen Dec. ¶ 11, Exh. 4 at 36, 44-45.

Defendants now argue that the Compliance, Access and Notice conditions simply reflect a request for "modest cooperation with federal law enforcement prerogatives in the immigration setting."  Docket No. 14 at 17.  However, the certifications that Defendants now require Byrne JAG recipients to submit more closely echo these contemporaneous public comments from Secretary Nielsen and Director Homan, threatening "criminal prosecution" of state and local officials and "holding back funding" from jurisdictions that do not actively assist Defendants' immigration enforcement efforts.  Smith Dec. ¶¶ 3-6, Exhs. 1-4.

Despite the new requirements, Defendants stated that "[a]ward notifications are expected to be made by September 30, 2018."  Schmidt Dec. at ¶ 22, Exh. 11 at 35.  And Defendants have made 850 awards with respect to the Byrne JAG FY 18 local solicitation.[1]  To date, however — seven months later — Defendants still have taken no action on the FY 2018 applications of the State of Oregon and the City.

### 1.     Defendants withheld Byrne JAG funds from Oregon for FY 2018.

OCJC submitted the State of Oregon's application for FY 2018 Byrne JAG Funds on August 22, 2018.  For FY 2018, the State of Oregon anticipated receiving $2,092,704, and the State of Oregon expected a response to its application by September 30, 2018.  Schmidt Dec. ¶¶ 8, 22-24, Exh. 11 at 15, 35, Exh. 14.

Defendants do not dispute receiving the State of Oregon's application for FY 2018 but, to date, the State of Oregon has not received a response to its FY 2018 Byrne JAG application.  In fact, the State anticipates that Defendants will withhold the FY 2018 funds as they have withheld

---

[1] *See* Office of Justice Programs, "Awards Made for Solicitation BJA FY 18 Edward Byrne Memorial Justice Assistance Grant (JAG) Program - Local Solicitation," https://external.ojp.usdoj.gov/SelectorServer/awards/pdf/solicitation/BJA%20FY%2018%20Edward%20Byrne%20Memorial%20Justice%20Assistance%20Grant%20(JAG)%20Program%20-%20Local%20Solicitation (last visited Mar. 14, 2019).

the FY 2017 funds. Schmidt Dec. ¶¶ 8, 21, 23-24, Exh. 14; Docket No. 14 at 10, 22-23 ("OJP has not otherwise acted on plaintiffs' applications.")

### 2.    Defendants withheld Byrne JAG funds from the City.

Defendants recently issued an award notification to the City for its FY 2017 Byrne JAG funds pursuant to a preliminary injunction won in the Northern District of Illinois by the United States Conference of Mayors on behalf of its members — which include the City. S*ee City of Evanston v. Sessions*, No. 18-cv-4853, Docket No. 23 (N.D. Ill. Aug. 9, 2018) (stay lifted in *United States Conference of Mayors v. Sessions*, No. 18-2734, Docket No. 13 (7th Cir. Aug. 29, 2018)). The City anticipates that Defendants will begin releasing those funds shortly. Docket No. 15 at 73-100; Nordeen Dec. ¶ 9. But Defendants are still fighting the issuance of a permanent injunction in that case. *See City of Evanston*, No. 18-cv-4853, Docket No. 67. And while the City was awarded $385,515 for its FY 2017 Byrne JAG as a result of that preliminary injunction, Defendants have indicated that they may seek to enforce immigration-enforcement requirements against the City or seek reimbursement of any disbursed FY 2017 funds from the City if Defendants prevail in their separate action in the Seventh Circuit against the United States Conference of Mayors. Nordeen Dec. ¶ 10, Exh. 3; Schmidt Dec. ¶ 14, Exh. 3.

For FY 2018, the City anticipates receiving $391,694 in Byrne JAG funds. Nordeen Dec. ¶ 11, Exh. 4. Of those FY 2018 funds, $189,585 are to be retained by the City for its Police Bureau, $148,960 are to be passed on to subgrantee Multnomah County for its district attorney's office, and $53,149 are to be passed on to subgrantee City of Gresham for its police bureau. *Id*. Defendants have issued numerous FY 2018 Byrne JAG awards to many jurisdictions across the United States, but have ignored the City's application. Nordeen Dec. ¶ 14. The City anticipates that Defendants intend to continue withholding the FY 2018 funds.

Defendants' communications reveal that they view the City to be in violation of the Compliance, Access or Notice Conditions. Nordeen Dec. ¶ 15, Exhs. 6-7. Without conceding any such violation, the City agrees that, in accordance with ORS 181A.820, the Portland Police

Bureau does not enforce federal immigration laws absent a connection to other criminal activity. In January 2017, the Portland Chief of Police explained that compliance with ORS 181A.820, and positive engagement with refugees and immigrants in Portland, improve public safety. Nordeen Dec. ¶ 16, Exh. 8. Portland Police Bureau Policy 810.10 establishes policies and procedures consistent with that view. Nordeen Dec. ¶ 17. And regardless of compliance with or violation of those conditions, the City disputes Defendants' authority to impose those conditions in the first place.

## V. LEGAL STANDARD

A party is entitled to summary judgment where it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The material facts in this case — pertaining to Defendants' historical acceptance and recent rejection of Plaintiffs' applications for funds under the Bryne JAG program, as well as Plaintiffs' fulfillment of all necessary requirements beyond those challenged here — are not genuinely in dispute. Thus, this case presents solely legal questions, the determination of which will dictate that one party or another is entitled to judgment as a matter of law. To the extent that Defendants move for dismissal of Plaintiffs complaint for failure to state a claim, that motion requires resolution of the same legal questions: if Plaintiffs are entitled to judgment as a matter of law, then their complaint necessarily states a claim and dismissal is not required.[2]

## VI. ARGUMENT

Plaintiffs' arguments are few and straightforward. They are that Plaintiffs have standing to raise their claims, that the statutes underlying the Compliance Condition are invalid under anti-commandeering principles, that the Access and Notice Conditions are invalid under separation-of-powers principles and would also be an invalid exercise of authority under the

---

[2] By contrast, if Defendants are entitled to judgment as a matter of law, then Plaintiffs' complaint necessarily fails to state a valid legal claim and dismissal is required.

Spending Clause, and that Plaintiffs are therefore entitled to declaratory and injunctive relief, as well as mandamus.

Every federal district court to have considered any of those arguments has accepted them, and the two federal appellate courts to have considered any of those arguments has either accepted them or concluded that they are likely to succeed; in fact, Plaintiffs are aware of no federal court to have reached a contrary conclusion, and Defendants have not cited any such case. *See City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018); *States of New York v. Dept. of Justice*, 343 F. Supp. 3d 213 (S.D.N.Y. 2018); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018); *see also City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018), *reh'g en banc granted in part, opinion vac'd in part*, 17-2991, 2018 WL 4268817 (June 4, 2018), *vac'd*, 17-2991, 2018 WL 4268814 (Aug. 10, 2018); *City of Philadelphia v. Attorney Gen. of United States of Am.*, 916 F.3d 276 (3d Cir. 2019).[3]

For the reasons set forth below, this case presents no reason to depart from the sound conclusions and analysis of the courts that have already addressed these arguments.

---

[3] As set forth below, each of the cited district court decisions agreed that the Compliance Condition violated anti-commandeering principles and that the Access and Notice Conditions were invalid under either or both a spending-clause or separation-of-powers analysis. As will further be set forth below, all of those courts allowed injunctive relief, and all three of the courts to be presented with a request for mandamus allowed it.

The Seventh Circuit reviewed, on appeal of a preliminary injunction, only whether the Access and Notice Conditions were likely to have violated separation-of-powers principles; the later partial grant and withdrawal of en banc review pertained only to the nationwide scope of that injunction. *See City of Chicago*, 2018 WL 4268814, at *1-*2 (summarizing procedural history of case, issues on panel review, and issues on which rehearing was allowed but ultimately vacated).

The Third Circuit concluded only that the challenged conditions were invalid under separation-of-powers principles, holding that the Byrne JAG statute did not authorize any of those conditions and thereby obviating the need for review of any other question presented in that case. *See City of Philadelphia*, 916 F.3d at 279, 284.

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

A.     **Plaintiffs have standing to raise their claims.**

At the outset, Defendants contend that this case is not ripe and therefore non-justiciable because Plaintiffs do not allege that the challenged conditions "have had any effect on them" because Defendants have not yet denied them any Byrne JAG funds.  Docket No. 14 at 22-23. But even without a formal denial, the withholding of congressionally-appropriated funds amounts to a real and concrete injury, especially when those funds remain withheld more than a year after the end of the fiscal year for which they were appropriated.  *See City of Philadelphia*, 309 F. Supp.3d at 343 ("[I]t bears emphasis that Congress specifically set the JAG Program as an annual award, and the DOJ's delay has precluded the City from receiving the intended award at such time as the City can make timely use of it."); *City & Cty. of San Francisco*, 349 F. Supp. 3d at 974 ("The Byrne JAG program is a formula grant that requires the Attorney General to disburse funds annually * * *.").  That financial injury is sufficient to establish standing. *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015) (en banc) (explaining that a "loss of funds promised under federal law" is enough to "satisf[y] Article III's standing requirement").

Indeed, in *City of Seattle v. Trump*, 2017 WL 4700144 (W.D. Wash. Oct. 19, 2017), the court considered similar arguments from Defendants that the cities of Portland and Seattle lacked standing to bring claims challenging an executive order related to Section 1373.  The court there explained that the plaintiffs, including the City of Portland, had identified ordinances that the Defendants were likely to find in violation of Section 1373.  *Id*. at *7.  "Plaintiffs need not wait for the Government to affirmatively name them as 'sanctuary cities,' * * * or cut Plaintiffs' federal funding," before seeking declaratory relief.  *Id.*  That standing determination was made *before* Defendants had withheld awards and payments under the challenged executive order, which purported to withhold all federal grants from sanctuary jurisdictions.[4]  Since that decision,

---

[4] The Ninth Circuit ultimately invalidated that executive order.  *See City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  But that decision does not prevent Defendants from purporting to withhold specific funds, such as Byrne JAG funds, by asserting as they do here, that the statutes governing those funds allow Defendants to impose new conditions on the

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

Oregon has not received either the FY 2017 or FY 2018 awards, which were granted to other jurisdictions months ago.  And Portland has received the FY 2017 award only under a disputed preliminary injunction, with a specific threat that the conditions will be imposed at a later date, and has similarly been outright denied the FY 2018 award.  Defendants' threats of criminal prosecutions and clawing back previously awarded funds further highlight the existing conflict.

Moreover, leaving aside their financial injury, Plaintiffs have a concrete interest in protecting their sovereign power to determine for themselves how best to use their police powers for the benefit of their citizens and their priorities.  *See Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) (explaining that "when a federal law interferes with a state's exercise of its sovereign power to create and enforce a legal code," it "inflict[s] on the state the requisite injury-in-fact" (internal quotation marks omitted)); *see also Texas v. United States*, 787 F.3d 733, 749 (5th Cir 2015) (citing authorities to support a state's standing to challenge federal assertion of authority over an area "that the state believed it controlled," to challenge federal "preemption of an existing state law," and to challenge federal action "making the enforcement of an existing state law more difficult").

At a minimum, the State of Oregon has standing to challenge the constitutionality of Sections 1373 and 1644 — regardless of whether Defendants disburse Byrne JAG funds — because a state has standing to assert infringement of its rights under the Tenth Amendment.  *See Massachusetts v. E.P.A.*, 549 U.S. 497, 520 n.17, 127 S. Ct. 1438 (2007) (explaining the "critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what [prior decisions] prohibit[]) and allowing a State to assert its rights under federal law (which it has standing to do)").

Defendants ask this court to let the administrative process play out.  Docket No. 14 at 23.  But, as Defendants explain, "OJP has not otherwise acted on plaintiffs' applications and has not

receipt of those funds.  Nor did that decision resolve the Tenth Amendment argument raised in this case.

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

denied either application, and neither of the plaintiffs has yet been asked to certify compliance with Sections 1373 or 1644 or with the access or notice condition." *Id*. In short, Defendants contend that Plaintiffs should wait for an administrative process that only begins when Defendants decide to act—without any indication of when, or indeed whether, that may ever happen. Plaintiffs cannot be made to wait on an illusory administrative process. The Supreme Court has explained that exhaustion of administrative remedies is unnecessary if there is: (1) "an indefinite [administrative] timeframe," (2) "undue prejudice" to the plaintiff in the form of irreparable harm if unable to secure immediate judicial consideration," or (3) the agency hearing officer lacks institutional competence" to determine "the constitutionality of the statute." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992), *superseded by statute*, 42 U.S.C. § 1997e. That is precisely what has occurred here. Defendants, after significant and unnecessary delay, have issued the majority of awards for FY 2017,[5] and 850 of the FY 2018 awards.[6] Nevertheless, without explanation or action beyond that discussed above, Defendants continue to deny both awards for Oregon and the FY 2018 award for the City. In short, Defendants alone are responsible for leaving the status of these awards in limbo—and they cannot use their own failure to act as a basis for avoiding a justiciable controversy.

Given the real and concrete injuries, multiple courts have rejected Defendants' lack-of-standing response to materially identical claims raised by similarly situated plaintiffs, and

---

[5] On the Byrne JAG website, Defendants have posted an update stating: "As a result of a stay issued by the 7th Circuit on June 26, 2018, BJA has now processed the majority of the state, local and tribal FY17 JAG awards." Office of Justice Programs, Edward Byrne Memorial Justice Assistance Grant Program, https://www.bja.gov/Jag/ (last visited Mar. 14, 2019). *See also* Office of Justice Programs, "Awards Made for Solicitation BJA FY 17 Edward Byrne Memorial Justice Assistance Grant (JAG) Program - Local Solicitation," https://external.ojp.usdoj.gov/SelectorServer/awards/pdf/solicitation/BJA%20FY%202017%20Edward%20Byrne%20Memorial%20Justice%20Assistance%20Grant%20(JAG)%20Program%20-%20Local%20Solicitation (last visited Mar. 14, 2019).

[6] *See* Office of Justice Programs, "Awards Made for Solicitation BJA FY 18 Edward Byrne Memorial Justice Assistance Grant (JAG) Program - Local Solicitation," https://external.ojp.usdoj.gov/SelectorServer/awards/pdf/solicitation/BJA%20FY%202018%20Edward%20Byrne%20Memorial%20Justice%20Assistance%20Grant%20(JAG)%20Program%20-%20Local%20Solicitation (last visited Mar. 14, 2019).

Defendants cannot cite a single court to have accepted that argument.  *See, e.g.*, *City & Cty. of San Francisco*, 349 F. Supp. 3d at 966 ("California and San Francisco have demonstrated Article III standing to challenge the conditions and their claims are ripe for review."); *City of Chicago*, 321 F. Supp. 3d at 866 (concluding "that the Attorney General's decision to impose the Conditions constitutes final agency action that is ripe for judicial review" under the Administrative Procedures Act); *City of Philadelphia*, 309 F. Supp. at 280 (reaching similar conclusion for purposes of APA).

**B.    The Compliance Condition relies on statutes that violate the Tenth Amendment.**

The Compliance Condition is Defendants' attempt to condition receipt of Byrne JAG funds on Plaintiffs' certification of compliance with 8 U.S.C. §§ 1373 and 1644.

In relevant part, 8 U.S.C. § 1373 provides that, notwithstanding "any other provision of * * * State, or local law," a state or local government "entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(a).  It imposes similar restrictions on whether a "person or agency may prohibit, or in any way restrict," a state or local "government entity" from maintaining immigration status information or exchanging such information with the federal immigration authority specifically or with other federal, state, or local government bodies generally.  8 U.S.C. § 1373(b).

A similar provision is found in 8 U.S.C. § 1644, which provides in relevant part that notwithstanding "any other provision of * * * State, or local law, no State or local government entity may be prohibited, or in any way restricted, from" exchanging immigration status information with the federal immigration authority.

As explained below, the Tenth Amendment prohibits the federal government from dictating what a state legislature may and may not do, and Sections 1373 and 1644 do just that.

Sections 1373 and 1644 are therefore invalid, and so too is the Compliance Condition that relies upon them.

> **1.     Under the Tenth Amendment, Defendants may not dictate what a state or local government may or may not do.**

Under the Tenth Amendment, the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Broadly, that provision confirms a foundational element of our federal union, which is "dual sovereignty" under which "both the Federal Government and the States wield sovereign powers." *Murphy v. Nat'l Collegiate Athletic Ass'n*, __ U.S. __, 138 S. Ct. 1461, 1475 (2018).

One feature of that dual sovereignty is a grant of enumerated legislative powers to the federal government; "all other legislative power is reserved for the States." *Id*. at 1476. And "conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Id*. The Supreme Court has recognized that limit on federal authority under what has come to be known as the "anti-commandeering doctrine," a corollary to the Tenth Amendment's confirmation of dual sovereignty between a federal government of enumerated powers and state governments with plenary powers. *Id*.

At the heart of the anti-commandeering doctrine is a simple rule: the federal government cannot "dictate[] what a state legislature may and may not do" because otherwise, state legislatures would be "put under the direct control of Congress," as if "federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." *Id*. at 1478. Because that effect would be a "direct affront to state sovereignty," it is impermissible. *Id*.; *see also Printz v. United States*, 521 U.S. 898, 935, 117 S. Ct. 2365 (1997) ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program."); *New York v. United States*, 505 U.S. 144, 188, 112 S. Ct. 2408 (1992) ("The Federal Government may not compel

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

the States to enact or administer a federal regulatory program."); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578, 132 S. Ct. 2566 (2012) (applying anti-commandeering principle to "whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own").  The anti-commandeering doctrine applies equally whether the federal government attempts to "command[] 'affirmative' action" from state legislatures or whether it attempts to "impos[e] a prohibition" on the laws that state legislatures may enact.  *Murphy*, 138 S. Ct. at 1478.

To guide courts in applying the anti-commandeering doctrine, *Murphy* offered a non-exhaustive list of purposes that the doctrine should serve.  138 S. Ct. at 1477.  First, by "divid[ing] authority between federal and state governments," it promotes a "healthy balance of power between the States and the Federal Government [that] reduces the risk of tyranny and abuse from either front." *Id*. (internal brackets and quotation marks omitted).  Second, the anti-commandeering doctrine supports "political accountability" by ensuring that responsibility for a law is not "blurred" by circumstances in which a state "imposes regulations only because it has been commanded to do so by Congress." *Id*.  And third, the anti-commandeering rule "prevents Congress from shifting the costs of regulation to the States," because "if Congress can compel the States to enact and enforce its program," it need not "weigh the expected benefits of the program against its costs." *Id*.

## 2.    Sections 1373 and 1644 are invalid under the Tenth Amendment.

In light the anti-commandeering doctrine's clear prohibitions, as well as its purposes, Sections 1373 and 1644 are invalid.  They amount to the federal government dictating what a state or local government can or cannot do.

As to Section 1373, at least, every court to have considered the question in light of *Murphy* agrees that the statute is unconstitutional.  *States of New York*, 343 F. Supp. 3d at 234-35 ("It necessarily follows that § 1373 is unconstitutional under the anti-commandeering principles of the Tenth Amendment.  Section 1373 unequivocally dictates what a state legislature may and

may not do.  Section 1373's prohibition on states and localities from restricting their officials

from communicating with immigration authorities constitutes a direct order to states and

localities in violation of the anti-commandeering rule." (internal quotation marks, citations, and

brackets omitted)); *City & Cty. of San Francisco*, 349 F. Supp. 3d at 953 ("[W]ith Section 1373

imposed on states and local governments, federal priorities dictate state action and this inevitably

reaches the state's relationship with its own citizens and undocumented immigrant communities

in ways that no doubt will affect their perceptions of the state and trust in its law enforcement

agencies.  For the reasons discussed above, I find that Section 1373 is unconstitutional."

(internal quotation marks and citations omitted)); *City of Chicago*, 321 F. Supp. 3d at 872 ("In

sum, Section 1373 impermissibly directs the functioning of local government in contravention of

Tenth Amendment principles * * * *.  Section 1373 is thus unconstitutional on its face."); *City of

Philadelphia*, 309 F. Supp. 3d at 329 (explaining that Sections 1373(a) and (b) "unequivocally

dictate[] what a state legislature may and may not do * * * by prohibiting certain conduct of

government entities or officials" (internal quotation marks omitted)); *id*. at 331 ("Because

Section 1373 violates the Tenth Amendment of the Constitution, the City is entitled to a

declaratory judgment on Count VI of its Amended Complaint.").

    Put simply, Section 1373 expressly and unequivocally prohibits Plaintiffs from choosing

not to participate in federal immigration enforcement.[7]  It directly dictates that  the State of

Oregon and the City may not — whether for policy reasons, for resource-management reasons,

for any other reason, or for no reason — enact laws  or policy that require state and local officials

to devote their time and resources solely to state and local responsibilities.  Indeed, Defendants'

denial of Byrne JAG funds in this case demonstrates precisely that effect: in denying those funds,

---

[7] This choice to not enforce federal immigration law is distinct from actively opposing the
federal government's own enforcement efforts.  Even if the supremacy of federal law on
immigration matters would preempt any attempt by Plaintiffs to enact laws that actively thwart
immigration enforcement, simply declining to participate in enforcement does not amount to
actively thwarting it.  "Standing aside does not equate to standing in the way."  *United States v.
California*, 314 F. Supp. 3d 1077, 1105 (E.D. Cal. 2018) (granting in part and denying in part
federal government's request to preliminarily enjoin the enforcement of certain California laws).

Page 24 -  **PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
DEFENDANTS' MOTION TO DISMISS**                     9478194 v9

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

Defendants contend that Plaintiffs' laws and policies — such as ORS 181A.820 and ORS 180.805 — are prohibited by Section 1373. Thus, Defendants cannot reasonably dispute that Section 1373 has the effect of prohibiting state and local governments from enacting certain laws, bringing Section 1373 within the core of what the anti-commandeering doctrine forbids.[8]

And that conclusion is consistent with the purposes of the anti-commandeering doctrine. First, Section 1373 fails to respect the sovereignty of states and their subdivisions, whose citizens should be permitted to conclude that entanglement with and participation in federal immigration enforcement impairs state and local governments' ability to fulfill their separate and independent responsibilities to combat crime and maintain the general welfare of their population. *See generally States of New York*, 343 F. Supp. 3d at 235; *City & Cty. of San Francisco*, 349 F. Supp. 3d at 951. Second, Section 1373 purports to authorize individual state and local officials and law enforcement officers — whose presence in local communities is larger and more visible than that of the federal government — to ignore state and local priorities in favor of immigration priorities set at the federal level. Section 1373 thus undermines political accountability by increasing the likelihood that the public will blame state and local governments for federal decisions. *States of New York*, 343 F. Supp. 3d at 235. Third, Section 1373 shifts a portion of immigration enforcement costs onto states, which have fewer resources than the federal government and many of their own responsibilities to fund. *See generally States of New York*, 343 F. Supp. 3d at 235; *City & Cty. of San Francisco*, 349 F. Supp. 3d at 952.

For all those reasons, Section 1373 is unconstitutional under the anti-commandeering doctrine. And this case requires no separate analysis of Section 1644 because Defendants agree that Section 1644 is "similar" to Section 1373, Docket No. 14 at 18, and because they offer no

---

[8] Although Plaintiffs intend a facial challenge to the constitutionality of Sections 1373 and 1644, the facts of this case establish at a minimum that those laws are unconstitutional as applied to Plaintiffs through the Compliance Condition. In contrast to a facial attack, an "as-applied challenge is one that tests a statute's constitutionality in one particular fact situation while refusing to adjudicate the constitutionality of the law in other fact situations." *Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011) (internal quotation marks omitted).

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

separate analysis of Section 1644 apart from Section 1373.  Regardless, Section 1644 is subject

to an identical analysis because it is not materially distinguishable from Section 1373; to the

contrary, it is materially identical in its attempt to dictate what a state or local government entity

may not do.

Seeking to escape that conclusion, Defendants argue: (1) that the anti-commandeering

doctrine is inapplicable because this case involves a voluntary grant, (Docket No. 14 at 23-24,

26); (2) that Sections 1373 and 1644 are permissible under an information-gathering exception to

the anti-commandeering doctrine, (Docket No. 14 at 24-25, 26-27); and (3) that the anti-

commandeering doctrine is inapplicable because Section 1373 and 1644 are part of a federal

regulatory scheme that preempts state law, (Docket No. 14 at 25-26, 28).

Again, every court to have considered those arguments has rejected them, and this court

should do the same for the same reasons. *See States of New York*, 343 F. Supp. 3d at 233-37

(rejecting all of Defendants' arguments listed above); *City & Cty. of San Francisco*, 349 F. Supp.

3d at 949-50, 952-53 (rejecting all of Defendants' arguments listed above); *City of Chicago*, 321

F. Supp. 3d at 867, 870-73 (rejecting Defendants' information-gathering argument); *City of*

*Philadelphia*, 309 F. Supp. 3d at 329-30 (rejecting all of Defendants' arguments listed above).

First, the voluntariness of the Byrne JAG program cannot save Sections 1373 and 1644

from their facial unconstitutionality.  As another court has already explained, that kind of

argument "ignores that Section 1373 is an extant federal law with which" states "must comply,

completely irrespective of whether or not it accepts Byrne JAG funding."  *City & Cty. of San*

*Francisco*, 349 F. Supp. 3d at 949; *City of Chicago*, 321 F. Supp. 3d at 867 (similar). Although

Plaintiffs are particularly aggrieved by Sections 1373 and 1644 because of Defendants' attempt

to rely upon them as conditions for Byrne JAG funding, the voluntariness of that grant program

cannot defeat Plaintiffs' independent and otherwise meritorious challenge to generally applicable

federal laws.  *See, e.g.*, *City & Cty. of San Francisco*, 349 F. Supp. 3d at 949 (holding that "the

voluntariness of the grant program does not remove a challenge to a potentially applicable

Page 26 -  **PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
DEFENDANTS' MOTION TO DISMISS**             9478194 v9

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

federal law, here Section 1373, from the scope of the Tenth Amendment"); *City of Chicago*, 321 F. Supp. 3d at 867 (similar); *States of New York*, 343 F. Supp. 3d at 237 (similar).  Defendants' voluntary-federal-grant argument would be better taken if Plaintiffs were raising a Tenth Amendment challenge solely to a grant condition in which Congress had independently imposed requirements akin to those found in Sections 1373 and 1644.  But that is not what Plaintiffs are arguing here.  Rather, Plaintiffs have raised an independent challenge to those statutes, relying on the withholding of Byrne JAG funds to demonstrate an injury traceable to those invalid statutes while also raising a subsidiary challenge to the Compliance Condition's reliance on those invalid statutes.

Second, Sections 1373 and 1644 cannot be upheld as mere information-gathering provisions.  Even assuming that the anti-commandeering doctrine includes an exception for statutes requiring state authorities to provide information to the federal government — which the Supreme Court has never held and Plaintiffs do not concede[9] — Sections 1373 and 1644 present "a graver intrusion into state sovereignty than merely requiring the reporting of certain data." *States of New York*, 343 F. Supp. 3d at 236.  Beyond simply requiring the reporting of data, those statutes prohibit states "from doing anything that 'in any way restrict[s]' the flow of certain information to immigration authorities," thereby affecting "a wide range of information-governance rules," even preventing them "from disciplining an employee for choosing to spend her free time or work time assisting in the enforcement of federal immigration laws." *Id.* (quoting § 1373(a); other internal quotation marks omitted); *see also City & Cty. of San Francisco*, 349 F. Supp. 3d at 953; *City of Chicago*, 321 F. Supp. 3d at 872; *City of Philadelphia*,

---

[9] In fact, the Supreme Court has expressly left that question open for another day.  *See Printz*, 521 U.S. at 918 ("[Some statutes], which require only the provision of information to the Federal Government, do not involve the precise issue before us here, which is the forced participation of the States' executive in the actual administration of a federal program.  We of course do not address these or other currently operative enactments that are not before us; it will be time enough to do so if and when their validity is challenged in a proper case."); *see also id.* at 936 (O'Connor, J., concurring) ("[T]he Court appropriately refrains from deciding whether other purely ministerial reporting requirements imposed by Congress on state and local authorities pursuant to its Commerce Clause powers are similarly invalid.").

309 F. Supp. 3d at 330-31.  In that way, Sections 1373 and 1644 control state actions well beyond the "purely ministerial" data reporting contemplated when *Printz* held open a possible exception to the anti-commandeering doctrine.[10]  *See* 521 U.S. at 936 (O'Connor, J., concurring). By their very terms, those statutes regulate state and local governments' ability to manage what its own employees may or may not do.  Those statutes do not "require only the provision of information to the Federal Government."[11]  *See Printz*, 521 U.S. at 918.  Indeed, Defendants recognize as much, suggesting that federal immigration law, including Sections 1373 and 1644, require Plaintiffs to "terminate custody [of immigrants] in a manner that does not hinder the Federal Government's assumption of custody."  Docket No. 14 at 29.

Third, and finally, Sections 1373 and 1644 cannot be upheld as preemption provisions. Federal preemption occurs when "Congress enacts a law that imposes restrictions or confers rights on private actors" for whom state law creates conflicting restrictions or rights, in which case "the federal law takes precedence and the state law is preempted" under the Supremacy Clause.  *Murphy*, 138 S. Ct. at 1480.  Although some preemptive statutes "might appear to operate directly on the States," they do not run afoul of anti-commandeering principles because their substantive effect "confers on private entities" a "federal right to engage in certain conduct subject only to certain (federal) constraints" while being free from any parallel state-law constraints — as an example, federal regulations of the airline industry impose certain

---

[10] *Reno v. Condon*, 528 U.S. 141 (2000), similarly does not support Defendants' position.  It involved a law that applied "equally to state and private actors" who controlled certain databases. *Murphy*, 138 S. Ct. at 1479.  The law did not "apply solely to States," nor did it regulate the states as "States in their sovereign capacity."  *Reno*, 528 U.S. at 142, 146.  By contrast, Sections 1373 and 1644 directly and specifically interfere with the ability of state and local governments to direct and control their officers and employees in performing official duties. "Thus, the saving grace of *Reno* does not apply here."  *City of Chicago*, 321 F. Supp. 3d at 869; *see also City of Philadelphia*, 309 F. Supp. 3d at 330.

[11] An example well illustrates the distinction:  If federal law required Defendants to report every week all undocumented immigrants being held at in state or local custody, this duty could be discharged by a single employee.  But Section 1373 tells Defendants that they cannot manage any of its employees in one particular respect, leaving dozens or hundreds of employees free to supply all kinds of information — obtained in the course of their state or local employment — to the federal government, without state or local control over the accuracy, efficiency, or expense of that activity.

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

constraints on airlines while conferring on them the right to be free from additional state-law constraints. *Id.* at 1480-81 (discussing *Morales v. Trans World Airlines, Inc.*, 504 US 374, 112 S. Ct. 2031 (1992)).

As *Murphy* explained, a federal statute is preemptive only if can "be best read as one that regulates *private actors*." *Murphy*, 138 S. Ct. at 1479 (emphasis added). But Sections 1373 and 1644 create no rights or restrictions applicable to *private* actors; rather, they affect only government "official[s]" and "entit[ies]." For that reason, those statutes are not preemptive in nature and cannot be saved from an anti-commandeering challenge on that basis. *See States of New York*, 343 F. Supp. 3d at 236 ("Defendants have failed to show that § 1373 regulates private actors at all, let alone that it is best read as regulating private actors." (internal quotation marks, brackets, and ellipses omitted)); *City & Cty. of San Francisco*, 349 F. Supp. 3d at 950 ("Section 1373 * * * does not regulate private actors or provide private actors with any additional rights in the [Immigration and Nationality Act]'s statutory scheme."); *City of Philadelphia*, 309 F. Supp. 3d at 329 ("Given their plain language, neither Section 1373(a) nor Section 1373(b) can be best read as regulating private actors. *On their face, they regulate state and local governmental entities and officials, which is fatal to their constitutionality under the Tenth Amendment*." (emphasis added)).

Defendants cloud the issue by melding the requirements of Sections 1373 and 1644 with the broader INA statutes. Those laws allow for federal immigration authorities to begin removal proceedings and detain individuals after they have been released from state or local custody. 8 U.S.C. §§ 1231(a); 1226(c). But nothing in ORS 181A.820, ORS 180.805, or Portland's ordinances or policies prevents federal immigration authorities from carrying out those laws. And while Defendants argue that the INA gives an "allowance" to state and local governments to complete imprisonment under their laws prior to removal, nothing suggests that is the purpose of the statutes. *See* 8 U.S.C. §§ 1231(a); 1226(c). Sections 1373 and 1644 were not imposed as tradeoffs—empowering states and local jurisdictions to imprison aliens, provided they share

information with the federal government.[12]  Rather, Sections 1373 and 1644 impose affirmative requirements on state and local governments.  For that reason, Defendants are mistaken to rely on *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289-91, 101 S. Ct. 2352 (1981).  *See* Docket No. 14 at 28-29.  The federal law at issue in *Hodel* regulated the operators of coal mines, and it did not compel states to enforce those federal regulations, "to expend any state funds, or to participate in the federal regulatory program in any manner whatsoever," meaning that "the full regulatory burden will be borne by the Federal Government" within any state that declines to participate.  *Id*. at 288-89.  Here, by contrast, the challenged laws do not simply offer the states the choice to participate in federal immigration enforcement; rather, they require states to affirmatively assist in that federal regulatory responsibility.  Docket No. 14 at 29 (asserting that Sections 1373 and 1644 permissibly prevent plaintiffs from restricting their own officials from "provid[ing] the minimal cooperation needed for federal officials to exercise their duties")).

In short, Sections 1373 and 1644 are unconstitutional and invalid under the Tenth Amendment anti-commandeering doctrine.

### 3.    Because Sections 1373 and 1644 are invalid, so too is any condition requiring compliance with them.

Because Sections 1373 and 1644 are invalid, Defendants have "no authority to demand state and local governments certify compliance" with them.  *City & Cty. of San Francisco*, 349 F. Supp. 3d at 953-54.  And although Congress enacted a condition requiring applicants for Byrne JAG funds to certify compliance with "all other applicable Federal laws," 34 U.S.C. § 10153(a)(5)(D), such "applicable" laws cannot include unconstitutional ones.  *See City & Cty.*

---

[12] Defendants note that "Congress could have provided for immediate removal of aliens regardless of pending state or local criminal prosecutions or punishment."  Docket No. 14 at 22. But it did not.  Even if Congress had structured the removal proceedings in that way, the federal government still could not commandeer the resources of state and local governments to assist with such proceedings.  Two regulatory schemes have not "collided" as Defendants suggest. There may be parallel jurisdiction over certain individuals, and Congress has determined how to orderly address this jurisdiction.  *See* 8 U.S.C. §§ 1231(a); 1226(c).  *Separately*, Congress has chosen to commandeer state and local resources.  *See* 8 U.S.C. §§ 1373; 1644.

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

*of San Francisco*, 349 F. Supp. 3d at 953; *States of New York*, 343 F. Supp. 3d at 231 (explaining that Section 1373 must "not be an 'applicable' law because it is unconstitutional"); *City of Chicago*, 321 F. Supp. 3d at 875 ("Thus, it makes no difference that the Court reads 'all other applicable Federal laws' broadly; no matter the breadth of this provision, it will never capture an unconstitutional statute.").

In sum, Defendants cannot rely on the "all other applicable Federal laws" provision to support the Compliance Condition.  The Compliance Condition is therefore unauthorized and *ultra vires* because, as set forth below, Congress did not delegate to Defendants any authority to impose their own conditions on the receipt of legislatively appropriated Byrne JAG funds.  *See City & Cty. of San Francisco*, 349 F. Supp. 3d at 953 n.3 ("Because I do not find * * * independent authority for the Attorney General to impose the conditions, it follows that there would not be authority to impose a separate grant condition identical to Section 1373's terms, without an act of Congress.").  On that analysis, Plaintiffs are entitled to judgment as a matter of law on their challenge to Sections 1373 and 1644, as well as on their subsidiary challenge to the Compliance Condition.

## C.    The Access and Notice conditions violate separation-of-powers principles.

The Access and Notice Conditions are also unauthorized and invalid, but for a different reason — they violate separation-of-powers principles.  Again, the Access Condition requires recipients of Byrne JAG funds, as a condition of receiving those funds, to permit DHS personnel "to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States."  And the Notice Condition requires recipients of Byrne JAG funds, as a condition of receiving those funds, to "provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act."

As set forth below, any condition imposed on the receipt of legislatively appropriated funds must originate from Congress, directly or by delegation.  And because the statutes governing the Byrne JAG program do not delegate authority for the executive to create conditions for receiving such funds, any conditions created by the executive are invalid.

### 1.    Congress alone is vested with legislative and spending authority.

The United States Constitution specifically grants spending powers, often called the "power of the purse," to Congress alone: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  "Nothing in Article II of the Constitution provides the Executive with any independent authority to spend, or withhold, federal funds that Congress has appropriated."  *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 639 (E.D. Pa. 2017); *see also City of Chicago*, 888 F.3d at 283 ("The power of the purse does not belong to the Executive Branch.  It rests in the Legislative Branch.").  To the contrary, the executive branch is obligated to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.

The legislative power of the purse includes authority to "condition the receipt of funds, by states and others, on compliance with federal directives."  *State of Nevada v. Skinner*, 884 F.2d 445, 447 (9th Cir. 1989); *see also Fullilove v. Klutznick*, 448 U.S. 448, 474, 100 S. Ct. 2758 (1980) ("Incident to this power, Congress may attach conditions on the receipt of federal funds.").  Congress may delegate that authority to the executive branch, but that coordinate branch of government "does not otherwise have the inherent authority * * * to condition the payment of such federal funds on adherence to its political priorities."  *City of Chicago*, 888 F.3d at 283.  Explained more fully:

> Congress is in control of the Spending Power to "set the terms on which it disburses federal money to the State," *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296, 126 S. Ct. 2455, 165 L.Ed.2d 526 (2006), but if it intends to impose conditions on federal grants, "it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).  By extension, the Executive Branch "does not have

> unilateral authority to refuse to spend ... funds" already appropriated by Congress
> "for a particular project or program." *In re Aiken Cty.*, 725 F.3d 255, 261 n.1
> (D.C. Cir. 2013).  Congress still may, consistent with the separation of powers,
> delegate certain authority to spend money to the Executive Branch.  *See Clinton v.
> City of New York*, 524 U.S. 417, 488, 118 S. Ct. 2091, 141 L.Ed.2d 393 (1998)
> ("Congress has frequently delegated the President the authority to spend, or not to
> spend, particular sums of money.").  However, the Constitution evidences the
> "unmistakable expression of a determination that legislation by the national
> Congress be a step-by-step, deliberate and deliberative process." *I.N.S. v.
> Chadha*, 462 U.S. 919, 959, 103 S. Ct. 2764, 77 L.Ed.2d 317 (1983).

*City & Cty. of San Francisco*, 349 F. Supp. 3d at 944.

Thus, where the executive branch imposes conditions on the receipt of legislatively

appropriated funds, the validity of those conditions turns on whether they were imposed pursuant

to a legislative delegation of authority to condition the receipt of those funds.  *See City of

Philadelphia*, 916 F.3d at 279 ("Where, as here, the Executive Branch claims authority not

granted to it in the Constitution, it literally has no power to act unless and until Congress confers

power upon it.  Therefore, our inquiry is straightforward: did Congress empower the Attorney

General to impose the Challenged Conditions?" (internal quotation marks, ellipses, and citation

omitted)).

### 2.    Congress did not delegate authority to create the challenged conditions.

Because Defendants imposed the Notice and Access Conditions in their capacity as

executive-branch officials, the dispute over those conditions requires determining whether

Congress intended to vest executive-branch officials with discretion to impose any conditions on

the receipt of Byrne JAG funds.  But every court to have considered the question agrees that the

Byrne JAG grant is "'a formula grant rather than a discretionary grant,' which means it is not

awarded at the discretion of a state or federal agency, but pursuant to a statutory formula." *States

of New York*, 343 F. Supp. 3d at 227 (quoting *City of Chicago*, 888 F.3d at 285; other internal

quotation marks and ellipses omitted); *see also City & Cty. of San Francisco*, 349 F. Supp. 3d at

945 ("The Byrne JAG Program is a formula grant program, not a discretionary program,

meaning that Congress has already determined who the recipients are and how much money they

receive."); *City of Philadelphia*, 309 F. Supp. 3d at 343-44 (stating that "the JAG statute is a

Page 33 -  **PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
DEFENDANTS' MOTION TO DISMISS**              9478194 v9

formula (rather than discretionary) grant" phrased "in mandatory language"); *City of Philadelphia*, 916 F.3d at 290 (explaining that "Congress structured the Byrne JAG program as a 'formula grant,'" before refusing to "turn[] the formula grant into a discretionary one"). Indeed, even Defendants agree that the "Byrne JAG Program provides statutory 'formula grants.'" Docket No. 14 at 15; Schmidt Dec. at ¶¶ 13, 22, Exh. 1 at 13 ("JAG awards are based on a statutory formula described below."); Exh. 11 at 15-16 (same).

That mandatory view of Byrne JAG funding necessarily follows from the text of the Byrne JAG statutes, which provide that "the Attorney General shall * * * allocate" grant money pursuant to a statutory formula based on the state's population and violent crime statistics. 34 U.S.C. § 10156(a)(1). That conclusion is consistent with other provisions applicable to the Byrne JAG program, which contain only "limited discretionary authority for the Attorney General to carry out specific parts of the grant program," and it is also consistent with Congress's 2005 repeal of "the only directly immigration-related requirement for Byrne JAG program funding" and with Congress's repeated refusal "to exercise its power to impose immigration conditions on Byrne JAG grants" when faced with proposed legislation on the subject. *City & Cty. of San Francisco*, 349 F. Supp. 3d at 945-46; *see also generally City of Philadelphia*, 916 F.3d at 285-87 (similar).

Rather than dispute the general lack of discretion for the executive branch to condition receipt of Byrne JAG funds, Defendants point to two specific statutory provisions that, in their view, authorize the conditions at issue in this case. Docket No. 14 at 30-33. But neither of those provisions provides the necessary delegation of authority to condition receipt of Byrne JAG funds.

First, Defendants misplace their reliance on 34 U.S.C. § 10102(a)(6), which they read as delegating condition-making power to the Assistant Attorney General. Docket No. 14 at 31-33. That statute, contained in the subchapter creating the Office of Justice Programs, is titled "Duties and Functions of Assistant Attorney General," and states in relevant part:

> The Assistant Attorney General shall * * * exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants, and determining priority purposes for formula grants*.

34 U.S.C. § 10102(a)(6) (emphasis added). Defendants point to the emphasized phrase as a delegation of condition-creating power to the Assistant Attorney General.

But every court to have considered 34 U.S.C. § 10102(a)(6) has agreed that it does not amount to a delegation of authority to create and impose new conditions on the receipt of Byrne JAG funds. *States of New York*, 343 F. Supp. 3d at 227-28; *City & Cty. of San Francisco*, 349 F. Supp. 3d at 947-48; *City of Chicago*, 888 F.3d at 284-87 (analyzing the issue only as a preliminary matter, to assess likelihood of success on the merits); *City of Philadelphia*, 309 F. Supp. 3d at 320 (incorporating previous analysis from *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 616 (E.D. Pa. 2017)); *City of Philadelphia*, 916 F.3d at 288 ("Given its text and structure, 34 U.S.C. § 10102 does not authorize the Attorney General's imposition of the Challenged Conditions."). Those courts have all agreed that the only powers that § 10102(a)(6) grants to the Assistant Attorney General are those that "may be vested" in that official by statute or by the Attorney General's delegation of a power that he holds. That is, "the italicized language is not a 'stand-alone grant of authority to the Assistant Attorney General to attach any conditions to any grants;' rather, such authority must come from elsewhere in the chapter or have been delegated by the Attorney General, who may only delegate it to the extent that he has such power." *States of New York*, 343 F. Supp. 3d at 228 (quoting *City of Chicago*, 888 F.3d at 285). Put differently, the purpose of the italicized phrase is to allow the Assistant Attorney General to attach conditions to grants whenever Congress has delegated that power to the Attorney General.[13]

---

[13] Defendants' argument that they have previously relied on the "special conditions" language for other Byrne JAG conditions that have gone unchallenged is not relevant. *See* Docket No. 14 at 32-33. The Attorney General "may not bootstrap itself into an area in which it has no jurisdiction by repeatedly violating its statutory mandate." *S.E.C. v. Sloan*, 436 U.S. 103, 119 (1978) (quoting *FMC v. Seatrain Lines, Inc.*, 411 U.S. 726, 745 (1973)).

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

Moreover, leaving the plain meaning of the text aside, any contrary conclusion would be inconsistent with "the structure of § 10102 and of the Byrne JAG statute," for reasons well explained by the Seventh Circuit. *City of Chicago*, 888 F.3d at 285-87. Defendants read § 10102(a)(6) as creating the "power to impose *any* conditions on *any* grants," which is a power so "sweeping" that Congress is unlikely to have placed it in what otherwise appears to be a "catch-all provision at the end of a list of explicit powers." *City of Chicago*, 888 F.3d at 285; *see also City of Philadelphia*, 916 F.3d at 288 (similar). Moreover, Defendants' reading is inconsistent both with "the goal of the statute to support the needs of law enforcement while providing flexibility to state and local governments" and with "the nature of the Byrne JAG grant, which is a formula grant rather than a discretionary grant," and which leaves only precisely limited and "strictly circumscribed" authority for "the Attorney General to depart" from the prescribed formula. *City of Chicago*, 888 F.3d at 285-86. Where even the Attorney General cannot impose such conditions on Byrne JAG funds, an Assistant Attorney General is unlikely to have been vested with authority to "abrogate the entire distribution scheme." *Id*. at 286. Finally, statutory context shows that Congress knew how to grant such condition-creating authority, as it "explicitly did so in another statute within the same Act" that introduced the phrase on which Defendants rely. *See id*. at 286-87 (discussing 34 U.S.C. § 10446(e)(3), which provides that, when disbursing funds under a different grant, "the Attorney General may impose reasonable conditions on grant awards to ensure that the States meet statutory, regulatory, and other program requirements").[14]

Nor can Defendants find the necessary delegation in 34 U.S.C. § 10153(A)(4), which require applications for Byrne JAG funds to include an "assurance that, for each fiscal year

---

[14] Even if those arguments were unpersuasive, Defendants' reliance on § 10102(a)(6)'s discussion of "special conditions" is misplaced because that phrase is "a term of art referring to conditions for high-risk grantees with difficulty adhering to grant requirements that does not apply to the challenged conditions." *See States of New York*, 343 F. Supp. 3d at 229 n.9 (internal quotation marks omitted; citing *City of Chicago*, 888 F.3d at 285 n.2 and *City of Philadelphia*, 280 F. Supp. 3d at 617); *City & Cty. of San Francisco*, 349 F. Supp. 3d at 948 n.2 (similar, citing same cases).

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

covered by an application, the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require." Docket No. 14 at 33.  By its terms, Section 10153(A)(4) applies only to "programmatic and financial" information — that is, information about the programs on which grant funds are spent and the allocation of those funds among those programs.  That provision cannot apply to immigration information.  *See City of Philadelphia*, 916 F.3d at 285 ("The data-reporting requirement is expressly limited to 'programmatic and financial' information — i.e., information regarding the handling of federal funds and the programs to which those funds are directed.  It does not cover Department priorities unrelated to the grant program.").

Defendants' reliance on 34 U.S.C. § 10153(A)(5)(C) is similarly misplaced.  Docket No. 14 at 33.  Under that provision, applications for Byrne JAG funds must include a certification that "there has been appropriate coordination with affected agencies."  As a first matter, that provision's use of the past tense means that it requires certification "that there *was* appropriate coordination in connection with the grantee's application," but it "does not serve as a basis to impose an *ongoing* requirement to coordinate on matters unrelated to the use of grant funds." *City of Philadelphia*, 916 F.3d at 285 (emphases in original).  Moreover, that provision's requirement of "appropriate" coordination with "affected" agencies must be read narrowly, as applicable only to coordination related to Byrne JAG purposes (as opposed to full coordination with all agencies on all subjects).  *Cf. City of Philadelphia*, 916 F.3d at 289 (explaining that "applicable laws" in 34 U.S.C. § 10153(a)(5)(D) must be read narrowly to give effect to the word "applicable," especially when the other conditions in Section 10153(a)(5) "all relate to the programs that will be funded under the grant").  Defendants' proposed broader reading — which would allow Defendants to impose *any* coordination conditions with *any* agencies as to *any* funds — would create sweeping discretionary authority that, as other courts have repeatedly explained, is inconsistent with the structure of the Byrne JAG program.  *See City of Philadelphia*, 916 F.3d at 286 ("If Congress had already given the Attorney General this

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

sweeping authority to withhold all funds for any reason, it would have no need to delineate

numerous, specific circumstances under which the Attorney General may withhold limited

amounts of funds.  Even if the statute were ambiguous — which it is not — we generally would

not interpret such a provision to render superfluous more specific delegations of power.”); *City

of Chicago*, 888 F.3d at 286-86 (similar).

  In short, Defendants can point to no statutory provision by which Congress delegated to

executive-branch officials the authority to impose conditions like the Access and Notice

conditions.  Indeed, as the Third Circuit recently explained, Defendants’ view of the Byrne JAG

program cannot be squared with a statute found in “the ‘Administrative Provisions’ Section of

the same chapter of the code as” the statutes governing Byrne JAG funds.  *See City of

Philadelphia*, 916 F.3d at 290-91.  That statute provides:

> Nothing in this chapter or any other Act shall be construed to authorize
> any department, agency, officer, or employee of the United States to exercise any
> direction, supervision, or control over any police force or any other criminal
> justice agency of any State or any political subdivision thereof.

34 U.S.C. § 10228.  For all those reasons, the Access and Notice Conditions are invalid under

separation-of-powers principles, and Plaintiffs are entitled to judgment as a matter of law on

their challenge to those conditions.

**D.** **The Access and Notice Conditions also fail under the Spending Clause.**

  In the alternative, even assuming that Congress did delegate to Defendants its spending-

power authority to attach conditions to the receipt of funds, that authority is not unlimited.  *See

City & Cty. of San Francisco*, 349 F. Supp. 3d at 955 (explaining that the spending power “is not

absolute”).  Rather, when Congress attaches conditions to the receipt of money under its

spending power, those conditions must:  (i) be in pursuit of the general welfare; (ii) be

unambiguous; (iii) be reasonably related to Congress’s articulated goal; and (iv) not induce the

State to commit an unconstitutional action.  *Id.* (citing *State of Nevada v. Skinner*, 884 F.2d 445,

447 (9th Cir. 1989)).  Because Congress cannot delegate any more authority than it could

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

lawfully exercise itself, any conditions imposed by the executive-branch officials — even pursuant to a delegation of authority to do so — would be invalid if they do not satisfy those four criteria.

Here, the Access and Notice Conditions fail on the second and third criteria — that is, those conditions are neither unambiguous nor reasonably related to Congress's articulated goal in appropriating the relevant funds. Of the two courts to have addressed this argument, both have agreed that the Access and Notice Conditions are an unlawful exercise of the spending power because they fail on at least one of those requirements. *City & Cty. of San Francisco*, 349 F. Supp. 3d at 955-61 ("Even if Congress delegated the Spending Power to the Attorney General, the challenged conditions are ambiguous and insufficiently related to the grant or the local criminal justice program purposes of the federal spending."); *City of Philadelphia*, 309 F. Supp. 3d at 325 (incorporating previous analysis from *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 639-47 (E.D. Pa. 2017)).

But ultimately, this Court need not address this alternative argument if it agrees — like every court to have considered the issue — that the Access and Notice Conditions are invalid under separation-of-powers principles. *See States of New York*, 343 F. Supp. 3d at 238 n.23 ("Because the Court concludes that the separation of powers prevents Defendants from imposing the three conditions at all, the Court need not consider Plaintiffs' argument that the conditions are impermissibly unrelated or ambiguous under the Spending Clause."). For that reason, Plaintiffs simply refer this court to the analysis in *City & Cty. of San Francisco*, 349 F. Supp. 3d at 955-61.

**E.    Plaintiffs are entitled to declaratory, mandamus, and injunctive Relief.**

Because the challenged statutes and conditions are all invalid, Plaintiffs are entitled to declaratory relief. *See generally* 28 U.S.C. 2201(a). Further, as explained below, Plaintiffs are entitled to the mandamus and injunctive relief requested in their First Amended Complaint.

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

1.    **Plaintiffs are entitled to mandamus relief.**

The Mandamus Act grants this court jurisdiction "to compel an officer or employee of the

United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

Mandamus "is available to compel a federal official to perform a duty only if: (1) the

individual's claim is clear and certain; (2) the official's duty is nondiscretionary, ministerial, and

so plainly prescribed as to be free from doubt, and (3) no other adequate remedy is available."

*Kildare v. Saenz*, 325 F.3d 1078, 1084 (9th Cir. 2003).

In light of the mandatory, non-discretionary nature of the Byrne JAG program's formula

grant, as discussed above, the first two requirements are met here.[15] *See generally States of New*

*York*, 343 F. Supp. 3d at 242; *see also* Schmidt Dec. at ¶¶ 13, 22, Exhs. 1 at 13, 11 at 15-16

(Defendants Byrne JAG Solicitations detail the statutory formula for the JAG awards).

Defendants contend that their chosen path of inaction rather than denial shields them from

mandamus relief. Docket No. 14 at 35. But that is precisely why mandamus relief is necessary

— no other remedy is adequate. "[A]n agency's 'unreasonable delay' may be 'so egregious as to

warrant mandamus." *States of New York*, 343 F. Supp. 3d at 242 (quoting *Telecomms. Research*

*& Action Ctr. (TRAC) v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984)). Cases of "unreasonable

delay" in the Ninth Circuit are evaluated using the six *TRAC* factors:

> (1) the time agencies take to make decisions must be governed by a rule of
> reason; (2) where Congress has provided a timetable or other indication of the
> speed with which it expects the agency to proceed in the enabling statute, that
> statutory scheme may supply content for this rule of reason; (3) delays that might

---

[15] Defendants emphasize that the governing statute provides that the "Attorney General *may*, in
accordance with the formula * * * make grants to the States and units of local government,"
suggesting that the grant is discretionary. Docket No. 14 at 29 (quoting 34 U.S.C. § 10152(a)(1).
That is not the case, however, and other courts have rejected that same argument. *See City of
Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) ("In the formula grant program
the authorizing Act of Congress determines who the recipients are and how much money each
shall receive."). "[I]n the context of the structure of the statute and the nondiscretionary nature
of the Byrne JAG formula grant, the single word 'may' does not support the proposition that the
Attorney General may withhold grants entirely. Rather, this provision means that the Attorney
General may issue grants only for the statutorily prescribed purposes." *States of New York*, 343
F. Supp. 3d at 242.

Page 40 -  **PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
DEFENDANTS' MOTION TO DISMISS**                    9478194 v9

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*In re A Community Voice*, 878 F.3d 779, 786 (9th Cir. 2017) (quoting *TRAC*, 750 F.2d at 80).

Other courts that have considered those factors in the context of Defendants withholding of Byrne JAG awards have concluded that "[e]ach factor supports mandamus relief for the Byrne JAG grant." *States of New York*, 343 F. Supp. 3d at 243 ("Accordingly, the Court will grant the States mandamus relief compelling Defendants to reissue their award letters without the three unlawful conditions and to disburse their FY 2017 awards without regard to those conditions."); *City & Cty. of San Francisco*, 349 F. Supp. 3d at 974 (allowing mandamus relief). In challenging the availability of mandamus relief, Defendants largely reprise their arguments on the merits of the case, asserting that disbursing funds under the Byrne JAG program requires more than the ministerial discharge of a mandatory duty. Docket No. 14 at 34-35. But because those arguments fail to defeat the merits of Plaintiffs' claims, they must also fail when offered to defeat the availability of mandamus relief.

### 2. Plaintiffs are entitled to permanent injunctive relief, with nationwide scope.

A permanent injunction is appropriate when: (i) a plaintiff has "suffered an irreparable injury;" (ii) available remedies at law are "inadequate;" (iii) the "balance of hardships" between the parties supports an equitable remedy; and (iv) public interest is "not disserved." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S. Ct. 1837 (2006).

Plaintiffs have established the first two factors because their constitutional injuries — the enforcement against them of unconstitutional statutes and grant conditions — are irreparable and cannot be adequately compensated by monetary damages. *See Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) ("We have stated that an alleged constitutional infringement will often alone constitute irreparable harm." (internal quotation marks omitted)). In the absence

of injunctive relief, Plaintiffs will be faced with choosing between either of two forms of irreparable harm — Plaintiffs will be required either to comply with Defendants' conditions and thereby erode the trust Plaintiffs need to maintain the safety of a state population that includes immigrant communities, or to decline much-needed grant funds and suffer the erosion of public safety caused by significant funding shortfalls for critical law enforcement initiatives funded by Byrne JAG.

Plaintiffs have also established the third factor because the deprivation of millions of dollars in Byrne JAG funds is a significant burden. By contrast, Defendants suffer no burden to their legal rights if they are prohibited from enforcing the unconstitutional conditions.

Finally, Plaintiffs have established the fourth factor — that an injunction is in the public interest — for two reasons. First, an injunction will serve as a necessary check on federal executive-branch officials who seek to encroach on powers constitutionally reserved to the states and to the legislature. Second, the public interest is better served when state and local programs receive money that they rely upon for public safety and that Congress has appropriated to them for that purpose.

In short, Plaintiffs are entitled to their requested injunctive relief. *See States of New York*, 343 F. Supp. 3d at 244 ("Accordingly, Plaintiffs are entitled to a permanent injunction against the three challenged conditions."); *City & Cty. of San Francisco*, 349 F. Supp. 3d at 973 ("Accordingly, I grant the injunction in favor of California and San Francisco * * *."); *City of Philadelphia*, 916 F.3d at 291 ("We do not doubt, as the District Court rightly decided, that equitable relief was warranted in this case.").

Moreover, this court should order any injunctive relief in this case to be nationwide in scope. As explained above, every court to have considered these issues has decided them against the federal government. Multiple district courts across the country, as well as two federal courts of appeals, have concluded that the challenged conditions are invalid or are likely invalid. In that circumstance, the benefits of a nationwide injunction outweigh its potential costs. Critics of

nationwide injunctions argue that such injunctions encourage forum shopping, and that they hamper the development of the law by eliminating the opportunity for multiple courts to express their views such that ultimate review by the Supreme Court can benefit from the sharpening effect of judicial disagreement.  *See generally*, Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417,457-62 (2017); *accord California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018).  But whatever the merits of those concerns may be as a general matter, they are no longer so compelling when multiple courts have expressed unanimity that the federal government has acted unlawfully and that all arguments to the contrary are meritless.  In that situation, the federal government should not be permitted to rely on those meritless and unlawful grounds to deprive states and localities of much-needed funds unless and until those states and localities go to the trouble and expense of filing suit for those funds.  And although the Ninth Circuit reversed a nationwide *preliminary* injunction as overbroad in *Azar*, that result turned on the limited record developed on such a preliminary ruling.  *See* 911 F.3d at 584.  Here, by contrast, Plaintiffs are asking for a *permanent* injunction, after fully litigating the merits of the issue.  Moreover, a nationwide injunction is necessary to affording complete relief to Plaintiffs, who seek to compete for Byrne JAG funding on a level playing field with all other applicants. *See City of Los Angeles v. Whitaker*, No. 2:18-cv-07347-R-JC (C.D. Cal. Feb. 15, 2019) (explaining that the court "cannot reasonably provide complete relief to Los Angeles without enjoining Defendants from imposing the Conditions as to all competitors" for Byrne JAG funding).

## VII. CONCLUSION

For the foregoing reasons, this court should deny Defendants' motion to dismiss and grant summary judgment on all of Plaintiffs' claims.

DATED April  8 , 2019.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General

**PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' MOTION TO DISMISS**                          9478194 v9

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

_____*s/ Marc Abrams*_____
MARC ABRAMS #890149
Assistant Attorney-in-Charge
TIMOTHY SMITH  #914374
Senior Assistant Attorney General
PEENESH SHAH  #112131
Assistant Attorney General
JUSTIN KIDD  #094070
Assistant Attorney General
Trial Attorneys
Tel (503) 947-4700
Fax (503) 947-4791
Marc.Abrams@doj.state.or.us
Tim.Smith@doj.state.or.us
Peenesh.H.Shah@doj.state.or.us
Justin.Kidd@doj.state.or.us
    Of Attorneys for Plaintiffs State of Oregon,
    Kate Brown and Ellen Rosenblum


TRACY P. REEVE  #891123
Portland City Attorney

_____*s/ Tracy P. Reeve*_____
DENIS M. VANNIER  #044406
Senior Deputy City Attorney
NAOMI SHEFFIELD  #170601
Deputy City Attorney
Tel: (503) 823-4047
Fax: (503) 823-3089
Denis.Vannier@portlandoregon.gov
Naomi.Sheffield@portlandoregon.gov
    Of Attorneys for Plaintiff City of Portland

Page 44 -  **PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
DEFENDANTS' MOTION TO DISMISS**                9478194 v9