ELLEN F. ROSENBLUM
Attorney General
MARC ABRAMS  #890149
Assistant Attorney-in-Charge
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
Telephone: (503) 947-4700
Fax: (503) 947-4791
Email:  marc.abrams@doj.state.or.us
        Additional attorneys listed on signature page

Attorneys for Plaintiffs State of Oregon, Kate Brown, and Ellen Rosenblum

TRACY P. REEVE  #891123
City Attorney
DENIS M. VANNIER  #044406
Senior Deputy City Attorney
Portland Office of the City Attorney
1221 SW Fourth Avenue, Suite 430
Portland, OR 97204
Telephone: (503) 823-4047
Fax: (503) 823-3089
Email:  Denis.Vannier@portlandoregon.gov

Attorneys for Plaintiff City of Portland

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| THE STATE OF OREGON, KATE BROWN, Governor; ELLEN ROSENBLUM, Attorney General; and THE CITY OF PORTLAND, | Case No.  6:18-cv-01959-MC |
| Plaintiffs, | DECLARATION OF MICHAEL SCHMIDT |
| v. | |
| DONALD J. TRUMP, President of the United State, in his official capacity; MATTHEW G. WHITAKER, Acting Attorney General of the United States, in his official capacity; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

Page 1 -   DECLARATION OF MICHAEL SCHMIDT
MA/crr/9517717-v1

I, Michael Schmidt, declare:

1.      I am employed as the Executive Director of the Oregon Criminal Justice Commission ("CJC"). I joined CJC in August 2013, and I have served as the Executive Director since January of 2015.

2.      I make this declaration under penalty of perjury and in support of the First Amended Complaint for Declaratory, Injunctive, and Mandamus Relief and Plaintiffs' Combined Motion for Summary Judgment and Response to Defendants' Motion to Dismiss. I further make this declaration from a combination of personal knowledge and reliance upon CJC records which are regularly maintained in the ordinary course of business. I am competent to testify to the facts herein.

3.      In my role as Executive Director of CJC, I am responsible for overseeing all aspects of the agency program areas as well as working closely with the Governor and Legislature on matters of public safety policy. Before assuming my current role, I served as Justice Reinvestment Liaison for the CJC, and as a Deputy District Attorney in the Multnomah County District Attorney's Office.

4.      The purpose of the CJC is to improve the legitimacy, efficiency, and effectiveness of state and local criminal justice systems. The agency is tasked with developing and maintaining a state criminal justice policy and a comprehensive, long-range plan for a coordinated state criminal justice system that encompasses: public safety; offender accountability; crime reduction and prevention; and offender treatment and rehabilitation. ORS 137.656. As the State Administering Agency for the U.S. Department of Justice's ("USDOJ") Bureau of Justice Assistance, CJC also provides oversight of the Edward Byrne Memorial Justice Assistance Grant ("JAG") Program funding. At the federal level, the JAG program is administered by the USDOJ's Office of Justice Programs.

5.      The CJC administers both state grant programs and federal grant programs. The JAG program is one of the federal grant programs that CJC manages for the State of Oregon. In

Page 2 -    DECLARATION OF MICHAEL SCHMIDT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

essence, the CJC is the state entity that receives the JAG formula awards that are allocated to the State of Oregon.

6.      Oregon has applied for JAG state funding through CJC since 2005. Through FY 2016, all of the State of Oregon's JAG applications have been awarded. Through FY 2016, the State of Oregon has never been denied any JAG funds for which it applied.

7.      In FY 2016, CJC applied for and received $2 million in state JAG funds, and since 2005 CJC has received a total of $26.1 million total in JAG funds.

8.      Based on the formula prescribed by the JAG statute, the State of Oregon expected to receive $2,034,945 in fiscal year ("FY") 2017. Based on the formula prescribed by statute, the State of Oregon expected to receive approximately $2,092,074 in JAG funding in FY 2018.

9.      The CJC uses JAG funds to issue subawards throughout Oregon. In making these subawards, the CJC consults with the Governor's office to identify priorities for the JAG funds. These funding priorities are then confirmed by the CJC Commission in consultation with various stakeholders throughout the State. CJC focuses primarily on grants for (a) Drug Treatment and Enforcement Programs, (b) Mental Health Programs, and (c) Planning, Evaluation, and Technology Improvement Programs.

10.      CJC's selection of sub recipients follows a competitive process for eligible jurisdictions. The State of Oregon operates on a two-year budget cycle, resulting in a two-year subaward grant cycle. For each grant cycle, the CJC develops a Request for Grant Proposals (RFGP), supervises the application process, and administers the awards as designed. Previous RFGPs have been open to all 36 counties in Oregon. CJC reviews the responsive proposals and awards funds to those programs that meet the requirements of the proposal.

11.      The current FY 2016 JAG award to CJC funds subawards to local jurisdictions for Local Public Safety Coordinating Council development, specialty courts support, and statewide assistance to local crime victims. The FY 2016 award also funds the development of the Oregon Victim's Services Portal Project which acts to provide a mechanism to meet a crime victim's

Page 3 -    DECLARATION OF MICHAEL SCHMIDT
MA/crr/9517717-v1

preferences and needs as the offender moves through the criminal justice system. More specifically, CJC uses the FY 2016 JAG award to support operational grant requests from Oregon specialty courts to fund innovative evidence-based practices that support best-practice standards. The Specialty Court Grant Program calls for evidence-based problem-solving court strategies designed to address the root causes of criminal activity and substance use disorders by coordinating efforts of the judiciary, prosecution, defense, probation, law enforcement, treatment, mental health, and social services.

12.     If CJC receives FY 2017 JAG funding, CJC plans on releasing an RFGP to fund similar specialty court programs for the next two-year funding cycle of 2019-21. More specifically, if CJC receives FY 2017 JAG funding, CJC plans to use the grants to support specialty courts designed to address root causes of criminal activity and to provide statewide assistance to local crime victims. The CJC intends to release the RFGP in May 2019 with subawards granted in July 2019.

### The FY 2017 Byrne JAG Application

13.     On July 25, 2017, USDOJ announced the FY 2017 JAG State Solicitation. Attached as Exhibit 1 and incorporated herein by reference is a true and correct copy of the USDOJ's FY 2017 State Solicitation for JAG. The same day, the USDOJ issued two press releases. Attached as Exhibits 2 and 3 are true and correct copies of the press releases issued by the USDOJ on July 25, 2017. In the first press release, Attorney General Sessions announced that "[f]rom now on, the [USDOJ] will only provide Byrne JAG grants to cities and states that comply with federal law, allow federal immigration access to detention facilities, and provide 48 hours notice before they release an illegal alien wanted by federal authorities." Ex. 2.

14.     In the second press release, entitled Backgrounder on Grant Requirements, the USDOJ announced that recipients of FY 2017 JAG awards would be required to do the following: 1) certify compliance with 8 U.S.C. § 1373, 2) permit personnel from the U.S. Department of Homeland Securities ("DHS") to access any detention facility in order to meet

Page 4 -   DECLARATION OF MICHAEL SCHMIDT

with an alien and inquire as to his or her right to be or remain in the United States; and 3) provide at least 48 hours advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien. Ex. 3.

15. The CJC submitted its FY 2017 Application on August 23, 2017. Attached as Exhibit 4 and incorporated herein by reference is a true and correct copy of the State of Oregon's FY 2017 JAG application.

16. On November 15, 2017, CJC hosted an on-site monitoring visit from a USDOJ staff member. The USDOJ staff member sought information regarding the status of CJC's programs. The USDOJ staff member confirmed the details of the November 15, 2017 site visit in a January 10, 2018 letter, a true and correct copy of which has been attached as Exhibit 5 and is incorporated herein by reference. The USDOJ staff member confirmed that "[n]o programmatic or administrative issues requiring formal resolution were identified during the site visit." The USDOJ staff member also confirmed that CJC's JAG programs "appear to be progressing according to the plans presented in the approved applications, and are in compliance with Federal, OJP, and [Bureau of Justice Assistance] guidelines for this grant."

17. On November 15, 2017, CJC also received a letter from the USDOJ. Attached as Exhibit 6 and incorporated herein by reference is a true and correct copy of the USDOJ's November 15, 2017 letter. The USDOJ asked the CJC to address "whether Oregon has laws, policies, or practices that violate [8 U.S.C. § 1373]." On December 7, 2017, CJC answered USDOJ's questions and assured the USDOJ that the "State of Oregon does not restrict state entities or officials from providing information regarding citizenship or immigration status to the Department of Homeland Security." Attached as Exhibit 7 and incorporated herein by reference is a true and correct copy of my December 7, 2017 letter to the USDOJ.

18. On January 24, 2018, the CJC received a second letter from the USDOJ. Attached as Exhibit 8 and incorporated herein by reference is a true and correct copy of the USDOJ's

Page 5 -    DECLARATION OF MICHAEL SCHMIDT
MA/crr/9517717-v1

January 24, 2018 letter. The USDOJ advised that after reviewing CJC's December 7, 2017 letter, "the [USDOJ] remains concerned that your jurisdiction's laws, policies, or practices may violate section 1373, or at a minimum, that they may be interpreted or applied in a manner inconsistent with section 1373." The USDOJ then requested documents from CJC related to its concerns.

19.     On February 23, 2018, CJC again responded to the USDOJ and produced responsive documents. CJC assured the USDOJ that "Oregon law enforcement agencies are not violating 8 USC § 1373."Attached as Exhibit 9 and incorporated herein by reference is a true and correct copy of my February 23, 2018 letter to the USDOJ.

20.     On April 17, 2018, CJC received an email from the USDOJ providing an update regarding the State of Oregon's FY 2017 JAG application. Attached as Exhibit 10 is a true and correct copy of the USDOJ's April 17, 2018 email. In part, the USDOJ explained that it had "not awarded its FY 2017 Byrne JAG grants due to the issuance of a nationwide injunction by a U.S. District Court on September 15, 2017," but that in the meantime "state and local applicants for Byrne JAG grants under the FY 2017 program may obligate and expend their own funds on allowable JAG projects after the start date of October 1, 2016.  Once the grants are awarded, FY 2017 Byrne JAG funds received, if any, may be used for reimbursement of those expenditures."

21.     To date, CJC has not received a grant of funds in response to its FY 2017 JAG application despite its timely application and timely responses to all inquiries.

### The FY 2018 Byrne JAG Application

22.     On July 20, 2018, USDOJ announced the FY 2018 JAG State Solicitation. Attached as Exhibit 11 and incorporated herein by reference is a true and correct copy of the USDOJ's FY 2018 JAG State Solicitation. The CJC submitted its FY 2018 Application on August 22, 2018. Attached as Exhibit 12 and incorporated herein by reference is a true and correct copy of the State of Oregon's FY 2018 JAG application. The State of Oregon plans to use FY 2018 Byrne JAG funds to support specialty court programs that target non-violent felony

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

offenders in an integrated, systemic approach to reduce drug use and recidivism while increasing public safety.

23.    To date, the USDOJ has not responded to the State of Oregon's FY 2018 JAG application, and to date, CJC has not received a grant of funds for FY 2018.

### The impact of loss of JAG funds to CJC

24.    As explained above, the State of Oregon expected to receive $2,034,945 in Byrne JAG funds for FY 2017, and the State of Oregon expected to receive $2,092,704 for FY 2018. According to the FY 2017 JAG State Solicitation, Ex. 1, the "expected allocations by State for the FY 2017 JAG program can be found at https://www.bja.gov/Funding/17JAGStateAllocations.pdf." Ex. 1 at 1, 13. Attached as Exhibit 13 is a true and correct copy of the Fiscal Year (FY) 2017 Edward Byrne Memorial Justice Assistance Grant (JAG) Allocations reflecting an allocation to the State of Oregon in the amount of $2,034,945.  According to the FY 2018 JAG State Solicitation, Ex. 11, the "expected allocations by State for the FY 2018 JAG Program can be found at https://www.bja.gov/Funding/18JAGStateAllocations.pdf." Ex. 11 at 1, 15. Attached as Exhibit 14 is a true and correct copy of the Fiscal Year (FY) 2018 Edward Byrne Memorial Justice Assistance Grant (JAG) Allocations reflecting an allocation to the State of Oregon in the amount of $2,092,704.

25.    The CJC and local jurisdictions that rely on the CJC for JAG subawards will be critically impacted if CJC is not awarded, or cannot accept, a JAG award for FY 2017 and FY 2018. Twenty-five percent of Oregon's Specialty Court Grant Program is funded by JAG funds. Of the 41 specialty courts funded, fifteen are funded in whole or in part with JAG funds. If Oregon does not receive its FY 2017 and FY 2018 funds, the CJC will have to reduce the number of programs funded decreasing Oregon's capacity to support specialty courts. Insufficient funding for specialty courts may result in primary resource gaps including

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700 / Fax: (503) 947 -4791

insufficiencies in recovery housing, substance use disorder treatment, mental health treatment, and employment training or opportunities.

**I declare under penalty of perjury that the foregoing is true and correct.**

EXECUTED on March  14 , 2019.

*s/ Michael Schmidt*

MICHAEL SCHMIDT
Executive Director
Oregon Criminal Justice Commission

Page 8 -    DECLARATION OF MICHAEL SCHMIDT
MA/crr/9517717-v1

OMB No. 1121-0329
**Approval Expires 12/31/2018**

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Assistance*



---

The U.S. Department of Justice (DOJ), Office of Justice Programs (OJP), Bureau of Justice Assistance (BJA) is seeking applications for the Edward Byrne Memorial Justice Assistance Grant (JAG) Program. This program furthers the Department's mission by assisting State, local, and tribal efforts to prevent or reduce crime and violence.

# Edward Byrne Memorial Justice Assistance Grant Program

## FY 2017 State Solicitation

## Applications Due: August 25, 2017

### Eligibility

Only States may apply under this solicitation. By law, for purposes of the JAG program, the term "States" includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa. (Throughout this solicitation, each reference to a State or States includes all of these 56 jurisdictions.)

A JAG application is not complete, and a State may not receive award funds, unless the chief executive of the applicant State (e.g., the governor) properly executes, and the State submits, the "Certifications and Assurances by Chief Executive of Applicant Government" attached to this solicitation as Appendix I.

In addition, as discussed further below, in order validly to accept an FY 2017 JAG award, the chief legal officer of the applicant State must properly execute, and the State must submit, the specific certification regarding compliance with 8 U.S.C. § 1373 attached to this solicitation as Appendix II. (The text of 8 U.S.C. § 1373 appears in Appendix III.)

The expected allocations by State for the FY 2017 JAG program can be found at: https://www.bja.gov/Funding/17JAGStateAllocations.pdf.

### Deadline

Applicants must register in the OJP Grants Management System (GMS) prior to submitting an application under this solicitation. All applicants must register, even those that previously registered in GMS. Select the "Apply Online" button associated with the solicitation title. All registrations and applications are due by 5 p.m. eastern time on August 25, 2017.

Exhibit 1
Page 1 of 44

This deadline does **not** apply to the certification regarding compliance with 8 U.S.C. § 1373. As explained <u>below</u>, a State may not validly accept an award, however, unless that certification is submitted to OJP on or before the day the State submits the signed award acceptance documents.

For additional information, see <u>How to Apply</u> in <u>Section D. Application and Submission Information</u>.

## Contact Information

For technical assistance with submitting an application, contact the Grants Management System Support Hotline at 888-549-9901, option 3, or via email at <u>GMS.HelpDesk@usdoj.gov</u>. The <u>GMS</u> Support Hotline operates 24 hours a day, 7 days a week, including on federal holidays.

An applicant that experiences unforeseen GMS technical issues beyond its control that prevent it from submitting its application by the deadline must email the National Criminal Justice Reference Service (NCJRS) Response Center at <u>grants@ncjrs.gov</u> **within 24 hours after the application deadline** in order to request approval to submit its application. Additional information on reporting technical issues appears under "Experiencing Unforeseen GMS Technical Issues" in the <u>How to Apply</u> in <u>Section D. Application and Submission Information</u>.

For assistance with any other requirement of this solicitation, applicants may contact the NCJRS Response Center by telephone at 1-800-851-3420; via TTY at 301-240-6310 (hearing impaired only); by email at <u>grants@ncjrs.gov</u>; by fax to 301-240-5830, or by web chat at <u>https://webcontact.ncjrs.gov/ncjchat/chat.jsp</u>. The NCJRS Response Center hours of operation are 10:00 a.m. to 6:00 p.m. eastern time, Monday through Friday, and 10:00 a.m. to 8:00 p.m. eastern time on the solicitation close date. Applicants also may contact the appropriate BJA <u>State Policy Advisor</u>.

Grants.gov number assigned to this solicitation: BJA-2017-11360

Release date: July 25, 2017

2

Exhibit 1
Page 2 of 44

# Contents

A. Program Description ................................................................................ 5

    Overview ...............................................................................................5

    Program-Specific Information ...............................................................5

        Permissible uses of JAG Funds – In general ..................................5

        Limitations on the use of JAG funds ...............................................6

        State obligations regarding use of JAG funds and units of local government ..........8

        Required compliance with applicable federal laws ..........................9

        Potential funding reductions for noncompliance with PREA and SORNA .................9

        BJA Areas of Emphasis ................................................................10

    Goals, Objectives, and Deliverables ...................................................11

    Evidence-Based Programs or Practices ..............................................12

B. Federal Award Information ......................................................................12

    Type of Award ....................................................................................13

    Financial Management and System of Internal Controls .....................14

    Budget and Financial Information ........................................................14

    Cost Sharing or Match Requirement ...................................................15

    Pre-Agreement Costs (also known as Pre-award Costs) .....................15

    Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs ......15

    Costs Associated with Language Assistance (if applicable) .................15

C. Eligibility Information .............................................................................16

D. Application and Submission Information .................................................16

    What an Application Should Include .....................................................16

    How to Apply .....................................................................................28

E. Application Review Information ...............................................................30

    Review Process ..................................................................................30

F. Federal Award Administration Information ...............................................31

    Federal Award Notices .......................................................................31

    Statutory and Regulatory Requirements; Award Conditions ...............31

    General Information about Post-Federal Award Reporting Requirements ...............32

G. Federal Awarding Agency Contact(s) .....................................................33

H. Other Information ..................................................................................33

    Freedom of Information Act and Privacy Act (5 U.S.C. § 552 and 5 U.S.C. § 552a)..33

    Provide Feedback to OJP ...................................................................34

Application Checklist ..................................................................................35

3

Exhibit 1
Page 3 of 44

Appendix I.................................................................................. 37
Appendix II................................................................................. 39
Appendix III............................................................................... 41
Appendix IV .............................................................................. 43

# Edward Byrne Memorial
# Justice Assistance Grant Program

## FY 2017 State Solicitation
## CFDA #16.738

## A. Program Description

### Overview

The Edward Byrne Memorial Justice Assistance Grant (JAG) Program is the primary provider of federal criminal justice funding to States and units of local government.  BJA will award JAG program funds to eligible States under this FY 2017 JAG Program State Solicitation.  (A separate solicitation will be issued for applications to BJA directly from units of local government.)

**Statutory Authority:**  The JAG program statute is Subpart I of Part E of Title I of the Omnibus Crime Control and Safe Streets Act of 1968.  Title I of the "Omnibus Act" generally is codified at Chapter 26 of Title 42 of the United States Code; the JAG program statute is codified at 42 U.S.C. §§ 3750-3758.  See also 28 U.S.C. § 530C(a).

### Program-Specific Information

### Permissible uses of JAG Funds -- In general

In general, JAG funds awarded to a State under this FY 2017 solicitation may be used to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of the following—

- Law enforcement programs.
- Prosecution and court programs.
- Prevention and education programs.
- Corrections and community corrections programs.
- Drug treatment and enforcement programs.
- Planning, evaluation, and technology improvement programs.
- Crime victim and witness programs (other than compensation).
- Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams.

Under the JAG program, States may use award funds for broadband deployment and adoption activities as they relate to criminal justice activities.

Exhibit 1
Page 5 of 44

**Limitations on the use of JAG funds**

*Prohibited and controlled uses of funds.* JAG funds may not be used (whether directly or indirectly) for any purpose prohibited by federal statute or regulation, including those purposes specifically prohibited by the JAG program statute as set out at 42 U.S.C. § 3751(d):

> (1) Any security enhancements or any equipment to any nongovernmental entity that is not engaged in criminal justice or public safety.
>
> (2) Unless the Attorney General certifies that extraordinary and exigent circumstances exist that make the use of such funds to provide such matters essential to the maintenance of public safety and good order—
>
> > (A) vehicles (excluding police cruisers), vessels (excluding police boats), or aircraft (excluding police helicopters);
> > (B) luxury items;
> > (C) real estate;
> > (D) construction projects (other than penal or correctional institutions); or
> > (E) any similar matters.

For additional information on expenditures prohibited under JAG, as well as expenditures that are permitted but "controlled," along with the process for requesting approval regarding controlled items, refer to the JAG Prohibited and Controlled Expenditures Guidance. Information also appears in the JAG FAQs.

*Cap on use of JAG award funds for administrative costs* – A State may use up to 10 percent of a JAG award, including up to 10 percent of any earned interest, for costs associated with administering the award.

*Prohibition of supplanting; no use of JAG funds as "match"* – JAG funds may not be used to supplant State or local funds, but must be used to increase the amounts of such funds that would, in the absence of Federal funds, be made available for law enforcement activities. See the JAG FAQs on BJA's JAG web page for examples of supplanting.

Although supplanting is prohibited, as discussed under "What An Application Should Include," the leveraging of federal funding is encouraged.

Absent specific federal statutory authority to do so, JAG award funds may not be used as "match" for the purposes of other federal awards.

*Other restrictions on use of funds.* If a State chooses to use its FY 2017 JAG funds for particular, defined types of expenditures, it must satisfy certain preconditions.

- Body-Worn Cameras (BWC)

  A State that proposes to use FY 2017 JAG award funds to purchase BWC equipment, or to implement or enhance BWC programs, must provide to OJP a certification(s) that the State (or, if applicable, that any unit of local government that will receive funds from the State for BWC purposes) has policies and procedures in place related to BWC equipment usage, data storage and access, privacy considerations, training, etc. The certification can be found at https://www.bja.gov/Funding/BodyWornCameraCert.pdf.

6

Exhibit 1
Page 6 of 44

A State that proposes to use JAG funds for BWC-related expenses (including through a unit of local government receiving funds from the State) will have funds withheld until the required certification is submitted and approved by OJP.

**The BJA BWC Toolkit provides model BWC policies and best practices to assist departments in implementing BWC programs.**

Apart from the JAG program, BJA provides funds under the Body-Worn Camera Policy and Implementation Program (BWC Program). The BWC Program allows jurisdictions to develop and implement policies and practices required for effective program adoption, and address program factors including the purchase, deployment, and maintenance of camera systems and equipment; data storage and access; and privacy considerations. Interested States may wish to refer to the BWC web page for more information.  States should note, however, that JAG funds may not be used as any part of the 50 percent match required by the BWC Program.

- Body Armor

Ballistic-resistant and stab-resistant body armor can be funded through the JAG Program, as well as through BJA's Bulletproof Vest Partnership (BVP) Program. The BVP Program is designed to provide a critical resource to State and local law enforcement through the purchase of ballistic-resistant and stab-resistant body armor. For more information on the BVP Program, including eligibility and application, refer to the BVP web page. States should note, however, that JAG funds may not be used as any part of the 50 percent match required by the BVP Program.

Body armor purchased with JAG funds may be purchased at any threat level, make, or model from any distributor or manufacturer, as long as the body armor has been tested and found to comply with the latest applicable National Institute of Justice (NIJ) ballistic or stab standards. In addition, body armor purchased must be made in the United States.

As is the case in the BVP Program, States that propose to purchase body armor with JAG funds must certify that law enforcement agencies receiving body armor have a written "mandatory wear" policy in effect. FAQs related to the mandatory wear policy and certifications can be found at https://www.bja.gov/Funding/JAGFAQ.pdf. This policy must be in place for at least all uniformed officers before any FY 2017 funding can be used by the State for body armor. There are no requirements regarding the nature of the policy other than it being a mandatory wear policy for all uniformed officers while on duty. The certification must be signed by the Authorized Representative and must be attached to the application, if proposed as part of the application. If the State proposes to change project activities to utilize JAG funds to purchase body armor after the award is accepted, the State must submit the signed certification to BJA at that time. A mandatory wear concept and issues paper and a model policy are available by contacting the BVP Customer Support Center at vests@usdoj.gov or toll free at 1–877–758–3787. The certification form related to mandatory wear can be found at: www.bja.gov/Funding/BodyArmorMandatoryWearCert.pdf.

- DNA Testing of Evidentiary Materials and Upload of DNA Profiles to a Database

If JAG program funds will be used for DNA testing of evidentiary materials, any resulting **eligible** DNA profiles must be uploaded to the Combined DNA Index System (CODIS,

7

Exhibit 1
Page 7 of 44

the national DNA database operated by the FBI) by a government DNA lab with access to CODIS. No profiles generated with JAG funding may be entered into any other non-governmental DNA database without prior express written approval from BJA.

In addition, funds may not be used for purchase of DNA equipment and supplies when the resulting DNA profiles from such technology are not accepted for entry into CODIS.

- Interoperable Communication

    States (including subrecipients) that use FY 2017 JAG funds to support emergency communications activities (including the purchase of interoperable communications equipment and technologies such as voice-over-internet protocol bridging or gateway devices, or equipment to support the build out of wireless broadband networks in the 700 MHz public safety band under the Federal Communications Commission [FCC] Waiver Order) should review FY 2017 SAFECOM Guidance. The SAFECOM Guidance is updated annually to provide current information on emergency communications policies, eligible costs, best practices, and technical standards for State, local, tribal, and territorial grantees investing federal funds in emergency communications projects. Additionally, emergency communications projects should support the Statewide Communication Interoperability Plan (SCIP) and be coordinated with the full-time Statewide Interoperability Coordinator (SWIC) in the State of the project. As the central coordination point for their State's interoperability effort, the SWIC plays a critical role, and can serve as a valuable resource. SWICs are responsible for the implementation of the SCIP through coordination and collaboration with the emergency response community. The U.S. Department of Homeland Security Office of Emergency Communications maintains a list of SWICs for each of the States and territories. Contact OEC@hq.dhs.gov. All communications equipment purchased with FY 2017 JAG program funding should be identified during quarterly performance metrics reporting.

    In order to promote information sharing and enable interoperability among disparate systems across the justice and public safety community, OJP requires the recipient to comply with DOJ's Global Justice Information Sharing Initiative guidelines and recommendations for this particular grant. Recipients must conform to the Global Standards Package (GSP) and all constituent elements, where applicable, as described at: https://www.it.ojp.gov/gsp_grantcondition. Recipients must document planned approaches to information sharing and describe compliance to the GSP and appropriate privacy policy that protects shared information, or provide detailed justification for why an alternative approach is recommended.

## State obligations regarding use of JAG funds and units of local government

A State that applies for and receives an FY 2017 JAG award must—

- Pass-through a predetermined percentage of funds to "units of local government." (For purposes of the JAG program, a "unit of local government" includes a city, county, township, town, and certain federally-recognized Indian tribes.) This predetermined percentage (often referred to as the "variable pass-through" or VPT) is calculated by OJP's Bureau of Justice Statistics (BJS), based on the total criminal justice expenditures by the State and its units of local government. The variable pass-through percentages that will apply to an FY 2017 award to a recipient State can be found at: https://www.bja.gov/jag/pdfs/VPT-for-SAAs-updated-June-2017.pdf. (If a State believes

8

Exhibit 1
Page 8 of 44

the VPT percentage has been calculated incorrectly, the State may provide pertinent, verifiable data to BJA and ask OJP to reconsider.)

In certain circumstances, some or all of a project administered by a recipient State may count as part of the variable pass-through. In general, a State may do so to the extent that— (1) the State-administered project will directly benefit a unit of local government, and (2) one unit (or more) of local government voluntarily agrees and acknowledges in an appropriate written certification that the specified amount of State-administered funds would directly benefit the unit of local government in question and agrees that funding the project at the State level is in the best interests of the unit of local government. See the JAG FAQs for an example.

- Appropriately use or distribute the amount of funds that are *added* to the State's FY 2017 award because certain units of local government within the State are ineligible for a direct FY 2017 award of JAG funds because of their small size. (These small-size units of local government sometimes are referred to as "less-than-$10,000 jurisdictions.") The State must provide these additional funds included in its FY 2017 award to State police departments that provide criminal justice services to the "less-than-$10,000 jurisdictions" within the State and/or subaward the funds to such jurisdictions.

- Ensure that any court disposition or other records generated by JAG-funded programs are made available to State repositories if they are relevant to the National Instant Background Check System (NICS) determinations.

**Required compliance with applicable federal laws**

By law, the chief executive (e.g., the governor) of each State that applies for an FY 2017 JAG award must certify that the State will "comply with all provisions of [the JAG program statute] and all other applicable Federal laws." To satisfy this requirement, each State applicant must submit two properly-executed certifications, using the forms shown at Appendix I and II.

All applicants should understand that OJP awards, including certifications provided in connection with such awards, are subject to review by DOJ, including by OJP and by the DOJ Office of the Inspector General. Applicants also should understand that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in a certification submitted to OJP in support of an application may be the subject of criminal prosecution, and also may result in civil penalties and administrative remedies for false claims or otherwise. Administrative remedies that may be available to OJP with respect to an FY 2017 award include suspension or termination of the award, placement on the DOJ high-risk grantee list, disallowance of costs, and suspension or debarment of the recipient.

**Potential funding reductions for noncompliance with PREA and SORNA**

*Prison Rape Elimination Act of 2003 (PREA).* In 2012, DOJ published National PREA Standards, which were promulgated to prevent, detect, and respond to sexual victimization and abuse in confinement settings. The PREA Standards are set out at 28 C.F.R. Part 115, and apply to confinement facilities including adult prisons and jails, juvenile facilities, police lockups, and community corrections facilities.

Under PREA, if a State's chief executive (e.g., governor) does not certify full compliance with the National PREA Standards, the State is subject to the loss of 5 percent of certain DOJ grant

9

Exhibit 1
Page 9 of 44

funds, including JAG award funds, unless: (1) the chief executive submits an assurance to DOJ that no less than 5 percent of such funds will be used solely for the purpose of enabling the State to achieve and certify full compliance with the Standards in future years; or (2) the chief executive requests that the affected funds be held in abeyance by DOJ.  See 42 U.S.C. § 15607(e)(2).

A reduction of a JAG award to a State under the provisions of PREA will **not** affect the portion of the JAG award that is reserved for local jurisdictions.

For additional information concerning PREA implementation, send inquiries to the PREA Management Office at PREACompliance@usdoj.gov and/or review the PREA FAQs.

*Sex Offender Registration and Notification Act (SORNA).* SORNA, which is Title I of the Adam Walsh Child Protection and Safety Act of 2006, mandates a 10-percent reduction in JAG award to a "State" that has failed to substantially implement SORNA. For such States, the 10-percent reduction has been applied to JAG awards since FY 2012 and will continue to be applied in each subsequent year until the JAG recipient has substantially implemented SORNA. Further, States that have substantially implemented SORNA have an ongoing obligation to maintain that status each year. A JAG reduction will be applied each year a jurisdiction has failed to have substantially implemented SORNA.

A reduction of a JAG award to a State under the provisions of SORNA will **not** affect the portion of the JAG award that is reserved for local jurisdictions.

For additional information regarding SORNA implementation, including requirements and a list of States that will be affected in FY 2017 by the 10-percent reduction to JAG awards, contact Samantha Opong with the OJP Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART Office) at Samantha.Opong@usdoj.gov or 202-514-9320. Additional SORNA guidance can be found within the SORNA FAQs.

**BJA Areas of Emphasis**

BJA recognizes that there are significant pressures on State and local criminal justice systems. In these challenging times, shared priorities and leveraged resources can make a significant impact. BJA intends to focus much of its work as a component of OJP on the areas of emphasis described below, and encourages each State recipient of an FY 2017 JAG award to join us in addressing these challenges.

*Reducing Gun Violence –* Gun violence has touched nearly every State and local government in America. While our nation has made great strides in reducing violent crime, some municipalities and regions continue to experience unacceptable levels of violent crime at rates far in excess of the national average. BJA encourages States to invest JAG funds in programs to combat gun violence, enforce existing firearms laws, and improve the process for ensuring that persons prohibited from purchasing guns are prevented from doing so, by enhancing reporting to the FBI's NICS.

*National Incident-Based Reporting System (NIBRS) –* The FBI has formally announced its intentions to establish NIBRS as the law enforcement (LE) crime data reporting standard for the nation. The transition to NIBRS will provide a more complete and accurate picture of crime at the national, State, and local level. Once this transition is complete, the FBI will no longer collect summary data and will accept data only in the NIBRS format.  Also, once the transition is

10

Exhibit 1
Page 10 of 44

complete, JAG award amounts will be calculated on the basis of submitted NIBRS data. Transitioning all law enforcement agencies to NIBRS is the first step in gathering more comprehensive crime data. BJA encourages State recipients of FY 2017 JAG awards to use JAG funds to expedite the transition to NIBRS.

*Officer Safety and Wellness* – The issue of law enforcement safety and wellness is an important priority for the Department of Justice. Preliminary data compiled by the National Law Enforcement Officers Memorial Fund indicates that there were 135 line-of-duty law enforcement deaths in 2016 – the highest level in the past five years, and a 10 percent increase from 2015 (123 deaths).

Firearms-related deaths continued to be the leading cause of death (64), increasing 56 percent from 2015 (41). Of particular concern is that, of the 64 firearms-related deaths, 21 were as a result of ambush-style attacks representing the highest total in more than two decades. Traffic-related deaths continued to rise in 2016 with 53 officers killed, a 10 percent increase from 2015 (48 deaths). Additionally, there were 11 job-related illness deaths in 2016, mostly heart attacks.

BJA sees a vital need to focus not only on tactical officer safety concerns, but also on health and wellness as they affect officer performance and safety. It is important for law enforcement to have the tactical skills necessary, and also be physically and mentally well, to perform, survive, and be resilient in the face of the demanding duties of the profession. BJA encourages States to use JAG funds to address these needs by providing training, such as paying for tuition and travel expenses related to attending trainings such as the <u>VALOR training</u>, as well as funding for health and wellness programs for law enforcement officers.

*Border Security* – The security of the United States borders is critically important to the reduction and prevention of transnational drug-trafficking networks and combating all forms of human trafficking networks within the United States (sex and labor trafficking of foreign nationals and U.S. citizens of all sexes and ages). These smuggling operations on both sides of the border contribute to a significant increase in violent crime and United States deaths from dangerous drugs. Additionally, illegal immigration continues to place a significant strain on federal, State, and local resources—particularly those agencies charged with border security and immigration enforcement—as well as the local communities into which many of the illegal immigrants are placed. BJA encourages States to use JAG funds to support law enforcement hiring, training, and technology enhancement in the area of border security.

*Collaborative Prosecution* – BJA supports strong partnerships between prosecutors and police as a mean to improve case outcomes and take violent offenders off the street. BJA strongly encourages State and local law enforcement to foster strong partnerships with prosecutors to adopt new collaborative strategies aimed at combating increases in crime, particularly violent crime. (BJA's "Smart Prosecution" Initiative is a related effort by OJP to promote partnerships between prosecutors and researchers to develop and deliver effective, data-driven, evidence-based strategies to solve chronic problems and fight crime.)

**Goals, Objectives, and Deliverables**

In general, the FY 2017 JAG State program is designed to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice. Although the JAG State program provides assistance directly to States, through pass-through (and similar) requirements, the JAG State program also is designed to assist units of local government with respect to criminal justice.

11

Exhibit 1
Page 11 of 44

As discussed in more detail below, a State that receives an FY 2017 JAG award will be required to make various types of reports and to submit data related to performance measures and accountability. The Goals, Objectives and Deliverables are directly related to the JAG Progam accountability measures at https://bjapmt.ojp.gov/help/jagdocs.html.

**Evidence-Based Programs or Practices**

OJP strongly emphasizes the use of data and evidence in policy making and program development in criminal justice, juvenile justice, and crime victim services. OJP is committed to:

- Improving the quantity and quality of evidence OJP generates.
- Integrating evidence into program, practice, and policy decisions within OJP and the field.
- Improving the translation of evidence into practice.

OJP considers programs and practices to be evidence-based when their effectiveness has been demonstrated by causal evidence, generally obtained through one or more outcome evaluations. Causal evidence documents a relationship between an activity or intervention (including technology) and its intended outcome, including measuring the direction and size of a change, and the extent to which a change may be attributed to the activity or intervention. Causal evidence depends on the use of scientific methods to rule out, to the extent possible, alternative explanations for the documented change. The strength of causal evidence, based on the factors described above, will influence the degree to which OJP considers a program or practice to be evidence-based. The OJP CrimeSolutions.gov website is one resource that applicants may use to find information about evidence-based programs in criminal justice, juvenile justice, and crime victim services.

A useful matrix of evidence-based policing programs and strategies is available through the Center for Evidence-Based Crime Policy at George Mason University. BJA offers a number of program models designed to effectively implement promising and evidence-based strategies through the BJA "Smart Suite" of programs including Smart Policing, Smart Supervision, Smart Pretrial, Smart Defense, Smart Prosecution, Smart Reentry, and others (see https://www.bja.gov/Programs/CRPPE/smartsuite.html). BJA encourages States to use JAG funds to support these "smart on crime" strategies, including effective partnerships with universities and research partners and with non-traditional criminal justice partners.

**BJA Success Stories**
The BJA Success Stories web page features projects that have demonstrated success or shown promise in reducing crime and positively impacting communities. This web page will be a valuable resource for States, localities, territories, tribes, and criminal justice professionals who seek to identify and learn about JAG and other successful BJA-funded projects linked to innovation, crime reduction, and evidence-based practices. **BJA strongly encourages the recipient to submit success stories annually (or more frequently).**

If a State has a Success Story it would like to submit, it may be submitted through My BJA account, using "add a Success Story" and the Success Story Submission form. Register for a My BJA account using this registration link.

# B. Federal Award Information

Exhibit 1
Page 12 of 44

BJA expects to make up to 56 awards of up to $17.7 million, with an estimated total amount awarded of up to $174.4 million.

BJA plans to make awards for a four-year period of performance, to begin on October 1, 2016. An extension should not exceed 12 months. An extension beyond this period may be made on a case-by-case basis at the discretion of BJA and must be requested via GMS no less than 30 days prior to the end of the period for performance.

The expected allocations by State for the FY 2017 JAG program can be found at: https://www.bja.gov/Funding/17JAGStateAllocations.pdf.

All awards are subject to the availability of appropriated funds and to any modifications or additional requirements that may be imposed by statute.

**Type of Award**
BJA expects that any award under this solicitation will be in the form of a grant. See Statutory and Regulatory Requirements; Award Conditions, under Section F. Federal Award Administration Information, for a brief discussion of important statutes, regulations, and award conditions that apply to many (or in some cases, all) OJP grants.

JAG awards are based on a statutory formula as described below:

Once each fiscal year's overall JAG Program funding level is determined, BJA works with BJS to begin a four-step grant award calculation process, which, in general, consists of:

1. Computing an initial JAG allocation for each State, based on its share of violent crime and population (weighted equally).

2. Reviewing the initial JAG allocation amount to determine if the State allocation is less than the minimum award amount defined in the JAG legislation (0.25 percent of the total). If this is the case, the State is funded at the minimum level, and the funds required for this are deducted from the overall pool of JAG funds. Each of the remaining States receive the minimum award plus an additional amount based on its share of violent crime and population.

3. Dividing each State's final award amount (except for the territories and District of Columbia) between the State and its units of local governments at a rate of 60 and 40 percent, respectively.

4. Determining unit of local government award allocations, which are based on their proportion of the State's 3-year violent crime average. If the "eligible award amount" for a particular unit of local government as determined on this basis is $10,000 or more, then the unit of local government is eligible to apply directly to OJP (under the JAG Local solicitation) for a JAG award. If the "eligible award amount" to a particular unit of local government as determined on this basis would be less than $10,000, however, the funds are not made available for a direct award to that particular unit of local government, but instead are added to the amount that otherwise would have been awarded to the State. (The State's obligations with respect to this additional amount for the "less-than-$10,000 jurisdictions" are summarized above.)

13

BJA-2017-11360

Exhibit 1
Page 13 of 44

**Financial Management and System of Internal Controls**

Award recipients and subrecipients (including recipients or subrecipients that are pass-through entities[1]) must, as described in the Part 200 Uniform Requirements[2] as set out at 2 C.F.R. 200.303:

> (a) Establish and maintain effective internal control over the Federal award that provides reasonable assurance that [the recipient (and any subrecipient)] is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award. These internal controls should be in compliance with guidance in "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States and the "Internal Control Integrated Framework", issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

> (b) Comply with Federal statutes, regulations, and the terms and conditions of the Federal awards.

> (c) Evaluate and monitor [the recipient's (and any subrecipient's)] compliance with statutes, regulations, and the terms and conditions of Federal awards.

> (d) Take prompt action when instances of noncompliance are identified including noncompliance identified in audit findings.

> (e) Take reasonable measures to safeguard protected personally identifiable information and other information the Federal awarding agency or pass-through entity designates as sensitive or [the recipient (or any subrecipient)] considers sensitive consistent with applicable Federal, State, local, and tribal laws regarding privacy and obligations of confidentiality.

To help ensure that applicants understand administrative requirements and cost principles, OJP encourages prospective applicants to enroll, at no charge, in the DOJ Grants Financial Management Online Training, available here.

**Budget and Financial Information**

*Trust Fund* -- SAAs may draw down JAG funds either in advance or on a reimbursement basis. To draw down in advance, a trust fund must be established in which to deposit the funds. The trust fund may or may not be an interest-bearing account. If subrecipients draw down JAG funds in advance, they also must establish a trust fund in which to deposit funds.

*Tracking and reporting regarding JAG funds used for State administrative costs* – As indicated earlier, a State may use up to 10 percent of a JAG award, including up to 10 percent of any earned interest, for costs associated with administering the award. Administrative costs (when utilized) must be tracked separately; a recipient must report in separate financial status reports

---

[1] For purposes of this solicitation, the phrase "pass-through entity" includes any recipient or subrecipient that provides a subaward ("subgrant") to carry out part of the funded award or program.
[2] The "Part 200 Uniform Requirements" refers to the DOJ regulation at 2 C.F.R Part 2800, which adopts (with certain modifications) the provisions of 2 C.F.R. Part 200.

14

(SF-425) those expenditures that specifically relate to each particular JAG Award during any particular reporting period.

*No commingling.*  Both the State recipient and all subrecipients of JAG funds are prohibited from commingling funds on a program-by-program or project-by-project basis. *For this purpose, use of the administrative JAG funds to perform work across all active awards in any one year is not considered comingling.*

### Cost Sharing or Match Requirement
The JAG program does not require a match.

For additional cost sharing and match information, see the <u>DOJ Grants Financial Guide</u>.

### Pre-Agreement Costs (also known as Pre-award Costs)
Pre-agreement costs are costs incurred by the applicant prior to the start date of the period of performance of the grant award.

OJP does **not** typically approve pre-agreement costs.  An applicant must request and obtain the prior written approval of OJP for any such costs. All such costs incurred prior to award and prior to approval of the costs are incurred *at the sole risk* of the applicant.  (Generally, no applicant should incur project costs *before* submitting an application requesting federal funding for those costs.)

Should there be extenuating circumstances that make it appropriate for OJP to consider approving pre-agreement costs, the applicant may contact the point of contact listed on the title page of this solicitation for the requirements concerning written requests for approval. If approved in advance by OJP, award funds may be used for pre-agreement costs, consistent with the recipient's approved budget and applicable cost principles. See the section on "Costs Requiring Prior Approval" in the <u>DOJ Grants Financial Guide</u> for more information.

### Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs
OJP strongly encourages every applicant that proposes to use award funds for any conference-, meeting-, or training-related activity (or similar event) to review carefully—before submitting an application—the OJP and DOJ policy and guidance on approval, planning, and reporting of such events, available at
<u>https://www.ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm</u>.

OJP policy and guidance (1) encourage minimization of conference, meeting, and training costs; (2) require prior written approval (which may affect project timelines) of most conference, meeting, and training costs for cooperative agreement recipients, as well as some conference, meeting, and training costs for grant recipients; and (3) set cost limits, which include a general prohibition of all food and beverage costs.

### Costs Associated with Language Assistance (if applicable)
If an applicant proposes a program or activity that would deliver services or benefits to individuals, the costs of taking reasonable steps to provide meaningful access to those services or benefits for individuals with limited English proficiency may be allowable. Reasonable steps to provide meaningful access to services or benefits may include interpretation or translation services, where appropriate.

For additional information, see the "Civil Rights Compliance" section under "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2017 Awards" in the OJP Funding Resource Center.

# C. Eligibility Information

For information on eligibility, see the title page of this solicitation.

Note that, as discussed in more detail below, the certification regarding compliance with 8 U.S.C. § 1373 must be executed and submitted before a State can make a valid award acceptance. Also, a State may not receive award funds (and its award will include a condition that withholds funds) until it submits a properly-executed "Certifications and Assurances by Chief Executive of Applicant Government."

# D. Application and Submission Information

**What an Application Should Include**
This section describes in detail what an application should include. An applicant should anticipate that if it fails to submit an application that contains all of the specified elements, it may negatively affect the review of its application; and, should a decision be made to make an award, it may result in the inclusion of award conditions that preclude the recipient from accessing or using award funds until the recipient satisfies the conditions and OJP makes the funds available.

An applicant may combine the Budget Narrative and the Budget Detail Worksheet in one document. If an applicant submits only one budget document, however, it must contain **both** narrative and detail information. Please review the "Note on File Names and File Types" under How to Apply to be sure applications are submitted in permitted formats.

OJP strongly recommends that applicants use appropriately descriptive file names (e.g., "Program Narrative," "Budget Detail Worksheet and Budget Narrative," "Timelines," "Memoranda of Understanding," "Résumés") for all attachments. Also, OJP recommends that applicants include résumés in a single file.

**In general, if a State fails to submit required information or documents, OJP either will return the State's application in the Grants Management System (GMS) for submission of the missing information or documents, or will attach a condition to the award that will withhold award funds until the necessary information and documents are submitted. (As discussed elsewhere in this solicitation, the certification regarding compliance with 8 U.S.C. § 1373 – which is set out at Appendix II – will be handled differently. Unless and until that certification is submitted, the State will be unable to make a valid acceptance of the award.)**

1. **Information to Complete the Application for Federal Assistance (SF-424)**

The SF-424 is a required standard form used as a cover sheet for submission of pre-applications, applications, and related information. GMS takes information from the applicant's profile to populate the fields on this form.

To avoid processing delays, an applicant must include an accurate legal name on its SF-424. Current OJP award recipients, when completing the field for "Legal Name," should use the same legal name that appears on the prior year award document, which is also the legal name stored in OJP's financial system. On the SF-424, enter the Legal Name in box 5 and Employer Identification Number (EIN) in box 6 exactly as it appears on the prior year award document. An applicant with a current, active award(s) must ensure that its GMS profile is current. If the profile is not current, the applicant should submit a Grant Adjustment Notice updating the information on its GMS profile prior to applying under this solicitation.

A new applicant entity should enter the Official Legal Name and address of the applicant entity in box 5 and the EIN in box 6 of the SF-424.

**Intergovernmental Review:** This solicitation ("funding opportunity") **is** within the scope of Executive Order 12372, concerning State opportunities to coordinate applications for federal financial assistance.  See 28 C.F.R. Part 30.  An applicant may find the names and addresses of State Single Points of Contact (SPOCs) at the following website: https://www.whitehouse.gov/omb/grants_spoc/. If the State appears on the SPOC list, the applicant must contact the State SPOC to find out about, and comply with, the State's process under E.O. 12372. In completing the SF-424, an applicant whose State appears on the SPOC list is to make the appropriate selection in response to question 19 once the applicant has complied with its State E.O. 12372 process. (An applicant whose State does not appear on the SPOC list should answer question 19 by selecting the response that the "Program is subject to E.O. 12372 but has not been selected by the State for review.")

2. **Project Abstract**

Applications should include a high-quality project abstract that summarizes the proposed project in 400 words or less. Project abstracts should be:

- Written for a general public audience.
- Submitted as a separate attachment with "Project Abstract" as part of its file name.
- Single-spaced, using a standard 12-point font (Times New Roman) with 1-inch margins.
- Include applicant name, title of the project, a brief description of the problem to be addressed and the targeted area/population, project goals and objectives, a description of the project strategy, any significant partnerships, and anticipated outcomes.
- Identify up to 10 project identifiers that would be associated with proposed project activities. The list of identifiers can be found at www.bja.gov/funding/JAGIdentifiers.pdf.

3. **Program Narrative**

The following sections **should** be included as part of the program narrative[3]:

a. <u>Statement of the Problem</u> – Identify the State's strategy/funding priorities for the FY 2017 JAG funds, the subgrant award process and timeline, and a description of the programs to be funded over the 4-year grant period. States are strongly encouraged to prioritize the funding on evidence-based projects.

b. <u>Project Design and Implementation</u> – Describe the State's strategic planning process that guides its priorities and funding strategy. This should include a description of how local communities are engaged in the planning process and the data and analysis utilized to support the plan; it should identify the stakeholders currently participating in the strategic planning process, the gaps in the State's needed resources for criminal justice purposes, and how JAG funds will be coordinated with State and related justice funds.

c. <u>Capabilities and Competencies</u> – Describe any additional strategic planning/coordination efforts in which the State participates with other criminal justice criminal/juvenile justice agencies in the State.

d. <u>Plan for Collecting the Data Required for this Solicitation's Performance Measures</u> – OJP will require each successful applicant to submit specific performance measures data as part of its reporting under the award (see "<u>General Information about Post-Federal Award Reporting Requirements</u>" in <u>Section F. Federal Award Administration Information</u>). The performance measures correlate to the goals, objectives, and deliverables identified under "<u>Goals, Objectives, and Deliverables</u>" in <u>Section A. Program Description</u>. Post award, recipients will be required to submit quarterly performance metrics through BJA's PMT, located at https://bjapmt.ojp.gov. The application should describe the applicant's plan for collection of all of the performance measures data listed in the JAG Program accountability measures at: https://bjapmt.ojp.gov/help/jagdocs.html.

BJA does not require applicants to submit performance measures data with their application. Performance measures are included as an alert that BJA will require successful applicants to submit specific data as part of their reporting requirements. For the application, applicants should indicate an understanding of these requirements and discuss how they will gather the required data, should they receive funding.

**Note on Project Evaluations**
An applicant that proposes to use award funds through this solicitation to conduct project evaluations should be aware that certain project evaluations (such as systematic investigations designed to develop or contribute to generalizable knowledge) may constitute "research" for purposes of applicable DOJ human subjects protection regulations. However, project evaluations that are intended only to generate internal improvements to a program or service, or are conducted only to meet OJP's performance measure data reporting requirements, likely do

---

[3] For information on subawards (including the details on proposed subawards that should be included in the application), see "Budget and Associated Documentation" under <u>Section D. Application and Submission Information</u>.

not constitute "research." Each applicant should provide sufficient information for OJP to determine whether the particular project it proposes would either intentionally or unintentionally collect and/or use information in such a way that it meets the DOJ regulatory definition of research that appears at 28 C.F.R. Part 46 ("Protection of Human Subjects").

Research, for the purposes of human subjects protection for OJP-funded programs, is defined as "a systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge." 28 C.F.R. 46.102(d).

For additional information on determining whether a proposed activity would constitute research for purposes of human subjects protection, applicants should consult the decision tree in the "Research and the Protection of Human Subjects" section of the "Requirements related to Research" web page of the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2017" available through the OJP Funding Resource Center. Every prospective applicant whose application may propose a research or statistical component also should review the "Data Privacy and Confidentiality Requirements" section on that web page.

### 4. Budget and Associated Documentation

#### a. Budget Detail Worksheet
A sample Budget Detail Worksheet can be found at www.ojp.gov/funding/Apply/Resources/BudgetDetailWorksheet.pdf. An applicant that submits its budget in a different format should use the budget categories listed in the sample budget worksheet. The Budget Detail Worksheet should break out costs by year.

For questions pertaining to budget and examples of allowable and unallowable costs, see the DOJ Grants Financial Guide.

#### b. Budget Narrative
The budget narrative should thoroughly and clearly describe every category of expense listed in the proposed budget detail worksheet. OJP expects proposed budgets to be complete, cost effective, and allowable (e.g., reasonable, allocable, and necessary for project activities). This narrative should include a full description of all costs, including administrative costs (if applicable).

An applicant should demonstrate in its Budget Narrative how it will maximize cost effectiveness of award expenditures. Budget narratives should generally describe cost effectiveness in relation to potential alternatives and the goals of the project. For example, a budget narrative should detail why planned in-person meetings are necessary, or how technology and collaboration with outside organizations could be used to reduce costs, without compromising quality.

The Budget Narrative should be mathematically sound and correspond clearly with the information and figures provided in the Budget Detail Worksheet. The narrative should explain how the applicant estimated and calculated all costs, and how those costs are necessary to the completion of the proposed project. The narrative may include tables for clarification purposes, but need not be in a spreadsheet format. As with the Budget Detail Worksheet, the budget narrative should describe costs by year.

**c. Information on Proposed Subawards (if any), as well as on Proposed Procurement Contracts (if any)**

Applicants for OJP awards typically may propose to make "subawards." Applicants also may propose to enter into procurement "contracts" under the award.

Whether–for purposes of federal grants administrative requirements–a particular agreement between a recipient and a third party will be considered a "subaward" or instead considered a procurement "contract" under the award is determined by federal rules and applicable OJP guidance. It is an important distinction, in part because the federal administrative rules and requirements that apply to "subawards" and procurement "contracts" under awards differ markedly.

In general, the central question is the relationship between what the third-party will do under its agreement with the recipient and what the recipient has committed (to OJP) to do under its award to further a public purpose (e.g., services the recipient will provide, products it will develop or modify, research or evaluation it will conduct). If a third party will provide some of the services the recipient has committed (to OJP) to provide, will develop or modify all or part of a product the recipient has committed (to OJP) to develop or modify, or conduct part of the research or evaluation the recipient has committed (to OJP) to conduct, OJP will consider the agreement with the third party a subaward for purposes of federal grants administrative requirements.

This will be true **even if** the recipient, for internal or other non-federal purposes, labels or treats its agreement as a procurement, a contract, or a procurement contract. Neither the title nor the structure of an agreement determines whether the agreement–for purposes of federal grants administrative requirements–is a "subaward" or is instead a procurement "contract" under an award.

Additional guidance on the circumstances under which (for purposes of federal grants administrative requirements) an agreement constitutes a subaward as opposed to a procurement contract under an award is available (along with other resources) on the OJP Part 200 Uniform Requirements web page.

**(1) Information on proposed subawards and required certification regarding 8 U.S.C. § 1373 from certain subrecipients**

***General requirement for federal authorization of any subaward; statutory authorizations of subawards under the Byrne JAG program statute.*** Generally, a recipient of an OJP award may not make subawards ("subgrants") unless the recipient has specific federal authorization to do so. Unless an applicable statute or DOJ regulation specifically authorizes (or requires) particular subawards, a recipient must have authorization from OJP before it may make a subaward.

**JAG subawards that are required or specifically authorized by statute (see 42 U.S.C. § 3751(a) and 42 U.S.C. § 3755)**
**do not require prior approval to authorize subawards. This includes subawards made by States under the JAG program.**

A particular subaward may be authorized by OJP because the recipient included a sufficiently detailed description and justification of the proposed subaward in the application as approved by OJP. If, however, a particular subaward is not authorized by federal statute or regulation, and is not sufficiently described and justified in the application as approved by OJP, the recipient will be required, post-award, to request and obtain written authorization from OJP before it may make the subaward.

If an applicant proposes to make one or more subawards to carry out the federal award and program, and those subawards are not specifically authorized (or required) by statute or regulation, the applicant should: (1) identify (if known) the proposed subrecipient(s), (2) describe in detail what each subrecipient will do to carry out the federal award and federal program, and (3) provide a justification for the subaward(s), with details on pertinent matters such as special qualifications and areas of expertise. Pertinent information on subawards should appear not only in the Program Narrative, but also in the Budget Detail Worksheet and budget narrative.

NEW *Required certification regarding 8 U.S.C. § 1373 from any proposed subrecipient that is a unit of local government or "public" institution of higher education.* Before a State may subaward FY 2017 award funds to a unit of local government or to a public institution of higher education, it will be required (by award condition) to obtain a properly-executed certification regarding compliance with 8 U.S.C. § 1373 from the proposed subrecipient. (This requirement regarding 8 U.S.C. § 1373 will not apply to subawards to Indian tribes). The specific certification the State must require from a unit of local government will vary somewhat from the specific certification it must require from a public institution of higher education. The forms will be posted and available for download at https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.

**(2) Information on proposed procurement contracts (with specific justification for proposed noncompetitive contracts over $150,000)**

Unlike a recipient contemplating a subaward, a recipient of an OJP award generally does not need specific prior federal authorization to enter into an agreement that—for purposes of federal grants administrative requirements—is considered a procurement contract, **provided that** (1) the recipient uses its own documented procurement procedures and (2) those procedures conform to applicable federal law, including the Procurement Standards of the (DOJ) Part 200 Uniform Requirements (as set out at 2 C.F.R. 200.317 - 200.326). The Budget Detail Worksheet and budget narrative should identify proposed procurement contracts. (As discussed above, subawards must be identified and described separately from procurement contracts.)

The Procurement Standards in the (DOJ) Part 200 Uniform Requirements, however, reflect a general expectation that agreements that (for purposes of federal grants administrative requirements) constitute procurement "contracts" under awards will be entered into on the basis of full and open competition. If a proposed procurement contract would exceed the simplified acquisition threshold—currently, $150,000—a recipient of an OJP award may not proceed without competition, unless and until the recipient receives specific advance authorization from OJP to use a non-competitive approach for the procurement.

An applicant that (at the time of its application) intends—without competition—to enter into a procurement contract that would exceed $150,000 should include a detailed justification that explains to OJP why, in the particular circumstances, it is appropriate to proceed without competition. Various considerations that may be pertinent to the justification are outlined in the DOJ Grants Financial Guide.

**d. Pre-Agreement Costs**
For information on pre-agreement costs, see Section B. Federal Award Information.

**5. Indirect Cost Rate Agreement (if applicable)**

Indirect costs may be charged to an award only if:

a) The recipient has a current (that is, unexpired), federally-approved indirect cost rate; or
b) The recipient is eligible to use, and elects to use, the "de minimis" indirect cost rate described in the (DOJ) Part 200 Uniform Requirements, as set out at 2 C.F.R. 200.414(f).

**Note**: This rule does not eliminate or alter the JAG-specific restriction in federal law that charges for administrative costs may not exceed 10 percent of the award amount, regardless of the approved indirect cost rate.

An applicant with a current (that is, unexpired) federally-approved indirect cost rate is to attach a copy of the indirect cost rate agreement to the application. An applicant that does not have a current federally-approved rate may request one through its cognizant federal agency, which will review all documentation and approve a rate for the applicant entity, or, if the applicant's accounting system permits, applicants may propose to allocate costs in the direct cost categories.

For assistance with identifying the appropriate cognizant federal agency for indirect costs, please contact the OCFO Customer Service Center at 1-800-458-0786 or at ask.ocfo@usdoj.gov. If DOJ is the cognizant federal agency, applicants may obtain information needed to submit an indirect cost rate proposal at www.ojp.gov/funding/Apply/Resources/IndirectCosts.pdf.

Certain OJP recipients have the option of electing to use the "de minimis" indirect cost rate. An applicant that is eligible to use the "de minimis" rate that wishes to use the "de minimis" rate should attach written documentation to the application that advises OJP of both: (1) the applicant's eligibility to use the "de minimis" rate, and (2) its election to do so. If an eligible applicant elects the "de minimis" rate, costs must be consistently charged as either indirect or direct costs, but may not be double charged or inconsistently charged as both. The "de minimis" rate may no longer be used once an approved federally-negotiated indirect cost rate is in place. (No entity that ever has had a federally-approved negotiated indirect cost rate is eligible to use the "de minimis" rate.)

**6. Financial Management and System of Internal Controls Questionnaire (including applicant disclosure of high-risk status)**

Every State is to complete the OJP Financial Management and System of Internal Controls Questionnaire as part of its application.

7. **Applicant Disclosure of High Risk Status**

Applicants that are currently designated high risk by another federal grant making agency must disclose that status. For purposes of this disclosure, high risk includes any status under which a federal awarding agency provides additional oversight due to the applicant's past performance, or other programmatic or financial concerns with the applicant. If an applicant is designated high risk by another federal awarding agency, the applicant must provide the following information:

- The federal agency that currently designated the applicant as high risk
- Date the applicant was designated high risk
- The high-risk point of contact at that federal awarding agency (name, phone number, and email address).
- Reasons for the high risk status, as set out by the federal awarding agency

OJP seeks this information to help ensure appropriate federal oversight of OJP awards. An applicant that is considered "high-risk" by another federal awarding agency is not automatically disqualified from receiving an OJP award. OJP may, however, consider the information in award decisions, and may impose additional OJP oversight of any award under this solicitation (including through the conditions that accompany the award document).

8. **Disclosure of Lobbying Activities**

An applicant that expends any funds for lobbying activities is to provide all of the information requested on the form Disclosure of Lobbying Activities (SF-LLL).

9. **Certifications and Assurances by the Chief Executive of the Applicant Government**

A JAG application is not complete, and a State may not receive award funds, unless the chief executive of the applicant State (e.g., the governor) properly executes, and the State submits, the "Certifications and Assurances by the Chief Executive of the Applicant Government" attached to this solicitation as Appendix I.

OJP will not deny an application for an FY 2017 award for failure to submit these "Certifications and Assurances by the Chief Executive of the Applicant Government" by the application deadline, but a State will not receive award funds (and its award will include a condition that withholds funds) until it submits these certifications and assurances, properly-executed by the chief executive of the State (e.g., the governor).

10. **Certification of Compliance with 8 U.S.C. § 1373 by the Chief Legal Officer of the Applicant Government**

The chief legal officer of an applicant State (e.g., the Attorney General of the State) is to carefully review the "State or Local Government: FY 2017 Certification of Compliance with 8

Exhibit 1
Page 23 of 44

U.S.C. § 1373" that is attached as Appendix II to this solicitation.  If the chief legal officer determines that he or she may execute the certification, the State is to submit the certification as part of its application.

As discussed further below, a State applicant will be *unable to make a valid award acceptance* of an FY 2017 JAG award unless and until a properly-executed certification by its chief legal officer is received by OJP on or before the day the State submits an executed award document.

## 11. State Strategic Plan (if applicable)

States are strongly encouraged to use JAG funding in support of an existing statewide strategic plan. An applicant State should attach a current version of the State strategic plan to its application, if one exists.  If a State does not have such a plan, the program narrative should describe the State's timeline and process for developing such a strategic plan.

> **ALERT**    *A recent amendment to the JAG program statute requires, starting with the FY 2019 JAG program, that States have in place and submit a strategic plan that identifies stakeholders, describes evidence-based approaches that will be used, and illustrates how the State will allocate funding.  By law, strategic plans are to be updated every five years.*

Training and technical assistance (TTA) is available from BJA's TTA providers to assist States with the development of their strategic planning process and plan.

To help ensure that States consider the impact of JAG funding decisions across the entire criminal justice system, BJA strongly encourages each State to bring all criminal justice system stakeholders together in the strategic planning process. The strategic planning process should include local governments, and representatives of all segments of the criminal justice system, including judges, prosecutors, law enforcement personnel, and corrections personnel, as well as providers of indigent defense services, victim services, juvenile justice delinquency prevention programs, community corrections, and reentry services. For more information, see the National Center for Justice Planning website.

## 12. Additional Attachments

   a. **Applicant Disclosure of Pending Applications**
      Each applicant is to disclose whether it has (or is proposed as a subrecipient under) any pending applications for federally-funded grants or cooperative agreements that (1) include requests for funding to support the same project being proposed in the application under this solicitation, and (2) would cover identical cost items outlined in the budget submitted to OJP as part of the application under this solicitation. The applicant is to disclose applications made directly to federal awarding agencies, and also applications for subawards of federal funds (e.g., applications to State agencies that will subaward ("subgrant") federal funds).

24

BJA-2017-11360

Exhibit 1
Page 24 of 44

OJP seeks this information to help avoid any inappropriate duplication of funding. Leveraging multiple funding sources in a complementary manner to implement comprehensive programs or projects is encouraged and is not seen as inappropriate duplication.

Each applicant that has one or more pending applications as described above is to provide the following information about pending applications submitted within the last 12 months:

- The federal or State funding agency.
- The solicitation name/project name.
- The point of contact information at the applicable federal or State funding agency.

| Federal or State Funding Agency | Solicitation Name/Project Name | Name/Phone/Email for Point of Contact at Federal or State Funding Agency |
|---|---|---|
| DOJ/Office of Community Oriented Policing Services (COPS) | COPS Hiring Program | Jane Doe, 202/000-0000; jane.doe@usdoj.gov |
| Health & Human Services/ Substance Abuse & Mental Health Services Administration | Drug-Free Communities Mentoring Program/ North County Youth Mentoring Program | John Doe, 202/000-0000; john.doe@hhs.gov |

Each applicant should include the table as a separate attachment to its application. The file should be named "Disclosure of Pending Applications." The applicant Legal Name on the application must match the entity named on the disclosure of pending applications statement.

Any applicant that does not have any pending applications as described above is to submit, as a separate attachment, a statement to this effect: "[Applicant Name on SF-424] does not have (and is not proposed as a subrecipient under) any pending applications submitted within the last 12 months for federally-funded grants or cooperative agreements (or for subawards under federal grants or cooperative agreements) that request funding to support the same project being proposed in this application to OJP and that would cover identical cost items outlined in the budget submitted as part of this application."

**b. Research and Evaluation Independence and Integrity (if applicable)**

If an application involves research (including research and development) and/or evaluation, the applicant must demonstrate research/evaluation independence and integrity, including appropriate safeguards, before it may receive award funds. The

25

applicant must demonstrate independence and integrity regarding both this proposed research and/or evaluation, and any current or prior related projects.

Each application should include an attachment that addresses **both** i. and ii. below.

i. For purposes of this solicitation, each applicant is to document research and evaluation independence and integrity by including one of the following two items:

   a. A specific assurance that the applicant has reviewed its application to identify any actual or potential apparent conflicts of interest (including through review of pertinent information on the principal investigator, any co-principal investigators, and any subrecipients), and that the applicant has identified no such conflicts of interest – whether personal or financial or organizational (including on the part of the applicant entity or on the part of staff, investigators, or subrecipients) – that could affect the independence or integrity of the research, including the design, conduct, and reporting of the research.

   OR

   b. A specific description of actual or potential apparent conflicts of interest that the applicant has identified – including through review of pertinent information on the principal investigator, any co-principal investigators, and any subrecipients – that could affect the independence or integrity of the research, including the design, conduct, or reporting of the research. These conflicts may be personal (e.g., on the part of investigators or other staff), financial, or organizational (related to the applicant or any subrecipient entity). Some examples of potential investigator (or other personal) conflict situations are those in which an investigator would be in a position to evaluate a spouse's work product (actual conflict), or an investigator would be in a position to evaluate the work of a former or current colleague (potential apparent conflict). With regard to potential organizational conflicts of interest, as one example, generally an organization would not be given an award to evaluate a project, if that organization had itself provided substantial prior technical assistance to that specific project or a location implementing the project (whether funded by OJP or other sources), because the organization in such an instance might appear to be evaluating the effectiveness of its own prior work. The key is whether a reasonable person understanding all of the facts would be able to have confidence that the results of any research or evaluation project are objective and reliable. Any outside personal or financial interest that casts doubt on that objectivity and reliability of an evaluation or research product is a problem and must be disclosed.

ii. In addition, for purposes of this solicitation, each applicant is to address possible mitigation of research integrity concerns by including, at a minimum, one of the following two items:

26

BJA-2017-11360

Exhibit 1
Page 26 of 44

a. If an applicant reasonably believes that no actual or potential apparent conflicts of interest (personal, financial, or organizational) exist, then the applicant should provide a brief narrative explanation of how and why it reached that conclusion. The applicant also is to include an explanation of the specific processes and procedures that the applicant has in place, or will put in place, to identify and prevent (or, at the very least, mitigate) any such conflicts of interest pertinent to the funded project during the period of performance. Documentation that may be helpful in this regard may include organizational codes of ethics/conduct and policies regarding organizational, personal, and financial conflicts of interest. There is no guarantee that the plan, if any, will be accepted as proposed.

OR

b. If the applicant has identified actual or potential apparent conflicts of interest (personal, financial, or organizational) that could affect the independence and integrity of the research, including the design, conduct, or reporting of the research, the applicant is to provide a specific and robust mitigation plan to address each of those conflicts. At a minimum, the applicant is expected to explain the specific processes and procedures that the applicant has in place, or will put in place, to identify and eliminate (or, at the very least, mitigate) any such conflicts of interest pertinent to the funded project during the period of performance. Documentation that may be helpful in this regard may include organizational codes of ethics/conduct and policies regarding organizational, personal, and financial conflicts of interest. There is no guarantee that the plan, if any, will be accepted as proposed.

OJP will assess research and evaluation independence and integrity based on considerations such as the adequacy of the applicant's efforts to identify factors that could affect the objectivity or integrity of the proposed staff and/or the applicant entity (and any subrecipients) in carrying out the research, development, or evaluation activity; and the adequacy of the applicant's existing or proposed remedies to control any such factors.

**c. State Governing Body Review**

Applicants must submit information via the Certification and Assurances by the Chief Executive (See Appendix I) which documents that the JAG application was made available for review by the governing body of the state, or to an organization designated by that governing body, for a period that was not less than 30 days before the application was submitted to BJA. The same Chief Executive Certification will also specify that an opportunity to comment on this application was provided to citizens prior to the application submission to the extent applicable law or established procedures make such opportunity available. In the past, this has been accomplished via submission of specific review dates; now OJP will only accept a Governor's certification to attest to these facts. States may continue to submit actual dates of review should they wish to do so, in addition to the submission of the Chief Executive Certification.

**How to Apply**

An applicant must submit its application through the Grants Management System (GMS), which provides support for the application, award, and management of awards at OJP. Each applicant entity **must register in GMS for each specific funding opportunity.** Although the registration and submission deadlines are the same, OJP urges each applicant entity to **register promptly**, especially if this is the first time the applicant is using the system. Find complete instructions on how to register and submit an application in GMS at www.ojp.gov/gmscbt/. An applicant that experiences technical difficulties during this process should email GMS.HelpDesk@usdoj.gov or call 888-549-9901 (option 3), 24 hours every day, including during federal holidays. OJP recommends that each applicant **register promptly** to prevent delays in submitting an application package by the deadline.

**Note on File Types: GMS does not accept executable file types as application attachments.** These disallowed file types include, but are not limited to, the following extensions: ".com," ".bat," ".exe," ".vbs," ".cfg," ".dat," ".db," ".dbf," ".dll," ".ini," ".log," ".ora," ".sys," and ".zip."

Every applicant entity must comply with all applicable System for Award Management (SAM) and unique entity identifier (currently, a Data Universal Numbering System [DUNS] number) requirements. If an applicant entity has not fully complied with applicable SAM and unique identifier requirements by the time OJP makes award decisions, OJP may determine that the applicant is not qualified to receive an award and may use that determination as a basis for making the award to a different applicant.

All applicants should complete the following steps:

1. **Acquire a unique entity identifier (DUNS number).** In general, the Office of Management and Budget requires every applicant for a federal award (other than an individual) to include a "unique entity identifier" in each application, including an application for a supplemental award. Currently, a DUNS number is the required unique entity identifier.

   A DUNS number is a unique nine-digit identification number provided by the commercial company Dun and Bradstreet. This unique entity identifier is used for tracking purposes, and to validate address and point of contact information for applicants, recipients, and subrecipients. It will be used throughout the life cycle of an OJP award. Obtaining a DUNS number is a free, one-time activity. Call Dun and Bradstreet at 866-705-5711 to obtain a DUNS number or apply online at www.dnb.com. A DUNS number is usually received within 1-2 business days.

2. **Acquire registration with the SAM.** SAM is the repository for certain standard information about federal financial assistance applicants, recipients, and subrecipients. All applicants for OJP awards (other than individuals) must maintain current registrations in the SAM database. Each applicant must **update or renew its SAM registration at least annually** to maintain an active status. SAM registration and renewal can take as long as 10 business days to complete.

   Information about SAM registration procedures can be accessed at https://www.sam.gov/.

3. **Acquire a GMS username and password**. New users must create a GMS profile by selecting the "First Time User" link under the sign-in box of the GMS home page. For more

information on how to register in GMS, go to www.ojp.gov/gmscbt. Previously registered applicants should ensure, prior to applying, that the user profile information is up-to-date in GMS (including, but not limited to, address, legal name of agency and authorized representative) as this information is populated in any new application.

4. **Verify the SAM (formerly CCR) registration in GMS.** OJP requires each applicant to verify its SAM registration in GMS. Once logged into GMS, click the "CCR Claim" link on the left side of the default screen. Click the submit button to verify the SAM (formerly CCR) registration.

5. **Search for the funding opportunity on GMS.** After logging into GMS or completing the GMS profile for username and password, go to the "Funding Opportunities" link on the left side of the page. Select BJA and **FY 17 Edward Byrne Memorial State Justice Assistance Grant (JAG) Program.**

6. **Register by selecting the "Apply Online" button associated with the funding opportunity title.** The search results from step 5 will display the "funding opportunity" (solicitation) title along with the registration and application deadlines for this solicitation. Select the "Apply Online" button in the "Action" column to register for this solicitation and create an application in the system.

7. **Follow the directions in GMS to submit an application consistent with this solicitation.** Once the application is submitted, GMS will display a confirmation screen stating the submission was successful. **Important:** In some instances, applicants must wait for GMS approval before submitting an application. OJP urges each applicant to submit its application **at least 72 hours prior** to the application due date.

### Note: Application Versions
If an applicant submits multiple versions of the same application, OJP will review **only** the most recent system-validated version submitted.

### Experiencing Unforeseen GMS Technical Issues
An applicant that experiences unforeseen GMS technical issues beyond its control that prevent it from submitting its application by the deadline may contact the GMS Help Desk or the SAM Help Desk (Federal Service Desk) to report the technical issue and receive a tracking number. The applicant is expected to email the NCJRS Response Center identified in the Contact Information section on the title page **within 24 hours after the application deadline** to request approval to submit its application after the deadline. The applicant's email must describe the technical difficulties, and must include a timeline of the applicant's submission efforts, the complete grant application, the applicant's DUNS number, and any GMS Help Desk or SAM tracking number(s).

**Note: OJP does not automatically approve requests to submit a late application.** After OJP reviews the applicant's request, and contacts the GMS Help Desk to verify the reported technical issues, OJP will inform the applicant whether the request to submit a late application has been approved or denied. If OJP determines that the untimely application submission was due to the applicant's failure to follow all required procedures, OJP will deny the applicant's request to submit its application.

The following conditions generally are insufficient to justify late submissions to OJP solicitations:

- Failure to register in SAM or GMS in sufficient time (SAM registration and renewal can take as long as 10 business days to complete).
- Failure to follow GMS instructions on how to register and apply as posted on the GMS website.
- Failure to follow each instruction in the OJP solicitation.
- Technical issues with the applicant's computer or information technology environment, such as issues with firewalls.

# E. Application Review Information

**Review Process**
OJP is committed to ensuring a fair and open process for making awards. BJA reviews the application to make sure that the information presented is reasonable, understandable, measurable, and achievable, as well as consistent with the solicitation. BJA will also review applications to help ensure that JAG program-statute requirements have been met.

Pursuant to the (DOJ) Part 200 Uniform Requirements, before awards are made, OJP also reviews information related to the degree of risk posed by applicants. Among other things, to help assess whether an applicant that has one or more prior federal awards has a satisfactory record with respect to performance, integrity, and business ethics, OJP checks whether the applicant is listed in SAM as excluded from receiving a federal award. In addition, if OJP anticipates that an award will exceed $150,000 in federal funds, OJP also must review and consider any information about the applicant that appears in the non-public segment of the integrity and performance system accessible through SAM (currently, the Federal Awardee Performance and Integrity Information System; "FAPIIS").

**Important note on FAPIIS:** An applicant, at its option, may review and comment on any information about itself that currently appears in FAPIIS and was entered by a federal awarding agency. OJP will consider any such comments by the applicant, in addition to the other information in FAPIIS, in its assessment of the risk posed by the applicant.

The evaluation of risks goes beyond information in SAM, however. OJP itself has in place a framework for evaluating risks posed by applicants. OJP takes into account information pertinent to matters such as—

1. Applicant financial stability and fiscal integrity.
2. Quality of the management systems of the applicant, and the applicant's ability to meet prescribed management standards, including those outlined in the DOJ Grants Financial Guide.
3. Applicant's history of performance under OJP and other DOJ awards (including compliance with reporting requirements and award conditions), as well as awards from other federal agencies.
4. Reports and findings from audits of the applicant, including audits under the (DOJ) Part 200 Uniform Requirements.
5. Applicant's ability to comply with statutory and regulatory requirements, and to effectively implement other award requirements.

Absent explicit statutory authorization or written delegation of authority to the contrary, the Assistant Attorney General will make all final award decisions.

## F. Federal Award Administration Information

**Federal Award Notices**

OJP expects to issue award notifications by September 30, 2017. OJP sends award notification by email through GMS to the individuals listed in the application as the point of contact and the authorizing official. The email notification includes detailed instructions on how to access and view the award documents, and steps to take in GMS to start the award acceptance process. GMS automatically issues the notifications at 9:00 p.m. eastern time on the award date.

**NOTE:** In order validly to accept an award under the FY 2017 JAG program, a State must submit to GMS the certification by its chief legal officer regarding compliance with 8 U.S.C. § 1373, executed using the form that appears in Appendix II. (The form also may be downloaded at https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.) Unless the executed certification either— (1) is submitted to OJP together with the signed award document, or (2) is uploaded in GMS no later than the day the signed award document is submitted, **OJP will reject as invalid** any submission by a State that purports to accept an award under this solicitation.

Rejection of an initial submission as an invalid award acceptance is not a denial of the award. Consistent with award requirements, once the State **does** submit the necessary certification regarding 8 U.S.C. § 1373, the State **will** be permitted to submit an award document executed by the State on or after the date of that certification.

Also, in order for a State applicant validly to accept an award under the FY 2017 JAG program, an individual with the necessary authority to bind the applicant will be required to log in; execute a set of legal certifications and a set of legal assurances; designate a financial point of contact; thoroughly review the award, including **all** award conditions; and sign and accept the award. The award acceptance process requires physical signature of the award document by the authorized representative and the scanning of the fully-executed award document (along with the required certification regarding 8 U.S.C. § 1373, if not already uploaded in GMS) to OJP.

**Statutory and Regulatory Requirements; Award Conditions**

If selected for funding, in addition to implementing the funded project consistent with the OJP-approved application, the recipient must comply with all award requirements (including all award conditions), as well as all applicable requirements of federal statutes and regulations (including those referred to in assurances and certifications executed as part of the application or in connection with award acceptance, and administrative and policy requirements set by statute or regulation).

OJP strongly encourages prospective applicants to review information on post-award legal requirements generally applicable to FY 2017 OJP awards and common OJP award conditions **prior** to submitting an application.

Applicants should consult the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2017 Awards," available in the OJP Funding Resource Center. In addition, applicants should examine the following two legal documents, as each successful applicant must execute both documents in GMS before it may receive any award funds.

- Certifications Regarding Lobbying; Debarment, Suspension and Other Responsibility Matters; and Drug-Free Workplace Requirements

- **OJP Certified Standard Assurances** (*attached to this solicitation as Appendix IV*)

The web pages accessible through the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2017 Awards" are intended to give applicants for OJP awards a general overview of important statutes, regulations, and award conditions that apply to many (or in some cases, all) OJP grants and cooperative agreements awarded in FY 2017. Individual OJP awards typically also will include additional award conditions. Those additional conditions may relate to the particular statute, program, or solicitation under which the award is made; to the substance of the funded application; to the recipient's performance under other federal awards; to the recipient's legal status (e.g., as a for-profit entity); or to other pertinent considerations.

Individual FY 2017 Byrne JAG awards will include two new express conditions that, with respect to the "program or activity" that would be funded by the FY 2017 award, are designed to ensure that States and units of local government that receive funds from the FY 2017 Byrne JAG award: (1) permit personnel of the U.S. Department of Homeland Security ("DHS") to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States; and (2) provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act.

Compliance with the requirements of the two foregoing new award conditions will be an authorized and priority purpose of the award. The reasonable costs (to the extent not reimbursed under any other federal program) of developing and putting into place statutes, rules, regulations, policies, or practices as required by these conditions, and to honor any duly-authorized request from DHS that is encompassed by these conditions, will be allowable costs under the award.

**General Information about Post-Federal Award Reporting Requirements**
A State recipient of an award under this solicitation will be required to submit the following reports and data.

Required reports. Recipients typically must submit quarterly financial status reports, semi-annual progress reports, final financial and progress reports, and, if applicable, an annual audit report in accordance with the (DOJ) Part 200 Uniform Requirements or specific award conditions. Future awards and fund drawdowns may be withheld if reports are delinquent. (In appropriate cases, OJP may require additional reports.)

Awards that exceed $500,000 will include an additional condition that, under specific circumstances, will require the recipient to report (to FAPIIS) information on civil, criminal, and administrative proceedings connected with (or connected to the performance of) either the OJP award or any other grant, cooperative agreement, or procurement contract from the federal government. Additional information on this reporting requirement appears in the text of the award condition posted on the OJP website at https://ojp.gov/funding/FAPIIS.htm

Data on performance measures. In addition to required reports, each recipient of an award under this solicitation also must provide data that measure the results of the work done under the award. To demonstrate program progress and success, as well as to assist DOJ with fulfilling its responsibilities under GPRA and the GPRA Modernization Act of 2010, OJP will require State recipients to provide accountability metrics data. Accountability metrics data must be submitted through BJA's Performance Measurement Tool (PMT), available at https://bjapmt.ojp.gov. The accountability measures are available at: https://bjapmt.ojp.gov/help/jagdocs.html.  (Note that if a law enforcement agency receives JAG funds from a State, the State must submit quarterly accountability metrics data related to training that officers have received on use of force, racial and ethnic bias, de-escalation of conflict, and constructive engagement with the public.)

OJP may restrict access to award funds if a recipient of an OJP award fails to report required performance measure data in a timely manner.

# G. Federal Awarding Agency Contact(s)

For OJP contact(s), see the title page of this solicitation.

For contact information for GMS, see the title page.

# H. Other Information

**Freedom of Information Act and Privacy Act (5 U.S.C. § 552 and 5 U.S.C. § 552a)**
All applications submitted to OJP (including all attachments to applications) are subject to the federal Freedom of Information Act (FOIA) and to the Privacy Act. By law, DOJ may withhold information that is responsive to a request pursuant to FOIA if DOJ determines that the responsive information either is protected under the Privacy Act or falls within the scope of one of nine statutory exemptions under FOIA. DOJ cannot agree in advance of a request pursuant to FOIA not to release some or all portions of an application.

In its review of records that are responsive to a FOIA request, OJP will withhold information in those records that plainly falls within the scope of the Privacy Act or one of the statutory exemptions under FOIA. (Some examples include certain types of information in budgets, and names and contact information for project staff other than certain key personnel.) In appropriate circumstances, OJP will request the views of the applicant/recipient that submitted a responsive document.

For example, if OJP receives a request pursuant to FOIA for an application submitted by a nonprofit or for-profit organization or an institution of higher education, or for an application that involves research, OJP typically will contact the applicant/recipient that submitted the

33

application and ask it to identify—quite precisely—any particular information in the application that applicant/recipient believes falls under a FOIA exemption, the specific exemption it believes applies, and why. After considering the submission by the applicant/recipient, OJP makes an independent assessment regarding withholding information. OJP generally follows a similar process for requests pursuant to FOIA for applications that may contain law-enforcement sensitive information.

**Provide Feedback to OJP**

To assist OJP in improving its application and award processes, OJP encourages applicants to provide feedback on this solicitation, the application submission process, and/or the application review process. Provide feedback to OJPSolicitationFeedback@usdoj.gov.

**IMPORTANT:** This email is for feedback and suggestions only. OJP does **not** reply to messages it receives in this mailbox. A prospective applicant that has specific questions on any program or technical aspect of the solicitation **must** use the appropriate telephone number or email listed on the front of this solicitation document to obtain information. These contacts are provided to help ensure that prospective applicants can directly reach an individual who can address specific questions in a timely manner.

If you are interested in being a reviewer for other OJP grant applications, please email your résumé to ojppeerreview@lmsolas.com. (Do not send your résumé to the OJP Solicitation Feedback email account.) **Note:** Neither you nor anyone else from your organization or entity can be a peer reviewer in a competition in which you or your organization/entity has submitted an application.

# Application Checklist

## Edward Byrne Memorial Justice Assistance Grant (JAG) Program:
## FY 2017 State Solicitation

This application checklist has been created as an aid in developing an application.

**What an Applicant Should Do:**

*Prior to Registering in GMS:*
_____ Acquire a DUNS Number                    (see page 28)
_____ Acquire or renew registration with SAM    (see page 28)
*To Register with GMS:*
_____ For new users, acquire a GMS username and password*    (see page 28)
_____ For existing users, check GMS username and password*
          to ensure account access              (see page 29)
_____ Verify SAM registration in GMS           (see page 29)
_____ Search for correct funding opportunity in GMS      (see page 29)
_____ Select correct funding opportunity in GMS    (see page 29)
_____ Register by selecting the "Apply Online" button associated with the funding opportunity
          title                                 (see page 29)
_____ Read OJP policy and guidance on conference approval, planning, and reporting
          available at ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm
                                               (see page 15)
_____ If experiencing technical difficulties in GMS, contact the NCJRS Response Center (see
page 29)

*Password Reset Notice – GMS users are reminded that while password reset capabilities exist, this function is only associated with points of contact designated within GMS at the time the account was established. Neither OJP nor the GMS Help Desk will initiate a password reset unless requested by the authorized official or a designated point of contact associated with an award or application.

**Overview of Post-Award Legal Requirements:**

_____ Review the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2017 Awards" in the OJP Funding Resource Center.

**Scope Requirement:**

_____ The federal amount requested is within the allowable limit(s) of the FY 2017 JAG Allocations List as listed on BJA's JAG web page.

**What an Application Should Include:**

_____ Application for Federal Assistance (SF-424)        (see page 17)

_____ Intergovernmental Review                          (see page 17)
_____ Project Abstract                                  (see page 17)
_____ Program Narrative                                 (see page 18)
_____ Budget Detail Worksheet                           (see page 19)
_____ Budget Narrative                                  (see page 19)
_____ Indirect Cost Rate Agreement (if applicable)      (see page 22)
_____ Financial Management and System of Internal Controls Questionnaire (see 22)
_____ Disclosure of Lobbying Activities (SF-LLL) (if applicable) (see page 23)
_____ Certifications and Assurances by Chief Executive      (see page 23)
_____ Certification of Compliance with 8 U.S.C. § 1373 by Chief Legal Officer (see page 23)
_____ State Strategic Plan (if applicable)              (see page 24)
_____ Additional Attachments
          _____ Applicant Disclosure of Pending Applications (see page 24)
          _____ Research and Evaluation Independence and Integrity (if applicable)
                                                       (see page 25)

# Appendix I

## Certifications and Assurances by the Chief Executive of the Applicant Government

**Template for use by *chief executive* of the "State" (e.g., the governor)**

**Note**:  By law, for purposes of the JAG program, the term "States" includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa.

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

**Edward Byrne Justice Assistance Grant Program**
**FY 2017 State Solicitation**

Certifications and Assurances
by the Chief Executive of the Applicant Government

On behalf of the applicant "State" named below, in support of that State's application for an award under the FY 2017 Edward Byrne Justice Assistance Grant ("JAG") Program, and further to 42 U.S.C. § 3752(a), I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1. I am the chief executive of the applicant State named below, and I have the authority to make the following representations on my own behalf and on behalf of the applicant State. I understand that these representations will be relied upon as material in any OJP decision to make an award, under the application described above, to the applicant State.

2. I certify that no federal funds made available by the award (if any) that OJP makes based on the application described above will be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities.

3. I assure that the application described above (and any amendment to that application) was submitted for review to the governing body of the State (e.g., the State legislature), or to an organization designated by that governing body, not less than 30 days before the date of this certification.

4. I assure that, before the date of this certification— (a) the application described above (and any amendment to that application) was made public; and (b) an opportunity to comment on that application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure made such an opportunity available.

5. I assure that, for each fiscal year of the award (if any) that OJP makes based on the application described above, the applicant State will maintain and report such data, records, and information (programmatic and financial), as OJP may reasonably require.

6. I certify that— (a) the programs to be funded by the award (if any) that OJP makes based on the application described above meet all the requirements of the JAG Program statute (42 U.S.C. §§ 3750-3758); (b) all the information contained in that application is correct; (c) in connection with that application, there has been appropriate coordination with affected agencies; and (d) in connection with that award (if any), the applicant State will comply with all provisions of the JAG Program statute and all other applicable federal laws.

7. I have examined certification entitled "State or Local Government: FY 2017 Certification of Compliance with 8 U.S.C. § 1373" executed by the chief legal officer of the applicant government with respect to the FY 2017 JAG program and submitted in support of the application described above, and I hereby adopt that certification as my own on behalf of that government.

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it "supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 42 U.S.C. § 3795a), and also may subject me and the applicant State to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____          _____
Signature of Chief Executive of the Applicant "State"          Date of Certification

_____          _____
Printed Name of Chief Executive          Title of Chief Executive

_____
Name of Applicant State

38

BJA-2017-11360

Exhibit 1
Page 38 of 44

# Appendix II

**State or Local Government:**
**Certification of Compliance with 8 U.S.C. § 1373**

**Template for use by *chief legal officer* of the "State" (e.g., the State Attorney General)**

**Available for download at:**
https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

**State or Local Government:  FY 2017 Certification of Compliance with 8 U.S.C. § 1373**

On behalf of the applicant government entity named below, and in support of its application, I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

(1) I am the chief legal officer of the State or local government of which the applicant entity named below is a part ("the jurisdiction"), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP). I understand that OJP will rely upon this certification as a material representation in any decision to make an award under this FY 2017 OJP Program.

(2) I have carefully reviewed 8 U.S.C. § 1373(a) and (b), including the prohibitions on certain actions by State and local government entities, -agencies, and -officials regarding information on citizenship and immigration status. I also have reviewed the provisions set out at (or referenced in) 8 U.S.C. § 1551 note ("Abolition .... and Transfer of Functions"), pursuant to which references to the "Immigration and Naturalization Service" in 8 U.S.C. § 1373 are to be read, as a legal matter, as references to particular components of the U.S. Department of Homeland Security.

(3) I (and also the applicant entity) understand that the U.S. Department of Justice will require States and local governments (and agencies or other entities thereof) to comply with 8 U.S.C. § 1373, with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2017 OJP program under which this certification is being submitted ("the FY 2017 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2017 OJP Program.

(4) I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (cf. 42 U.S.C. § 901(a)(2)). Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (i.e., one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or -agency.

(5) I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning both—

    (a) the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2017 OJP Program; and

    (b) any prohibitions or restrictions potentially applicable to the "program or activity" sought to be funded under the FY 2017 OJP Program that deal with sending to, requesting or receiving from, maintaining, or exchanging information of the types described in 8 U.S.C. § 1373(a) or (b), whether imposed by a State or local government entity, -agency, or -official.

(6) As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any prohibition or any restriction that would apply to the "program or activity" to be funded in whole or in part under the FY 2017 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that deals with either— (1) a government entity or -official sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. § 1373(a); or (2) a government entity or -agency sending to, requesting or receiving from, maintaining, or exchanging information of the types (and with respect to the entities) described in 8 U.S.C. § 1373(b).

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. § 1001 and/or 1621, and/or 42 U.S.C. § 3795a), and also may subject me and the applicant entity to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____    _____
Signature of Chief Legal Officer of the Jurisdiction    Printed Name of Chief Legal Officer

_____    _____
Date of Certification    Title of Chief Legal Officer of the Jurisdiction

_____
Name of Applicant Government Entity (i.e., the applicant to the FY 2017 OJP Program identified below)

*FY 2017 OJP Program:* Byrne Justice Assistance Grant ("JAG") Program

40

# Appendix III

## 8 U.S.C. § 1373

# 8 U.S.C. § 1373 (as in effect on June 21, 2017)

## Communication between government agencies and the Immigration and Naturalization Service

### (a) In general

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

### (b) Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
(2) Maintaining such information.
(3) Exchanging such information with any other Federal, State, or local government entity.

### (c) Obligation to respond to inquiries

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

*See also* provisions set out at (or referenced in) 8 U.S.C. § 1551 note ("Abolition ... and Transfer of Functions")

OMB No. 1121-0140
Expires 5/31/2019

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

**CERTIFIED STANDARD ASSURANCES**

On behalf of the Applicant, and in support of this application for a grant or cooperative agreement, I certify under penalty of perjury to the Office of Justice Programs (OJP), U.S. Department of Justice ("Department"), that all of the following are true and correct:

(1) I have the authority to make the following representations on behalf of myself and the Applicant. I understand that these representations will be relied upon as material in any OJP decision to make an award to the Applicant based on its application.

(2) I certify that the Applicant has the legal authority to apply for the federal assistance sought by the application, and that it has the institutional, managerial, and financial capability (including funds sufficient to pay any required non-federal share of project costs) to plan, manage, and complete the project described in the application properly.

(3) I assure that, throughout the period of performance for the award (if any) made by OJP based on the application—

(a) the Applicant will comply with all award requirements and all federal statutes and regulations applicable to the award;

(b) the Applicant will require all subrecipients to comply with all applicable award requirements and all applicable federal statutes and regulations; and

(c) the Applicant will maintain safeguards to address and prevent any organizational conflict of interest, and also to prohibit employees from using their positions in any manner that poses, or appears to pose, a personal or financial conflict of interest.

(4) The Applicant understands that the federal statutes and regulations applicable to the award (if any) made by OJP based on the application specifically include statutes and regulations pertaining to civil rights and nondiscrimination, and, in addition—

(a) the Applicant understands that the applicable statutes pertaining to civil rights will include section 601 of the Civil Rights Act of 1964 (42 U.S.C. § 2000d); section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794); section 901 of the Education Amendments of 1972 (20 U.S.C. § 1681); and section 303 of the Age Discrimination Act of 1975 (42 U.S.C. § 6102);

(b) the Applicant understands that the applicable statutes pertaining to nondiscrimination may include section 815(c) of Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. § 3789d(c)); section 1407(e) of the Victims of Crime Act of 1984 (42 U.S.C. § 10604(e)); section 299A(b) of the Juvenile Justice and Delinquency Prevention Act of 2002 (42 U.S.C. § 5672(b)); and that the grant condition set out at section 40002(b)(13) of the Violence Against Women Act (42 U.S.C. § 13925(b)(13)) also may apply;

(c) the Applicant understands that it must require any subrecipient to comply with all such applicable statutes (and associated regulations); and

(d) on behalf of the Applicant, I make the specific assurances set out in 28 C.F.R. §§ 42.105 and 42.204.

(5) The Applicant also understands that (in addition to any applicable program-specific regulations and to applicable federal regulations that pertain to civil rights and nondiscrimination) the federal regulations applicable to the award (if any) made by OJP based on the application may include, but are not limited to, 2 C.F.R. Part 2800 (the DOJ "Part 200 Uniform Requirements") and 28 C.F.R. Parts 22 (confidentiality - research and statistical information), 23 (criminal intelligence systems), and 46 (human subjects protection).

(6) I assure that the Applicant will assist OJP as necessary (and will require subrecipients and contractors to assist as necessary) with the Department's compliance with section 106 of the National Historic Preservation Act of 1966 (54 U.S.C. § 306108), the Archeological and Historical Preservation Act of 1974 (54 U.S.C. §§ 312501-312508), and the National Environmental Policy Act of 1969 (42 U.S.C. §§ 4321-4335), and 28 C.F.R. Parts 61 (NEPA) and 63 (floodplains and wetlands).

(7) I assure that the Applicant will give the Department and the Government Accountability Office, through any authorized representative, access to, and opportunity to examine, all paper or electronic records related to the award (if any) made by OJP based on the application.

(8) I assure that, if the Applicant is a governmental entity, with respect to the award (if any) made by OJP based on the application—

(a) it will comply with the requirements of the Uniform Relocation Assistance and Real Property Acquisitions Act of 1970 (42 U.S.C. §§ 4601-4655), which govern the treatment of persons displaced as a result of federal and federally-assisted programs; and

(b) it will comply with requirements of 5 U.S.C. §§ 1501-1508 and 7324-7328, which limit certain political activities of State or local government employees whose principal employment is in connection with an activity financed in whole or in part by federal assistance.

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 42 U.S.C. § 3795a), and also may subject me and the Applicant to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by the Department, including by OJP and by the Department's Office of the Inspector General.

44

BJA-2017-11360

Exhibit 1
Page 43 of 44

# Appendix IV

## OJP Certified Standard Assurances

Attorney General Sessions Announces Immigration Compliance Requirements for Edwar...    Page 1 of 1

**Department of Justice**

**Office of Public Affairs**

FOR IMMEDIATE RELEASE                                                Tuesday, July 25, 2017

### Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs

The Department of Justice today posted a solicitation for the Edward Byrne Memorial Justice Assistance Grant Programs ("Byrne JAG"). Recipients for FY 2017 will be notified of new conditions of their grants that will increase information sharing between federal, state, and local law enforcement, ensuring that federal immigration authorities have the information they need to enforce immigration laws and keep our communities safe.

"So-called 'sanctuary' policies make all of us less safe because they intentionally undermine our laws and protect illegal aliens who have committed crimes," Attorney General Jeff Sessions said. "These policies also encourage illegal immigration and even human trafficking by perpetuating the lie that in certain cities, illegal aliens can live outside the law. This can have tragic consequences, like the 10 deaths we saw in San Antonio this weekend. As part of accomplishing the Department of Justice's top priority of reducing violent crime, we must encourage these 'sanctuary' jurisdictions to change their policies and partner with federal law enforcement to remove criminals. From now on, the Department will only provide Byrne JAG grants to cities and states that comply with federal law, allow federal immigration access to detention facilities, and provide 48 hours notice before they release an illegal alien wanted by federal authorities. This is consistent with long-established cooperative principles among law enforcement agencies. This is what the American people should be able to expect from their cities and states, and these long overdue requirements will help us take down MS-13 and other violent transnational gangs, and make our country safer."

**Attachment(s):**
Download Byrne JAG Grant Policy Backgrounder

**Topic(s):**
Grants
Immigration

**Component(s):**
Office of the Attorney General

**Press Release Number:**
17-826

*Updated November 8, 2017*

AR-00992

## BACKGROUNDER ON GRANT REQUIREMENTS

The following is on background, attributable to a DOJ official:

- Today, consistent with the goal of increasing information sharing between federal, state, and local law enforcement, Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG") recipients for FY 2017 have been notified that they will be required to do the following:

  - certify compliance with section 1373, a federal statute applicable to state and local governments that generally bars restrictions on communications between state and local agencies and officials at the Department of Homeland Security;

  - permit personnel of the U.S. Department of Homeland Security ("DHS") to access any detention facility in order to meet with an alien and inquire as to his or her right to be or remain in the United States; and

  - provide at least 48 hours advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien.

For background on the Byrne JAG program, please click here.

For more information on Byrne JAG allocation for past fiscal years, please click here.

For more information on Byrne JAG as it pertains to FY2017, please click here.

- Improving the flow of information between federal and state law enforcement authorities is paramount to ensuring that federal immigration authorities have the information they need to enforce the law and keep our communities safe.

- 8 U.S.C. § 1373 is a federal statute applicable to state and local governments that generally bars restrictions on communication between state and local agencies and officials at the Department of Homeland Security (and certain other entities) with respect to information regarding the citizenship or immigration status of any individual.

- In March 2016, the Department's Office of Justice Programs ("OJP") notified recipients of Byrne JAG grants of the requirement to comply with 8 U.S.C. § 1373. The Department has also announced that it will take all lawful steps to claw back any funds awarded to a jurisdiction that violates its grant agreement, including the condition to comply with section 1373.

- These common-sense measures will improve the flow of information between federal, state, and local law enforcement, and help keep our communities safe. Every year, the Department of Justice awards billions of dollars in grants to state and local jurisdictions across the United States. Unfortunately, some of these jurisdictions have adopted policies and regulations that frustrate the enforcement of federal immigration law, including by refusing to cooperate with federal immigration authorities in information sharing about illegal aliens who commit crimes.

- These measures will also prevent the counterproductive use of federal funds for policies that frustrate federal immigration enforcement. By refusing to communicate with the federal officials, these jurisdictions jeopardize the safety of their residents and undermine the Department's ability to protect the public and reduce crime and violence.

 BJA FY 17 Edward Byrne Memorial Justice Assistance Grant (JAG) Program – State Solicitation 2017-H2865-OR-DJ 

Application          Correspondence          Application: Switch to ... ▼

**Application Handbook  Submit Application**

Overview

Applicant
Information

Project Information

Budget and
Program
Attachments

Assurances and
Certifications

Review SF 424

Submit Application

Help/Frequently
Asked Questions

GMS Home

Log Off

- Application submitted on 08/23/2017

Exhibit 4
Page 1 of 51

# PROJECT ABSTRACT

The mission of the Criminal Justice Commission ("CJC") is to improve the legitimacy, efficiency, and effectiveness of state and local criminal justice systems. CJC serves as the primary coordinating body for the acceptance, planning and distribution of federal criminal justice funds leveraged to address the needs of the state criminal justice system. This responsibility includes: state and local public safety issue identification; system collaboration; policy development; and system planning and implementation.

## DRUG TREATMENT AND ENFORCEMENT PROGRAMS

Specialty courts target non-violent felony offenders with substance-use disorders in an integrated, systematic approach found to reduce drug use and recidivism while increasing public safety, and often provide family reunification. The opioid epidemic and other illicit drug dependence has demanded an increased need for specialty courts to address the root causes of criminal activity and substance-use disorders through an alternative to incarceration that helps to reduce recidivism and increase public safety.

## MENTAL HEALTH PROGRAM

Untreated or undertreated mental illness drives a disproportionate number of people into the criminal justice system. Often mental health courts can provide a diversion strategy for offenders with mental illness to prevent unnecessary incarceration and recurring arrests through appropriate community-based treatment and supervision. These community-based intervention programs offer the opportunity for medium- to high-risk individuals to be identified and enter into specialized treatment services.

## PLANNING, EVALUATION AND TECHNOLOGY IMPROVEMENT PROGRAMS

Reducing unnecessary incarceration while increasing public safety through effective community-based supervision of offenders is a priority for Oregon. Evidence-based treatment and program services promote reduced recidivism. Oregon's pretrial reform is moving forward with recommendations for the use of a validated risk assessment tool to inform pretrial release decisions.

CJC is acquiring a statewide Specialty Court Case Management System which will ensure that all service efforts are monitored, connected, and synchronized through one primary tool facilitating the support of daily operations, as well as enabling specialty court team members to manage participant data, treatment, and court compliance. Also, the System will sustain data collection for analysis and evaluation purposes, reporting, and program modification.

The Justice Reinvestment Summit offer public safety stakeholders from all of Oregon's counties a unique networking opportunity to assist localities in translating evidence into practice through informed policy decisions. The event provides its 950+ attendees to hear from local and national subject matter experts about successful and innovative evidence-based strategies in criminal justice.

Exhibit 4
Page 2 of 51

Oregon Criminal Justice Commission                    2017 Edward Byrne Memorial JAG State Application

JAG IDENTIFIERS

DRUGCOURTS                          PROGRAM EVALUATION

EVIDENCE-BASED                      STANDARDS

JUST REINV STRATEGIES AND TRG       SUBSTANCE ABUSE TREATMENT

MENTAL HEALTH                       SYSTEMIMPROVEMENTS

PROBLEM SOLVING COURTS              TASKFORCES

Exhibit 4
Page 3 of 51

# PROGRAM NARRATIVE

## 1.0  STATEMENT OF THE PROBLEM

The mission of the Criminal Justice Commission ("CJC") is to improve the legitimacy, efficiency, and effectiveness of state and local criminal justice systems.  The agency is tasked to develop and maintain a state criminal justice policy and comprehensive, long-range plan for a coordinated state criminal justice system that encompasses: public safety; offender accountability; crime reduction and prevention; and offender treatment and rehabilitation. [ORS 137.656] As the State Administering Agency ("SAA") for the Bureau of Justice Assistance ("BJA"), CJC provides oversight of the Edward Byrne Memorial Justice Assistance Grant ("JAG") program funding.

Additional responsibilities of CJC include:

- Conduct evaluations and studies;
- Oregon's Statistical Analysis Center ("SAC");
- Serve as a clearinghouse for information;
- Provide technical assistance to Local Public Safety Coordinating Councils ("LPSCC");
- Work with local and state associations to engage in evidence-based data-driven best practice;
- Encourage stakeholder engagement to address local and state geographic needs, trends, and challenges;
- Oregon's Specialty Court Best-Practice Standards ("Standards"); and
- Maintain and update sentencing guidelines.

CJC serves as the primary coordinating body for the acceptance, planning and distribution of federal criminal justice funds leveraged to address the needs of the state criminal justice system as well as smaller local entities that are not eligible to apply directly for JAG funding.  This responsibility includes: state and local public safety issue identification; system collaboration; policy development; and system planning and implementation.  In addition, CJC has been asked to lead the statewide planning efforts and initiatives to address the needs of the system.  JAG

Exhibit 4
Page 4 of 51

Oregon Criminal Justice Commission                    2017 Edward Byrne Memorial JAG State Application

funded programs are limited to a 24 month funding project period, and it is expected that local and state agencies will assume fiscal responsibility for projects when the federal JAG funding project period is over.

The 79th Oregon Legislative Assembly passed legislation to target racial profiling in officer-initiated traffic and pedestrian stops ("Stop Data") and modifies the charge of possession of controlled substances as a Class A misdemeanor, unless the offense involves substantial qualities or is classified as a commercial drug offense.[1]  For the Stop Data, the legislation requires CJC to collaborate with Oregon State Police ("OSP"), Department of Public Safety and Standards ("DPSST"), and the Oregon Department of Justice ("DOJ") to develop and implement a standardized method to be used by law enforcement officers to record stop data.  CJC will review the collected data and identify patterns or practices of profiling in a report by December 1, 2019.

This initiative follows Oregon's continued support of the statewide criminal justice efforts. Justice Reinvestment is Oregon's proactive approach to the growing need to obtain greater efficiencies in the criminal justice system through improved collaboration and decision making. Justice Reinvestment requires the CJC to assist LPSCCs in using a data-driven approach to achieve its four goals: 1) reduce prison populations; 2) reduce recidivism; 3) increase public safety; and 4) increase offender accountability.  Oregon's legislature continues to increase their support of this effort by funding the grant program through Department of Corrections ("DOC") avoided costs.  In 2013-15, the program granted $15 million of state funds to Oregon's 36 counties; 2015-17, $38.7 million was granted; and in 2017-19, $47.1 million were allocated to the program.

---

[1] 79th Oregon Legislative Assembly: 2017 Regular Session. *House Bill 2355 Enrolled.*  Retrieved August 2017 from https://olis.leg.state.or.us/liz/2017R1/Downloads/MeasureDocument/HB2355.

Exhibit 4
Page 5 of 51

Oregon Criminal Justice Commission                    2017 Edward Byrne Memorial JAG State Application

Oregon's Specialty Court Grant Program calls for evidence-based problem-solving court strategies designed to address the root causes of criminal activity and substance use disorders by coordinating efforts of the judiciary, prosecution, defense, probation, law enforcement, treatment, mental health, and social services.  With 72 courts statewide, non-violent felony offenders are offered an alternative to incarceration and the opportunity to become productive law-abiding citizens, while reducing recidivism and increasing public safety.  In 2015-17, CJC provided 36 of the 72 courts statewide with $13.2 million operational funds to maintain or enhance their programs through a competitive application. In 2017-19, 41 specialty courts were awarded grants totaling approximately $16.8 million.

Overall, CJC employs 14 staff and operates with a biennial budget of $72.5 million total funds, of which $64.8 million are state general fund.  The commission has approved the following program purpose areas for the FY17 JAG application: Drug treatment and enforcement programs; Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams; and Planning, evaluation and technology improvement programs.

## 1.1 DRUG TREATMENT AND ENFORCEMENT PROGRAMS

For the 17-19 biennium, CJC awarded $16.8 million operational grant funds to 41 specialty courts including adult drug, juvenile drug, family, veterans, mental health, and DWI courts. Specialty courts focus on addressing the root causes of crime and substance-use disorders by working with participants to offer treatment and solve underlying problems that lead to criminal activity. CJC serves as a clearinghouse and information center for best-practices applicable to these courts which includes coordinating research and distributing results to support evidence-

Page 3 of 12

Exhibit 4
Page 6 of 51

Oregon Criminal Justice Commission                    2017 Edward Byrne Memorial JAG State Application

based practice implementation.  The Standards were developed by CJC in consultation with the

Oregon Judicial Department ("OJD"). [2] [ORS 137.680]

Specialty courts target non-violent felony offenders with substance-use disorders in an integrated, systematic approach found to reduce drug use and recidivism while increasing public safety, and often provide family reunification.  Specialty courts may require an appropriate

assessment and should require physician monitoring for any participant on medication assisted

treatment ("MAT").  However, the opioid epidemic and other illicit drug dependence has

demanded the need for specialty courts to allow MAT and that participation cannot be the basis

for probation or specialty court violations.  In 2017, Oregon passed HB 3440 §6 which explicitly

states that:

> *An individual may not be denied entry into a specialty court in this state solely for*
> *the reason that the individual is taking, or intends to take, medication prescribed*
> *by a licensed health care practitioner for the treatment of drug abuse or*
> *dependency.* [3]

By addressing the root causes of criminal activity and substance-use disorders, the courts

offer participants an alternative to incarceration and providing them with the resources and

opportunities they need by through coordinated efforts.  CJC will use JAG funds to financially support operational grants from Oregon specialty courts to fund evidence-based practices that support best-practice standards.

---

[2] Criminal Justice Commission.  *Oregon Treatment Court Standards*.  Retrieved August 2017 from
http://www.oregon.gov/cjc/specialtycourts/Documents/family/OregonTreatmentCourtStandards.pdf.
[3] 79th Oregon Legislative Assembly: 2017 Regular Session.  *House Bill 4330 Enrolled*.  Retrieved August 2017 from
https://olis.leg.state.or.us/liz/2017R1/Downloads/MeasureDocument/HB3440.

Exhibit 4
Page 7 of 51

Oregon Criminal Justice Commission                    2017 Edward Byrne Memorial JAG State Application

## 1.2 MENTAL HEALTH PROGRAMS

Untreated or undertreated mental illness drives a disproportionate number of people into the criminal justice system.  Often mental health courts can provide a diversion strategy for offenders with mental illness to prevent unnecessary incarceration and recurring arrests through appropriate community-based treatment and supervision.  Of the 41 specialty courts that CJC has awarded in 2017-19, six are mental health courts.  These community-based intervention programs offer the opportunity for medium- to high-risk individuals to be identified and enter into specialized treatment services that may include MAT and other innovative approaches to assist with this population.

## 1.3 PLANNING, EVALUATION AND TECHNOLOGY IMPROVEMENT PROGRAMS

### 1.3.1 Pretrial Reform

Reducing unnecessary incarceration while increasing public safety through effective community-based supervision of offenders is a priority for Oregon.  Evidence-based treatment and program services promote reduced recidivism.  Through pretrial reform, the state is moving forward with recommendations for the use of a validated risk assessment tool to inform pretrial release decisions.  Further the Task Force on Public Safety ("Task Force") has been charged with implementing pretrial reform to lead to improved public safety and reductions in recidivism, and not merely intended to decrease the use of prisons and jails.  CJC will use JAG funds to support a consultant to assist the Task Force with implementation planning for pretrial reform.

Exhibit 4
Page 8 of 51

Oregon Criminal Justice Commission                    2017 Edward Byrne Memorial JAG State Application

1.3.2 Specialty Court Case Management System

Oregon's Department of Administrative Services ("DAS"), on behalf of CJC, has recently closed DASPS 2162-17, the Request for Proposal ("RFP") to procure a new Specialty Court Case Management System ("System"). The new System will (a) expand the electronic exchange of data between specialty court administrative units, specialty court end users, and public safety partners; (b) increase internal efficiencies by eliminating redundant and manual processes through workflow and electronic document management; and (c) enable the generation of participant detail and data analysis reports, including weekly staffing reports for team members in addition to quarterly and annual progress reporting to CJC.

The new System will be the official System of record for Oregon's specialty courts. It will collect, transmit, and process court records, that include, among other information, highly sensitive medical records, which are designated as Level 4 information assets by the Oregon's Chief Information Office ("OSCIO") and subject to protection under the Health Insurance Portability and Accountability Act ("HIPAA"), Health Information Technology for Economic and Clinical Health Act ("HITECH"), 42 C.F.R. Public Health as well as State of Oregon laws. [ORS 192.496 -192.581]

A requisite of the new System is increased operational efficiencies through modern and improved technology systems which will reduce time and costs dedicated by specialty courts to data entry and system maintenance tasks. The System will ensure that all service efforts are monitored, connected, and synchronized through one primary tool facilitating the support of daily operations, as well as enabling specialty court team members to manage participant data, treatment, and court compliance. Also, the System will sustain data collection for analysis and evaluation purposes, reporting, and program modification.

Exhibit 4
Page 9 of 51

Oregon Criminal Justice Commission                    2017 Edward Byrne Memorial JAG State Application

In order to meet the obligations set forth in ORS 137.680, CJC must replace its existing

solution, which was developed approximately 12-years ago, with a new System to be

implemented by a vendor who can also provide pre- and post-implementation Services as more

fully described in the RFP.

==CJC will use JAG funds to support the planning and execution for the statewide==

==implementation the System through a qualified Project Manager ("PM").== This PM will assist

jurisdictions with coordinated, synchronized implementation delivery that allows for the

facilitation of daily operations of specialty court programs as well as sustained data collection as

required.


1.3.3 2019 Justice Reinvestment Summit

The Justice Reinvestment Summit ("Summit") brings together public safety stakeholders and

LPSCC members from every geographic region in the state.[4]  This offers CJC and stakeholders a

unique networking opportunity to assist localities in translating evidence into practice through

informed policy decisions.  The event is an opportunity for stakeholders to hear from local and

national subject matter experts about successful and innovative evidence-based strategies in

criminal justice.

During the 2017 Summit, Governor Kate Brown delivered the welcome address to over 950

attendees.  The Governor was followed by Milwaukie County, Wisconsin's District Attorney

John Chisholm and Professor Emily Salisbury.  The 2-day event hosted nationally recognized

speakers as well as local workshops and breakout sessions with key topics for Oregon's criminal

justice system.  With a focus on a wide range of programs and solutions to address the four goals

---

[4] http://www.oregon.gov/cjc/summit/Pages/default.aspx

Exhibit 4
Page 10 of 51

of justice reinvestment, CJC was able to offer learning opportunities that included the intersection of mental health and criminal justice, trauma informed approaches, reentry and diversion programs, and new approaches for response to addiction and drug crimes.

Federal and state funds for the event were matched and exceeded in association and local sponsorships. Holding the event in February at the beginning of the Oregon Legislative Session, raised awareness and helped to secure $47.1 million in state justice reinvestment grant program funds.

CJC intends to use JAG funds to support the 3-day 2019 Justice Reinvestment Summit. It is anticipated that this event will, again, sell out the Salem Convention Center with the attendance of legislators, local, state and national policy advisors, criminal justice leaders, LPSCC members and public safety professionals. The Summit will continue to provide the collaborative learning environment for data-driven, fiscally responsible, evidence-based criminal justice system policies and practices.


1.4 VARIABLE PASS-THROUGH

Oregon is required to pass-through a federally determined percentage of funds to local jurisdictions and has additional requirements for funds that must be allocated specifically for what is referred to as "variable less-than $10,000 jurisdictions." Grant funds, excluding 10% administration costs and less than $10,000 amounts, are passed through to local jurisdictions. The less than $10,000 amount is provided locally to specialty court programs and through training/travel support for the 3-day 2019 Justice Reinvestment Summit to be held in Salem, Oregon.

Exhibit 4
Page 11 of 51

## 2.0  PROJECT DESIGN AND IMPLEMENTATION

Oregon's funding priorities direct resources to evidence-based best-practice programming in public safety.  CJC works directly with the Governor to target innovative programs that further the goals of the state's public safety agencies and associations.  This process does not result in a written strategic plan.  However, it does result in bringing together public safety stakeholders from across the state to identify the challenges, prioritize, and discuss solutions.  Through this approach, CJC develops a more complete view of challenges that can be addressed through strategic programs and funding support.

CJC recognizes the importance of collection and analysis of relevant, reliable, and valid criminal justice data.  The commission is charged with being the criminal justice policy advisory board for the state.  The statute requires the commission:

> *To develop and maintain a state criminal justice policy and comprehensive, long-range plan for a coordinated state criminal justice system that encompasses: public safety; offender accountability; crime reduction and prevention; and offender treatment and rehabilitation.* [ORS 137.656]

CJC provides staff support to the Task Force, responsible to oversee implementation of the policy section of justice reinvestment legislation.  In addition to that work, CJC has established Regional Implementation Councils ("RICs") to provide regular feedback to LPSCCs about prison usage, recidivism, sentencing impacts and other criminal justice policy changes.  CJC expects that counties will build a genuine collaborative LPSCC that is highly functioning with a shared purpose of improving the local criminal justice system while cooperating with the agency for statewide reform.  Key decision makers and stakeholders are expected to engage locally, just as association stakeholders engage at the state level.  Through this constructive dialogue,

Exhibit 4
Page 12 of 51

Oregon Criminal Justice Commission                                2017 Edward Byrne Memorial JAG State Application

effective collaboration, and positive engagement, CJC has demonstrated cultural change and influence on the criminal justice system.

Oregon's JAG strategic priorities are intentionally broad and vague, but informed by the work of the commission and the statewide need. The work is ongoing, includes input from a variety of public safety stakeholders as well as local and state agencies. Engaging the stakeholders in yet another planning process for JAG funds would not allow for the flexibility of funding the progressive needs of the state and be inefficient.

## 3.0 CAPABILITIES AND COMPETENCIES

CJC serves as both the SAA and SAC. As such, CJC is the principal agency responsible for Oregon's program policy evaluation and criminal justice research.

In order to make informed decisions, policy-makers require updated criminal justice data. The SAC has worked to gain access to arrest, charge and conviction data and is continuing to analyze these data and report the results to policy makers. This data analysis has helped the SAC to develop a comprehensive cost-benefit model, a risk-assessment tool, and legislative fiscal and racial/ethnic impact estimates. Continued analysis of these data is crucial in making recommendations on what law changes have the greatest potential for saving money while maintaining the effectiveness of Oregon's criminal justice system.

In 2016, Oregon received both the *Statistical/Management* and *Research/Policy* awards by the Justice Research and Statistics Association ("JRSA"). The Oregon Recidivism Analysis received the *Statistical/Management* award and broke out recidivism in new ways including: rates by age, by gender, by race and ethnicity, by crime type, and by level of risk to recidivate.[5]

---

[5] Criminal Justice Commission. *Oregon Recidivism* Analysis. Retrieved on August 2017 from http://www.jrsa.org/awards/winners/16_stat_or.pdf.

Page **10** of 12

Exhibit 4
Page 13 of 51

Oregon Criminal Justice Commission                    2017 Edward Byrne Memorial JAG State Application

The *Research/Policy* award was received for the Oregon Short-Term Transitional Leave ("STTL") Report that looked at the recidivism of offenders that received STTL to see if they were more, less, or similarly likely to commit new crimes as compared to those that did not.[6]

Data sharing and data-driven responses have played a significant role in the work of CJC in the past two years. The new interactive data connects public safety officials and policy makers with up-to-date information on local criminal justice systems.[7] This data provides a visual idea of criminal justice trends in Oregon. The Oregon Knowledge Bank ("OKB") is a statewide resource designed specifically for Oregon-based public safety programs and research. The OKB highlights innovative programs operating in the state and research about Oregon-based solutions.[8]

## 4.0  PLAN FOR COLLECTING THE DATA REQUIRED FOR THIS SOLICITATION'S PERFORMANCE MEASURES

CJC collects performance data on a quarterly basis from its subgrantees that aligns with BJA performance metrics. CJC monitors grantees for compliance through program and fiscal monitoring as grantees are expected to be working toward the program objectives as outlined in the Award Agreement while following appropriate fiscal procedures. Grantees are responsible for submitting progress reports specific to their program which then is reviewed and compiled for submission into the BJA Performance Measurement Tool ("PMT") as required.

---

[6] Criminal Justice Commission. *Short Term Transitional Leave Program in Oregon.* Retrieved on August 2017 from http://www.jrsa.org/awards/winners/16_research_or.pdf.
[7] Criminal Justice Commission. *Interactive Data.* Retrieved on August 2017 from http://www.oregon.gov/cjc/data/Pages/main.aspx.
[8] Criminal Justice Commission. *Oregon Knowledge Bank.* Retrieved on August 2017 from http://okb.oregon.gov/.

Exhibit 4
Page 14 of 51

Oregon Criminal Justice Commission                2017 Edward Byrne Memorial JAG State Application

During the project period, grant analysts review program and fiscal records, policies, and procedures and meet with program participants, staff, and other stakeholders. Monitoring visits are intended to verify compliance with grant and fiscal requirements, provide technical assistance, offer program development guidance, and observe program activities.

Grantees must submit complete progress reports according to established timelines in the Award Agreement. Progress reports have the following purposes:

- To determine whether the grantee is implementing the program as agreed;
- To determine whether the grantee demonstrates fidelity to identified evidence-based practices and/or programs;
- To determine whether the activities the grantee performs are linked to the specific outcomes identified for the program;
- To allow the grantee to present information on any problem encountered (for example, what problems existed, how they affected the program, and how they were resolved);
- To develop data for criminal justice planning and the statewide criminal justice strategy;
- To assist other localities that might undertake a similar program;
- To present information to the governor, the legislature, the U.S. Department of Justice, Congress, and research consultants; and
- To justify continued grant funding.

CJC requires accurate, clear, and verifiable expenditure documentation. Financial reporting must reflect all program expenditures as outlined in the Award Agreement. Detailed records must be maintained as supporting documentation for all expenditures listed by category, separated by match (if applicable) and grant expenses. In addition, backup documentation and invoices must be maintained with the grant file and will be subject to review upon request. Federally funded awards are subject to the Department of Justice Financial Guide and 2 CFR 200 on cost accounting principles, in addition to the Oregon Accounting Manual ("OAM").

CJC also has access to official records collected by the state including: statewide arrest records; OJD court records; and DOC felony conviction data. Recently, select counties have started to provide local jail data for analysis as well.

Exhibit 4
Page 15 of 51

# BUDGET NARRATIVE

The 2017 JAG funds will be administered by the Criminal Justice Commission (CJC) for the State of Oregon.

## CJC GRANT FUND EXPENDITURES

| | |
|---|---:|
| Personnel (Federal) | $ 126,367 |
| Fringe | $ 66,112 |
| Travel (Federal) | $ 6,078 |
| Equipment | -- |
| Supplies | -- |
| Construction | -- |
| Consultant Fees | -- |
| Consultant Expenses | -- |
| Contracts (Federal) | $ 1,831,456 |
| Contracts (Non-Federal) | -- |
| Other Costs | $ 4,392 |
| Indirect Costs | -- |

TOTAL CJC GRANT FUND EXPENDITURES: **$ 2,034,945**

CJC will retain up to 10% for CJC administrative purposes as allowed. Grant reporting will be performed by the CJC on behalf of subgrantees. The administrative funds will be used to fund the analyst, information systems specialist and criminologist of the agency. Funds will also be used for on-site monitoring statewide.

**PERSONNEL (Federal)**

Personnel costs will include 0.50 FTE analyst salary costs to conduct program monitoring and evaluation, prepare progress and evaluation reports, assist in the development of the Annual Report, conduct on-site visits, and provide technical assistance to the subgrantee. Other salary costs will include 0.20 FTE for the information systems specialist for the interactive data used to display statewide performance measures and 0.15 FTE for the agency criminologist to continue review of the programs for effectiveness.

**FRINGE**

Other Personal Expenditures (OPE) cover PERS, social security, workers compensation, medical benefits (FLEX) that are associated with the personnel salary costs for these positions. Amounts budgeted are for the same percentage of FTE with actual OPE rates for the employee.

Exhibit 4
Page 16 of 51

Oregon Criminal Justice Commission Application                    2017 Edward Byrne Memorial JAG State

**TRAVEL (Federal)**

Travel costs are determined on the 2018 GSA rate effective October 2017 and will be used for travel and lodging for statewide monitoring.

**Contracts (Federal)**

$1,831,456 will be passed through to sub awardees in support of three JAG program areas:

1.  Drug Treatment and Enforcement Programs AND Mental Health Programs

    a.  Specialty Court Grant Program to support operational grants funds to specialty court programs including adult drug, juvenile drug, family, veterans, mental health and DWI courts - $981,456.

2.  Planning, Evaluation, Technology Improvements

    a.  Pretrial Reform to provide recommendations for the use of a validated risk assessment tool statewide to inform pretrial release decisions - $200,000.

    b.  Specialty Court Case Management System to become the official system of record for Oregon's specialty courts - $500,000.

    c.  2019 Justice Reinvestment Summit to bring together public safety stakeholders every other year from all geographic regions of the state - $150,000.

Exhibit 4
Page 17 of 51



OMB APPROVAL NO.: 1121-0329
EXPIRES 7/31/2016

**View Budget Summary**

<u>General Instructions  &  Resources</u>

<u>Budget Detail Worksheet</u>

(1)  **Purpose:**  The Budget Detail Worksheet is provided for your use in the preparation of the budget and budget narrative.  All required information (including the budget narrative) must be provided.  Any category of expense not applicable to your budget may be left blank.  Indicate any <u>non-federal( match)</u> amount in the appropriate category, if applicable.

(2)  For each budget category, you can see a sample by clicking (To View an Example, Click Here) at the end of each description.

(3)  There are various hot links listed in red in the budget categories that will provide additional information via documents on the internet.

(4)  **Record Retention:** In accordance with the requirements set forth in <u>2 CFR Part 200.333</u> , all financial records, supporting documents, statistical records, and all other records pertinent to the award shall be retained by each organization for at least three years following the closure of the audit report covering the grant period.

(5)  The information disclosed in this form is subject to the Freedom of Information Act under 5 U.S.C. 55.2.



Exhibit 4
Page 18 of 51

**A.    Personnel** – List each position by title and name of employee, if available. Show the annual salary rate and the percentage of time to be devoted to the project. Compensation paid for employees engaged in grant activities must be consistent with that paid for similar work within the applicant organization. Include a description of the responsibilities and duties of each position in relationship to fulfilling the project goals and objectives. (*Note: Use whole numbers as the percentage of time, an example is 75.50% should be shown as 75.50*)  **To View an Example, Click Here**

PERSONNEL (FEDERAL)

| Name | Position | Computation | | | | Cost |
|------|----------|-------------|--|--|--|------|
| | | Salary | Basis | Percentage of Time | Length of Time | |
| Tiffany Quintero | Operations Analyst | $6,099.00 | Month | 50.00 | 24 | $73,188 |
| Alex Pichel | Information Systems Specialist | $5,829.00 | Month | 20.00 | 24 | $27,979 |
| Ann Leymon | Criminologist | $7,000.00 | Month | 15.00 | 24 | $25,200 |
| | | | Year | | | $0 |
| | | | | | FEDERAL TOTAL | $126,367 |

PERSONNEL NARRATIVE (FEDERAL)

Tiffany Quintero is the assigned analyst for all federal grants.  The administrative 10% will fund a portion of her salary.

Alex Pichel is the Information System Specialists responsible for the interactive data website display and Oregon Knowledge Bank.  The administrative 10% will fund a portion of his salary.

Ann Leymon is the Criminologist for CJC.  The administrative 10% will fund a portion of her salary.

Exhibit 4
Page 19 of 51

## PERSONNEL (NON-FEDERAL)

| Name | Position | Computation | | | | Cost |
|------|----------|-------------|--|--|--|------|
| | | Salary | Basis | Percentage of Time | Length of Time | |
| | | | Year | | | $0 |
| | | | | | NON-FEDERAL TOTAL | $0 |

## PERSONNEL NARRATIVE (NON-FEDERAL)

| | TOTAL PERSONNEL | $126,367 |
|--|-----------------|----------|

Exhibit 4
Page 20 of 51

B.    Fringe Benefits – Fringe benefits should be based on actual known costs or an approved negotiated rate by a Federal agency. If not based on an approved negotiated rate, list the composition of the fringe benefit package. Fringe benefits are for the personnel listed in budget category (A) and only for the percentage of time devoted to the project. Fringe benefits on overtime hours are limited to FICA, Workman's Compensation and Unemployment Compensation. (Note: Use decimal numbers for the fringe benefit rates, an example is 7.65% should be shown as .0765) To View an Example, Click Here

FRINGE BENEFITS (FEDERAL)

| Description | Computation | | Cost |
|---|---|---|---|
| | Base | Rate | |
| T. Quintero ($73,188 x 100% of time = Base x 54% OPE Rate) | $73,188.00 | 0.54 | $39,522 |
| A. Pichel ($27,979 x 100% of time = Base x 50% OPE Rate) | $27,979.00 | 0.5 | $13,990 |
| A. Leymon ($25,200 x 100% of time = Base x 50% OPE Rate) | $25,200.00 | 0.5 | $12,600 |
| | | FEDERAL TOTAL | $66,112 |

FRINGE BENEFITS NARRATIVE (FEDERAL)

Other Personal Expenditures (OPE) cover PERS, social security, workers compensation, medical benefits (FLEX) that are associated with the personnel salary costs for these positions.

Exhibit 4
Page 21 of 51

## FRINGE BENEFITS (NON-FEDERAL)

| Description | Computation | | Cost |
|---|---|---|---|
| | Base | Rate | |
| | | | $0 |
| | NON-FEDERAL TOTAL | | $0 |

## FRINGE BENEFITS NARRATIVE (NON-FEDERAL)

| | TOTAL FRINGE BENEFITS | $66,112 |
|---|---|---|

Exhibit 4
Page 22 of 51

C.    Travel – Itemize travel expenses of staff personnel by purpose (e.g., staff to training, field interviews, advisory group meeting, etc.). Describe the purpose of each travel expenditure in reference to the project objectives. Show the basis of computation (e.g., six people to 3-day training at $X airfare, $X lodging, $X subsistence). In training projects, travel and meals for trainees should be listed separately. Show the number of trainees and the unit costs involved. Identify the location of travel, if known; or if unknown, indicate "location to be determined." Indicate source of Travel Policies applied Applicant or Federal Travel Regulations. Note: Travel expenses for consultants should be included in the "Contractual/Consultant" category. To View an Example. Click Here

### TRAVEL (FEDERAL)

| Purpose of Travel | Location | Item | Cost Rate | Basis for Rate | Quantity | Number of People | Number of Trips | Cost | Cost |
|---|---|---|---|---|---|---|---|---|---|
| Monitoring | In-state Travel | | | | | | | | $6,078 |
| | | Lodging | $93.00 | Night | 2 | 2 | 10 | $3,720.00 | |
| | | Meals | $51.00 | Day | 1 | 2 | 10 | $1,020.00 | |
| | | Mileage | $0.535 | Mile | 250 | | 10 | $1,337.50 | |
| | | Transportation: | | | | | | | |
| | | | | Round-trip | | | | $0.00 | |
| | | Local Travel | | | | | | $0.00 | |
| | | Other | | | | | | $0.00 | |
| | | Subtotal | | | | | | $6,077.50 | |
| | | | | | | | FEDERAL TOTAL | | $6,078 |

### TRAVEL NARRATIVE (FEDERAL)

Oregon in-state travel using 2018 GSA rates effective October 2017-September 2018,  Standard rate Lodging $93, M&IE $51.

Mileage 2017 Calendar year GSA rates $0.535.

Exhibit 4
Page 23 of 51

## TRAVEL (NON-FEDERAL)

| Purpose of Travel | Location | Computation | | | | | | | Cost |
|---|---|---|---|---|---|---|---|---|---|
| | | Item | Cost Rate | Basis for Rate | Quantity | Number of People | Number of Trips | Cost | |
| | | Lodging | | Night | | | | $0.00 | |
| | | Meals | | Day | | | | $0.00 | |
| | | Mileage | | Mile | | | | $0.00 | |
| | | Transportation: | | | | | | | |
| | | | | Round-trip | | | | $0.00 | |
| | | Local Travel | | | | | | $0.00 | |
| | | Other | | | | | | | |
| | | | | | | | | $0.00 | |
| | | Subtotal | | | | | | $0.00 | $0 |
| | | | | | | NON-FEDERAL TOTAL | | | $0 |

## TRAVEL NARRATIVE (NON-FEDERAL)

| | TOTAL TRAVEL | $6,078 |
|---|---|---|

Exhibit 4
Page 24 of 51

**D.    Equipment** – List non-expendable items that are purchased (Note: Organization's own capitalization policy for classification of equipment should be used). Expendable items should be included in the "Supplies" category. Applicants should analyze the cost benefits of purchasing versus leasing equipment, especially high cost items and those subject to rapid technological advances. Rented or leased equipment costs should be listed in the "Contractual" category. Explain how the equipment is necessary for the success of the project, and describe the procurement method to be used. To View an Example, Click Here

EQUIPMENT (FEDERAL)

| Item | Computation | | Cost |
| --- | --- | --- | --- |
| | Quantity | Cost | |
| | | | $0 |
| | FEDERAL TOTAL | | $0 |

EQUIPMENT NARRATIVE (FEDERAL)

Exhibit 4
Page 25 of 51

## EQUIPMENT (NON-FEDERAL)

| Item | Computation | | Cost |
|------|-------------|--|------|
| | Quantity | Cost | |
| | | | $0 |
| | NON-FEDERAL TOTAL | | $0 |

## EQUIPMENT NARRATIVE (NON-FEDERAL)

| | |
|--|--|
| | TOTAL EQUIPMENT | $0 |

Exhibit 4
Page 26 of 51

E.    **Supplies** – List items by type (office supplies, postage, training materials, copying paper, and expendable equipment items costing less than $5,000, such as books, hand held tape recorders) and show the basis for computation. Generally, supplies include any materials that are expendable or consumed during the course of the project. To View an Example, Click Here

**SUPPLIES (FEDERAL)**

| Supply Items | Computation | | Cost |
| --- | --- | --- | --- |
| | Quantity/Duration | Cost | |
| | | | $0 |
| | | FEDERAL TOTAL | $0 |

**SUPPLIES NARRATIVE (FEDERAL)**

Exhibit 4
Page 27 of 51

## SUPPLIES (NON-FEDERAL)

| Supply Items | Computation | | Cost |
| --- | --- | --- | --- |
| | Quantity/Duration | Cost | |
| | | | $0 |
| NON-FEDERAL TOTAL | | | $0 |

## SUPPLIES NARRATIVE (NON-FEDERAL)

| | |
| --- | --- |
| | TOTAL SUPPLIES | $0 |

Exhibit 4
Page 28 of 51

F.    Construction – Provide a description of the construction project and an estimate of the costs.  As a rule, construction costs are not allowable.  In some cases, minor repairs or renovations may be allowable. Minor repairs and renovations should be classified in the "other" category.  Consult with the program office before budgeting funds in this category.  To View an Example, Click Here

CONSTRUCTION (FEDERAL)

| Purpose | Description of Work | Cost |
|---------|---------------------|------|
|         |                     |      |
|         |                     |      |
|         | FEDERAL TOTAL       | $0   |

CONSTRUCTION NARRATIVE (FEDERAL)

Exhibit 4
Page 29 of 51

## CONSTRUCTION (NON-FEDERAL)

| Purpose | Description of Work | Cost |
|---|---|---|
| | | $0 |
| | NON-FEDERAL TOTAL | |

## CONSTRUCTION NARRATIVE (NON-FEDERAL)

| | |
|---|---|
| | TOTAL CONSTRUCTION | $0 |

Exhibit 4
Page 30 of 51

5

G.   Consultants/Contracts – Indicate whether applicant's formal, written Procurement Policy or the Federal Acquisition Regulations are followed.
Consultant Fees:  For each consultant enter the name, if known, service to be provided, hourly or daily fee (8-hour day), and estimated time on the project. Consultant fees in excess of $650 per day or $81.25 per hour require additional justification and prior approval from OJP. To View an Example, Click Here

## CONSULTANT FEES (FEDERAL)

| Name of Consultant | Service Provided | Computation | | | Cost |
| --- | --- | --- | --- | --- | --- |
| | | Fee | Basis | Quantity | |
| | | | 8 Hour Day | | $0 |
| | | | | SUBTOTAL | $0 |

## CONSULTANT FEES NARRATIVE (FEDERAL)

Exhibit 4
Page 31 of 51

## CONSULTANT FEES (NON-FEDERAL)

| Name of Consultant | Service Provided | Computation | | | Cost |
| --- | --- | --- | --- | --- | --- |
| | | Fee | Basis | Quantity | |
| | | | 8 Hour Day | | $0 |
| | | | | SUBTOTAL | $0 |

## CONSULTANT FEES NARRATIVE (NON-FEDERAL)

Exhibit 4
Page 32 of 51

**Consultant Expenses:** List all expenses to be paid from the grant to the individual consultants in addition to their fees (i.e., travel, meals, lodging, etc.). This includes travel expenses for anyone who is not an employee of the applicant such as participants, volunteers, partners, etc.

## CONSULTANT EXPENSES (FEDERAL)

| Purpose of Travel | Location | Item | Cost Rate | Basis for Rate | Quantity | Number of People | Number of Trips | Cost | Cost |
|---|---|---|---|---|---|---|---|---|---|
| | | Lodging | | Night | | | | $0.00 | |
| | | Meals | | Day | | | | $0.00 | |
| | | Mileage | | Mile | | | | $0.00 | |
| | | Transportation: | | Round-trip | | | | $0.00 | |
| | | Local Travel | | | | | | $0.00 | |
| | | Other | | | | | | $0.00 | |
| | | Subtotal | | | | | | $0.00 | $0 |
| | | | | | | | SUBTOTAL | | $0 |
| | | | | | | | FEDERAL TOTAL | | $0 |

**Computation** spans Cost Rate, Basis for Rate, Quantity, Number of People, Number of Trips, Cost columns.

## CONSULTANT EXPENSES NARRATIVE (FEDERAL)

Exhibit 4
Page 33 of 51

## CONSULTANT EXPENSES (NON-FEDERAL)

| Purpose of Travel | Location | Computation | | | | | | | Cost |
|---|---|---|---|---|---|---|---|---|---|
| | | Item | Cost Rate | Basis for Rate | Quantity | Number of People | Number of Trips | Cost | |
| | | Lodging | | Night | | | | $0.00 | |
| | | Meals | | Day | | | | $0.00 | |
| | | Mileage | | Mile | | | | $0.00 | |
| | | Transportation: | | | | | | | |
| | | Local Travel | | Round-trip | | | | $0.00 | |
| | | Other | | | | | | $0.00 | |
| | | | | | | | | $0.00 | |
| | | Subtotal | | | | | | $0.00 | $0 |
| | | | | | | | SUBTOTAL | | $0 |
| | | | | | | | NON-FEDERAL TOTAL | | $0 |

## CONSULTANT EXPENSES NARRATIVE (NON-FEDERAL)

| | | |
|---|---|---|
| | TOTAL CONSULTANTS | $0 |

Exhibit 4
Page 34 of 51

**Contracts.** Provide a description of the product or service to be procured by contract and an estimate of the cost. Applicants are encouraged to promote free and open competition in awarding contracts. A separate justification must be provided for sole source contracts in excess of $150,000. A sole source contract may not be awarded to a commercial organization that is ineligible to receive a direct award. Note: This budget category may include subawards.

## CONTRACTS (FEDERAL)

| Item | Cost |
|---|---|
| Specialty Court Grant Program | $981,456 |
| County of Yamhill, Oregon - Pretrial Reform | $200,000 |
| Specialty Court Case Management System - Vendor not identified | $500,000 |
| Justice Reinvestment Summit | $150,000 |
| FEDERAL TOTAL | $1,831,456 |

## CONTRACTS NARRATIVE (FEDERAL)

Detail for these projects can be found in the Program Narrative.

Exhibit 4
Page 35 of 51

## CONTRACTS (NON-FEDERAL)

| Item | Cost |
|------|------|
| NON-FEDERAL TOTAL | $0 |

## CONTRACTS NARRATIVE (NON-FEDERAL)

| | |
|------|------|
| TOTAL CONTRACTS | $1,831,456 |
| TOTAL CONSULTANTS/CONTRACTS | $1,831,456 |

Exhibit 4
Page 36 of 51

**H.    Other Costs** – List items (e.g., rent (arms-length transaction only ), reproduction, telephone, janitorial or security services, and investigative or confidential funds) by major type and the basis of the computation. For example, provide the square footage and the cost per square foot for rent or provide a monthly rental cost and how many months to rent. The basis field is a text field to describe the quantity such as square footage, months, etc.  To View an Example, Click Here

## OTHER COSTS (FEDERAL)

| Description | Computation | | | | Cost |
| --- | --- | --- | --- | --- | --- |
| | Quantity | Basis | Cost | Length of Time | |
| Rent | 1 | Office Space | $205.5 | 24 | $4,932 |
| | | | | FEDERAL TOTAL | $4,932 |

## OTHER COSTS NARRATIVE (FEDERAL)

Rent for office space for

Exhibit 4
Page 37 of 51

OTHER COSTS (NON-FEDERAL)

| Description | Computation | | | | Cost |
| | Quantity | Basis | Cost | Length of Time | |
|---|---|---|---|---|---|
| | | | | | $0 |
| | | | | NON-FEDERAL TOTAL | $0 |

OTHER COSTS NARRATIVE (NON-FEDERAL)

| | TOTAL OTHER COSTS | $4,932 |
|---|---|---|

Exhibit 4
Page 38 of 51

I.    Indirect Costs – Indirect costs are allowed if the applicant has a Federally approved indirect cost rate. A copy of the rate approval, (a _fully executed negotiated agreement_), must be attached. If the applicant does not have an approved rate, one can be requested by contacting the applicant's _cognizant Federal agency_, or the applicant may elect to charge a deminimis rate of 10% of modified total direct costs as indicated in _2 CFR Part 200.414f_. If the applicant's accounting system permits, costs may be allocated in the direct cost categories. (_Use whole numbers as the Indirect rate, an example is an indirect rate of 15.73% should be shown as 15.73_) _To View an Example. Click Here_

**INDIRECT COSTS (FEDERAL)**

| Description | Computation | | Cost |
| --- | --- | --- | --- |
| | Base | Rate | |
| | | | $0 |
| | | FEDERAL TOTAL | $0 |

**INDIRECT COSTS NARRATIVE (FEDERAL)**

Exhibit 4
Page 39 of 51

## INDIRECT COSTS (NON-FEDERAL)

| Description | Computation | | Cost |
|---|---|---|---|
| | Base | Rate | |
| | | | $0 |
| | NON-FEDERAL TOTAL | | $0 |

## INDIRECT COSTS NARRATIVE (NON-FEDERAL)

| | TOTAL INDIRECT COSTS | $0 |
|---|---|---|

Exhibit 4
Page 40 of 51

**Budget Summary** -- When you have completed the budget worksheet, transfer the totals for each category to the spaces below. Compute the total direct costs and the total project costs. Indicate the amount of Federal funds requested and the amount of non-Federal funds that will support the project.

| Budget Category | Federal Request | Non-Federal Amounts | Total |
|---|---|---|---|
| A. Personnel | $126,367 | $0 | $126,367 |
| B. Fringe Benefits | $66,112 | $0 | $66,112 |
| C. Travel | $6,078 | $0 | $6,078 |
| D. Equipment | $0 | $0 | $0 |
| E. Supplies | $0 | $0 | $0 |
| F. Construction | $0 | $0 | $0 |
| G. Consultants/Contracts | $1,831,456 | $0 | $1,831,456 |
| H. Other | $4,932 | $0 | $4,932 |
| Total Direct Costs | $2,034,945 | $0 | $2,034,945 |
| I.  Indirect Costs | $0 | $0 | $0 |
| **TOTAL PROJECT COSTS** | $2,034,945 | $0 | $2,034,945 |

| | |
|---|---|
| **Federal Request** | $2,034,945 |
| **Non-Federal Amount** | $0 |
| **Total Project Cost** | $2,034,945 |

*Public Reporting Burden*

*Paperwork Reduction Act Notice: Under the Paperwork Reduction Act, a person is not required to respond to a collection of information unless it displays a current valid OMB control number. We try to create forms and instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. The estimated average time to complete and file this application is four (4) hours per application. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, you can write the Office of Justice Programs, Office of the Chief Financial Officer, 810 Seventh Street, NW, Washington, DC 20531; and to the Public Use Reports Project, 1121-0188, Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.*

Exhibit 4
Page 41 of 51

 **BJA FY 17 Edward Byrne Memorial Justice Assistance Grant (JAG) Program - State Solicitation** 2017-H2865-OR-DJ 

| Financial Management and System of Internal Controls Questionnaire |
|---|
| Form Submitted On: Tue Apr 03 09:31:32 EDT 2018 |

| # | Question | Provided Response |
|---|---|---|
| 1. | Name of Organization and Address: Organization Name: | Oregon Criminal Justice Commission |
| | Street1: | 885 Summer St NE |
| | Street2: | - |
| | City: | Salem |
| | State: | OREGON |
| | Zip Code: | 97301 |
| 2. | Authorized Representative's Name and Title: Prefix: | - |
| | First Name: | Michael |
| | Middle Name: | - |
| | Last Name: | Schmidt |
| | Suffix: | - |
| | Title: | Executive Director |
| 3. | Phone: | 5033784830 |
| 4. | Fax: | 5033784861 |
| 5. | Email: | michael.schmidt@oregon.gov |
| 6. | Year Established: | 1995 |
| 7. | Employer Identification Number (EIN): | 93902047 |
| 8. | DUNS Number: | 136203424 |
| 9. a) | Is the applicant entity a nonprofit organization (including a nonprofit institution of higher education) as described in 26 of U.S.C. 501(c)(3) and exempt from taxation under 26 U.S.C. 501(a)? | No |
| 9. b) | Does the applicant nonprofit organization maintain offshore accounts for the purpose of avoiding paying the tax described in 26 U.S.C. 511(a)? | - |
| 9. c) | With respect to the most recent year in which the applicant nonprofit organiation was required to file a tax return, does the applicant nonprofit organization believe (or assert) that it satisfies the requirements of 26 C.F.R. 53.4958-6 (which relate to the reasonableness of compensation of certain individuals)? | - |
| 10. | Has the applicant entity undergone any of the following types of audit(s)(Please check all that apply): [OMB A-133 Single Audit] | - |
| | Has the applicant entity undergone any of the following types of audit(s)(Please check all that apply): [Financial Statement Audit] | - |
| | Has the applicant entity undergone any of the following types of | - |

Exhibit 4
Page 42 of 51

| | audit(s)(Please check all that apply): [Defense Contract Agency Audit (DCAA)] | |
|---|---|---|
| | Has the applicant entity undergone any of the following types of audit(s)(Please check all that apply): [Other Audit] | - |
| | Other Audit Agency (list type of audit) | - |
| | Has the applicant entity undergone any of the following types of audit(s)(Please check all that apply): [None] | Yes |
| 11. | Most Recent Audit Report Issued: | - |
| | Name of Audit Agency/Firm: | - |
| 12. | On the most recent audit, what was the auditor's opinion? | - |
| | Enter the number of findings (if none, enter "0"): | - |
| | Enter the dollar amount of questioned costs (if none, enter "$0"): | - |
| | Were material weaknesses noted in the report or opinion? | - |
| 13. | Which of the following best describes the applicant entity's accounting system: | Combination |
| 14. | Does the applicant entity's accounting system have the capability to identify the receipt and expenditure of award funds separately seperately for each Federal award? | Yes |
| 15. | Does the applicant entity's accounting system have the capability to record expenditures for each Federal award by the budget cost categories shown in the approved budget? | Yes |
| 16. | Does the applicant entity's accounting system have the capability to record cost sharing ("match") seperately for each Federal award, and maintain documentation to support recorded match or cost share? | Yes |
| 17. | Does the applicant entity's accounting system have the capability to accurately track employee actual time spent performing work for each federal award, and to accurately allocate charges for employee salaries and wages for each federal award, and maintain records to support the actual time spent and specific allocation of charges associated with each applicant employee? | Yes |
| 18. | Does the applicant entity's accounting system include budgetary controls to preclude the applicant entity from incurring obligations or costs that exceed the amount of funds available under a federal award (the total amount of the award, as well as the amount available in each budget cost category)? | Yes |
| 19. | Is applicant entity familiar with the "cost principles" that apply to recent and future federal awards, including the general and specific principles set out in 2 C.F.R. Part 200? | Yes |
| 20. | Does the applicant entity's property management system(s) maintain the following information on property purchased with federal award funds (1) a description of the property; (2) an identification number; (3) the source of funding for the property, including the award number; (4) where holds title; (5) acquisition date; (6) acquisition cost; (7) federal share of the acquisition cost; (8) location and condition of the property; (9) ultimate disposition information? | Yes |
| 21. | Does the applicant entity maintain written policies and procedures for | Yes |

Exhibit 4
Page 43 of 51

| | procurement transaction that - (1) are designed to avoid unnecessary or duplicative purchases; (2) provide for analysis of lease versus purchase alternatives; (3) set out a process for soliciting goods and services, and (4) include standards of conduct that address conflicts of interest? | |
|---|---|---|
| 22. a) | Are the applicant entity's procurement policies and procedures designed to ensure that procurements are conducted in a manner that provides full and open competition to the extent practicable, and to avoid practices that restrict competition? | Yes |
| 22. b) | Does the applicant entity's procurement policies and procedures require documentation of the history of a procurement, including the rationale for the method of procurement, selection of contract type, selection or rejection of contractors, and basis for the contract price? | Yes |
| 23. | Does the applicant entity have written policies and procedures designed to prevent the applicant entity from entering into a procurement contract under a federal award with any entity or individual that is suspended or debarred from such contracts, including provisions for checking the "Excluded Parties List" system (www.sam.gov) for suspended or debarred sub-grantees and contractors, prior to award? | Yes |
| 24. (a) | Does the applicant entity maintain a standard travel policy? | Yes |
| 24. (b) | Does the applicant entity adhere to the Federal Travel Regulation (FTR)? | Yes |
| 25. | Does the applicant entity have written policies, procedures, and/or guidance designed to ensure that any subawards made by the applicant entity under a federal award - (1) clearly document applicable federal requirements, (2) are appropriately monitored by the applicant, and (3) comply with the requirements in 2 CFR Part 200 (see 2 CFR 200.331)? | Yes |
| 26. | Is the applicant entity aware of the differences between subawards under federal awards and procurement contracts under federal awards, including the different roles and responsibilities associated with each? | Yes |
| 27. | Does the applicant entity have written policies and procedures designed to prevent the applicant entity from making a subaward under a federal award to any entity or individual that is suspended or debarred from such subawards? | Yes |
| 28. | Is the applicant entity designated ?high risk? by a federal grant-making agency outside of DOJ? (High risk includes any status under which a federal awarding agency provides additional oversight due to the applicant's past performance, or other programmatic or financial concerns with the applicant.) | No |
| (a) | Name(s) of the federal awarding agency: | - |
| (b) | Date(s) the agency notified the applicant entity of the "high risk" designation: | - |
| (c) | Contact information for the "high risk" point of contact at the federal agency: | - |
| | Phone: | - |

Exhibit 4
Page 44 of 51

|  | Email: | - |
|---|---|---|
| (d) | Reason for "high risk" status, as set out by the federal agency: | - |
| Cert. | Name: | Michael Schmidt |
|  | Date: | 03-22-2018 |
|  | Title: | Executive Director |
|  | Other: | - |
|  | Phone: | 5033784830 |

Close this window

Exhibit 4
Page 45 of 51

## DISCLOSURE OF LOBBYING ACTIVITIES

Complete this form to disclose lobbying activities pursuant to 31 U.S.C. 1352

(See reverse for public burden disclosure.)

Approved by OMB
0348-0046

| 1. Type of Federal Action: | 2. Status of Federal Action: | 3. Report Type: |
|---|---|---|
| ☐ a. contract<br>b. grant<br>c. cooperative agreement<br>d. loan<br>e. loan guarantee<br>f. loan insurance | ☐ a. bid/offer/application<br>b. initial award<br>c. post-award | ☐ a. initial filing<br>b. material change<br>**For Material Change Only:**<br>year ▨ quarter ▨<br>date of last report ▨ |

| 4. Name and Address of Reporting Entity:<br>☐ Prime    ☐ Subawardee<br>Tier          *if known:* | 5. If Reporting Entity in No. 4 is a Subawardee, Enter Name and Address of Prime: |
|---|---|
| **Congressional District,** *if known:* | **Congressional District,** *if known:* |

| 6. Federal Department/Agency: | 7. Federal Program Name/Description:<br><br>CFDA Number, *if applicable:* _____ |
|---|---|

| 8. Federal Action Number, *if known:* | 9. Award Amount, *if known:*<br>$ |
|---|---|

| 10. a. Name and Address of Lobbying Registrant<br>( *if individual, last name, first name, MI*): | b. Individuals Performing Services (*including address if different from No. 10a*)<br>(*last name, first name, MI*): |
|---|---|

| 11. Information requested through this form is authorized by title 31 U.S.C. section 1352. This disclosure of lobbying activities is a material representation of fact upon which reliance was placed by the tier above when this transaction was made or entered into. This disclosure is required pursuant to 31 U.S.C. 1352. This information will be reported to the Congress semi-annually and will be available for public inspection. Any person who fails to file the required disclosure shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure. | Signature: ▨<br>Print Name: ▨<br>Title: _____<br>Telephone No.: _____ Date: ▨ |
|---|---|

| Federal Use Only: | Authorized for Local Reproduction<br>Standard Form LLL (Rev. 7-97) |
|---|---|

Exhibit 4<br>Page 46 of 51

## INSTRUCTIONS FOR COMPLETION OF SF-LLL, DISCLOSURE OF LOBBYING ACTIVITIES

This disclosure form shall be completed by the reporting entity, whether subawardee or prime Federal recipient, at the initiation or receipt of a covered Federal action, or a material change to a previous filing, pursuant to title 31 U.S.C. section 1352. The filing of a form is required for each payment or agreement to make payment to any lobbying entity for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with a covered Federal action. Complete all items that apply for both the initial filing and material change report. Refer to the implementing guidance published by the Office of Management and Budget for additional information.

1. Identify the type of covered Federal action for which lobbying activity is and/or has been secured to influence the outcome of a covered Federal action.

2. Identify the status of the covered Federal action.

3. Identify the appropriate classification of this report. If this is a followup report caused by a material change to the information previously reported, enter the year and quarter in which the change occurred. Enter the date of the last previously submitted report by this reporting entity for this covered Federal action.

4. Enter the full name, address, city, State and zip code of the reporting entity. Include Congressional District, if known. Check the appropriate classification of the reporting entity that designates if it is, or expects to be, a prime or subaward recipient. Identify the tier of the subawardee, e.g., the first subawardee of the prime is the 1st tier. Subawards include but are not limited to subcontracts, subgrants and contract awards under grants.

5. If the organization filing the report in item 4 checks "Subawardee," then enter the full name, address, city, State and zip code of the prime Federal recipient. Include Congressional District, if known.

6. Enter the name of the Federal agency making the award or loan commitment. Include at least one organizational level below agency name, if known. For example, Department of Transportation, United States Coast Guard.

7. Enter the Federal program name or description for the covered Federal action (item 1). If known, enter the full Catalog of Federal Domestic Assistance (CFDA) number for grants, cooperative agreements, loans, and loan commitments.

8. Enter the most appropriate Federal identifying number available for the Federal action identified in item 1 (e.g., Request for Proposal (RFP) number; Invitation for Bid (IFB) number; grant announcement number; the contract, grant, or loan award number; the application/proposal control number assigned by the Federal agency). Include prefixes, e.g., "RFP-DE-90-001."

9. For a covered Federal action where there has been an award or loan commitment by the Federal agency, enter the Federal amount of the award/loan commitment for the prime entity identified in item 4 or 5.

10. (a) Enter the full name, address, city, State and zip code of the lobbying registrant under the Lobbying Disclosure Act of 1995 engaged by the reporting entity identified in item 4 to influence the covered Federal action.

    (b) Enter the full names of the individual(s) performing services, and include full address if different from 10 (a). Enter Last Name, First Name, and Middle Initial (MI).

11. The certifying official shall sign and date the form, print his/her name, title, and telephone number.

According to the Paperwork Reduction Act, as amended, no persons are required to respond to a collection of information unless it displays a valid OMB Control Number. The valid OMB control number for this information collection is OMB No. 0348-0046. Public reporting burden for this collection of information is estimated to average 10 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Management and Budget, Paperwork Reduction Project (0348-0046), Washington, DC 20503.

Exhibit 4
Page 47 of 51

## DISCLOSURE OF PENDING APPLICATIONS

The Oregon Criminal Justice Commission does not have pending applications submitted within the last 12 months for federally funded grants or sub grants (including cooperative agreements) that include requests for funding to support the same project being proposed under this solicitation and will cover the identical cost items outlined in the budget narrative and worksheet in the application under this solicitation.

# RESEARCH AND EVALUATION INDEPENDENCE AND INTEGRITY

The Oregon Criminal Justice Commission (CJC) and Oregon Statistical Analysis Center (SAC) reasonably believe that no potential personal or organizational conflicts of interest exist. CJC and SAC have established reputations locally and nationwide for conducting objective research. The CJC Commission provides an additional oversight body to approve research design, scope, contracts, and final evaluations and reports. The commission is comprised of geographically diverse criminal justice practitioners appointed by the Governor, as well as one state senator and state representative. This provides an impartial forum to address actual or apparent conflicts of interest in addition to other research bias that may cast doubt on the validity of a project.

Currently, CJC is running two randomized controlled trials (RCT) and two quasi-experimental studies. During Oregon's 2017 Legislative Session, CJC has been tasked with additional statewide studies including the distribution and effect public funds used for alcohol and drug treatment and racial profiling by law enforcement in traffic stops.

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

## Edward Byrne Justice Assistance Grant Program
## FY 2017 State Solicitation

**Certifications and Assurances**
**by the Chief Executive of the Applicant Government**

On behalf of the applicant "State" named below, in support of that State's application for an award under the FY 2017 Edward Byrne Justice Assistance Grant ("JAG") Program, and further to 42 U.S.C. § 3752(a), I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1. I am the chief executive of the applicant State named below, and I have the authority to make the following representations on my own behalf and on behalf of the applicant State. I understand that these representations will be relied upon as material in any OJP decision to make an award, under the application described above, to the applicant State.

2. I certify that no federal funds made available by the award (if any) that OJP makes based on the application described above will be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities.

3. I assure that the application described above (and any amendment to that application) was submitted for review to the governing body of the State (e.g., the State legislature), or to an organization designated by that governing body, not less than 30 days before the date of this certification.

4. I assure that, before the date of this certification— (a) the application described above (and any amendment to that application) was made public; and (b) an opportunity to comment on that application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure made such an opportunity available.

5. I assure that, for each fiscal year of the award (if any) that OJP makes based on the application described above, the applicant State will maintain and report such data, records, and information (programmatic and financial), as OJP may reasonably require.

6. I certify that— (a) the programs to be funded by the award (if any) that OJP makes based on the application described above meet all the requirements of the JAG Program statute (42 U.S.C. §§ 3750-3758); (b) all the information contained in that application is correct; (c) in connection with that application, there has been appropriate coordination with affected agencies; and (d) in connection with that award (if any), the applicant State will comply with all provisions of the JAG Program statute and all other applicable federal laws.

7. I have examined certification entitled "State or Local Government: FY 2017 Certification of Compliance with 8 U.S.C. § 1373" executed by the chief legal officer of the applicant government with respect to the FY 2017 JAG program and submitted in support of the application described above, and I hereby adopt that certification as my own on behalf of that government.

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it "supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 42 U.S.C. § 3795a), and also may subject me and the applicant State to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____          _____
Signature of Chief Executive of the Applicant "State"          Date of Certification

_____          _____
Printed Name of Chief Executive          Title of Chief Executive

_____
Name of Applicant State

Exhibit 4
Page 50 of 51

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

**State or Local Government:  FY 2017 Certification of Compliance with 8 U.S.C. § 1373**

On behalf of the applicant government entity named below, and in support of its application, I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

(1) I am the chief legal officer of the State or local government of which the applicant entity named below is a part ("the jurisdiction"), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP).  I understand that OJP will rely upon this certification as a material representation in any decision to make an award to the applicant entity.

(2) I have carefully reviewed 8 U.S.C. § 1373(a) and (b), including the prohibitions on certain actions by State and local government entities, -agencies, and -officials regarding information on citizenship and immigration status.  I also have reviewed the provisions set out at (or referenced in) 8 U.S.C. § 1551 note ("Abolition ... and Transfer of Functions"), pursuant to which references to the "Immigration and Naturalization Service" in 8 U.S.C. § 1373 are to be read, as a legal matter, as references to particular components of the U.S. Department of Homeland Security.

(3) I (and also the applicant entity) understand that the U.S. Department of Justice will require States and local governments (and agencies or other entities thereof) to comply with 8 U.S.C. § 1373, with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2017 OJP program under which this certification is being submitted ("the FY 2017 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2017 OJP Program.

(4) I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (cf. 42 U.S.C. § 901(a)(2)).  Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (i.e., one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or -agency.

(5) I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning both—

    (a)  the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant government entity under this FY 2017 OJP Program; and

    (b)  any prohibitions or restrictions potentially applicable to the "program or activity" sought to be funded under the FY 2017 OJP Program that deal with sending to, requesting or receiving from, maintaining, or exchanging information of the types described in 8 U.S.C. § 1373(a) or (b), whether imposed by a State or local government entity, -agency, or -official.

(6) As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any prohibition or any restriction that would apply to the "program or activity" to be funded in whole or in part under the FY 2017 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that deals with either— (1) a government entity or -official sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. § 1373(a); or (2) a government entity or -agency sending to, requesting or receiving from, maintaining, or exchanging information of the types (and with respect to the entities) described in 8 U.S.C. § 1373(b).

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 42 U.S.C. § 3795a), and also may subject me and the applicant entity to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812).  I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____          _____
Signature of Chief Legal Officer of the Jurisdiction          Printed Name of Chief Legal Officer

_____          _____
Date of Certification          Title of Chief Legal Officer of the Jurisdiction

_____
Name of Applicant Government Entity (i.e., the applicant to the FY 2017 OJP Program identified below)

**FY 2017 OJP Program:  Byrne Justice Assistance Grant ("JAG") Program**

Exhibit 4
Page 51 of 51



**U.S. Department of Justice**

Office of Justice Programs

*Bureau of Justice Assistance*

*Washington, D.C. 20531*

January 10, 2018

Michael Schmidt
Executive Director
Oregon Criminal Justice Commission

RE:
2015-DJ-BX-0749, Oregon Criminal Justice Commission
2013-DJ-BX-0013, Oregon Criminal Justice Commission
2016-DJ-BX-0459, Oregon Criminal Justice Commission
2014-DJ-BX-1050, Oregon Criminal Justice Commission

Dear Mr. Schmidt:

Thank you for the time and assistance your staff provided during the BJA on-site monitoring
visit November 15, 2017. The visit provided valuable information on the status of your
Edward Byrne Memorial Justice Assistance Grant Programs.

No programmatic or administrative issues requiring formal resolution were identified during
the site visit. The Edward Byrne Memorial Justice Assistance Grant Programs appear to be
progressing according to the plans presented in the approved applications, and are in
compliance with Federal, OJP, and BJA guidelines for this grant. I appreciate the work that
Tiffany Quintero has completed in managing the projects, the digital filing system is
impressive. She provided me with information on the successful Justice Reinvestment
Summit held last February and she also provided me with an overview of the websites and
the data portal which connects public safety officials with criminal justice trends statewide.
Congratulations on all these successful projects.

If you have any further questions concerning the site visit, your program, or available
technical assistance, please do not hesitate to contact me at 202.598.3969 and/or
Heather.Wiley@ojp.usdoj.gov. Thank you again for your cooperation during my recent visit.

Exhibit 5
Page 1 of 2

Sincerely,

Heather Wiley

**cc:**
Tiffany A Quintero

Exhibit 5
Page 2 of 2



**U.S. Department of Justice**

Office of Justice Programs

*Washington, D.C 20531*

November 15, 2017

Michael Schmidt
Executive Director
Oregon Criminal Justice Commission
885 Summer Street NE
Salem, OR 97301

Dear Mr. Schmidt,

Your FY 2016 Byrne JAG grant award required you to comply with 8 U.S.C. § 1373. Section 1373 compliance is an ongoing requirement that the Department of Justice monitors. The Department of Justice is concerned that the following Oregon laws, policies, or practices may violate section 1373:

- **HB 3464, Effective August 15, 2017.** Section 1(1) prohibits "disclos[ing], for the purposes of enforcement of federal immigration laws," address and contact information. The Department is concerned that this appears to restrict the sending of information regarding immigration status, in violation of section 1373(a).

- **HB 3464, Effective August 15, 2017.** Section 1(3) states that a "public body may decline to disclose . . . information concerning a person's citizenship or immigration status" unless certain exceptions apply. The Department is concerned that this appears to restrict the sending of information regarding immigration status, in violation of section 1373(a).

- **ORS § 181A.820.** This law provides that "[n]o law enforcement agency of the State of Oregon or of any political subdivision of the state shall use agency moneys, equipment or personnel for the purpose of detecting . . . persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws." The Department is concerned that this appears to restrict the sending or requesting of information regarding immigration status, in violation of section 1373(a) and (b).

1

Exhibit 6
Page 1 of 2

By December 8, 2017, please submit a response to this letter that addresses whether Oregon has laws, policies, or practices that violate section 1373, including those discussed above. In addition to your compliance in FY 2016, please address whether you would comply with section 1373 throughout the award period, should you receive an FY 2017 Byrne JAG grant award. To the extent Oregon laws or policies contain so called "savings clauses," please explain in your submission the way these savings clauses are interpreted and applied, and whether these interpretations are communicated to Oregon officers or employees.

The Department has not made a final determination regarding Oregon's compliance with section 1373. This letter does not constitute final agency action and nothing in this letter creates any right or benefit enforceable at law against the United States.

Sincerely,

Alan Hanson
Acting Assistant Attorney General

2

Exhibit 6
Page 2 of 2



Kate Brown, Governor

**Criminal Justice Commission**
885 Summer St NE
Salem, OR 97301-2522
TEL: 503-378-4830
FAX: 503-378-4861

Michael Schmidt
Executive Director

**COMMISSIONERS:**
Robert Ball
Chairman
Sen. Floyd Prozanski*
Rep. Duane Stark
Walter Beglau
Rob Bovett
Wally Hicks
Greg Hazarabedian
Kiki Parker-Rose
Sebastian Tapia
*Non-Voting

Alan Hanson
Acting Assistant Attorney General
Office of Justice Programs
United States Department of Justice
Washington, D.C. 20531

Dear Mr. Hanson:

I am in receipt of your letter, dated November 15, 2017, regarding the State of Oregon's compliance with 8 U.S.C. § 1373 as a condition of receiving an FY 2016 Byrne JAG grant award. The State of Oregon is in compliance with federal law, including Section 1373. Section 1373, in substance, prohibits states from restricting government entities and officials from providing "information regarding ... citizenship or immigration status" to the Department of Homeland Security. The statute does not, however, affirmatively require any information to be shared.

The State of Oregon does not restrict state entities or officials from providing information regarding citizenship or immigration status to the Department of Homeland Security.

Your letter expresses concern that two Oregon statutes may violate section 1373. The first is House Bill 3464. This statute, enacted this year, does not restrict state entities or officials from providing "information regarding ... citizenship or immigration status" to the Department of Homeland Security. Section 1(1) restricts disclosure of other types of information, like addresses and contact information, but does not restrict the sharing of information about citizenship or immigration status. Section 1(3) of the statute states that public bodies *may* — permissively — decline to disclose certain information. It does not restrict anyone from sharing that information if they wish. Because section 1373 does not affirmatively require information sharing, this provision is consistent with the federal statute.

In fact, HB 3464 was drafted to comply with section 1373. The Oregon Governor and the Oregon Attorney General both testified to the Legislature that the State would remain in compliance with the federal law. Pursuant to section 2 of the statute, the Oregon Department of Justice is preparing guidance to that effect.

You also ask about ORS 181A.820. This statute, enacted 30 years ago, bars Oregon law enforcement agencies from expending resources "for the purpose of detecting or apprehending persons" for violating federal immigration laws. Nothing in this statute prohibits law enforcement agencies from sharing immigration status or citizenship information with federal immigration authorities. Indeed, ORS § 181A.820(2)(a) specifically provides that "law enforcement agencies may exchange information" with federal immigration authorities to "verify the immigration status of a person if the person is arrested for any criminal offense." Accordingly, Oregon law is in compliance with the requirements of 8 U.S.C. § 1373.

Please let me know if you have additional questions or if I can be of further assistance.

Sincerely,

Michael Schmidt
Executive Director, Oregon Criminal Justice Commission

Exhibit 7
Page 1 of 1



**U.S. Department of Justice**

Office of Justice Programs

*Bureau of Justice Assistance*

_____

*Washington, D.C. 20531*

January 24, 2018

Michael Schmidt
Executive Director – Oregon Criminal Justice Commission
885 Summer Street, NE
Salem, Oregon 97301

RE: Document request for Grant 2016-DJ-BX-0459, Oregon Criminal Justice Commission

Dear Director Schmidt:

Thank you for your response to our November 15, 2017, letter regarding your jurisdiction's
compliance with 8 U.S.C. § 1373, a federal law with which your jurisdiction must comply as an
eligibility requirement for receiving Byrne Justice Assistance Grant (Byrne JAG) funding from
the Department of Justice (Department or DOJ). After reviewing your response, the Department
remains concerned that your jurisdiction's laws, policies, or practices may violate section 1373,
or, at a minimum, that they may be interpreted or applied in a manner inconsistent with section
1373.

In light of these concerns, the Department is requesting certain documents as described below.
This request is made consistent with 2 CFR § 200.336, as adopted by Department regulation 2
CFR § 2800.101. In your FY 2016 Byrne JAG award, you agreed to the following (listed as
special condition #23):

> [The recipient agrees to] cooperate with [the Bureau of Justice Assistance
> ("BJA")] and [Office of the Chief Financial Officer ("OCFO")] on all grant
> monitoring requests.... The recipient [also] agrees to provide to BJA and OCFO
> all documentation necessary to complete monitoring tasks, including
> documentation related to any subawards made under this award. Further, the
> recipient agrees to abide by reasonable deadlines set by BJA and OCFO for
> providing the requested documents. Failure to cooperate with BJA's/OCFO's
> grant monitoring activities may result in sanctions affecting the recipient's DOJ
> awards, including but not limited to withholdings and/or other restrictions on the
> recipient's access to grant funds; referral to the Office of the Inspector General for
> audit review; designation of the recipient as a DOJ High Risk grantee; or
> termination of an award(s).

Exhibit 8
Page 1 of 4

Please respond to the below request by providing to Chris Casto, BJA, at Chris.Casto@usdoj.gov by no later than February 23, 2018, all responsive documents, consistent with the instructions in Attachment A.

Documents Requested:

> All documents reflecting any orders, directives, instructions, or guidance to your law enforcement employees (including, but not limited to, police officers, correctional officers, and contract employees), whether formal or informal, that were distributed, produced, and/or in effect during the relevant timeframe, regarding whether and how these employees may, or may not, communicate with the Department of Justice, the Department of Homeland Security, and/or Immigration and Customs Enforcement, or their agents, whether directly or indirectly.

BJA will review your submissions and seek additional information, if necessary. The Department fully anticipates your complete cooperation in this matter. Should you fail to respond in a complete and timely manner, the Department will subpoena these documents in accordance with 34 U.S.C. §§ 10225, 10221, 10230, 10151 – 10158, 10102(a)(6), 10110, and 10110 note.

These materials are critical to our ongoing review. Should the Department determine your jurisdiction is out of compliance with section 1373, the Department may, as detailed in your award documents, seek return of your FY 2016 grant funds, require additional conditions for receipt of any FY 2017 Byrne JAG funding for which you have applied, and/or deem you ineligible for FY 2017 Byrne JAG funds.

Thank you for your prompt attention to this request. We look forward to working through this matter with you. Any specific questions concerning this request can be sent to directly to Tracey Trautman, BJA Deputy Director, at Tracey.Trautman@usdoj.gov or call (202) 305-1491.

Sincerely,

Jon Adler

Jon Adler
Director
Bureau of Justice Assistance
Office of Justice Programs
810 7th Street NW
Washington, DC 20531

Exhibit 8
Page 2 of 4

## Attachment A

## Instructions

1.     These requests apply to all documentary material in your possession, custody, or control regardless of their location and regardless of whether such documents are held by your employees, attorneys, consultants, accountants, investigators, representatives or agents, or any other person acting on your behalf.  To the extent that responsive documents are not in your possession, custody, or control, these requests require Respondent to identify those documents with specificity, as well as the individuals and/or entities that currently maintain possession, custody, or control over such documents.

2.     The term "document" includes all writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form.  The term "document" specifically includes electronically stored information.

3.     The term "relevant timeframe" means the period from September 30, 2015 through January 24, 2018.

4.     The terms "you" and "your" refer to the Oregon state law enforcement agencies.

5.     These requests are continuing in nature.  If you become aware of or acquire possession, custody, or control of additional responsive documents, you shall promptly submit copies of such additional documents to the Office of Justice programs, consistent with these instructions.

6.     If any documents are withheld based upon a claim of privilege, work product doctrine, or any other protection from discovery:

     a.     identify the document in writing with a description of each such document or part thereof, including, as applicable, the type of document (e.g., letter, memorandum, or handwritten notes); subject matter, date of preparation, number of pages, name, contact

Exhibit 8
Page 3 of 4

information, and title of author(s); and the name, contact information, and title of all actual and intended recipients;

b.    state the privilege(s), work product doctrine(s), or other protection(s) from discovery relied upon for withholding the document; and

c.    state all facts supporting the claim of privilege(s), work product doctrine(s), or other protection(s) from discovery in sufficient detail to allow an assessment of its validity.

7.    To the extent that you produce copies of documents, the originals must be maintained and safeguarded and made available upon request.

8.    Identify all responsive documents that have been lost, discarded, or destroyed.  In so doing, state the type of document, its date, the approximate date it was lost, discarded, or destroyed, and the identity of each person having knowledge of the contents thereof.  Please explain why any related documents were destroyed.  Was the document disposed of in accordance with established policies?

9.    Production of documentary material shall be made in such a manner as to ensure that the source and location of such material may be readily determined.

10.    File folders, index or file tabs, binder covers, labels and other materials identifying documentary material responsive to these requests, or in which documentary material responsive to these requests are contained, shall be produced intact with such documentary material.

11.    Documentary material attached to each other shall not be separated unless sufficient records are kept to permit reconstruction of such grouping and separation is identified.

Exhibit 8
Page 4 of 4



Kate Brown, Governor

**Criminal Justice Commission**
885 Summer St NE
Salem, OR 97301-2522
TEL: 503-378-4830
FAX: 503-378-4861

Michael Schmidt
Executive Director
Oregon Criminal Justice Commission
885 Summer St NE
Salem, OR 97301

Michael Schmidt
Executive Director

**COMMISIONERS:**
Robert Ball
Chairman
Sen. Floyd Prozanski*
Rep. Duane Stark*
Rod Underhill
Rob Bovett
Wally Hicks
Jessica Kampfe
Kiki Parker-Rose
Sebastian Tapia
*Non-Voting

Jon Adler
Director
Bureau of Justice Assistance
Office of Justice Programs
810 7th Street NW
Washington, DC 20531

Dear Mr. Adler,

I write in response to your letter of January 24 demanding certain documents. You asked me to provide you with:

> All documents reflecting any orders, directives, instructions, or guidance to your law enforcement employees (including, but not limited to, police officers, correctional officers, and contract employees), whether formal or informal, that were distributed, produced, and/or in effect during the relevant timeframe, regarding whether and how these employees may, or may not, communicate with the Department of Justice, the Department of Homeland Security, and/or Immigration and Customs Enforcement, or their agents, whether directly or indirectly.

Instructions appended to your letter explain that "your" should be understood to mean "the Oregon state law enforcement agencies." This demand evinces a serious misunderstanding about the role of the Oregon Criminal Justice Commission (CJC), and ignores the purposes for which the United States Department of Justice (USDOJ) grants funds to the CJC.

Succinctly, CJC does not employ any police officers, correctional officers, or other law enforcement officers. Nor does it control Oregon state law enforcement agencies. Consequently, the CJC is not in position to generate documents of the type you have requested, and CJC has no records responsive to your request. In addition, CJC's sub-grantees do not include any Oregon state law enforcement agencies. As CJC's 2016 grant application materials clearly explained, the funds sought by CJC are used for three purposes:

Exhibit 9
Page 1 of 4



Kate Brown, Governor

Criminal Justice Commission
885 Summer St NE
Salem, OR 97301-2522
TEL: 503-378-4830
FAX: 503-378-4861

Michael Schmidt
Executive Director

COMMISIONERS:
Robert Ball
Chairman
Sen. Floyd Prozanski*
Rep. Duane Stark*
Rod Underhill
Rob Bovett
Wally Hicks
Jessica Kampfe
Kiki Parker-Rose
Sebastian Tapia
*Non-Voting

## 1. DRUG TREATMENT AND ENFORCEMENT PROGRAMS

CJC intends to financially support targeted need-based grant requests from Oregon specialty courts to fund innovative evidence-based practices that support best-practice standards. The Specialty Court Grant Program calls for evidence-based problem-solving court strategies designed to address the root causes of criminal activity and substance use disorders by coordinating efforts of the judiciary, prosecution, defense, probation, law enforcement, treatment, mental health, and social services.

## 2. PLANNING, EVALUATION, TECHNOLOGY IMPROVEMENTS

Local Public Safety Coordinating Councils (LPSCCs) are at the core of the Justice Reinvestment process and their involvement is critical to developing and supporting local programs that meet the goals and requirements established. CJC intends to financially support LPSCCs who have little or no professional staff (Coordinator) in targeted counties and provide ongoing technical assistance to LPSCCs statewide through coordinated training opportunities.

## 3. CRIME VICTIMS

CJC intends to financially support the Oregon District Attorney's Association (ODAA) in the initial funding of the Witness Intimidation Support Program (WISP) to assist local crime victims with services of an immediate nature in response to the increasing threat to victims and witnesses in criminal cases. This pilot program will provide a flexible option to meet the critical needs of threatened crime victims on an emergency basis, to ensure their well-being and availability for court proceedings or other activities related to an ongoing case.

The Oregon Victim's Services Portal Project will provide a mechanism to relay a crime victim's preferences and needs as the offender moves through the criminal justice system. CJC intends to financially support Multnomah County in the technical development of this unique program for crime victims.

None of these purposes involves funding state law enforcement agencies.

In short, CJC does not control state law enforcement officers or agencies, and does not have authority to demand documents from state law enforcement agencies. Nor do the grants provided to the CJC give USDOJ any authority to demand documents from state law enforcement agencies, none of which are CJC sub-grantees.

Exhibit 9
Page 2 of 4



Kate Brown, Governor

Criminal Justice Commission
885 Summer St NE
Salem, OR 97301-2522
TEL: 503-378-4830
FAX: 503-378-4861

==Nevertheless, as I stated in my previous letter to Alan Hanson, the State of Oregon complies with 8 USC § 1373.== Both Governor Kate Brown and Attorney General Ellen Rosenblum have explained this publicly. In an effort to avoid an unnecessary fight with USDOJ over a statute that the state is not violating, state law enforcement agencies were provided with your request and asked to provide any responsive documents in their possession. I have enclosed a handful of policies identified by the Oregon Department of Corrections, along with some email correspondence within that agency.[1]

Michael Schmidt
Executive Director

COMMISIONERS:
Robert Ball
Chairman
Sen. Floyd Prozanski*
Rep. Duane Stark*
Rod Underhill
Rob Bovett
Wally Hicks
Jessica Kampfe
Kiki Parker-Rose
Sebastian Tapia
*Non-Voting

Based on their responses and subsequent review, the following state agencies do not appear to have any records responsive to your request:

- Oregon Department of Justice[2]
- Oregon Department of Public Safety Standards and Training
- Oregon Liquor Control Commission
- Oregon Lottery
- Oregon State Police[3]

By providing you with this information, I am in no way suggesting that the terms of the grant agreement between CJC and USDOJ give USDOJ any authority to demand or access documents from these state law enforcement agencies. Nor do I wish to give you the misimpression that the CJC has authority to compel state law enforcement agencies to provide it with the information you have requested.

---

[1] The materials provided to me include redactions to protect privileged communications between the Department of Corrections and its general counsel.

[2] I have attached material prepared by ODOJ which discusses 8 USC § 1373. It does not reflect a state law enforcement agency's directives to its law enforcement employees, but a presentation made by ODOJ to state agency managers. However, the document explains the restrictions that 8 USC § 1373 imposes on the state. In my prior letter I noted that ODOJ was working on guidance documents regarding Oregon House Bill 3464 (2017). Those have not been completed. Once they are, I expect they will be publicly available. However, I can provide them to you directly if you wish.

[3] I have attached the solitary OSP document that OSP suggested might fall within the scope of your request. However, it does not appear to be responsive, as it says nothing about "whether and how [OSP] employees may, or may not, communicate with the Department of Justice, the Department of Homeland Security, and/or Immigration and Customs Enforcement, or their agents."

Exhibit 9
Page 3 of 4



Kate Brown, Governor

**Criminal Justice Commission**
885 Summer St NE
Salem, OR 97301-2522
TEL: 503-378-4830
FAX: 503-378-4861

Michael Schmidt
Executive Director

But, as you will see, Oregon state law enforcement agencies are not violating 8 USC § 1373. In fact, the ODOJ guidance attached clearly explains the restrictions imposed on the state by 8 USC § 1373. The included ODOC policies do not restrict communication with federal immigration authorities. Indeed, in a single instance where an ODOC manager gave direction that could have been understood in a manner contrary to the federal statute, she was subsequently instructed to clarify to her staff what was explicit in the materials she initially sent them: Oregon does not restrict its employees from sharing citizenship and immigration status information with federal immigration authorities.

I hope that providing these documents to you will help avoid a pointless dispute over matters that have nothing to do with the important projects Byrne Justice Assistance Grants are helping to fund.

Sincerely,

Michael Schmidt

COMMISIONERS:
Robert Ball
Chairman
Sen. Floyd Prozanski*
Rep. Duane Stark*
Rod Underhill
Rob Bovett
Wally Hicks
Jessica Kampfe
Kiki Parker-Rose
Sebastian Tapia
*Non-Voting

Exhibit 9
Page 4 of 4

**Smith Tim**

| | |
|---|---|
| **From:** | SCHMIDT Michael * CJC <Michael.SCHMIDT@oregon.gov> |
| **Sent:** | Tuesday, April 17, 2018 11:23 PM |
| **To:** | QUINTERO Tiffany * CJC |
| **Subject:** | Fwd: FY2017 Byrne JAG Update |

FYI

Sent from my iPad

Begin forwarded message:

> **From:** "Trautman, Tracey (OJP)" <Tracey.Trautman@usdoj.gov>
> **Date:** April 17, 2018 at 5:35:55 PM PDT
> **To:** "Trautman, Tracey (OJP)" <Tracey.Trautman@usdoj.gov>
> **Subject:** FY2017 Byrne JAG Update
>
> Good evening SAA partners:
>
> BJA has not awarded its FY 2017 Byrne JAG grants due to the issuance of a nationwide injunction by a U.S. District Court on September 15, 2017 (with the exception of two awards made prior to the issuance of the injunction). Since that time, BJA has received a number of questions from other applicants as to whether they may use any FY 2017 JAG funding that they may be awarded to reimburse themselves for obligations or expenditures that they incur or make with their own funds prior to any actual receipt of the FY 2017 JAG award. Consistent with longstanding Department of Justice policy, and as indicated in the two Byrne JAG awards that were made in FY 2017, while the final award of Byrne JAG awards for the FY 2017 program is delayed due to the nationwide injunction, state and local applicants for Byrne JAG grants under the FY 2017 program may obligate and expend their own funds on allowable JAG projects after the start date of October 1, 2016. Once the grants are awarded, FY2017 Byrne JAG funds received, if any, may be used for reimbursement of those expenditures.
>
> In fact, it is typical for the project start date for Byrne JAG grants to predate that actual award date. To address this situation in connection with FY 2017 program, BJA has placed added specific language in a special condition for use in each FY 2017 Byrne JAG state and local award document.
>
> Grant Condition Number 51 in the FY 2017 Byrne JAG State and Local Award Conditions expressly provides for JAG reimbursements and distinguishes such reimbursements from the concept of supplantation, which is prohibited by the JAG statute (see 34 U.S.C. § 10614(d)(3)):
>
> "Authorization to obligate (federal) award funds to reimburse certain project costs incurred on or after October 1, 2016"
>
> "The recipient may obligate (federal) award funds only after the recipient makes a valid acceptance of the award. As of the first day of the period of performance for the award (October 1, 2016), however, the recipient may choose to incur project costs using non-federal funds, but any such project costs are incurred at the recipient's risk until, at a minimum-- (1) the recipient makes a valid acceptance of the award, and (2) all applicable withholding conditions are removed by OJP (via a Grant Adjustment Notice). (A withholding condition is a condition in the award document that precludes the recipient from

1

Exhibit 10
Page 1 of 2

obligating, expending, or drawing down all or a portion of the award funds until the condition is removed.)"

"Except to the extent (if any) that an award condition expressly precludes reimbursement of project costs incurred "at risk," if and when the recipient makes a valid acceptance of this award and OJP removes each applicable withholding condition through a Grant Adjustment Notice, the recipient is authorized to obligate (federal) award funds to reimburse itself for project costs incurred "at-risk" earlier during the period of performance (such as project costs incurred prior to award acceptance or prior to removal of an applicable withholding condition), provided that those project costs otherwise are allowable costs under the award."

"Nothing in this condition shall be understood to authorize the recipient (or any sub recipient at any tier) to use award funds to "supplant" State or local funds in violation of the recipient's certification (executed by the chief executive of the State or local government) that federal funds will be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities."

Thank you—

Tracey

Tracey Trautman
Deputy Director
Bureau of Justice Assistance
U.S. Department of Justice
(202) 305-1491 (desk)
(202) 353-5333 (cell)
Tracey.Trautman@usdoj.gov

2

Exhibit 10
Page 2 of 2

OMB No. 1121-0329
**Approval Expires 11/30/2020**

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Assistance*



The U.S. Department of Justice (DOJ), Office of Justice Programs (OJP), Bureau of Justice Assistance (BJA) is seeking applications for the Edward Byrne Memorial Justice Assistance Grant (JAG) Program. This program furthers the Department's mission by assisting state, local, and tribal efforts to prevent or reduce crime and violence.

# Edward Byrne Memorial
# Justice Assistance Grant (JAG) Program

## FY 2018 State Solicitation

### Applications Due: August 22, 2018

### Eligibility

Only states may apply under this solicitation. By law, for purposes of the JAG Program, the term "states" includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa. (Throughout this solicitation, each reference to a state or states includes all 56 jurisdictions.)

A JAG application is not complete, and a state may not access award funds, unless the chief executive of the applicant state (e.g., the governor) properly executes, and the state submits, the "Certifications and Assurances by the Chief Executive of the Applicant Government" attached to this solicitation as Appendix A.

In addition, as discussed further below, in order to validly accept a fiscal year (FY) 2018 JAG award, the chief legal officer of the applicant state must properly execute, and the state must submit, the specific certifications regarding compliance with certain federal laws attached to this solicitation as Appendix B and Appendix C. (The text of the relevant federal laws appears in Appendix D.)

The expected allocations by state for the FY 2018 JAG Program can be found at https://www.bja.gov/funding/FY18-State-JAG-Web-Allocations.pdf.

All recipients and subrecipients must forgo any profit or management fee.

1

Exhibit 11
Page 1 of 57

# Deadline

Applicants must register in the OJP Grants Management System (GMS) at https://grants.ojp.usdoj.gov/ prior to submitting an application under this solicitation. All applicants must register, even those that previously registered in GMS. Select the "Apply Online" button associated with the solicitation title. All registrations and applications are due by 5:00 p.m. eastern time on August 22, 2018.

For additional information, see How to Apply in Section D. Application and Submission Information.

# Contact Information

For technical assistance with submitting an application, contact the Grants Management System Support Hotline at 888–549–9901, option 3, or via email at GMS.HelpDesk@usdoj.gov. The GMS Support Hotline operates 24 hours a day, 7 days a week, including on federal holidays.

An applicant that experiences unforeseen GMS technical issues beyond its control that prevent it from submitting its application by the deadline must email the National Criminal Justice Reference Service (NCJRS) Response Center at grants@ncjrs.gov **within 24 hours after the application deadline** in order to request approval to submit its application. Additional information on reporting technical issues appears under "Experiencing Unforeseen GMS Technical Issues" in How to Apply in Section D. Application and Submission Information.

For assistance with any other requirement of this solicitation, applicants may contact the NCJRS Response Center by telephone at 1–800–851–3420; via TTY at 301–240–6310 (hearing impaired only); by email at grants@ncjrs.gov; by fax to 301–240–5830, or by web chat at https://webcontact.ncjrs.gov/ncjchat/chat.jsp. The NCJRS Response Center hours of operation are 10:00 a.m. to 6:00 p.m. eastern time, Monday through Friday, and 10:00 a.m. to 8:00 p.m. eastern time on the solicitation close date. Applicants also may contact the appropriate BJA State Policy Advisor.

Release date: July 20, 2018

2

Exhibit 11
Page 2 of 57

# Contents

A. Program Description......................................................................................... 5
  Overview .........................................................................................................5
  Program-specific Information ...........................................................................5
    Permissible uses of JAG Funds – In general.............................................5
    Limitations on the use of JAG funds .........................................................6
    State obligations regarding use of JAG funds and units of local government.........10
    Required compliance with applicable federal laws ...................................10
    Potential funding reductions for noncompliance with PREA and SORNA...............11
    BJA Areas of Emphasis ..........................................................................12
  Objectives and Deliverables...........................................................................14
  Evidence-based Programs or Practices ..........................................................14
  Information Regarding Potential Evaluation of Programs and Activities....................14
B. Federal Award Information ............................................................................. 15
  Type of Award ...............................................................................................15
  Financial Management and System of Internal Controls...............................16
  Budget and Financial Information...................................................................17
  Cost Sharing or Match Requirement ..............................................................17
  Pre-agreement Costs (also known as Pre-award Costs) ...............................17
  Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs.......18
  Costs Associated with Language Assistance (if applicable)..........................18
C. Eligibility Information ...................................................................................... 18
D. Application and Submission Information ......................................................... 19
  What an Application Should Include................................................................19
  How to Apply .................................................................................................32
E. Application Review Information ....................................................................... 34
  Review Process .............................................................................................34
F. Federal Award Administration Information....................................................... 35
  Federal Award Notices...................................................................................35
  Statutory and Regulatory Requirements; Award Conditions .........................36
  General Information about Post-federal Award Reporting Requirements .................37
G. Federal Awarding Agency Contact(s) ............................................................ 38
H. Other Information ........................................................................................... 38
  Freedom of Information Act and Privacy Act (5 U.S.C. § 552 and 5 U.S.C. § 552a)..38
  Provide Feedback to OJP ...............................................................................39

3

Exhibit 11
Page 3 of 57

Appendix A: Certifications and Assurances by the Chief Executive ...........................40

Appendix B: Certification of Compliance with 8 U.S.C. §§ 1373 and 1644 ................42

Appendix C: Certification of Compliance with 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), and 1366(1) & (3) .......................................................................44

Appendix D: Certain relevant federal laws, as in effect on June 7, 2018 ...................46

Appendix E: Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE).......................52

Appendix F: Additional Award Purposes ...................................................................53

Appendix G: Application Checklist ...........................................................................56

4

Exhibit 11
Page 4 of 57

# Edward Byrne Memorial
# Justice Assistance Grant (JAG) Program
# FY 2018 State Solicitation
# CFDA #16.738

## A. Program Description

### Overview

The Edward Byrne Memorial Justice Assistance Grant (JAG) Program is the primary provider of federal criminal justice funding to states and units of local government. BJA will award JAG Program funds to eligible states under this FY 2018 JAG Program State Solicitation. (A separate solicitation will be issued for applications to BJA directly from units of local government.)

**Statutory Authority:** The JAG Program statute is Subpart I of Part E of Title I of the Omnibus Crime Control and Safe Streets Act of 1968. Title I of Public Law No. 90-351 (generally codified at 34 U.S.C. 10151-10158), including subpart 1 of part E (codified at 34 U.S.C. 10151 - 10158); see also 28 U.S.C. 530C(a).

### Program-specific Information

### Permissible uses of JAG Funds – In general

In general, JAG funds awarded to a state under this FY 2018 solicitation may be used to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for **criminal justice**, including for any one or more of the following:

- Law enforcement programs
- Prosecution and court programs
- Prevention and education programs
- Corrections and community corrections programs
- Drug treatment and enforcement programs
- Planning, evaluation, and technology improvement programs
- Crime victim and witness programs (other than compensation)
- Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams

Additionally, JAG funds awarded to a state under this FY 2018 solicitation may be used for any purpose indicated in Appendix F.

In connection with the all of the above purposes (including those indicated in the appendix), it should be noted that the statute defines "criminal justice" as "activities pertaining to crime prevention, control, or reduction, or the enforcement of the criminal law, including, but not limited to, police efforts to prevent, control, or reduce crime or to apprehend criminals, including juveniles, activities of courts having criminal jurisdiction, and related agencies (including but not

5

Exhibit 11
Page 5 of 57

limited to prosecutorial and defender services, juvenile delinquency agencies and pretrial service or release agencies), activities of corrections, probation, or parole authorities and related agencies assisting in the rehabilitation, supervision, and care of criminal offenders, and programs relating to the prevention, control, or reduction of narcotic addiction and juvenile delinquency."

Under the JAG Program, states may use award funds for broadband deployment and adoption activities as they relate to criminal justice activities.

**Limitations on the use of JAG funds**
*Prohibited uses of funds* – JAG funds may not be used (whether directly or indirectly) for any purpose prohibited by federal statute or regulation, including those purposes specifically prohibited by the JAG Program statute as set out at 34 U.S.C. § 10152.

JAG funds may not be used (directly or indirectly) for security enhancements or equipment for nongovernmental entities not engaged in criminal justice or public safety. Additionally, **JAG funds may not be used (directly or indirectly) to pay for any of the following items unless the BJA Director certifies that extraordinary and exigent circumstances exist,** making them essential to the maintenance of public safety and good order:

- Vehicles, vessels, or aircraft*
- Luxury items
- Real estate
- Construction projects (other than penal or correctional institutions)
- Any similar items

**\*Police cruisers, police boats, and police helicopters are allowable vehicles under JAG and do not require BJA certification.**

For information about requesting a waiver to obtain BJA certification for a listed prohibited item, or for examples of allowable vehicles that do not require BJA certification, refer to the JAG FAQs.

*Cap on use of JAG award funds for administrative costs* – Up to 10 percent of a JAG award, including up to 10 percent of any earned interest, may be used for costs associated with administering the award.

*Prohibition of supplanting; prohibition on use of JAG funds as match* – JAG funds may not be used to supplant state or local funds but must be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities. See the JAG FAQs for examples of supplanting.

Although supplanting is prohibited, as discussed under What An Application Should Include, leveraging of federal funding is encouraged.

Absent specific federal statutory authority to do so, JAG award funds may not be used as a match for the purposes of other federal awards.

*Other restrictions on use of funds* – If a state chooses to use its FY 2018 JAG funds for particular, defined types of expenditures, it must satisfy certain preconditions.

6

Exhibit 11
Page 6 of 57

- Body-Worn Cameras (BWCs)
  A state that proposes to use FY 2018 JAG award funds to purchase BWC equipment, or to implement or enhance BWC programs, must provide to OJP a certification(s) that each state law enforcement agency receiving the equipment or implementing the program has policies and procedures in place related to BWC equipment usage, data storage and access, privacy considerations, and training. The certification form related to BWC policies and procedures can be found at https://www.bja.gov/Funding/BodyWornCameraCert.pdf.

  A state that proposes to use JAG funds for BWC-related expenses will have funds withheld until the required certification is submitted and approved by OJP. If the state proposes to change project activities to utilize JAG funds for BWC-related expenses after the award is accepted, the state must submit the signed certification to OJP at that time.

  Further, before making any subaward for BWC-related expenses, the state JAG recipient must collect a completed BWC certification from the proposed subrecipient. Any such certifications must be maintained by the state JAG recipient, and made available to OJP upon request.

  **The BJA BWC Toolkit provides model BWC policies and best practices to assist criminal justice departments in implementing BWC programs.**

  Apart from the JAG Program, BJA provides funds under the Body-Worn Camera Policy and Implementation (BWC) Program. The BWC Program allows jurisdictions to develop and implement policies and practices required for effective program adoption, and to address program factors including the purchase, deployment, and maintenance of camera systems and equipment; data storage and access; and privacy considerations. Interested states may wish to refer to the BWC Program web page for more information. States should note, however, that JAG funds may not be used as any part of the 50 percent match required by the BWC Program.

- Body Armor
  Body armor purchased with FY 2018 JAG funds may be purchased at any threat level designation, make, or model from any distributor or manufacturer, as long as the body armor has been tested and found to comply with the latest applicable National Institute of Justice (NIJ) ballistic or stab standards. Further, body armor or armor vests purchased with FY 2018 JAG funds must also be "uniquely fitted vests" as this term is used in the context of the Bulletproof Vest Partnership (BVP) Program (see 34 U.S.C. § 10202(c)(1)(A)) requiring that grantees using JAG funds to purchase armor vests or body armor comply with requirements established for BVP grants. For these purposes, "uniquely fitted vests" means protective (ballistic or stab-resistant) armor vests that conform to the individual wearer to provide the best possible fit and coverage, through a combination of: (1) correctly sized panels and carrier, determined through appropriate measurement, and (2) properly adjusted straps, harnesses, fasteners, flaps, or other adjustable features. The requirement that body armor be "uniquely fitted" does **not** require body armor that is individually manufactured based on the measurements of an individual wearer. In support of OJP's efforts to improve officer safety, the American Society for Testing and Materials (ASTM) International has made available the Standard Practice for Body Armor Wearer Measurement and Fitting of Armor (Active Standard ASTM E3003) available at no cost. The Personal Armor Fit Assessment checklist is excerpted from ASTM E3003.

7

Exhibit 11
Page 7 of 57

A state that proposes to use FY 2018 JAG award funds to purchase body armor must provide OJP with a certification(s) that each state law enforcement agency receiving body armor has a written "mandatory wear" policy in effect. *See* 34 U.S.C. § 10202(c). The certification form related to mandatory wear can be found at www.bja.gov/Funding/BodyArmorMandatoryWearCert.pdf.

A state that proposes to use JAG funds to purchase body armor will have funds withheld until the required certification is submitted and approved by OJP. If the state proposes to change project activities to utilize JAG funds to purchase body armor after the award is accepted, the state must submit the signed certification to OJP at that time.

Further, before making any subaward for the purchase of body armor, the state JAG recipient must collect a completed mandatory wear certification from the proposed subrecipient. Any such certifications must be maintained by the state JAG recipient, and made available to OJP upon request.

A mandatory wear concept and issues paper and a model policy are available at the BVP Customer Support Center, at vests@usdoj.gov or toll free at 1–877–758–3787. Additional information and FAQs related to the mandatory wear policy and certifications can be found at https://www.bja.gov/Funding/JAGFAQ.pdf.

Apart from the JAG Program, BJA provides funds under the Bulletproof Vest Partnership (BVP) Program. The BVP Program is designed to provide a critical resource to state and local law enforcement agencies for the purchase of ballistic-resistant and stab-resistant body armor. For more information on the BVP Program, including eligibility and application, refer to the BVP web page. States should note, however, that JAG funds may not be used as any part of the 50 percent match required by the BVP Program.

- Interoperable Communications
  States (and any subrecipients) that use FY 2018 JAG funds to support emergency communications activities (including the purchase of interoperable communications equipment and technologies such as Voice over Internet Protocol bridging or gateway devices, or equipment to support the build out of wireless broadband networks in the 700 MHz public safety band under the Federal Communications Commission [FCC] Waiver Order) should review 2018 SAFECOM Guidance. SAFECOM Guidance is updated annually to provide current information on emergency communications policies, eligible costs, best practices, and technical standards for state, local, tribal, and territorial grantees investing federal funds in emergency communications projects. Additionally, emergency communications projects funded with FY 2018 JAG funds should support the Statewide Communication Interoperability Plan (SCIP) and be coordinated with the full-time Statewide Interoperability Coordinator (SWIC) in the state of the project. As the central coordination point for a state's interoperability effort, the SWIC plays a critical role, and can serve as a valuable resource. SWICs are responsible for the implementation of SCIP through coordination and collaboration with the emergency response community. The U.S. Department of Homeland Security Office of Emergency Communications maintains a list of SWICs for each of the states and territories. Contact OEC@hq.dhs.gov for more information. All communications equipment purchased with FY 2018 JAG Program funding should be identified during quarterly performance metrics reporting.

Exhibit 11
Page 8 of 57

Further, information-sharing projects funded with FY 2018 JAG funds must comply with DOJ's Global Justice Information Sharing Initiative guidelines, as applicable, in order to promote information sharing and enable interoperability among disparate systems across the justice and public safety community. Recipients (and subrecipients) must conform to the Global Standards Package (GSP) and all constituent elements, where applicable, as described at: https://www.it.ojp.gov/gsp_grantcondition. Recipients (and subrecipients) will be required to document planned approaches to information sharing and describe compliance with GSP and an appropriate privacy policy that protects shared information, or provide detailed justification for why an alternative approach is recommended.

For JAG applicants considering implementing communications technology projects, it is worthwhile to consider the First Responder Network Authority (FirstNet) Program. The Middle Class Tax Relief and Job Creation Act of 2012 (47 U.S.C. §§ 1401 et seq.) established the First Responder Network Authority (FirstNet) as an independent authority within the National Telecommunications and Information Administration (NTIA). FirstNet's statutory mission is to take all actions necessary to ensure the establishment of a nationwide public safety broadband network (NPSBN). The NPSBN will use the 700 MHz D block spectrum to provide Long-Term Evolution (LTE)-based broadband services and applications to public safety entities. The network is based on a single, national network architecture that will evolve with technological advances and initially consist of a core network and radio access network. While mission critical voice communications will continue to occur on land mobile radio (LMR), in time, FirstNet is expected to provide public safety entities with mission critical broadband data capabilities and services including, but not limited to: messaging; image sharing; video streaming; group text; voice; data storage; applications; location-based services; and quality of service, priority and preemption. This reliable, highly secure, interoperable, and innovative public safety communications platform will bring 21st century tools to public safety agencies and first responders, allowing them to get more information quickly and helping them to make faster and better decisions. For more information on FirstNet services, the unique value of the FirstNet network to public safety, and how to subscribe for the FirstNet service should your state or territory opt in, please visit www.FirstNet.gov. To learn about FirstNet's programs and activities, including its consultation and outreach with public safety, the state plans process, FirstNet's history and promise, and how it plans to ensure that the FirstNet network meets the needs of public safety, please visit www.FirstNet.gov or contact info@firstnet.gov.

- <u>DNA Testing of Evidentiary Materials and Upload of DNA Profiles to a Database</u>
  If JAG Program funds are to be used for DNA testing of evidentiary materials, any resulting eligible DNA profiles must be uploaded to the Combined DNA Index System (CODIS, the national DNA database operated by the FBI) by a government DNA lab with access to CODIS. No profiles generated with JAG funding may be entered into any other non-governmental DNA database without prior expressed written approval from BJA.

  In addition, funds may not be used for purchase of DNA equipment and supplies when the resulting DNA profiles from such technology are not acceptable for entry into CODIS.

- <u>Entry of Records into State Repositories</u>
  As appropriate and to the extent consistent with law, a condition may be imposed that would require the following: with respect to any "program or activity" that receives federal financial assistance under this solicitation that is likely to generate or upgrade court dispositions or other records that are relevant to National Instant Background Check

9

Exhibit 11
Page 9 of 57

System (NICS) determinations (which includes any dispositions or records whatsoever that involve any "alien [who] is illegally or unlawfully in the United States" (18 U.S.C. § 922(g)(5)(A) (generally prohibiting any such alien to possess any firearm or ammunition)), a system must be in place to ensure that all such NICS-relevant dispositions or records that are generated or upgraded are made available in timely fashion to state repositories/databases that are accessed by NICS.

**State obligations regarding use of JAG funds and units of local government**
A state that applies for and receives an FY 2018 JAG award must:

- Pass through a predetermined percentage of funds to units of local government. (For purposes of the JAG Program, a "unit of local government" includes a city, county, township, town, and certain federally recognized Indian tribes.) This predetermined percentage (often referred to as the "variable pass-through" or VPT) is calculated by OJP's Bureau of Justice Statistics (BJS), based on the total criminal justice expenditures by a state and its units of local government. The variable pass-through percentages that will apply to an FY 2018 award to a recipient state can be found at: https://www.bja.gov/jag/pdfs/VPT-for-SAAs-updated-June-2017.pdf. (If a state believes the VPT percentage has been calculated incorrectly, the state may provide pertinent, verifiable data to BJA and ask OJP to reconsider.)

- Appropriately use or distribute the amount of funds that are **added** to the state's FY 2018 award because certain units of local government within the state are ineligible for a direct FY 2018 award of JAG funds due to their small size. (These small size units of local government are referred to as "less-than-$10,000 jurisdictions.") The state must provide these additional funds included in its FY 2018 award to state police departments that provide criminal justice services to the "less-than-$10,000 jurisdictions" within the state and/or subaward the funds to such jurisdictions.

**Required compliance with applicable federal laws**
By law, the chief executive (e.g., the governor) of each state that applies for an FY 2018 JAG award must certify that the state will "comply with all provisions of [the JAG program statute] and all other applicable Federal laws." To satisfy this requirement, each state applicant must submit three properly executed certifications, using the forms shown in Appendices A, B, and C.

All applicants should understand that OJP awards, including certifications provided in connection with such awards, are subject to review by DOJ, including by OJP and by the DOJ Office of the Inspector General. Applicants also should understand that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in a certification submitted to OJP in support of an application may be the subject of criminal prosecution, and also may result in civil penalties and administrative remedies for false claims or otherwise. Administrative remedies that may be available to OJP with respect to an FY 2018 award include suspension or termination of the award, placement on the DOJ high risk grantee list, disallowance of costs, and suspension or debarment of the recipient.

**National Incident-Based Reporting System (NIBRS) 3 Percent Set-aside**
In FY 2016, the Federal Bureau of Investigation (FBI) formally announced its intention to sunset the Uniform Crime Reporting (UCR) Program's traditional Summary Reporting System (SRS) and replace it with the UCR Program's National Incident-Based Reporting System (NIBRS). By January 1, 2021, the FBI intends for NIBRS to be the law enforcement crime data reporting standard for the nation.

10

Exhibit 11
Page 10 of 57

By statute, JAG Program awards are calculated using summary Part 1 violent crime data from the FBI's UCR Program. (See 34 U.S.C. § 10156.) Once SRS has been replaced by NIBRS, JAG award amounts will be calculated using NIBRS data. In preparation for the FBI's 2021 NIBRS compliance deadline, beginning in FY 2018, BJA is requiring, through the application of a special condition, direct JAG award recipients not certified by the FBI as NIBRS compliant to dedicate 3 percent of their JAG award toward achieving full compliance with the FBI's NIBRS data submission requirements under the UCR Program. The 3 percent requirement will assist state and local jurisdictions in working toward compliance, to ensure they continue to have critical criminal justice funding available through JAG when SRS is replaced by NIBRS in FY 2021.

The requirement for a NIBRS set-aside will not be applied to subawards from states. Rather, state JAG recipients must ensure that at least 3 percent of the total award amount is used toward NIBRS compliance, unless the FBI has certified that the state is already NIBRS compliant. States must clearly indicate in their application narratives and budgets what projects will be supported with this 3 percent set-aside.

The following are examples of costs and projects that relate to NIBRS implementation at the state or local level that could be funded under the JAG Program: software, hardware, and labor that directly support or enhance a state or agency's technical capacity for collecting, processing, and analyzing data reported by local law enforcement (LE) agencies and then submitting NIBRS data to the FBI; training personnel responsible for the state's Incident Based Reporting (IBR) program on receiving, processing, analyzing, and validating incident-based data from local LE agencies in their state; training local agencies in how to collect and submit NIBRS data; and technical assistance for LE agency personnel responsible for (1) managing the agency's crime incident data, (2) processing and validating the data, and (3) extracting and submitting IBR data to the state UCR Program according to the states and/or directly to the FBI according to the NIBRS standard.

BJA will waive the set-aside requirement for states that have been certified as NIBRS compliant by the FBI as of the posting date of this solicitation. States for which the FBI certifies NIBRS compliance after that date may request a waiver of the set-aside requirement from the BJA Director. The waiver request from an appropriate state official must clearly state that the state has been certified as NIBRS compliant by the FBI, and should be submitted with the application, or, as appropriate, through a request for a Grant Adjustment Notice after an award is made. In any instance in which a waiver request is submitted, the state must retain documentation on file that demonstrates the FBI certification of NIBRS compliance. Such documentation must be made available for BJA review, upon request. The BJA Director will review all requests for waivers. If approved, states will not be subject to the 3 percent set-aside requirement.

Note: U.S. territories and tribal jurisdictions will not be subject to the 3 percent set-aside for NIBRS compliance until FY 2019. Tribal jurisdictions and the five U.S. territories will be strongly encouraged to dedicate a portion of JAG funding to NIBRS conversion; however, this is not a requirement for FY 2018 JAG funding. Utilizing this phased-in approach will allow the territories and tribal jurisdictions to plan for the change in funding direction and provide BJA with time to coordinate or provide technical assistance.

**Potential funding reductions for noncompliance with PREA and SORNA**
Prison Rape Elimination Act of 2003 (PREA). In 2012, DOJ published the National PREA Standards, which were promulgated to prevent, detect, and respond to sexual victimization and abuse in confinement settings. The PREA Standards are set out at 28 C.F.R. Part 115, and

11

Exhibit 11
Page 11 of 57

apply to confinement facilities including adult prisons and jails, juvenile facilities, and police lockups.

Under PREA, if a state's chief executive (e.g., governor) does not certify full compliance with the National PREA Standards, the state is subject to the loss of five percent of certain DOJ grant funds, including JAG award funds, unless: (1) the chief executive submits an assurance to DOJ that no less than five percent of such funds will be used solely for the purpose of enabling the state to achieve and certify full compliance with the PREA Standards in future years; or (2) the chief executive requests that the affected funds be held in abeyance by DOJ. See 34 U.S.C. § 30307(e)(2).

A reduction of a JAG award to a state under the provisions of PREA will **not** affect the portion of the JAG award that is reserved for local jurisdictions.

For additional information concerning PREA implementation, send inquiries to the PREA Management Office at PREACompliance@usdoj.gov and/or review the PREA FAQs.

Sex Offender Registration and Notification Act (SORNA). SORNA, which is Title I of the Adam Walsh Child Protection and Safety Act of 2006, mandates a 10 percent reduction in a JAG award to a state that has failed to substantially implement SORNA. Further, states that have substantially implemented SORNA have an ongoing obligation to maintain that status each year. A JAG reduction will be applied for each year a jurisdiction has failed to have substantially implemented SORNA.

A reduction of a JAG award to a state under the provisions of SORNA will **not** affect the portion of the JAG award that is reserved for local jurisdictions.

For additional information regarding SORNA implementation, including requirements and a list of states that will be affected in FY 2018 by the 10 percent reduction to the JAG award, send inquiries to AskSMART@usdoj.gov. Additional SORNA guidance can be found within the SORNA FAQs.

**BJA Areas of Emphasis**
BJA recognizes that many state and local criminal justice systems currently face challenging fiscal environments and that an important, cost-effective way to relieve those pressures is to share or leverage resources through cooperation among federal, state, and local law enforcement. BJA intends to focus much of its work on the areas of emphasis described below, and encourages each state recipient of an FY 2018 JAG award to join federal law enforcement agencies across the board in addressing these challenges.

Reducing Violent Crime – Recognizing that crime problems, including felonious possession and use of a firearm and/or gang violence, illegal drug sales and distribution, human trafficking, and other related violent crime, vary from community to community, BJA encourages states to tailor their programs to the local crime issues, and to be data-informed in their work. States should consider investing JAG funds in programs to combat firearms violence, and to improve the process for ensuring that persons prohibited from purchasing firearms (see, e.g., 18 U.S.C. § 922(g)) are prevented from doing so, by utilizing technology such as eTrace and NIBIN to analyze evidence, as well as by enhancing complete, accurate, and timely reporting to the FBI's NICS. States are also encouraged to coordinate with the United States Attorneys and Project Safe Neighborhood (PSN) grantees in order to leverage funding for violence reduction projects, and to coordinate their law enforcement activities with those of federal law

12

Exhibit 11
Page 12 of 57

enforcement agencies such as the FBI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Drug Enforcement Administration, and the Department of Homeland Security.

Officer Safety and Wellness – The issue of law enforcement safety and wellness is an important priority for BJA and DOJ. According to the *Preliminary 2017 Law Enforcement Officer Fatalities Report*, released by the National Law Enforcement Officers Memorial Fund (NLEOMF), as of December 28, 2017, there were 128 law enforcement line-of-duty deaths nationwide in 2017. Firearms-related deaths were the second leading cause of law enforcement deaths (44) in 2017, according to the NLEOMF report. Of those deaths, the leading circumstance was officers shot while responding to a domestic disturbance (7), followed by traffic enforcement, investigative activities, and dealing with a suspicious person or vehicle—6 instances in each circumstance. Additionally, deaths due to circumstances other than firearms- or traffic-related deaths increased by 61 percent in 2017 with 37 deaths compared to 23 in 2016. Sixteen of those deaths were due to job-related illnesses, including 10 deaths due to heart attacks.

Based on the latest reports (2016 and 2015) from the FBI's Law Enforcement Officers Killed and Assaulted (LEOKA) data, there appeared to be a continuing increase in assaults between 2015 and 2016. There were 57,180 assaults in 2016 versus 50,212 in 2015. Of those, 16,535 resulted in officer injuries in 2016 compared to 14,281 in 2015. The 2016 LEOKA data show that there were 17 officers killed in ambush situations, which is an increase from 2015 when 4 officers were killed in ambush situations.

BJA sees a vital need to focus not only on tactical officer safety concerns but also on health and wellness, as they affect officer performance and safety. It is important for law enforcement to have the tactical skills necessary, and also to be physically and mentally well, to perform, survive, and be resilient in the face of the demanding duties of the profession. BJA encourages states to use JAG funds to address these needs by providing training, and paying for tuition and travel expenses related to attending trainings such as those available through the BJA VALOR Initiative, as well as funding for health and wellness programs for law enforcement officers.

Border Security – Securing U.S. borders (and internationally accessible waterways and airports) is critically important to the reduction and prevention of transnational drug-trafficking networks and combating all forms of human trafficking within the United States (including sex and labor trafficking of foreign nationals and U.S. citizens of all sexes and ages). Smuggling and trafficking operations to, from, and within the United States contribute to a significant increase in violent crime and U.S. deaths. BJA encourages states to enhance border, waterway, and port security by using JAG funds to support law enforcement hiring, training, and technology enhancement, as well as cooperation and coordination among federal, state, local, and tribal law enforcement agencies.

Collaborative Prosecution and Law Enforcement – BJA supports strong partnerships between prosecutors and law enforcement, at all levels of government, in order to help take violent offenders off the street. BJA strongly encourages state and local law enforcement agencies to foster strong partnerships with federal law enforcement agencies, and with their own prosecutors, as well as federal prosecutors, to adopt new, cost-effective, collaborative strategies to reduce crime, particularly violent crime. (BJA's Innovative Prosecution Solutions Program is a related effort to promote partnerships between prosecutors and researchers to develop and deliver effective, data-driven, evidence-based strategies to solve chronic problems and fight crime.)

13

Exhibit 11
Page 13 of 57

**Objectives and Deliverables**
In general, the FY 2018 JAG Program is designed to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice. Although the JAG Program provides assistance directly to states, through pass-through (and similar) requirements, the JAG Program also is designed to assist units of local government with respect to criminal justice.

As discussed in more detail in the General Information about Post-federal Award Reporting Requirements discussion, a state that receives an FY 2018 JAG award will be required to produce various types of reports and to submit data related to performance measures and accountability. The objectives and deliverables are directly related to the JAG Program accountability measures described at https://bjapmt.ojp.gov/help/jagdocs.html.

**Evidence-based Programs or Practices**
OJP strongly emphasizes the use of data and evidence in policy making and program development in criminal justice, juvenile justice, and crime victim services. OJP is committed to:

- Improving the quantity and quality of evidence OJP generates.
- Integrating evidence into program, practice, and policy decisions within OJP and the field.
- Improving the translation of evidence into practice.

OJP considers programs and practices to be evidence-based when their effectiveness has been demonstrated by causal evidence, generally obtained through one or more outcome evaluations. Causal evidence documents a relationship between an activity or intervention (including technology) and its intended outcome, including measuring the direction and size of a change, and the extent to which a change may be attributed to the activity or intervention. Causal evidence depends on the use of scientific methods to rule out, to the extent possible, alternative explanations for the documented change. The strength of causal evidence, based on the factors described above, will influence the degree to which OJP considers a program or practice to be evidence-based. The OJP CrimeSolutions.gov website at https://www.crimesolutions.gov/ is one resource that applicants may use to find information about evidence-based programs in criminal justice, juvenile justice, and crime victim services.

A useful matrix of evidence-based policing programs and strategies is available through BJA's Matrix Demonstration Project. BJA offers a number of program models designed to effectively implement promising and evidence-based strategies through the BJA Innovation Suite of programs including Innovations in Policing, Prosecution, Supervision, Reentry, and others (see https://www.bja.gov/Programs/CRPPE/innovationssuite.html). BJA encourages states to use JAG funds to support these crime innovation strategies, including effective partnerships with universities and research partners and with non-traditional criminal justice partners.

**Information Regarding Potential Evaluation of Programs and Activities**
The Department of Justice has prioritized the use of evidence-based programming and deems it critical to continue to build and expand the evidence informing criminal and juvenile justice programs and crime victim services to reach the highest level of rigor possible. Therefore, applicants should note that OJP may conduct or support an evaluation of the programs and activities funded under this solicitation. Recipients and sub-recipients will be expected to cooperate with program-related assessments or evaluation efforts, including through the collection and provision of information or data requested by OJP (or its designee) for the assessment or evaluation of any activities and/or outcomes of those activities funded under this

14

Exhibit 11
Page 14 of 57

solicitation. The information or data requested may be in addition to any other financial or performance data already required under this program.

**BJA Success Stories**
The BJA-sponsored Success Stories web page features projects that have demonstrated success or shown promise in reducing crime and positively impacting communities. This web page is a valuable resource for states, localities, territories, tribes, and criminal justice professionals who seek to identify and learn about JAG and other successful BJA-funded projects linked to innovation, crime reduction, and evidence-based practices. **BJA strongly encourages the submission of success stories annually (or more frequently).**

If a state has a success story it would like to submit, it may be submitted through the My BJA account, using "Add a Success Story" and the Success Story Submission form. Register for a My BJA account using this registration link.

# B. Federal Award Information

BJA expects to make up to 56 awards of up to $176,700,000.

BJA plans to make awards for a 4-year period of performance, to begin on October 1, 2017. An extension should not exceed 12 months. An extension beyond this period may be made on a case-by-case basis, at the discretion of BJA, and must be justified by circumstances beyond the control of the recipient and subrecipient, as well as requested via GMS, no fewer than 30 days prior to the end of the period for performance.

The expected allocations by state for the FY 2018 JAG program can be found at: https://www.bja.gov/funding/FY18-State-JAG-Web-Allocations.pdf.

All awards are subject to the availability of appropriated funds and to any modifications or additional requirements that may be imposed by statute.

**Type of Award**
BJA expects that any award under this solicitation will be in the form of a grant. See Statutory and Regulatory Requirements; Award Conditions, under Section F. Federal Award Administration Information, for a brief discussion of important statutes, regulations, and award conditions that apply to many (or in some cases, all) OJP grants.

JAG awards are based on a statutory formula as described below:

Once each fiscal year's overall JAG Program funding level is determined, BJA works with BJS to begin a four-step grant award calculation process, which, in general, consists of:

    (1) Computing an initial JAG allocation for each state, based on its share of violent crime and population (weighted equally).

    (2) Reviewing the initial JAG allocation amount to determine if the state allocation is less than the minimum award amount defined in the JAG legislation (0.25 percent of the total). If this is the case, the state is funded at the minimum level, and the funds required for this are deducted from the overall pool of JAG funds. Each of the remaining states

15

Exhibit 11
Page 15 of 57

receives the minimum award plus an additional amount based on its share of violent crime and population.

(3) Dividing each state's final award amount (except for the territories and District of Columbia) between the state and its units of local governments at a rate of 60 and 40 percent, respectively.

(4) Determining unit of local government award allocations, which are based on their proportion of the state's 3-year violent crime average. If the "eligible award amount" for a particular unit of local government, as determined on this basis, is $10,000 or more, then the unit of local government is eligible to apply directly to OJP (under the JAG Local solicitation) for a JAG award. If the "eligible award amount" to a particular unit of local government, as determined on this basis, would be less than $10,000, however, the funds are not made available for a direct award to that particular unit of local government, but instead are added to the amount that otherwise would have been awarded to the state. (The state's obligations with respect to this additional amount for the "less-than-$10,000 jurisdictions" are summarized above.)

**Financial Management and System of Internal Controls**
Award recipients and subrecipients (including recipients or subrecipients that are pass-through entities[1]) must, as described in the Part 200 Uniform Requirements[2] as set out at 2 C.F.R. 200.303:

   (a) Establish and maintain effective internal control over the federal award that provides reasonable assurance that [the recipient (and any subrecipient)] is managing the federal award in compliance with federal statutes, regulations, and the terms and conditions of the federal award. These internal controls should be in compliance with guidance in "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States and the "Internal Control Integrated Framework", issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

   (b) Comply with federal statutes, regulations, and the terms and conditions of the federal awards.

   (c) Evaluate and monitor [the recipient's (and any subrecipient's)] compliance with statutes, regulations, and the terms and conditions of federal awards.

   (d) Take prompt action when instances of noncompliance are identified including noncompliance identified in audit findings.

   (e) Take reasonable measures to safeguard protected personally identifiable information and other information the federal awarding agency or pass-through entity designates as sensitive or [the recipient (or any subrecipient)] considers

---

[1] For purposes of this solicitation, the phrase "pass-through entity" includes any recipient or subrecipient that provides a subaward ("subgrant") to carry out part of the funded award or program.
[2] The "Part 200 Uniform Requirements" refers to the DOJ regulation at 2 C.F.R Part 2800, which adopts (with certain modifications) the provisions of 2 C.F.R. Part 200.

16

BJA-2018-13625

Exhibit 11
Page 16 of 57

sensitive consistent with applicable federal, state, local, and tribal laws regarding privacy and obligations of confidentiality.

To help ensure that applicants understand administrative requirements and cost principles, OJP encourages prospective applicants to enroll, at no charge, in the DOJ Grants Financial Management Online Training, available at https://ojpfgm.webfirst.com/. (This training is required for all OJP award recipients.)

Also, applicants should be aware that OJP collects information from applicants on their financial management and systems of internal controls (among other information) which is used to make award decisions. Under Section D. Application and Submission Information, applicants may access and review the OJP Financial Management and System of Internal Controls Questionnaire (http://ojp.gov/funding/Apply/Resources/FinancialCapability.pdf) that OJP requires **all** applicants (other than an individual applying in his/her personal capacity) to download, complete, and submit as part of the application.

**Budget and Financial Information**
Trust Fund – State administering agencies (SAAs) may draw down JAG funds either in advance or on a reimbursement basis. Non-federal entities must maintain advance payments of federal awards in interest-bearing accounts, unless regulatory exclusions apply (2 CFR 200.305(b)(8)). Subrecipients that draw down JAG funds in advance are subject to the same requirement and must first establish an interest-bearing account.

Tracking and reporting regarding JAG funds used for state administrative costs – As indicated earlier, up to 10 percent of a JAG award, including up to 10 percent of any earned interest, may be used for costs associated with administering the award. Administrative costs (when utilized) must be tracked separately; a recipient must report in separate financial status reports (SF-425) those expenditures that specifically relate to each particular JAG Award during any particular reporting period.

No commingling – Both the state recipient and all subrecipients of JAG funds are prohibited from commingling funds on a program-by-program or project-by-project basis. **For this purpose, use of the administrative JAG funds to perform work across all active awards in any one year is not considered commingling.**

**Cost Sharing or Match Requirement**
The JAG Program does not require a match. However, if a successful application proposes a voluntary match amount, and OJP approves the budget, the total match amount incorporated into the approved budget becomes mandatory and subject to audit.

For additional cost sharing and match information, see the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm..

**Pre-agreement Costs (also known as Pre-award Costs)**
Pre-agreement costs are costs incurred by the applicant prior to the start date of the period of performance of the grant award.

OJP does **not** typically approve pre-agreement costs. An applicant must request and obtain the prior written approval of OJP for any such costs. All such costs incurred prior to award and prior to approval of the costs are incurred *at the sole risk* of the applicant. (Generally, no applicant

17

BJA-2018-13625

Exhibit 11
Page 17 of 57

should incur project costs *before* submitting an application requesting federal funding for those costs.) Should there be extenuating circumstances that make it appropriate for OJP to consider approving pre-agreement costs, the applicant may contact the point of contact listed on the title page of this solicitation for the requirements concerning written requests for approval. If approved in advance by OJP, award funds may be used for pre-agreement costs, consistent with the recipient's approved budget and applicable cost principles. See the section on "Costs Requiring Prior Approval" in the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm for more information.

**Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs**
OJP strongly encourages every applicant that proposes to use award funds for any conference-, meeting-, or training-related activity (or similar event) to review carefully—before submitting an application—the OJP and DOJ policy and guidance on approval, planning, and reporting of such events, available at
https://www.ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm. OJP policy and guidance (1) encourage minimization of conference, meeting, and training costs; (2) require prior written approval (which may affect project timelines) of most conference, meeting, and training costs for cooperative agreement recipients, as well as some conference, meeting, and training costs for grant recipients; and (3) set cost limits, which include a general prohibition of all food and beverage costs.

**Costs Associated with Language Assistance (if applicable)**
If an applicant proposes a program or activity that would deliver services or benefits to individuals, the costs of taking reasonable steps to provide meaningful access to those services or benefits for individuals with limited English proficiency may be allowable. Reasonable steps to provide meaningful access to services or benefits may include interpretation or translation services, where appropriate.

For additional information, see the "Civil Rights Compliance" section under "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" in the OJP Funding Resource Center at https://ojp.gov/funding/index.htm.


# C. Eligibility Information

For eligibility information, see the title page.

For information on cost sharing or match requirements, see Section B. Federal Award Information.

Note that, as discussed in more detail below, the certifications regarding compliance with certain federal laws (see Appendices B and C) must be executed and submitted before a state can make a valid award acceptance. Also, a state may not access award funds (and its award will include a condition that withholds funds) until it submits a properly executed "Certifications and Assurances by Chief Executive of Applicant Government" (see Appendix A).

## D. Application and Submission Information

**What an Application Should Include**
This section describes in detail what an application should include. An applicant should anticipate that if it fails to submit an application that contains all of the specified elements, it may negatively affect the review of its application; and, should a decision be made to make an award, it may result in the inclusion of award conditions that preclude the recipient from accessing or using award funds until the recipient satisfies the conditions and OJP makes the funds available.

An applicant may combine the Budget Narrative and the Budget Detail Worksheet in one document. If an applicant submits only one budget document, however, it must contain **both** narrative and detail information. Please review the "Note on File Names and File Types" under How to Apply to be sure applications are submitted in permitted formats.

**NOTE:** OJP has combined the Budget Detail Worksheet and Budget Narrative in a single document collectively referred to as the Budget Detail Worksheet. See "Budget Information and Associated Documentation" below for more information about the Budget Detail Worksheet and where it can be accessed.

OJP strongly recommends that applicants use appropriately descriptive file names (e.g., "Program Narrative," "Budget Detail Worksheet," "Timelines," "Memoranda of Understanding," "Résumés") for all attachments. Also, OJP recommends that applicants include résumés in a single file.

Please review the "Note on File Names and File Types" under How to Apply to be sure applications are submitted in permitted formats.

**In general, if a state fails to submit the required information or documents, OJP either will return the state's application in the Grants Management System (GMS) for submission of the missing information or documents or will attach a condition to the award that will withhold award funds until the necessary information and documents are submitted. (As discussed elsewhere in this solicitation, the certifications regarding compliance certain federal laws—which are set out at Appendix B and Appendix C—will be handled differently. Unless and until those certifications are submitted, the state will be unable to make a valid acceptance of the award.)**

1. **Information to Complete the Application for Federal Assistance (SF-424)**
   The SF-424 is a required standard form used as a cover sheet for submission of pre-applications, applications, and related information. GMS takes information from the applicant's profile to populate the fields on this form.

   To avoid processing delays, an applicant must include an accurate legal name on its SF-424. On the SF-424, current OJP award recipients, when completing the field for "Legal Name" (box 5), should use the same legal name that appears on the prior year award document (which is also the legal name stored in OJP's financial system.) Also, these applicants should enter the Employer Identification Number (EIN) in box 6 exactly as it appears on the prior year award document. An applicant with a current, active award(s) must ensure that its GMS profile is current. If the profile is not current, the applicant should

submit a Grant Adjustment Notice updating the information on its GMS profile prior to applying under this solicitation.

A new applicant entity should enter its official legal name, its address, its EIN, and its Data Universal Numbering System (DUNS). A new applicant entity should attach official legal documents to its application (e.g., articles of incorporation, 501(c)(3) status documentation, organizational letterhead) to confirm the legal name, address, and EIN entered into the SF-424. OJP will use the System for Award Management (SAM) to confirm the legal name and DUNS number entered in the SF-424; therefore, an applicant should ensure that the information entered in the SF-424 matches its current registration in SAM. See the How to Apply section for more information on SAM and DUNS numbers.

**Intergovernmental Review:**
This solicitation ("funding opportunity") **is** subject to Executive Order 12372. An applicant may find the names and addresses of State Single Points of Contact (SPOCs) at the following website: https://www.whitehouse.gov/wp-content/uploads/2017/11/Intergovernmental_-Review-_SPOC_01_2018_OFFM.pdf. If the state appears on the SPOC list, the applicant must contact the state SPOC to find out about, and comply with, the state's process under E.O. 12372. In completing the SF-424, an applicant whose state appears on the SPOC list is to make the appropriate selection in response to question 16 once the applicant has complied with its state E.O. 12372 process. (An applicant whose state does not appear on the SPOC list should answer question 16 by selecting the response that the "Program is subject to E.O. 12372 but has not been selected by the state for review.")

2. **Project Identifiers**
   Applications should identify at least three and no more than 10 project identifiers that would be associated with the proposed project activities. The list of identifiers can be found at www.bja.gov/funding/JAGIdentifiers.pdf.

3. **Program Narrative**
   The following sections **should** be included as part of the program narrative[3]:

   a. Description of the Issue – Identify the state's strategy/funding priorities for the FY 2018 JAG funds, the subgrant award process and timeline, and a description of the programs to be funded over the 4-year grant period. States are strongly encouraged to prioritize the funding of evidence-based projects and the data used to determine these priorities and data needed for comprehensive planning efforts. The state should describe any barriers to accessing these data, opportunities to improve cross system information sharing, and progress or challenges the state has faced in NIBRS implementation.

   b. Project Design and Implementation – Describe the state's process for engagement of stakeholders from across the justice continuum and how that input informs priorities. This should include a description of how local communities are engaged in the planning process, how state and local planning efforts are coordinated, and challenges faced in coordination. It should identify the stakeholders representing each purpose area who are participating in the strategic planning process, the gaps in the state's needed resources for criminal justice purposes, plans to improve the administration of the criminal justice

---

[3] For information on subawards (including the details on proposed subawards that should be included in the application), see "Budget and Associated Documentation" under Section D. Application and Submission Information.

system, and how JAG funds will be coordinated with state and related justice funds. States are strongly encouraged to utilize an evidence-informed approach to funding decisions and evidence-informed approaches to addressing and preventing (violent) crime. This includes providing support to subrecipients as they develop data-driven practices and programs.

c.  <u>Capabilities and Competencies</u> – Describe any additional strategic planning/coordination efforts in which the state participates with other criminal justice criminal/juvenile justice agencies in the state. Please provide an overview of any evidence-informed programs that have been implemented successfully and how that program might inform implementation of plan priorities.

d.  <u>Plan for Collecting the Data Required for this Solicitation's Performance Measures</u> – OJP will require each successful applicant to submit specific performance data that demonstrate the results of the work carried out under the award (see "<u>General Information about Post-Federal Award Reporting Requirements</u>" in <u>Section F. Federal Award Administration Information</u>). The performance data correlate to the objectives and deliverables identified under "<u>Objectives and Deliverables</u>" in <u>Section A. Program Description</u>. Post award, recipients will be required to submit quarterly performance metrics through BJA's PMT, located at <u>https://bjapmt.ojp.gov</u>. The application should describe the applicant's plan for collection of all of the performance measures data listed in the JAG Program accountability measures at: <u>https://bjapmt.ojp.gov/help/jagdocs.html</u>.

Applicants should visit OJP's performance measurement page at <u>www.ojp.gov/performance</u> for an overview of performance measurement activities at OJP.

BJA does not require applicants to submit performance measures data with their application. Performance measures are included as an alert that BJA will require successful applicants to submit specific performance data as part of their reporting requirements. For the application, applicants should indicate an understanding of these requirements and discuss how they will gather the required data, should they receive funding.

**Note on Project Evaluations**
An applicant that proposes to use award funds through this solicitation to conduct project evaluations should be aware that certain project evaluations (such as systematic investigations designed to develop or contribute to generalizable knowledge) may constitute "research" for purposes of applicable DOJ human subjects protection regulations. However, project evaluations that are intended only to generate internal improvements to a program or service, or are conducted only to meet OJP's performance measure data reporting requirements, likely do not constitute "research." Each applicant should provide sufficient information for OJP to determine whether the particular project it proposes would either intentionally or unintentionally collect and/or use information in such a way that it meets the DOJ regulatory definition of research that appears at 28 C.F.R. Part 46 ("Protection of Human Subjects").

Research, for the purposes of human subjects protection for OJP-funded programs, is defined as "a systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge." 28 C.F.R. 46.102(d).

21

For additional information on determining whether a proposed activity would constitute research for purposes of human subjects protection, applicants should consult the decision tree in the "Research and the Protection of Human Subjects" section of the "Requirements related to Research" web page of the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" available through the OJP Funding Resource Center at https://ojp.gov/funding/index.htm. Every prospective applicant whose application may propose a research or statistical component also should review the "Data Privacy and Confidentiality Requirements" section on that web page.

**4.  Budget and Associated Documentation**

The Budget Detail Worksheet and the Budget Narrative are now combined in a single document collectively referred to as the Budget Detail Worksheet. The Budget Detail Worksheet is a user-friendly, fillable, Microsoft Excel-based document designed to calculate totals. Additionally, the Excel workbook contains worksheets for multiple budget years that can be completed as necessary. **All applicants should use the Excel version when completing the proposed budget in an application, except in cases where the applicant does not have access to Microsoft Excel or experiences technical difficulties.** If an applicant does not have access to Microsoft Excel or experiences technical difficulties with the Excel version, then the applicant should use the 508-compliant accessible Adobe Portable Document Format (PDF) version.

Both versions of the Budget Detail Worksheet can be accessed at https://ojp.gov/funding/Apply/Forms/BudgetDetailWorksheet.htm.

**a.  Budget Detail Worksheet**

The Budget Detail Worksheet should provide the detailed computation for each budget line item, listing the total cost of each and showing how it was calculated by the applicant. For example, costs for personnel should show the annual salary rate and the percentage of time devoted to the project for each employee paid with grant funds. The Budget Detail Worksheet should present a complete itemization of all proposed costs.

For questions pertaining to budget and examples of allowable and unallowable costs, see the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm.

**b.  Budget Narrative**

The budget narrative should thoroughly and clearly describe **every** category of expense listed in the proposed budget detail worksheet. OJP expects proposed budgets to be complete, cost effective, and allowable (e.g., reasonable, allocable, and necessary for project activities). **This narrative should include a full description of all costs, including funds set aside for NIBRS project(s) and administrative costs (if applicable).**

An applicant should demonstrate in its budget narrative how it will maximize cost effectiveness of award expenditures. Budget narratives should generally describe cost effectiveness in relation to potential alternatives and the objectives of the project. For example, a budget narrative should detail why planned in-person meetings are necessary, or how technology and collaboration with outside organizations could be used to reduce costs, without compromising quality.

22

BJA-2018-13625

Exhibit 11
Page 22 of 57

The budget narrative should be mathematically sound and correspond clearly with the information and figures provided in the Budget Detail Worksheet. The narrative should explain how the applicant estimated and calculated all costs, and how those costs are necessary to the completion of the proposed project. The narrative may include tables for clarification purposes, but need not be in a spreadsheet format. As with the Budget Detail Worksheet, the budget narrative should describe costs by year.

c. **Information on Proposed Subawards (if any), as well as on Proposed Procurement Contracts (if any)**

Applicants for OJP awards typically may propose to make *subawards*. Applicants also may propose to enter into procurement *contracts* under the award.

Whether an action—for federal grants administrative purposes—is a subaward or procurement contract is a critical distinction as significantly different rules apply to subawards and procurement contracts. If a recipient enters into an agreement that is a subaward of an OJP award, specific rules apply—many of which are set by federal statutes and DOJ regulations; others by award conditions. These rules place particular responsibilities on an OJP recipient for any subawards the OJP recipient may make. The rules determine much of what the written subaward agreement itself must require or provide. The rules also determine much of what an OJP recipient must do both before and after it makes a subaward. If a recipient enters into an agreement that is a procurement contract under an OJP award, a substantially different set of federal rules applies.

OJP has developed the following guidance documents to help clarify the differences between subawards and procurement contracts under an OJP award and outline the compliance and reporting requirements for each. This information can be accessed online at https://ojp.gov/training/training.htm.

- Subawards under OJP Awards and Procurement Contracts under Awards: A Toolkit for OJP Recipients.
- Checklist to Determine Subrecipient or Contractor Classification.
- Sole Source Justification Fact Sheet and Sole Source Review Checklist.

In general, the central question is the relationship between what the third-party will do under its agreement with the recipient and what the recipient has committed (to OJP) to do under its award to further a public purpose (e.g., services the recipient will provide, products it will develop or modify, research or evaluation it will conduct). If a third party will provide some of the services the recipient has committed (to OJP) to provide, will develop or modify all or part of a product the recipient has committed (to OJP) to develop or modify, or conduct part of the research or evaluation the recipient has committed (to OJP) to conduct, OJP will consider the agreement with the third party a subaward for purposes of federal grants administrative requirements.

This will be true **even if** the recipient, for internal or other non-federal purposes, labels or treats its agreement as a procurement, a contract, or a procurement contract. Neither the title nor the structure of an agreement determines whether the agreement—for purposes of federal grants administrative requirements—is a *subaward* or is instead a procurement *contract* under an award. The substance of the relationship should be given

greater consideration than the form of agreement between the recipient and the outside entity.

**(1) Information on proposed subawards and required certification regarding certain federal laws from certain subrecipients**

General requirement for federal authorization of any subaward; statutory authorizations of subawards under the JAG Program statute.
Generally, a recipient of an OJP award may not make subawards ("subgrants") unless the recipient has specific federal authorization to do so. Unless an applicable statute or DOJ regulation specifically authorizes (or requires) particular subawards, a recipient must have authorization from OJP before it may make a subaward.

**JAG subawards that are required or specifically authorized by statute (see 34 U.S.C. § 10152(a) and 34 U.S.C. § 10156) do not require prior approval to authorize subawards. This includes subawards made by states under the JAG Program.**
A particular subaward may be authorized by OJP because the recipient included a sufficiently detailed description and justification of the proposed subaward in the application as approved by OJP. If, however, a particular subaward is not authorized by federal statute or regulation, and is not sufficiently described and justified in the application as approved by OJP, the recipient will be required, post-award, to request and obtain written authorization from OJP before it may make the subaward.

If an applicant proposes to make one or more subawards to carry out the federal award and program, and those subawards are not specifically authorized (or required) by statute or regulation, the applicant should: (1) identify (if known) the proposed subrecipient(s), (2) describe in detail what each subrecipient will do to carry out the federal award and federal program, and (3) provide a justification for the subaward(s), with details on pertinent matters such as special qualifications and areas of expertise. Pertinent information on subawards should appear not only in the Program Narrative but also in the Budget Detail Worksheet and budget narrative.

**Required certifications, generally relating to various federal statutes, from any proposed subrecipient that is a state or local government entity.** Before a state may subaward FY 2018 award funds to a unit of local government or to a public institution of higher education, it will be required (by specific award condition, the terms of which will govern) to obtain a properly executed certification, generally relating to various specific federal laws, from the proposed subrecipient. (This requirement regarding these federal laws will not apply to subawards to Indian tribes). The specific certification the state must require from a unit of local government will vary somewhat from the specific certification it must require from a public institution of higher education. The forms will be posted and available for download at https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.

**(2) Information on proposed procurement contracts (with specific justification for proposed noncompetitive contracts over $150,000)**
Unlike a recipient contemplating a subaward, a recipient of an OJP award generally does not need specific prior federal authorization to enter into an agreement that—for purposes of federal grants administrative requirements—is considered a procurement contract, **provided that** (1) the recipient uses its own documented procurement

24

procedures and (2) those procedures conform to applicable federal law, including the Procurement Standards of the (DOJ) Part 200 Uniform Requirements (as set out at 2 C.F.R. 200.317 - 200.326). The Budget Detail Worksheet and budget narrative should identify proposed procurement contracts. (As discussed above, subawards must be identified and described separately from procurement contracts.)

The Procurement Standards in the Part 200 Uniform Requirements, however, reflect a general expectation that agreements that (for purposes of federal grants administrative requirements) constitute procurement "contracts" under awards will be entered into on the basis of full and open competition. All noncompetitive (sole source) procurement contracts must meet the OJP requirements outlined at https://ojp.gov/training/subawards-procurement.htm. If a proposed procurement contract would exceed the simplified acquisition threshold—currently, $150,000—a recipient of an OJP award may not proceed without competition unless and until the recipient receives specific advance authorization from OJP to use a non-competitive approach for the procurement. An applicant that (at the time of its application) intends—without competition—to enter into a procurement contract that would exceed $150,000 should include a detailed justification that explains to OJP why, in the particular circumstances, it is appropriate to proceed without competition.

If the applicant receives an award, sole source procurements that do not exceed the Simplified Acquisition Threshold (currently $150,000) must have written justification for the noncompetitive procurement action maintained in the procurement file. If a procurement file does not have the documentation that meets the criteria outlined in 2 C.F.R. 200, the procurement expenditures may not be allowable. Sole source procurement over the $150,000 Simplified Acquisition Threshold must have prior approval from OJP using a Sole Source Grant Adjustment Notice (GAN). Written documentation justifying the noncompetitive procurement must be submitted with the GAN and maintained in the procurement file.

**d. Pre-agreement Costs**
For information on pre-agreement costs, see Section B. Federal Award Information.

**5. Indirect Cost Rate Agreement (if applicable)**
Indirect costs may be charged to an award only if:

(a) The recipient has a current (unexpired), federally approved indirect cost rate; or
(b) The recipient is eligible to use, and elects to use, the "de minimis" indirect cost rate described in the (DOJ) Part 200 Uniform Requirements, as set out at 2 C.F.R. 200.414(f).

An applicant with a current (unexpired) federally approved indirect cost rate is to attach a copy of the indirect cost rate agreement to the application. An applicant that does not have a current federally approved rate may request one through its cognizant federal agency, which will review all documentation and approve a rate for the applicant entity, or, if the applicant's accounting system permits, applicants may propose to allocate costs in the direct cost categories.

For assistance with identifying the appropriate cognizant federal agency for indirect costs, please contact the Office of the Chief Financial Officer (OCFO) Customer Service Center at

1–800–458–0786 or at ask.ocfo@usdoj.gov. If DOJ is the cognizant federal agency, applicants may obtain information needed to submit an indirect cost rate proposal at www.ojp.gov/funding/Apply/Resources/IndirectCosts.pdf.

Certain OJP recipients have the option of electing to use the "de minimis" indirect cost rate. An applicant that is eligible to use the "de minimis" rate that wishes to use the "de minimis" rate should attach written documentation to the application that advises OJP of both-- (1) the applicant's eligibility to use the "de minimis" rate, and (2) its election to do so. If an eligible applicant elects the "de minimis" rate, costs must be consistently charged as either indirect or direct costs, but may not be double charged or inconsistently charged as both. The "de minimis" rate may no longer be used once an approved federally-negotiated indirect cost rate is in place. (No entity that ever has had a federally-approved negotiated indirect cost rate is eligible to use the "de minimis" rate.) For the "de minimis" rate requirements (including additional information on eligibility to elect to use the rate), see Part 200 Uniform Requirements, at 2 C.F.R. 200.414(f).

6. **Financial Management and System of Internal Controls Questionnaire (including applicant disclosure of high-risk status)**
   Every state is required to download, complete, and submit the OJP Financial Management and System of Internal Controls Questionnaire (Questionnaire) located at https://ojp.gov/funding/Apply/Resources/FinancialCapability.pdf as part of its application. The Questionnaire helps OJP assess the financial management and internal control systems, and the associated potential risks of an applicant as part of the pre-award risk assessment process.

   The Questionnaire should only be completed by financial staff most familiar with the applicant's systems, policies, and procedures in order to ensure that the correct responses are recorded and submitted to OJP. The responses on the Questionnaire directly impact the pre-award risk assessment and should accurately reflect the applicant's financial management and internal control system at the time of the application. The pre-award risk assessment is only one of multiple factors and criteria used in determining funding. However, a pre-award risk assessment that indicates that an applicant poses a higher risk to OJP may affect the funding decision and/or result in additional reporting requirements, monitoring, special conditions, withholding of award funds, or other additional award requirements.

   Among other things, the form requires each applicant to disclose whether it currently is designated "high risk" by a federal grant-making agency outside of DOJ. For purposes of this disclosure, high risk includes any status under which a federal awarding agency provides additional oversight due to the applicant's past performance, or other programmatic or financial concerns with the applicant. If an applicant is designated high risk by another federal awarding agency, the applicant must provide the following information:

   - The federal awarding agency that currently designates the applicant high risk.
   - The date the applicant was designated high risk.
   - The high risk point of contact at that federal awarding agency (name, phone number, and email address).
   - The reasons for the high risk status, as set out by the federal awarding agency.

OJP seeks this information to help ensure appropriate federal oversight of OJP awards. An applicant that is considered "high risk" by another federal awarding agency is not automatically disqualified from receiving an OJP award. OJP may, however, consider the information in award decisions, and may impose additional OJP oversight of any award under this solicitation (including through the conditions that accompany the award document).

7. **Disclosure of Lobbying Activities**
   Each applicant must complete and submit a Disclosure of Lobbying Activities form (SF-LLL). An applicant that expends any funds for lobbying activities is to provide all of the information requested on the form. An applicant that does not expend any funds for lobbying activities is to enter "N/A" in the text boxes for item 10 ("a. Name and Address of Lobbying Registrant" and "b. Individuals Performing Services").

8. **Certifications and Assurances by the Chief Executive of the Applicant Government**
   A JAG application is not complete, and a state may not access award funds, unless the chief executive of the applicant state (e.g., the governor) properly executes, and the state submits, the "Certifications and Assurances by the Chief Executive of the Applicant Government" attached to this solicitation as Appendix A.

   OJP will not deny an application for an FY 2018 award for failure to submit these "Certifications and Assurances by the Chief Executive of the Applicant Government" by the application deadline, but a state will not be able to access award funds (and its award will include a condition that withholds funds) until it submits these certifications and assurances, properly-executed by the chief executive of the state (e.g., the governor).

9. **Certifications by the Chief Legal Officer of the Applicant Government**
   The chief legal officer of an applicant state (e.g., the attorney general of the state) is to carefully review the two certifications attached to this solicitation as Appendix B and Appendix C. If the chief legal officer determines that he or she may execute the certifications, the state is to submit the certifications as part of its application.

   As discussed further in the Federal Award Notices section, a state applicant will be **unable to make a valid award acceptance** of an FY 2018 JAG award unless and until both properly executed certifications by its chief legal officer are received by OJP on or before the day the state submits an executed award document.

10. **Additional Attachments**

    a. **Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)**
       Each applicant must provide responses to the following questions as an attachment to the application:
       (1) Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?
       (2) Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?
       (3) If yes to either:
          • Please provide a copy of each law or policy.
          • Please describe each practice.

27

BJA-2018-13625

Exhibit 11
Page 27 of 57

- Please explain how the law, policy, or practice complies with section 1373.

See Appendix E for a template that applicants may use to prepare this attachment.

Note: Responses to these questions must be provided by the applicant as part of the JAG application. Further, the requirement to provide this information applies to all tiers of JAG funding and for all subawards made to state or local government entities, including public institutions of higher education. All subrecipient responses must be collected and maintained by the direct recipient of JAG funding and must be made available to DOJ upon request. Responses to these questions are not required from subrecipients that are either a tribal government/organization, a nonprofit organization, or a private institution of higher education.

OJP will not deny an application for an FY 2018 award for failure to submit these required responses by the application deadline, but a state will not receive award funds (and its award will include a condition that withholds funds) until it submits these responses.

b. **Applicant Disclosure of Pending Applications**
Each applicant is required to disclose whether it has (or is proposed as a subrecipient under) any pending applications for federally funded grants or cooperative agreements that (1) include requests for funding to support the same project being proposed in the application under this solicitation, <u>and</u> (2) would cover identical cost items outlined in the budget submitted to OJP as part of the application under this solicitation. The applicant is required to disclose applications made directly to federal awarding agencies, and also applications for subawards of federal funds (e.g., applications to state agencies that will subaward ("subgrant") federal funds).

OJP seeks this information to help avoid any inappropriate duplication of funding. Leveraging multiple funding sources in a complementary manner to implement comprehensive programs or projects is encouraged and is not seen as inappropriate duplication.

Each applicant that has one or more pending applications as described above is to provide the following information about pending applications submitted within the last 12 months:

- The federal or state funding agency.
- The solicitation name/project name.
- The point of contact information at the applicable federal or state funding agency.

| Federal or State Funding Agency | Solicitation Name/Project Name | Name/Phone/Email for Point of Contact at Federal or State Funding Agency |
|---|---|---|
| DOJ/Office of Community Oriented Policing Services (COPS) | COPS Hiring Program | Jane Doe, 202/000-0000; jane.doe@usdoj.gov |

28

BJA-2018-13625

Exhibit 11
Page 28 of 57

| Health & Human Services/ Substance Abuse & Mental Health Services Administration | Drug-Free Communities Mentoring Program/ North County Youth Mentoring Program | John Doe, 202/000-0000; john.doe@hhs.gov |
|---|---|---|

Each applicant should include the table as a separate attachment to its application. The file should be named "Disclosure of Pending Applications." The applicant Legal Name on the application must match the entity named on the disclosure of pending applications statement.

Any applicant that does not have any pending applications as described above is to submit, as a separate attachment, a statement to this effect: "[Applicant Name on SF-424] does not have (and is not proposed as a subrecipient under) any pending applications submitted within the last 12 months for federally-funded grants or cooperative agreements (or for subawards under federal grants or cooperative agreements) that request funding to support the same project being proposed in this application to OJP and that would cover identical cost items outlined in the budget submitted as part of this application."

c. **Research and Evaluation Independence and Integrity (if applicable)**
If an application involves research (including research and development) and/or evaluation, the applicant must demonstrate research/evaluation independence and integrity, including appropriate safeguards, before it may receive award funds. The applicant must demonstrate independence and integrity regarding both this proposed research and/or evaluation, and any current or prior related projects.

Each application should include an attachment that addresses **both** i. and ii. below.

    i.    For purposes of this solicitation, each applicant is to document research and evaluation independence and integrity by including one of the following two items:

        a.  A specific assurance that the applicant has reviewed its application to identify any actual or potential apparent conflicts of interest (including through review of pertinent information on the principal investigator, any co-principal investigators, and any subrecipients), and that the applicant has identified no such conflicts of interest—whether personal or financial or organizational (including on the part of the applicant entity or on the part of staff, investigators, or subrecipients) —that could affect the independence or integrity of the research, including the design, conduct, and reporting of the research.

OR

        b.  A specific description of actual or potential apparent conflicts of interest that the applicant has identified—including through review of pertinent information on the principal investigator, any co-principal investigators,

29

BJA-2018-13625

Exhibit 11
Page 29 of 57

and any subrecipients—that could affect the independence or integrity of the research, including the design, conduct, or reporting of the research. These conflicts may be personal (e.g., on the part of investigators or other staff), financial, or organizational (related to the applicant or any subrecipient entity). Some examples of potential investigator (or other personal) conflict situations are those in which an investigator would be in a position to evaluate a spouse's work product (actual conflict), or an investigator would be in a position to evaluate the work of a former or current colleague (potential apparent conflict). With regard to potential organizational conflicts of interest, as one example, generally an organization would not be given an award to evaluate a project, if that organization had itself provided substantial prior technical assistance to that specific project or a location implementing the project (whether funded by OJP or other sources), because the organization in such an instance might appear to be evaluating the effectiveness of its own prior work. The key is whether a reasonable person understanding all of the facts would be able to have confidence that the results of any research or evaluation project are objective and reliable. Any outside personal or financial interest that casts doubt on that objectivity and reliability of an evaluation or research product is a problem and must be disclosed.

ii.  In addition, for purposes of this solicitation, each applicant is to address possible mitigation of research integrity concerns by including, at a minimum, one of the following two items:

a.  If an applicant reasonably believes that no actual or potential apparent conflicts of interest (personal, financial, or organizational) exist, then the applicant should provide a brief narrative explanation of how and why it reached that conclusion. The applicant also is to include an explanation of the specific processes and procedures that the applicant has in place, or will put in place, to identify and prevent (or, at the very least, mitigate) any such conflicts of interest pertinent to the funded project during the period of performance. Documentation that may be helpful in this regard may include organizational codes of ethics/conduct and policies regarding organizational, personal, and financial conflicts of interest. There is no guarantee that the plan, if any, will be accepted as proposed.

OR

b.  If the applicant has identified actual or potential apparent conflicts of interest (personal, financial, or organizational) that could affect the independence and integrity of the research, including the design, conduct, or reporting of the research, the applicant is to provide a specific and robust mitigation plan to address each of those conflicts. At a minimum, the applicant is expected to explain the specific processes and procedures that the applicant has in place, or will put in place, to identify and eliminate (or, at the very least, mitigate) any such conflicts of interest pertinent to the funded project during the period of performance. Documentation that may be helpful in this regard may include organizational codes of ethics/conduct and policies regarding

30

BJA-2018-13625

Exhibit 11
Page 30 of 57

organizational, personal, and financial conflicts of interest. There is no guarantee that the plan, if any, will be accepted as proposed.

OJP will assess research and evaluation independence and integrity based on considerations such as the adequacy of the applicant's efforts to identify factors that could affect the objectivity or integrity of the proposed staff and/or the applicant entity (and any subrecipients) in carrying out the research, development, or evaluation activity; and the adequacy of the applicant's existing or proposed remedies to control any such factors.

**d. State Governing Body Review**

Applicants must submit information via the Certification and Assurances by the Chief Executive (see Appendix A), which documents that the JAG application was made available for review by the governing body of the state, or to an organization designated by that governing body, for a period that was not less than 30 days before the application was submitted to BJA. The same Chief Executive Certification will also specify that an opportunity to comment on this application was provided to citizens prior to the application submission to the extent applicable law or established procedures make such opportunity available. In the past, this has been accomplished via submission of specific review dates; now OJP will only accept a governor's certification to attest to these facts. States may continue to submit actual dates of review should they wish to do so, in addition to the submission of the Chief Executive Certification.

**e. State Strategic Plan (if applicable)**

For 2018 JAG applications, states are strongly encouraged to use JAG funding to implement programs identified in an existing statewide strategic plan. An applicant state should attach a current version of the state strategic plan to its application, if one exists. If a state does not have such a plan, the program narrative should describe the

---

*ALERT: A recent amendment to the JAG Program statute requires that states create and submit a strategic plan with their FY 2019 JAG grant applications. The plan must be developed with input from a broad range of identified stakeholders; must describe evidence-based approaches used for planning, program implementation, and evaluation; and illustrate how the state will allocate funding. By law, strategic plans are to be reviewed annually and updated every 5 years.*

---

state's timeline and process for developing such a strategic plan. The state strategic plan should describe how grants received will be used to improve the administration of the criminal justice system and should contain the following elements: needs statement, priorities to be addressed with JAG funding, objectives, action steps to achieve the objectives, stakeholders engaged, process used to select programs and services to fund, data necessary to support priorities for funding and accomplish identified objectives, outcomes expected, plans for program and services evaluation, and a detailed budget. The plan may also address barriers the state and its subrecipients face to collecting and using data, and to implementing and evaluating evidence informed approaches to preventing and reducing crime. Training and technical assistance (TTA) is

31

BJA-2018-13625

Exhibit 11
Page 31 of 57

available from BJA's TTA providers to assist states with the development of their strategic planning processes and plans.

To help ensure that states consider the impact of JAG funding decisions across the entire criminal justice system, BJA strongly encourages each state to involve all criminal justice system stakeholders in the strategic planning process. The strategic planning process should reflect input from all segments of the criminal justice system including local governments, judges, prosecutors, law enforcement and corrections personnel, providers of indigent defense services, victim services, juvenile justice and delinquency prevention programs, parole and probation services, and reentry services. For more information, see the National Criminal Justice Association Justice Planning website at http://www.ncja.org/ncja-services.

**How to Apply**
An applicant must submit its application through the Grants Management System (GMS), which provides support for the application, award, and management of awards at OJP. Each applicant entity **must register in GMS for each specific funding opportunity.** Although the registration and submission deadlines are the same, OJP urges each applicant entity to **register promptly,** especially if this is the first time the applicant is using the system. Find complete instructions on how to register and submit an application in GMS at www.ojp.gov/gmscbt/. An applicant that experiences technical difficulties during this process should email GMS.HelpDesk@usdoj.gov or call 888-549-9901 (option 3), 24 hours every day, including during federal holidays. OJP recommends that each applicant **register promptly** to prevent delays in submitting an application package by the deadline.

**Note on File Types: GMS does not accept executable file types as application attachments.** These disallowed file types include, but are not limited to, the following extensions: ".com," ".bat," ".exe," ".vbs," ".cfg," ".dat," ".db," ".dbf," ".dll," ".ini," ".log," ".ora," ".sys," and ".zip." GMS may reject applications with files that use these extensions. It is important to allow time to change the type of file(s) if the application is rejected.

**Unique Entity Identifier (DUNS Number) and System for Award Management (SAM)**
Every applicant entity must comply with all applicable System for Award Management (SAM) and unique entity identifier (currently, a Data Universal Numbering System [DUNS] number) requirements. SAM is the repository for certain standard information about federal financial assistance applicants, recipients, and subrecipients. A DUNS number is a unique nine-digit identification number provided by the commercial company Dun and Bradstreet. More detailed information about SAM and the DUNS number is in the numbered sections below.

If an applicant entity has not fully complied with the applicable SAM and unique identifier requirements by the time OJP makes award decisions, OJP may determine that the applicant is not qualified to receive an award and may use that determination as a basis for making the award to a different applicant.

If the applicant entity already has an Employer Identification Number (EIN), the SAM registration will take **up to two weeks to process**. If the entity does not have an EIN, then **the applicant should allow two to five weeks for obtaining the information from IRS when requesting the EIN via phone, fax, mail or Internet.** For more information about EIN, visit https://www.irs.gov/individuals/international-taxpayers/taxpayer-identification-numbers-tin.

**Registration and Submission Steps**
All applicants should complete the following steps:

1. **Acquire a unique entity identifier (currently, a DUNS number).** In general, the Office of Management and Budget requires every applicant for a federal award (other than an individual) to include a "unique entity identifier" in each application, including an application for a supplemental award. Currently, a DUNS number is the required unique entity identifier.

   This unique entity identifier is used for tracking purposes, and to validate address and point of contact information for applicants, recipients, and subrecipients. It will be used throughout the life cycle of an OJP award. Obtaining a DUNS number is a free, one-time activity. Call Dun and Bradstreet at 866–705–5711 to obtain a DUNS number or apply online at www.dnb.com/. A DUNS number is usually received within 2 business days.

2. **Acquire or maintain registration with SAM.** Any applicant for an OJP award creating a **new** entity registration (or updating or renewing a registration) in SAM.gov must submit an original, signed notarized letter appointing the authorized Entity Administrator within thirty (30) days of the registration activation. **Notarized letters must be submitted via U.S. Postal Service Mail. Read the Alert at www.sam.gov to learn more about what is required in the notarized letter, and read the Frequently Asked Questions (FAQs) at www.gsa.gov/samupdate to learn more about this process change.**

   All applicants for OJP awards (other than individuals) with current registration in SAM must maintain current registrations in the SAM database. Applicants will need the authorizing official of the organization and an Employer Identification Number (EIN).

   Information about SAM registration procedures can be accessed at www.sam.gov.

3. **Acquire a GMS username and password.** New users must create a GMS profile by selecting the "First Time User" link under the sign-in box of the GMS home page. For more information on how to register in GMS, go to www.ojp.gov/gmscbt. Previously registered applicants should ensure, prior to applying, that the user profile information is up-to-date in GMS (including, but not limited to, address, legal name of agency and authorized representative) as this information is populated in any new application.

4. **Verify the SAM (formerly CCR) registration in GMS.** OJP requires each applicant to verify its SAM registration in GMS. Once logged into GMS, click the "CCR Claim" link on the left side of the default screen. Click the submit button to verify the SAM (formerly CCR) registration.

5. **Search for the funding opportunity on GMS.** After logging into GMS or completing the GMS profile for username and password, go to the "Funding Opportunities" link on the left side of the page. Select "BJA" and "**FY 18 Edward Byrne Memorial Justice Assistance Grant (JAG) Program.**"

6. **Register by selecting the "Apply Online" button associated with the funding opportunity title.** The search results from step 5 will display the "funding opportunity" (solicitation) title along with the registration and application deadlines for this solicitation. Select the "Apply Online" button in the "Action" column to register for this solicitation and create an application in the system.

7. **Follow the directions in GMS to submit an application consistent with this solicitation.** Once the application is submitted, GMS will display a confirmation screen stating the submission was successful. **Important:** In some instances, an applicant must wait for GMS approval before submitting an application. OJP urges each applicant to submit its application **at least 72 hours prior** to the application due date.

<u>Note: Application Versions</u>
If an applicant submits multiple versions of the same application, OJP will review **only** the most recent system-validated version submitted.

**Experiencing Unforeseen GMS Technical Issues**
An applicant that experiences unforeseen GMS technical issues beyond its control that prevent it from submitting its application by the deadline may contact the <u>GMS Help Desk</u> or the SAM Help Desk (Federal Service Desk) at <u>https://www.fsd.gov/fsd-gov/home.do</u> to report the technical issue and receive a tracking number. The applicant is expected to email the NCJRS Response Center identified in the Contact Information section on the title page **within 24 hours after the application deadline** to request approval to submit its application after the deadline. The applicant's email must describe the technical difficulties, and must include a timeline of the applicant's submission efforts, the complete grant application, the applicant's DUNS number, and any GMS Help Desk or SAM tracking number(s).

**Note: OJP does not automatically approve requests to submit a late application.** After OJP reviews the applicant's request, and contacts the GMS Help Desk to verify the reported technical issues, OJP will inform the applicant whether the request to submit a late application has been approved or denied. If OJP determines that the untimely application submission was due to the applicant's failure to follow all required procedures, OJP will deny the applicant's request to submit its application.

The following conditions generally are insufficient to justify late submissions to OJP solicitations:

- Failure to register in SAM or GMS in sufficient time (SAM registration and renewal can take as long as 10 business days to complete).
- Failure to follow GMS instructions on how to register and apply as posted on the GMS website.
- Failure to follow each instruction in the OJP solicitation.
- Technical issues with the applicant's computer or information technology environment, such as issues with firewalls.

# E. Application Review Information

**Review Process**
OJP is committed to ensuring a fair and open process for making awards. BJA reviews the application to make sure that the information presented is reasonable, understandable, measurable, and achievable, as well as consistent with the solicitation. BJA will also review applications to help ensure that JAG program-statute requirements have been met.

Pursuant to the Part 200 Uniform Requirements, before award decisions are made, OJP also reviews information related to the degree of risk posed by applicants. Among other things, to

34

help assess whether an applicant that has one or more prior federal awards has a satisfactory record with respect to performance, integrity, and business ethics, OJP checks whether the applicant is listed in SAM as excluded from receiving a federal award.

In addition, if OJP anticipates that an award will exceed $150,000 in federal funds, OJP also must review and consider any information about the applicant that appears in the non-public segment of the integrity and performance system accessible through SAM (currently, the Federal Awardee Performance and Integrity Information System; "FAPIIS").

**Important note on FAPIIS:** An applicant, at its option, may review and comment on any information about itself that currently appears in FAPIIS and was entered by a federal awarding agency. OJP will consider any such comments by the applicant, in addition to the other information in FAPIIS, in its assessment of the risk posed by the applicant. The evaluation of risks goes beyond information in SAM, however. OJP itself has in place a framework for evaluating risks posed by applicants. OJP takes into account information pertinent to matters such as:

(1) Applicant financial stability and fiscal integrity
(2) Quality of the management systems of the applicant, and the applicant's ability to meet prescribed management standards, including those outlined in the DOJ Grants Financial Guide
(3) Applicant's history of performance under OJP and other DOJ awards (including compliance with reporting requirements and award conditions), as well as awards from other federal agencies
(4) Reports and findings from audits of the applicant, including audits under the (DOJ) Part 200 Uniform Requirements
(5) Applicant's ability to comply with statutory and regulatory requirements, and to effectively implement other award requirements

Absent explicit statutory authorization or written delegation of authority to the contrary, the Assistant Attorney General will make all final award decisions.

# F. Federal Award Administration Information

### Federal Award Notices

Award notifications are expected to be made by September 30, 2018. OJP sends award notification by email through GMS to the individuals listed in the application as the point of contact and the authorizing official. The email notification includes detailed instructions on how to access and view the award documents, and steps to take in GMS to start the award acceptance process. GMS automatically issues the notifications at 9:00 p.m. eastern time on the award date.

**NOTE:** In order to validly accept an award under the FY 2018 JAG Program, a state must submit to GMS the certifications by its chief legal officer regarding compliance with certain federal laws, executed using the forms that appear in Appendices B and C. (The forms also may be downloaded at https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.) Unless the executed certifications either (1) are submitted to OJP together with the signed award document or (2) are uploaded in GMS no later than the day the signed award document is

submitted, **OJP will reject as invalid** any submission by a state that purports to accept an award under this solicitation.

Rejection of an initial submission as an invalid award acceptance is not a denial of the award. Consistent with award requirements, once the state **does** submit the necessary certifications regarding compliance with certain federal laws, the state **will** be permitted to submit an award document executed by the state on or after the date of those certifications.

Also, in order for a state applicant to validly accept an award under the FY 2018 JAG Program, an individual with the necessary authority to bind the applicant will be required to log in; execute a set of legal certifications and a set of legal assurances; designate a financial point of contact; thoroughly review the award, including **all** award conditions; and sign and accept the award. The award acceptance process requires physical signature of the award document by the authorized representative and the scanning of the fully executed award document (along with the required certifications regarding compliance with certain federal laws, if not already uploaded in GMS) to OJP.

**Statutory and Regulatory Requirements; Award Conditions**
If selected for funding, in addition to implementing the funded project consistent with the OJP-approved application, the recipient must comply with award conditions, as well as all applicable requirements of federal statutes and regulations (including applicable requirements referred to in the assurances and certifications executed at the time of award acceptance). OJP strongly encourages prospective applicants to review information on post-award legal requirements and common OJP award conditions **prior** to submitting an application.

OJP strongly encourages prospective applicants to review information on post-award legal requirements generally applicable to FY 2018 OJP awards and common OJP award conditions **prior** to submitting an application.

Applicants should consult the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards", available in the OJP Funding Resource Center at https://ojp.gov/funding/index.htm. In addition, applicants should examine the following two legal documents, as each successful applicant must execute both documents before it may receive any award funds. (An applicant is not required to submit these documents as part of an application.)

- Certifications Regarding Lobbying; Debarment, Suspension and Other Responsibility Matters; and Drug-Free Workplace Requirements
- Certified Standard Assurances

The web pages accessible through the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" are intended to give applicants for OJP awards a general overview of important statutes, regulations, and award conditions that apply to many (or in some cases, all) OJP grants and cooperative agreements awarded in FY 2018. Individual OJP awards typically also will include additional award conditions. Those additional conditions may relate to the particular statute, program, or solicitation under which the award is made; to the substance of the funded application; to the recipient's performance under other federal awards; to the recipient's legal status (e.g., as a for-profit entity); or to other pertinent considerations.

Individual FY 2018 awards made pursuant to this solicitation will, as appropriate and to the extent consistent with law, include conditions that will require the recipient (and any subrecipient) that accepts the award to do various things, with respect to the "program or activity" that would receive federal financial assistance thereunder. **Although the specific terms of each of those conditions are what will govern the awards**, included among such conditions will be some that, **generally speaking**, will require the recipient (and any subrecipient) that accepts the award to do some or all of the following:

- Not to violate 8 U.S.C. § 1373 (prohibiting restrictions on—
    (1) communication to/from the Department of Homeland Security ("DHS") of information regarding the citizenship or immigration status of any individual; and
    (2) maintaining, or exchanging with any government entity, information regarding the immigration status of any individual).

- Not to violate 8 U.S.C. § 1644 (prohibiting restrictions on communication to/from DHS of information regarding the immigration status of an alien).

- Not to violate, or aid or abet any violation of, 8 U.S.C. § 1324(a) (forbidding any "person," in "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," to "conceal, harbor, or shield from detection, or attempt to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation" or to "engage in any conspiracy to commit any of the preceding acts. . ."or aid or abet the commission of any of the preceding acts").

- Not to impede the exercise of the authority of the federal government under 8 U.S.C. § 1266(a) & (c) (authorizing arrest and detention of certain aliens and providing that the federal government "shall take into custody" certain criminal aliens "when the alien is released") and 8 U.S.C. § 1231(a)(4) (relating to removal from the United States of aliens after detention/confinement at the federal, state, and local level), specifically by requiring such recipients to provide (where feasible) at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the recipient's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act.

- Not to impede the exercise by DHS agents, "anywhere in or outside the United States" (8 C.F.R. § 287.5(a)(1)), of their authority under 8 U.S.C. § 1357(a)(1) to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," specifically by requiring such recipients to permit DHS agents to have access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States.

The reasonable costs (to the extent not reimbursed under any other federal program) of complying with these conditions, including honoring any duly authorized request from DHS that is encompassed by these conditions, will be allowable costs under the award.

**General Information about Post-federal Award Reporting Requirements**
In addition to the deliverables described in <u>Section A. Program Description</u>, any recipient of an award under this solicitation will be required to submit the following reports and data.

<u>Required reports</u>. Recipients typically must submit quarterly financial status reports, semi-annual progress reports, final financial and progress reports, and, if applicable, an annual audit report in accordance with the Part 200 Uniform Requirements or specific award conditions. Future awards and fund drawdowns may be withheld if reports are delinquent. (In appropriate cases, OJP may require additional reports.)

Awards that exceed $500,000 will include an additional condition that, under specific circumstances, will require the recipient to report (to FAPIIS) information on civil, criminal, and administrative proceedings connected with (or connected to the performance of) either the OJP award or any other grant, cooperative agreement, or procurement contract from the federal government. Additional information on this reporting requirement appears in the text of the award condition posted on the OJP website at https://ojp.gov/funding/FAPIIS.htm.

<u>Data on performance measures</u>. In addition to required reports, each award recipient also must provide data that measure the results of the work done under the award. To demonstrate program progress and success, as well as to assist DOJ with fulfilling its responsibilities under the Government Performance and Results Act of 1993 (GPRA), Public Law 103-62, and the GPRA Modernization Act of 2010, Public Law 111–352, OJP will require any award recipient, post award, to provide performance data as part of regular progress reporting. Successful applicants will be required to access OJP's performance measurement page at www.ojp.gov/performance for an overview of performance measurement activities at OJP.

Accountability metrics data must be submitted through BJA's Performance Measurement Tool (PMT), available at https://bjapmt.ojp.gov. The accountability measures are available at: https://bjapmt.ojp.gov/help/jagdocs.html. (Note that if a law enforcement agency receives JAG funds from a state, the state must submit quarterly accountability metrics data related to training that officers have received on use of force, racial and ethnic bias, de-escalation of conflict, and constructive engagement with the public.)

OJP may restrict access to award funds if a recipient of an OJP award fails to report required performance measure data in a timely manner.

## G. Federal Awarding Agency Contact(s)

For OJP contact(s), see the title page of this solicitation.

For contact information for GMS, see the title page.

## H. Other Information

**Freedom of Information Act and Privacy Act (5 U.S.C. § 552 and 5 U.S.C. § 552a)**
All applications submitted to OJP (including all attachments to applications) are subject to the federal Freedom of Information Act (FOIA) and to the Privacy Act. By law, DOJ may withhold information that is responsive to a request pursuant to FOIA if DOJ determines that the responsive information either is protected under the Privacy Act or falls within the scope of one of nine statutory exemptions under FOIA. DOJ cannot agree in advance of a request pursuant to FOIA not to release some or all portions of an application.

In its review of records that are responsive to a FOIA request, OJP will withhold information in those records that plainly falls within the scope of the Privacy Act or one of the statutory exemptions under FOIA. (Some examples include certain types of information in budgets, and names and contact information for project staff other than certain key personnel.) In appropriate circumstances, OJP will request the views of the applicant/recipient that submitted a responsive document.

For example, if OJP receives a request pursuant to FOIA for an application submitted by a nonprofit or for-profit organization or an institution of higher education, or for an application that involves research, OJP typically will contact the applicant/recipient that submitted the application and ask it to identify—quite precisely—any particular information in the application that applicant/recipient believes falls under a FOIA exemption, the specific exemption it believes applies, and why. After considering the submission by the applicant/recipient, OJP makes an independent assessment regarding withholding information. OJP generally follows a similar process for requests pursuant to FOIA for applications that may contain law-enforcement sensitive information.

**Provide Feedback to OJP**
To assist OJP in improving its application and award processes, OJP encourages applicants to provide feedback on this solicitation, the application submission process, and/or the application review process. Provide feedback to OJPSolicitationFeedback@usdoj.gov.

**IMPORTANT:** This email is for feedback and suggestions only. OJP does **not** reply to messages it receives in this mailbox. A prospective applicant that has specific questions on any program or technical aspect of the solicitation **must** use the appropriate telephone number or email listed on the front of this solicitation document to obtain information. These contacts are provided to help ensure that prospective applicants can directly reach an individual who can address specific questions in a timely manner.

If you are interested in being a reviewer for other OJP grant applications, please email your résumé to ojpprsupport@usdoj.gov. (Do not send your résumé to the OJP Solicitation Feedback email account.) **Note:** Neither you nor anyone else from your organization or entity can be a peer reviewer in a competition in which you or your organization/entity has submitted an application.

**Appendix A**

**Certifications and Assurances by the Chief Executive of the Applicant Government**

**Template for use by the chief executive of the state (e.g., the governor)**

Visit https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm to download the most up-to-date version.

**Note:** By law, for purposes of the JAG Program, the term "states" includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa.

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

**Edward Byrne Justice Assistance Grant Program FY 2018 State Solicitation**

Certifications and Assurances
by the Chief Executive of the Applicant Government

On behalf of the applicant "State" named below, in support of that State's application for an award under the FY 2018 Edward Byrne Justice Assistance Grant ("JAG") Program, and further to 34 U.S.C. § 10153(a), I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1. I am the chief executive of the applicant State named below, and I have the authority to make the following representations on my own behalf and on behalf of the applicant State. I understand that these representations will be relied upon as material in any OJP decision to make an award, under the application described above, to the applicant State.

2. I certify that no federal funds made available by the award (if any) that OJP makes based on the application described above will be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities.

3. I assure that the application described above (and any amendment to that application) was submitted for review to the governing body of the State (e.g., the State legislature), or to an organization designated by that governing body, not less than 30 days before the date of this certification.

4. I assure that, before the date of this certification— (a) the application described above (and any amendment to that application) was made public; and (b) an opportunity to comment on that application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure made such an opportunity available.

5. I assure that, for each fiscal year of the award (if any) that OJP makes based on the application described above, the applicant State will maintain and report such data, records, and information (programmatic and financial), as OJP may reasonably require.

6. I certify that— (a) the programs to be funded by the award (if any) that OJP makes based on the application described above meet all the requirements of the JAG Program statute (34 U.S.C. §§ 10151-10158); (b) all the information contained in that application is correct; (c) in connection with that application, there has been appropriate coordination with affected agencies; and (d) in connection with that award (if any), the applicant State will comply with all provisions of the JAG Program statute and all other applicable federal laws.

7. I have examined certification entitled "State or Local Government: FY 2018 Certification of Compliance with 8 U.S.C. §§ 1373 & 1644" executed by the chief legal officer of the applicant government with respect to the FY 2018 JAG program and submitted in support of the application described above, and I hereby adopt that certification as my own on behalf of that government.

8. I have examined certification entitled "State or Local Government: FY 2018 Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1357(a), & 1366(1) & (3)" executed by the chief legal officer of the applicant government with respect to the FY 2018 JAG program and submitted in support of the application described above, and I hereby adopt that certification as my own on behalf of that government.

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it "supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. § 10271-10273), and also may subject me and the applicant State to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____                    _____
Signature of Chief Executive of the Applicant "State"                    Date of Certification

_____                    _____
Printed Name of Chief Executive                    Title of Chief Executive

_____
Name of Applicant State

**Appendix B**

**State or Local Government:**

**Certification of Compliance with 8 U.S.C. §§ 1373 and 1644**

Template for use by the chief legal officer of the state (e.g., the attorney general)

Visit https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm to download the most up-to-date version.

42

BJA-2018-13625

Exhibit 11
Page 42 of 57

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

<mark>State Government:  FY 2018 Certification of Compliance with 8 U.S.C. §§ 1373 & 1644</mark>

On behalf of the applicant government entity named below, and in support of its application, I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

    (1)  I am the chief legal officer of the State or local government of which the applicant entity named below is a part ("the jurisdiction"), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP).  I understand that OJP will rely upon this certification in any decision to make an award to the applicant entity.

    (2)  I have carefully reviewed 8 U.S.C. §§ 1373(a) & (b), and 1644, including the prohibitions on certain actions by State and local government entities, -agencies, and -officials regarding information on citizenship and immigration status.  I also have reviewed the provisions set out at (or referenced in) 8 U.S.C. § 1551 note ("Abolition ... and Transfer of Functions"), pursuant to which references to the "Immigration and Naturalization Service" in 8 U.S.C. §§ 1373 & 1644 are to be read, as a legal matter, as references to particular components of the U.S. Department of Homeland Security.

    (3)  I (and also the applicant entity) understand that the U.S. Department of Justice will require States and local governments (and agencies or other entities thereof) to comply with 8 U.S.C. §§ 1373 & 1644, with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2018 OJP program under which this certification is being submitted (the "FY 2018 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2018 OJP Program.

    (4)  I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (cf. 34 U.S.C. § 10251(a)(2)).  Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (i.e., one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or -agency.

    (5)  I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning both—

        (a)  the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program; and

        (b)  any prohibitions or restrictions potentially applicable to the "program or activity" sought to be funded under the FY 2018 OJP Program that deal with sending to, requesting or receiving from, maintaining, or exchanging information of the types described in 8 U.S.C. §§ 1373(a) & (b), and 1644, whether imposed by a State or local government entity, -agency, or -official.

    (6)  As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any prohibition or any restriction that would apply to the "program or activity" to be funded in whole or in part under the FY 2018 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that deals with either— (1) a government entity or -official sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. §§ 1373(a) & 1644; or (2) a government entity or -agency sending to, requesting or receiving from, maintaining, or exchanging information of the types (and with respect to the entities) described in 8 U.S.C. § 1373(b).

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. § 10271-10273), and also may subject me and the applicant entity to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____          _____
Signature of Chief Legal Officer of the Jurisdiction          Printed Name of Chief Legal Officer


_____          _____
Date of Certification          Title of Chief Legal Officer of the Jurisdiction


_____
Name of Applicant Government Entity (i.e., the applicant to the FY 2018 OJP Program identified below)


*FY 2018 OJP Program:*  **Byrne Justice Assistance Grant (JAG) Program: State**

**Appendix C**

**State or Local Government:**

**Certification of Compliance with 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), and 1366(1) & (3)**

Template for use by the chief legal officer of the state (e.g., the attorney general)

Visit https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm to download the most up-to-date version.

U.S. DEPARTMENT OF JUSTICE
OFFICE OF JUSTICE PROGRAMS

**State or Local Government:  FY 2018 Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), & 1366(1) & (3)**

On behalf of the applicant government entity named below, and in support of its application, I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1. I am the chief legal officer of the State or local government of which the applicant entity named below is a part ("the jurisdiction"), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP). I understand that OJP will rely upon this certification as a material representation in any decision to make an award to the applicant entity.

2. I have carefully reviewed each of the following sections of title 8, United States Code:

   a. § 1226(a) & (c) (authorizing arrest and detention of certain aliens and providing that the federal government "shall take into custody" certain criminal aliens "when the alien is released");

   b. § 1231(a)(4) (federal government may not "remove an alien who is sentenced to imprisonment until the alien is released from imprisonment");

   c. § 1324(a) (forbidding any "person," in "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," to "conceal[], harbor[], or shield[] from detection, or attempt[] to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation" or to "engage in any conspiracy to commit any of the preceding acts .... or aid[] or abet[] the commission of any of the preceding acts");

   d. § 1357(a) (authorizing immigration officers, "anywhere in or outside the United States" (see 8 C.F.R. § 287.5(a)), to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States"); and

   e. § 1366(1) & (3) (requiring the Attorney General annually to submit to Congress "a report detailing ... (1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense; [and] (3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal").

3. I (and also the applicant entity) understand that USDOJ will require States and local governments (including State and local government entities, -agencies, and -officials), with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2018 OJP program under which this certification is being submitted (the "FY 2018 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2018 OJP Program, not to violate, or to aid or abet any violation of, 8 U.S.C. § 1324(a), and not to impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a) or relating to 8 U.S.C. § 1366(1) & (3) or 8 U.S.C. § 1226(a) & (c).

4. I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (cf. 34 U.S.C. § 10251(a)(2)).  Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (i.e., one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or -agency.

5. I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning both—

   a. the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program; and

   b. any laws, rules, policies, or practices potentially applicable to the "program or activity" sought to be funded under the FY 2018 OJP Program that implicate any of the requirements relating to 8 U.S.C. §§ 1226(a) & (c), 1324(a), 1357(a), & 1366(1) & (3) that are described in ¶ 3 of this certification, whether imposed by a State or local government entity, -agency, or -official.

6. As of the date of this certification, neither the applicant nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any law, rule, policy, or practice that would apply to the "program or activity" to be funded in whole or in part under the FY 2018 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that would or does— (1) violate, or aid or abet any violation of, 8 U.S.C. § 1324(a); (2) impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a); (3) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1366(1) & (3); or (4) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1226(a) & (c).

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. § 10271-10273), and also may subject me and the applicant entity to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including associated certifications, are subject to review by USDOJ, including by OJP and the USDOJ Office of the Inspector General.

_____        _____
Signature of Chief Legal Officer of the Jurisdiction        Printed Name of Chief Legal Officer

_____        _____
Date of Certification        Title of Chief Legal Officer of the Jurisdiction

_____
Name of Applicant Government Entity (i.e., the applicant to the FY 2018 OJP Program identified below

*FY 2018 OJP Program:*  **Byrne Justice Assistance Grant (JAG) Program: State**

45

BJA-2018-13625

Exhibit 11
Page 45 of 57

**Appendix D**

**Certain relevant federal laws, as in effect on June 7, 2018**

**8 U.S.C. § 1373**

**Communication between government agencies and the Immigration and Naturalization Service**

**(a) In general**

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

**(b) Additional authority of government entities**

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

**(1)** Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

**(2)** Maintaining such information.

**(3)** Exchanging such information with any other Federal, State, or local government entity.

**(c) Obligation to respond to inquiries**

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

**8 U.S.C. § 1644**

**Communication between State and local government agencies and Immigration and Naturalization Service**

Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

**8 U.S.C. § 1226(a) & (c)**

**Apprehension and detention of aliens**

(a) Arrest, detention, and release

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--

46

      (1) may continue to detain the arrested alien; and
      (2) may release the alien on--
          (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
          (B) conditional parole; but
      (3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

\*\*\*

(c) Detention of criminal aliens
    (1) Custody
    The Attorney General shall take into custody any alien who--
          (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
          (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
          (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence1 to a term of imprisonment of at least 1 year, or
          (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

    (2) Release
    The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

**8 U.S.C. § 1231(a)(4)**

(a) Detention, release, and removal of aliens ordered removed
\*\*\*

**4) Aliens imprisoned, arrested, or on parole, supervised release, or probation**

    **(A) In general**
    Except as provided in section 259(a) of title 42 and paragraph (2), the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.

**(B) Exception for removal of nonviolent offenders prior to completion of sentence of imprisonment**

The Attorney General is authorized to remove an alien in accordance with applicable procedures under this chapter before the alien has completed a sentence of imprisonment-

 i. in the case of an alien in the custody of the Attorney General, if the Attorney General determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense related to smuggling or harboring of aliens or an offense described in section 1101(a)(43)(B), (C), (E), (I), or (L) of this title and (II) the removal of the alien is appropriate and in the best interest of the United States; or

 ii. in the case of an alien in the custody of a State (or a political subdivision of a State), if the chief State official exercising authority with respect to the incarceration of the alien determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense described in section 1101(a)(43)(C) or (E) of this title), (II) the removal is appropriate and in the best interest of the State, and (III) submits a written request to the Attorney General that such alien be so removed.

**(C) Notice**

Any alien removed pursuant to this paragraph shall be notified of the penalties under the laws of the United States relating to the reentry of deported aliens, particularly the expanded penalties for aliens removed under subparagraph (B).

**(D) No private right**

No cause or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.


## 8 U.S.C. § 1324(a)

**Bringing in and harboring certain aliens**

(a) Criminal penalties

 (1)(A) Any person who—

  i. knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

  ii. knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

  iii. knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

48

    iv.    encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

    v.    (v)(I) engages in any conspiracy to commit any of the preceding acts, or

    vi.    (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).

(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

    I.    in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under title 18, imprisoned not more than 10 years, or both;

    II.    in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, imprisoned not more than 5 years, or both;

    III.    in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) during and in relation to which the person causes serious bodily injury (as defined in section 1365 of title 18) to, or places in jeopardy the life of, any person, be fined under title 18, imprisoned not more than 20 years, or both; and

    IV.    in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) resulting in the death of any person, be punished by death or imprisoned for any term of years or for life, fined under title 18, or both.

(C) It is not a violation of clauses (ii) or (iii) of subparagraph (A), or of clause (iv) of subparagraph (A) except where a person encourages or induces an alien to come to or enter the United States, for a religious denomination having a bona fide nonprofit, religious organization in the United States, or the agents or officers of such denomination or organization, to encourage, invite, call, allow, or enable an alien who is present in the United States to perform the vocation of a minister or missionary for the denomination or organization in the United States as a volunteer who is not compensated as an employee, notwithstanding the provision of room, board, travel, medical assistance, and other basic living expenses, provided the minister or missionary has been a member of the denomination for at least one year.

(2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs-

    (A) be fined in accordance with title 18 or imprisoned not more than one year, or both; or

    (B) in the case of-

        (i) an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,

        (ii) an offense done for the purpose of commercial advantage or private financial gain, or

        (iii) an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry,

be fined under title 18 and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(iii), not more than 10 years, in the case of a first or second violation of

subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years.

(3)(A) Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under title 18 or imprisoned for not more than 5 years, or both.
(B) An alien described in this subparagraph is an alien who-
           (i) is an unauthorized alien (as defined in section 1324a(h)(3) of this title), and
           (ii) has been brought into the United States in violation of this subsection.

(4) In the case of a person who has brought aliens into the United States in violation of this subsection, the sentence otherwise provided for may be increased by up to 10 years if-
           (A) the offense was part of an ongoing commercial organization or enterprise;
           (B) aliens were transported in groups of 10 or more; and
           (C)(i) aliens were transported in a manner that endangered their lives; or
           (ii) the aliens presented a life-threatening health risk to people in the United States.


## 8 U.S.C. § 1357(a)

### Powers of immigration officers and employees

(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—
- **(1)** to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;
- **(2)** to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;
- **(3)** within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;
- **(4)** to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States; and
- **(5)** to make arrests-
- **(6)** for any offense against the United States, if the offense is committed in the officer's or employee's presence, or

**(7)** for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony,

**(8)** if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

Under regulations prescribed by the Attorney General, an officer or employee of the Service may carry a firearm and may execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States. The authority to make arrests under paragraph (5)(B) shall only be effective on and after the date on which the Attorney General publishes final regulations which (i) prescribe the categories of officers and employees of the Service who may use force (including deadly force) and the circumstances under which such force may be used, (ii) establish standards with respect to enforcement activities of the Service, (iii) require that any officer or employee of the Service is not authorized to make arrests under paragraph (5)(B) unless the officer or employee has received certification as having completed a training program which covers such arrests and standards described in clause (ii), and (iv) establish an expedited, internal review process for violations of such standards, which process is consistent with standard agency procedure regarding confidentiality of matters related to internal investigations.

## 8 U.S.C. § 1366(1) & (3)

**Annual report on criminal aliens**

Not later than 12 months after September 30, 1996, and annually thereafter, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report detailing—

    (1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense;

    ***

    (3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal;

    ***.

**Appendix E**

**Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)**

Each applicant must provide responses to the following questions as an attachment to the application:

(1) Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?

(2) Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?

(3) If yes to either:
- Please provide a copy of each law or policy;
- Please describe each practice; and
- Please explain how the law, policy, or practice complies with section 1373.

**Note:** Responses to these questions must be provided by the applicant to BJA as part of the JAG application. Further, the requirement to provide this information applies to all tiers of JAG funding, for all subawards made to state or local government entities, including public institutions of higher education. All subrecipient responses must be collected and maintained by the direct recipient of JAG funding and must be made available to DOJ upon request. Responses to these questions are not required from subrecipients that are either a tribal government/organization, a nonprofit organization, or a private institution of higher education.

**Appendix F**

Additional purposes for which JAG funds awarded to a state under this FY 2018 solicitation may be used:

      **(a)**    To enforce state and local laws that establish offenses similar to offenses established in 21 U.S.C. § 801 et seq., to improve the functioning of the **criminal justice** system, with emphasis on violent crime and serious offenders, by means including providing additional personnel, equipment, training, technical assistance, and information systems for the more widespread apprehension, prosecution, adjudication, detention, and rehabilitation of persons who violate these laws, and to assist the victims of such crimes (other than compensation), including—

          (1)    demand-reduction education programs in which law enforcement officers participate;

          (2)    multi-jurisdictional task-force programs that integrate federal, state, and local drug-law-enforcement agencies and prosecutors for the purpose of enhancing inter-agency co-ordination and intelligence, and facilitating multi-jurisdictional investigations;

          (3)    programs designed to target the domestic sources of controlled and illegal substances, such as precursor chemicals, diverted pharmaceuticals, clandestine laboratories, and cannabis cultivations;

          (4)    providing community and neighborhood programs that assist citizens in preventing and controlling crime, including special programs that address the problems of crimes committed against the elderly and special programs for rural jurisdictions;

          (5)    disrupting illicit commerce in stolen goods and property;

          (6)    improving the investigation and prosecution of white-collar crime, organized crime, public-corruption crimes, and fraud against the government, with priority attention to cases involving drug-related official corruption;

          (7)(A)    improving the operational effectiveness of law enforcement through the use of crime-analysis techniques, street-sales enforcement, schoolyard-violator programs, and gang-related and low-income-housing drug-control programs; and

              (B)    developing and implementing anti-terrorism plans for deep-draft ports, international airports, and other important facilities;

          (8)    career-criminal prosecution programs, including the development of proposed model drug-control legislation;

          (9)    financial investigative programs that target the identification of money-laundering operations and assets obtained through illegal drug trafficking, including the development of proposed model legislation, financial investigative training, and financial information-sharing systems;

          (10)    improving the operational effectiveness of the court process, by expanding prosecutorial, defender, and judicial resources, and implementing court-delay-reduction programs;'

          (11)    programs designed to provide additional public correctional resources and improve the corrections system, including treatment in prisons and jails, intensive-supervision programs, and long-range corrections and sentencing strategies;

          (12)    providing prison-industry projects designed to place inmates in a realistic working and training environment that will enable them to acquire

marketable skills and to make financial payments for restitution to their victims, for support of their own families, and for support of themselves in the institution;

(13)     providing programs that identify and meet the treatment needs of adult and juvenile drug-dependent and alcohol-dependent offenders;

(14)     developing and implementing programs that provide assistance to jurors and witnesses, and assistance (other than compensation) to victims of crimes;

(15)(A) developing programs to improve drug-control technology, such as pretrial drug-testing programs, programs that provide for the identification, assessment, referral to treatment, case-management and monitoring of drug-dependent offenders, and enhancement of state and local forensic laboratories; and

(B)     developing programs to improve **criminal justice** information systems (including automated fingerprint identification systems) to assist law enforcement, prosecution, courts, and corrections organizations;

(16)     innovative programs that demonstrate new and different approaches to enforcement, prosecution, and adjudication of drug offenses and other serious crimes;

(17)     addressing the problems of drug trafficking and the illegal manufacture of controlled substances in public housing;

(18)     improving the criminal and juvenile justice system's response to domestic and family violence, including spouse abuse, child abuse, and abuse of the elderly;

(19)     drug-control evaluation programs that the state and units of local government may utilize to evaluate programs and projects directed at state drug-control activities;

(20)     providing alternatives to prevent detention, jail, and prison for persons who pose no danger to the community;

(21)     programs of which the primary goal is to strengthen urban enforcement and prosecution efforts targeted at street drug sales;

(22)     programs for the prosecution of driving while intoxicated charges and the enforcement of other laws relating to alcohol use and the operation of motor vehicles;

(23)     programs that address the need for effective bindover systems for the prosecution of violent 16- and 17-year-old juveniles, in courts with jurisdiction over adults, for the crimes of—

(A)     murder in the first degree;
(B)     murder in the second degree;
(C)     attempted murder;
(D)     armed robbery when armed with a firearm;
(E)     aggravated battery or assault when armed with a firearm;
(F)     criminal sexual penetration when armed with a firearm; and
(G)     drive-by shootings as described 18 U.S.C. § 36;

(24)     law-enforcement and prevention programs relating to gangs or to youth who are involved or at risk of involvement in gangs;

(25)     developing or improving, in a forensic laboratory, a capability to analyze DNA for identification purposes; and

(26)     developing and implementing anti-terrorism training programs and procuring equipment for use by local law-enforcement authorities; and

54

BJA-2018-13625

Exhibit 11
Page 54 of 57

**(b)**     To reduce crime and improve public safety, including but not limited to, the following:

(1)(A)          hiring, training, and employing on a continuing basis new, additional law enforcement officers and necessary support personnel;

(B)     paying overtime to presently-employed law enforcement officers and necessary support personnel for the purpose of increasing the number of hours worked by such personnel; and

(C)     procuring equipment, technology, and other material directly related to basic law-enforcement functions;

(2)     enhancing security measures—

(A)     in and around schools; and

(B)     in and around any other facility or location that is considered by the unit of local government to have a special risk for incidents of crime;

(3)     establishing crime-prevention programs that may, though not exclusively, involve law-enforcement officials and that are intended to discourage, disrupt, or interfere with the commission of criminal activity, including neighborhood-watch and citizen-patrol programs, sexual-assault and domestic-violence programs, and programs intended to prevent juvenile crime;

(4)     establishing or supporting drug courts;

(5)     establishing early-intervention and -prevention programs for juveniles, in order to reduce or eliminate crime;

(6)     enhancing the adjudication process of cases involving violent offenders, including violent juvenile offenders;

(7)     enhancing programs under **(a)**, above;

(8)     establishing co-operative task forces between adjoining units of local government to work co-operatively to prevent and combat criminal activity, particularly criminal activity that is exacerbated by drug- or gang-related involvement; and

(9)     establishing a multi-jurisdictional task force, particularly in rural areas, composed of law-enforcement officials representing units of local government, that works with Federal law-enforcement officials to prevent and control crime.

**Appendix G**
**Application Checklist**

**Edward Byrne Memorial Justice Assistance Grant (JAG) Program:**

**FY 2018 State Solicitation**

This application checklist has been created as an aid in developing an application.

**What an Applicant Should Do:**

*Prior to Registering in GMS:*
_____ Acquire a DUNS Number                                      (see page 32)
_____ Acquire or renew registration with SAM                     (see page 33)
*To Register with GMS:*
_____ For new users, acquire a GMS username and password*        (see page 33)
_____ For existing users, check GMS username and password* to ensure account access
                                                                   (see page 33)
_____ Verify SAM registration in GMS                             (see page 33)
_____ Search for correct funding opportunity in GMS              (see page 33)
_____ Select correct funding opportunity in GMS                  (see page 33)
_____ Register by selecting the "Apply Online" button associated with the funding opportunity
         title                                                     (see page 33)
_____ Read OJP policy and guidance on conference approval, planning, and reporting
         available at ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm
                                                                   (see page 18)
_____ If experiencing technical difficulties in GMS, contact the NCJRS Response Center
                                                                   (see pages 2 and 34)

*Password Reset Notice – GMS users are reminded that while password reset capabilities exist, this function is only associated with points of contact designated within GMS at the time the account was established. Neither OJP nor the GMS Help Desk will initiate a password reset unless requested by the authorized official or a designated point of contact associated with an award or application.

**Overview of Post-Award Legal Requirements:**

_____ Review the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" in the OJP Funding Resource Center at https://ojp.gov/funding/index.htm.

**Scope Requirement:**

_____ The federal amount requested is within the allowable limit(s) of the FY 2018 JAG Allocations List as listed on BJA's JAG web page.

**Eligibility Requirement:**

Only states may apply under this solicitation. By law, for purposes of the JAG Program, the term "states" includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa. (Throughout this solicitation, each reference to a state or states includes all 56 jurisdictions.)

**What an Application Should Include:**

| | |
|---|---|
| _____ Application for Federal Assistance (SF-424) | (see page 19) |
| _____ Intergovernmental Review | (see page 20) |
| _____ Program Narrative | (see page 20) |
| _____ Budget Detail Worksheet | (see page 22) |
| _____ Budget Narrative | (see page 22) |
| _____ Indirect Cost Rate Agreement (if applicable) | (see page 22) |
| _____ Financial Management and System of Internal Controls Questionnaire | (see page 25) |
| _____ Disclosure of Lobbying Activities (SF-LLL) (if applicable) | (see page 26) |
| _____ Certifications and Assurances by Chief Executive | (see page 27) |
| _____ Certification of Compliance with 8 U.S.C. § 1373 by Chief Legal Officer | (see page 27) |
| _____ State Strategic Plan (if applicable) | (see page 31) |
| _____ Additional Attachments | |
| _____ Applicant Disclosure of Pending Applications | (see page 28) |
| _____ Research and Evaluation Independence and Integrity (if applicable) | |
| | (see page 29) |

57

BJA-2018-13625

Exhibit 11
Page 57 of 57

 

BJA FY 18 Edward Byrne Memorial Justice Assistance Grant
(JAG) Program - State Solicitation  2018-H3736-OR-DJ

<u>Help/Frequently
Asked Questions</u>

<u>GMS Home</u>

<u>Log Off</u>

**Submit Application**

Your application for the BJA FY 18 Edward Byrne Memorial Justice Assistance Grant (JAG) Program - State Solicitation has been successfully submitted. You will no longer be able to edit any information submitted. However, you can log in any time to view the application information.

You will be contacted by the Program Office when your application is processed or any other action is required by you.

Exhibit 12
Page 1 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

Applicant name:    State of Oregon Criminal Justice Commission

**1.0  Executive Summary**

The mission of the State of Oregon Criminal Justice Commission ("CJC") is to improve the legitimacy, efficiency, and effectiveness of state and local criminal justice systems. CJC serves as the primary coordinating body for the acceptance, planning and distribution of federal criminal justice funds leveraged to address the needs of the state criminal justice system. This responsibility includes: state and local public safety issue identification; system collaboration; policy development; and system planning and implementation.

As the State Administering Agency (SAA), the CJC is directly awarded the federal grants and is responsible for the allocation of resources statewide. Further the CJC serves as the primary coordinating body for state public safety issue identification, system collaboration, policy development, and system planning and implementation. The responsibility requires the CJC to work closely with public safety associations including prosecution, defense, law enforcement, court systems, the Department of Corrections (DOC), and victims services.

Specialty courts target non-violent felony offenders with substance-use disorders in an integrated, systematic approach found to reduce drug use and recidivism while increasing public safety, and often provide family reunification. The opioid epidemic and other illicit drug dependence has demanded an increased need for specialty courts to address the root causes of criminal activity and substance-use disorders through an alternative to incarceration that helps to reduce recidivism and increase public safety.

Exhibit 12
Page 2 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

Untreated or undertreated mental illness drives a disproportionate number of people into the criminal justice system. Often mental health courts can provide a diversion strategy for offenders with mental illness to prevent unnecessary incarceration and recurring arrests through appropriate community-based treatment and supervision. These community-based intervention programs offer the opportunity for medium- to high-risk individuals to be identified and enter into specialized treatment services.

CJC is acquiring a statewide Specialty Court Case Management System which will ensure that all service efforts are monitored, connected, and synchronized through one primary tool facilitating the support of daily operations, as well as enabling specialty court team members to manage participant data, treatment, and court compliance. Also, the System will sustain data collection for analysis and evaluation purposes, reporting, and program modification.

## 2.0  State of Oregon Criminal Justice Commission

2.1  OVERVIEW

The CJC was established in 1995 to improve the effectiveness and efficiency of state and local criminal justice systems by serving as a centralized and impartial forum for statewide public safety policy development, planning, and agency coordination. This responsibility includes state and local public safety issue identification, system collaboration, policy development, and system planning and implementation. Further, the CJC leads many statewide public safety planning efforts and initiatives to address the needs of the state and local criminal justice system. The primary duty of the commission is to develop and maintain a state criminal justice policy and

Exhibit 12
Page 3 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

comprehensive, long-range plan for a coordinated state criminal justice system that encompasses

public safety, offender accountability, crime reduction and prevention and offender treatment and

rehabilitation. [ORS 137.656 (2)]

In 2009, the CJC became the State Administering Agency (SAA) for the Bureau of Justice

Assistance grants. The CJC administers the state-funded Specialty Court Grant Program and

Justice Reinvestment Grant Program, in addition to staffing the Task Force on Public Safety and

the Asset Forfeiture Oversight Advisory Committee.  During the 2017-19 biennium, the CJC

actively administered 92 grants while furthering the efforts of criminal justice system

improvement through a data driven, evidence-based approach.  Over $64,000,000 in federal and

state grant funds were efficiently administered by the commission statewide.

The CJC also serves as the Statistical Analysis Center (SAC) which provides the state with the

capability for objective research and data analysis.  The SAC compiles and performs data

analyses that can be used in making policy recommendations and decisions as a critical

resource for understanding the costs and outcomes of public safety programs and interventions

within the criminal justice system. The SAC is able to analyze crime trends, as well as

sentencing policy and outcomes by blending data from Oregon State Police's (OSP) Law

Enforcement Data System (LEDS), the Oregon Judicial Department's (OJD) Odyssey system

and the DOC data warehouse to answer questions about the statewide criminal justice system

and plan for its future.

Exhibit 12
Page 4 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

The State of Oregon continues to pass major legislation related to public safety, crime, and criminal punishment. Recent reforms began in July 2013 when the Oregon Legislature passed House Bill (HB) 3194, Oregon's Justice Reinvestment bill.[1] HB 3194 enacted sentencing changes, probation condition reforms, directed state agencies to establish standards for specialty courts and reentry courts, revised the statewide definition of recidivism, and created the Oregon Center for Policing Excellence, a Justice Reinvestment Grant Program, and the Oregon Task Force on Public Safety.

Implementation of HB 3194 has been a primary focus of the CJC. The CJC staffs the Task Force on Public Safety and its subcommittees, has adopted rules for the administration of the Justice Reinvestment Grant Program, drafted specialty court standards, and supported best practice implementation for all of Oregon's specialty courts including those funded by federal Byrne JAG Funds. While much of the implementation of HB 3194 has fallen to the SAA arm of the CJC, the SAC arm has focused on the measurement of criminal justice system outcomes related to programs created pursuant to HB 3194. Indeed, a portion of this work constituted the Core Capacity Building Projects for the 2015 and 2016 SJS grants, which led to the development of online data dashboards presenting data on Justice Reinvestment performance measures, including prison use, reported crime and recidivism.

---

[1] Oregon Legislature. 77th Assembly. House Committee on Judiciary. HB 3194
https://olis.leg.state.or.us/liz/2013R1/Downloads/MeasureDocument/HB3194 (2013).

Exhibit 12
Page 5 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

## 2.2  PROGRAM JUSTIFICATION

In 2009, the CJC was designated by the Governor as the State Administering Agency (SAA) for the Bureau of Justice Assistance grants.  The CJC is directly awarded the federal grants and is responsible for the allocation of resources statewide.  Further the CJC serves as the primary coordinating body for state public safety issue identification, system collaboration, policy development, and system planning and implementation.

Following HB 3194, the Oregon Legislature passed HB 3078 in 2017.[2] HB 3194 built on the spirit and programming first enacted in HB 3, as it provided additional grant resources to local communities for downward departure prison diversion programs, created the Family Sentencing Alternative Pilot Program (FSAPP), expanded the use of a prison reentry program called Short-Term Transitional Leave (STTL), and changed sentencing rules for several property crimes.

The 79th Oregon Legislative Assembly passed legislation to target racial profiling in officer-initiated traffic and pedestrian stops (STOP Data) and modifies the charge of possession of controlled substances as a Class A misdemeanor, unless the offense involves substantial qualities or is classified as a commercial drug offense.[3]  For the Stop Data, the legislation requires CJC to collaborate with Oregon State Police (OSP), Department of Public Safety and Standards

---

[2] Oregon Legislature.  79th Assembly.  House Committee on Judiciary.  HB 3078
https://olis.leg.state.or.us/liz/2017R1/Downloads/MeasureDocument/HB3078/Enrolled (2017).
[3] 79th Oregon Legislative Assembly: 2017 Regular Session.  *House Bill 2355 Enrolled.*  Retrieved August 2017 from https://olis.leg.state.or.us/2017R1/Downloads/MeasureDocument/HB2355.

Exhibit 12
Page 6 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

(DPSST), and the Oregon Department of Justice (DOJ) to develop and implement a standardized method to be used by law enforcement officers to record stop data. CJC will review the collected data and identify patterns or practices of profiling in a report by December 1, 2019.

This initiative follows Oregon's continued support of the statewide criminal justice efforts. Justice Reinvestment is Oregon's proactive approach to the growing need to obtain greater efficiencies in the criminal justice system through improved collaboration and decision making. Justice Reinvestment requires the CJC to assist LPSCCs in using a data-driven approach to achieve its four goals: 1) reduce prison populations; 2) reduce recidivism; 3) increase public safety; and 4) increase offender accountability. Oregon's legislature continues to increase their support of this effort by funding the grant program through Department of Corrections (DOC) avoided costs. In 2013-15, the program granted $15 million of state funds to Oregon's 36 counties; 2015-17, $38.7 million was granted; and in 2017-19, $47.1 million were allocated to the program.

The CJC invests grant funds in programs that promote an equitable approach to public safety and balance law enforcement, accountability and treatment options in order to reduce recidivism. The CJC evaluates programs funded by grants and conducts monitoring to assess fidelity to evidence-based practice prescribed by ORS 182.515-525. JAG funded programs are limited to a 24 month funding project period, and it is expected that local and state agencies will assume fiscal responsibility for projects when the federal JAG funding project period is over.

Exhibit 12
Page 7 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

The programs that the CJC oversees and implements are designed to:

- Analyze criminal justice trends to understand drivers of local prison use;
- Promote the effective implementation of investments that increase public safety and improve offender accountability;
- Measure the impact of policy changes and reinvestment resources; and
- Tie results to funding.

## 2.3 AGENCY STRATEGIC PLAN

The Justice Reinvestment Initiative continues to be the agency's primary short- and long-term strategic plan. As part of the Justice Reinvestment Initiative of the United States Department of Justice, Oregon is wrapping up the state's Phase 2 effort which included BJA technical assistance funds for key implementation projects. The 2013 Justice Reinvestment legislation guides both CJC and statewide public safety strategic initiatives over the next 5-10 years.[4] The Public Safety Task Force (Task Force), reestablished in 2017 through HB 2238, is tasked with reviewing implementation of the Justice Reinvestment Program.[5] All 36 Oregon counties applied and were awarded Justice Reinvestment formula grant funds during the 2017-19 biennium. HB 3078 provided for additional Justice Reinvestment Supplemental grant funds to support downward departure prison diversion programs.[6] The new supplemental grant program

---

[4] Oregon Legislature. 77th Assembly, 2018. House Committee on Judiciary. HB 3194 https://olis.leg.state.or.us/liz/2013R1/Downloads/MeasureDocument/HB3194 (2013).
[5] Oregon Legislature. 79th Assembly, 2018. House Committee on Judiciary. HB 2238 https://olis.leg.state.or.us/liz/2017R1/Downloads/MeasureDocument/HB2238 (2017).
[6] Oregon Legislature. 79th Assembly, 2018. House Committee on Judiciary. HB 3078 §9 https://olis.leg.state.or.us/liz/2017R1/Downloads/MeasureDocument/HB3078 (2017).

Exhibit 12
Page 8 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

is aimed to decrease county prison intakes, including revocations, for the identified target

population.

Justice Reinvestment is Oregon's approach to controlling prison growth, investing the avoided

operational costs into local criminal justice systems to reduce recidivism, increase public safety

and increase offender accountability. The CJC's program administration and outcome

evaluations links directly to the Governor's plan for healthy and safe communities, investing in

equitable public safety, balancing law enforcement, accountability and treatment options to

reduce recidivism.  The agency's efforts to support this initiative are:

- Improve criminal justice decision making to emphasize data-driven decisions and evidence-based practices regarding community supervision and incarceration.
- Reduce recidivism by facilitating the successful reintegration of offenders into the community.
- Measure effectiveness of programs, services, and policies through sound relevant research.
- Examine criminal justice policies to embody fairness, consistent, proportionality, and opportunity.

The CJC implements these strategies to achieve the following success metrics:

- Decrease utilization of prison for property and drug offenders.
- Decrease recidivism rates for arrest, conviction and incarceration for a new crime.

### 3.0  The Description of the issue

Specialty Court Grant Program calls for evidence-based problem-solving court strategies

designed to address the root causes of criminal activity and substance use disorders by

coordinating efforts of the judiciary, prosecution, defense, probation, law enforcement,

Exhibit 12
Page 9 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

treatment, mental health, social services, and agencies. These courts offer nonviolent offenders an alternative to incarceration and teach participants to become productive law-abiding citizens, reducing recidivism and promoting healthier communities. With 72 courts statewide, non-violent felony offenders are offered an alternative to incarceration and the opportunity to become productive law-abiding citizens, while reducing recidivism and increasing public safety. In 2015-17, CJC provided 36 of the 72 courts statewide with $13.2 million operational funds to maintain or enhance their programs through a competitive application. In 2017-19, 41 specialty courts were awarded grants totaling approximately $16.8 million.

In 2013, the Oregon Legislative Assembly's passage of HB 3194 expanded the CJC's charge to include serving as a "clearinghouse and information center for the collection, preparation, analysis and dissemination of the best practices applicable to specialty courts" (ORS 137.680). The clearinghouse function includes coordinating research and distributing research results; coordinating specialty court– specific trainings; and supporting the implementation of programs and evidence-based practices.

The goal of the program is to financially support established treatment courts serving adults, juveniles, and families. Treatment courts have shown positive cost-effective results for people struggling with a substance use disorder as demonstrated by reduced recidivism rates and through the use of interdisciplinary team collaboration, court-directed treatment, and compliance.

During the 2017-19 biennium, the CJC awarded $16,787,007 of state and federal funds to 41 specialty courts. Approximately $4 million of these funds were federal fund grants.

Exhibit 12
Page 10 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

Overall, CJC employs 16 staff and operates with a biennial budget of $74.6 million total funds, of which $64.8 million are state general fund. The commission has approved the following program purpose areas for the FY18 JAG application: Drug treatment and enforcement programs; Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams; and Planning, evaluation and technology improvement programs.

## 3.1  DRUG TREATMENT AND ENFORCEMENT PROGRAMS

For the 17-19 biennium, CJC awarded $16.8 million operational grant funds to 41 specialty courts including adult drug, juvenile drug, family, veterans, mental health, and DWI courts. Specialty courts focus on addressing the root causes of crime and substance-use disorders by working with participants to offer treatment and solve underlying problems that lead to criminal activity. CJC serves as a clearinghouse and information center for best-practices applicable to these courts which includes coordinating research and distributing results to support evidence-based practice implementation. The Standards were developed by CJC in consultation with the Oregon Judicial Department ("OJD").[7] [ORS 137.680]

Specialty courts target non-violent felony offenders with substance-use disorders in an integrated, systematic approach found to reduce drug use and recidivism while increasing public safety, and often provide family reunification. Specialty courts may require an appropriate assessment and should require physician monitoring for any participant on medication assisted

---

[7] Criminal Justice Commission. *Oregon Treatment Court Standards.* Retrieved August 2017 from
http://www.oregon.gov/cjc/specialtycourts/Documents/family/OregonTreatmentCourtStandards.pdf.

Exhibit 12
Page 11 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

treatment ("MAT"). However, the opioid epidemic and other illicit drug dependence has

demanded the need for specialty courts to allow MAT and that participation cannot be the basis

for probation or specialty court violations. In 2017, Oregon passed HB 3440 §6 which explicitly

states that:

> *An individual may not be denied entry into a specialty court in this state solely for*
> *the reason that the individual is taking, or intends to take, medication prescribed*
> *by a licensed health care practitioner for the treatment of drug abuse or*
> *dependency.*[8]

By addressing the root causes of criminal activity and substance-use disorders, the courts offer

participants an alternative to incarceration and providing them with the resources and

opportunities they need by through coordinated efforts. CJC will use JAG funds to financially

support operational grants from Oregon specialty courts to fund evidence-based practices that

support best-practice standards.

## 3.2  MENTAL HEALTH PROGRAMS

Untreated or undertreated mental illness drives a disproportionate number of people into the

criminal justice system. Often mental health courts can provide a diversion strategy for

offenders with mental illness to prevent unnecessary incarceration and recurring arrests through

appropriate community-based treatment and supervision. Of the 41 specialty courts that CJC has

awarded in 2017-19, six are mental health courts. These community-based intervention

programs offer the opportunity for medium- to high-risk individuals to be identified and enter

---

[8] 79th Oregon Legislative Assembly: 2017 Regular Session. *House Bill 4330 Enrolled.* Retrieved August 2017 from
https://olis.leg.state.or.us/liz/2017R1/Downloads/MeasureDocument/HB3440.

Exhibit 12
Page 12 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

into specialized treatment services that may include MAT and other innovative approaches to assist with this population.

## 3.3  PLANNING, EVALUATION AND TECHNOLOGY IMPROVEMENT PROGRAMS

Specialty Court Case Management System

Oregon's Department of Administrative Services (DAS), on behalf of CJC, has procured a new Specialty Court Case Management System ("System"). The new System will (a) expand the electronic exchange of data between specialty court administrative units, specialty court end users, and public safety partners; (b) increase internal efficiencies by eliminating redundant and manual processes through workflow and electronic document management; and (c) enable the generation of participant detail and data analysis reports, including weekly staffing reports for team members in addition to quarterly and annual progress reporting to CJC.

The new System is the official System of record for Oregon's specialty courts. It collects, transmits, and processes treatment court records, that include, among other information, highly sensitive medical records, which are designated as Level 4 information assets by the Oregon's Chief Information Office (OSCIO) and subject to protection under the Health Insurance Portability and Accountability Act (HIPAA), Health Information Technology for Economic and Clinical Health Act (HITECH), 42 C.F.R. Public Health as well as State of Oregon laws. [ORS 192.496 -192.581]

A requisite of the new System is increased operational efficiencies through modern and improved technology systems which reduces time and costs dedicated by specialty courts to data

Exhibit 12
Page 13 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

entry and system maintenance tasks. The System ensures that all service efforts are monitored,

connected, and synchronized through one primary tool facilitating the support of daily

operations, as well as enables specialty court team members to manage participant data,

treatment, and court compliance. Also, the System sustains data collection for analysis and

evaluation purposes, reporting, and program modification.

In order to meet the obligations set forth in ORS 137.680, CJC had to replace the old solution,

which was developed approximately 12-years ago, with a new System being implemented by a

vendor which also provides post-implementation support services. CJC will use JAG funds to

support the hosting and maintenance of the solution.

3.4   VARIABLE PASS-THROUGH

Oregon is required to pass-through a federally determined percentage of funds to local

jurisdictions and has additional requirements for funds that must be allocated specifically for

what is referred to as "variable less-than $10,000 jurisdictions." Grant funds, excluding 10%

administration costs and less than $10,000 amounts, are passed through to local jurisdictions.

The less than $10,000 amount is provided locally to specialty court programs and the case

management system.

4.0  PROJECT DESIGN AND IMPLEMENTATION

Oregon's funding priorities direct resources to evidence-based best-practice programming in

public safety. CJC works directly with the Governor to target innovative programs that further

the goals of the state's public safety agencies and associations. This process does not result in a

Exhibit 12
Page 14 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

written strategic plan. However, it does result in bringing together public safety stakeholders from across the state to identify the challenges, prioritize, and discuss solutions. Through this approach, CJC develops a more complete view of challenges that can be addressed through strategic programs and funding support.

CJC recognizes the importance of collection and analysis of relevant, reliable, and valid criminal justice data. The commission is charged with being the criminal justice policy advisory board for the state. The statute requires the commission:

> *To develop and maintain a state criminal justice policy and comprehensive, long-range plan for a coordinated state criminal justice system that encompasses: public safety; offender accountability; crime reduction and prevention; and offender treatment and rehabilitation.* [ORS 137.656]

CJC provides staff support to the Task Force, responsible to oversee implementation of the policy section of justice reinvestment legislation. In addition to that work, CJC has established Regional Implementation Councils ("RICs") to provide regular feedback to LPSCCs about prison usage, recidivism, sentencing impacts and other criminal justice policy changes. CJC expects that counties will build a genuine collaborative LPSCC that is highly functioning with a shared purpose of improving the local criminal justice system while cooperating with the agency for statewide reform. Key decision makers and stakeholders are expected to engage locally, just as association stakeholders engage at the state level. Through this constructive dialogue, effective collaboration, and positive engagement, CJC has demonstrated cultural change and influence on the criminal justice system.

Exhibit 12
Page 15 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

Oregon's JAG strategic priorities are intentionally broad and vague, but informed by the

work of the commission and the statewide need. The work is ongoing, includes input

from a variety of public safety stakeholders as well as local and state agencies. Engaging

the stakeholders in yet another planning process for JAG funds would not allow for the

flexibility of funding the progressive needs of the state and be inefficient.

## 5.0 CAPABILITIES AND COMPETENCIES

CJC serves as both the SAA and SAC. As such, CJC is the principal agency responsible for

Oregon's program policy evaluation and criminal justice research.

In order to make informed decisions, policy-makers require updated criminal justice data. The

SAC has worked to gain access to arrest, charge and conviction data and is continuing to analyze

these data and report the results to policy makers. This data analysis has helped the SAC to

develop a comprehensive cost-benefit model, a risk-assessment tool, and legislative fiscal and

racial/ethnic impact estimates. Continued analysis of these data is crucial in making

recommendations on what law changes have the greatest potential for saving money while

maintaining the effectiveness of Oregon's criminal justice system.

In 2016, Oregon received both the *Statistical/Management* and *Research/Policy* awards by the

Justice Research and Statistics Association ("JRSA"). The Oregon Recidivism Analysis

received the *Statistical/Management* award and broke out recidivism in new ways including:

Exhibit 12
Page 16 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

rates by age, by gender, by race and ethnicity, by crime type, and by level of risk to recidivate.[9]
The *Research/Policy* award was received for the Oregon Short-Term Transitional Leave
("STTL") Report that looked at the recidivism of offenders that received STTL to see if they
were more, less, or similarly likely to commit new crimes as compared to those that did not.[10]

Data sharing and data-driven responses have played a significant role in the work of CJC in the
past two years. The new interactive data connects public safety officials and policy makers with
up-to-date information on local criminal justice systems.[11] This data provides a visual idea of
criminal justice trends in Oregon. The Oregon Knowledge Bank ("OKB") is a statewide
resource designed specifically for Oregon-based public safety programs and research. The OKB
highlights innovative programs operating in the state and research about Oregon-based
solutions.[12]

## 6.0 PLAN FOR COLLECTING THE DATA REQUIRED FOR THIS SOLICITATION'S PERFORMANCE MEASURES

CJC collects performance data on a quarterly basis from its subgrantees that aligns with BJA
performance metrics. CJC monitors grantees for compliance through program and fiscal
monitoring as grantees are expected to be working toward the program objectives as outlined in
the Award Agreement while following appropriate fiscal procedures. Grantees are responsible

---

[9] Criminal Justice Commission. *Oregon Recidivism* Analysis. Retrieved on August 2017 from
http://www.jrsa.org/awards/winners/16_stat_or.pdf.
[10] Criminal Justice Commission. *Short Term Transitional Leave Program in Oregon.* Retrieved on August 2017 from
http://www.jrsa.org/awards/winners/16_research_or.pdf.
[11] Criminal Justice Commission. *Interactive Data.* Retrieved on August 2017 from
http://www.oregon.gov/cjc/data/Pages/main.aspx.
[12] Criminal Justice Commission. *Oregon Knowledge Bank.* Retrieved on August 2017 from http://okb.oregon.gov/.

Exhibit 12
Page 17 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

for submitting progress reports specific to their program which then is reviewed and compiled

for submission into the BJA Performance Measurement Tool ("PMT") as required.

During the project period, grant analysts review program and fiscal records, policies, and

procedures and meet with program participants, staff, and other stakeholders. Monitoring visits

are intended to verify compliance with grant and fiscal requirements, provide technical

assistance, offer program development guidance, and observe program activities.

Grantees must submit complete progress reports according to established timelines in the Award

Agreement. Progress reports have the following purposes:

- To determine whether the grantee is implementing the program as agreed;
- To determine whether the grantee demonstrates fidelity to identified evidence-based practices and/or programs;
- To determine whether the activities the grantee performs are linked to the specific outcomes identified for the program;
- To allow the grantee to present information on any problem encountered (for example, what problems existed, how they affected the program, and how they were resolved);
- To develop data for criminal justice planning and the statewide criminal justice strategy;
- To assist other localities that might undertake a similar program;
- To present information to the governor, the legislature, the U.S. Department of Justice, Congress, and research consultants; and
- To justify continued grant funding.

CJC requires accurate, clear, and verifiable expenditure documentation. Financial reporting must

reflect all program expenditures as outlined in the Award Agreement. Detailed records must be

maintained as supporting documentation for all expenditures listed by category, separated by

match (if applicable) and grant expenses. In addition, backup documentation and invoices must

be maintained with the grant file and will be subject to review upon request. Federally funded

Exhibit 12
Page 18 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Program Narrative
Application Attachment 1

---

awards are subject to the Department of Justice Financial Guide and 2 CFR 200 on cost accounting principles, in addition to the Oregon Accounting Manual ("OAM").

CJC also has access to official records collected by the state including: statewide arrest records; OJD court records; and DOC felony conviction data. Recently, select counties have started to provide local jail data for analysis as well.

Exhibit 12
Page 19 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Budget Narrative
Application Attachment 3

---

Applicant name:     State of Oregon Criminal Justice Commission

The FY18 State JAG funds will be administered to specialty courts by the State of Oregon Criminal Justice Commission (CJC), as the State Administering Agency (SAA).

CJC GRANT FUND EXPENDITURES

| | |
|---|---:|
| Personnel (Federal) | $ 115,634 |
| Fringe | $ 77,672 |
| Travel (Federal) | -- |
| Equipment | -- |
| Supplies | -- |
| Construction | -- |
| Consultant Fees | -- |
| Consultant Expenses | -- |
| Contracts (Federal) | $ 1,883,432 |
| Contracts (Non-Federal) | -- |
| Other Costs | $ 15,966 |
| Indirect Costs | -- |

TOTAL CJC GRANT FUND EXPENDITURES: **$ 2,092,704**

CJC will retain up to 10% for CJC administrative purposes as allowed. Program and fiscal grant reporting will be performed by the CJC on behalf of subawards. The administrative funds will be used to fund the analyst, information systems specialist and criminologist of the agency.

**PERSONNEL (Federal)**

Personnel costs will include 0.60 FTE operations analyst salary costs to provide program monitoring and evaluation, prepare federal program and fiscal reports, and provide technical assistance for federal grant administration to the subawards. Other salary costs will include 0.10 FTE for the Research Director for research and evaluation of the specialty court programs for effectiveness.

**FRINGE**

Other Personal Expenditures (OPE) cover PERS, social security, workers compensation, medical benefits (FLEX) that are associated with the personnel salary costs for these positions. Amounts budgeted are for the same percentage of FTE with actual OPE rates for the employee.

Exhibit 12
Page 20 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Budget Narrative
Application Attachment 3

---

**Contracts (Federal)**

$1,883,432 will be passed through as subawards in support of Specialty Courts:

The Specialty Court Grant Program provides operational grants funds to specialty court programs including adult drug, juvenile drug, family, veterans, mental health and DUII courts.

Exhibit 12
Page 21 of 34

  BJA FY 18 Edward Byrne Memorial Justice Assistance Grant (JAG) Program - State Solicitation 2018-H0758-OR-DJ

| | Financial Management and System of Internal Controls Questionnaire |
|---|---|
| | Form Submitted On: Tue Apr 03 09:31:32 EDT 2018 |

| # | Question | Provided Response |
|---|---|---|
| 1. | Name of Organization and Address: Organization Name: | Oregon Criminal Justice Commission |
| | Street1: | 885 Summer St NE |
| | Street2: | - |
| | City: | Salem |
| | State: | OREGON |
| | Zip Code: | 97301 |
| 2. | Authorized Representative's Name and Title: Prefix: | - |
| | First Name: | Michael |
| | Middle Name: | - |
| | Last Name: | Schmidt |
| | Suffix: | - |
| | Title: | Executive Director |
| 3. | Phone: | 5033784830 |
| 4. | Fax: | 5033784861 |
| 5. | Email: | michael.schmidt@oregon.gov |
| 6. | Year Established: | 1995 |
| 7. | Employer Identification Number (EIN): | 93902047 |
| 8. | DUNS Number: | 136203424 |
| 9. a) | Is the applicant entity a nonprofit organization (including a nonprofit institution of higher education) as described in 26 of U.S.C. 501(c)(3) and exempt from taxation under 26 U.S.C. 501(a)? | No |
| 9. b) | Does the applicant nonprofit organization maintain offshore accounts for the purpose of avoiding paying the tax described in 26 U.S.C. 511(a)? | - |
| 9. c) | With respect to the most recent year in which the applicant nonprofit organiation was required to file a tax return, does the applicant nonprofit organization believe (or assert) that it satisfies the requirements of 26 C.F.R. 53.4958-6 (which relate to the reasonableness of compensation of certain individuals)? | - |
| 10. | Has the applicant entity undergone any of the following types of audit(s)(Please check all that apply): [OMB A-133 Single Audit] | - |
| | Has the applicant entity undergone any of the following types of audit(s)(Please check all that apply): [Financial Statement Audit] | - |
| | Has the applicant entity undergone any of the following types of | - |

Exhibit 12
Page 22 of 34

| | audit(s)(Please check all that apply): [Defense Contract Agency Audit (DCAA)] | |
|---|---|---|
| | Has the applicant entity undergone any of the following types of audit(s)(Please check all that apply): [Other Audit] | - |
| | Other Audit Agency (list type of audit) | - |
| | Has the applicant entity undergone any of the following types of audit(s)(Please check all that apply): [None] | Yes |
| 11. | Most Recent Audit Report Issued: | - |
| | Name of Audit Agency/Firm: | - |
| 12. | On the most recent audit, what was the auditor's opinion? | - |
| | Enter the number of findings (if none, enter "0"): | - |
| | Enter the dollar amount of questioned costs (if none, enter "$0"): | - |
| | Were material weaknesses noted in the report or opinion? | - |
| 13. | Which of the following best describes the applicant entity's accounting system: | Combination |
| 14. | Does the applicant entity's accounting system have the capability to identify the receipt and expenditure of award funds separately separately for each Federal award? | Yes |
| 15. | Does the applicant entity's accounting system have the capability to record expenditures for each Federal award by the budget cost categories shown in the approved budget? | Yes |
| 16. | Does the applicant entity's accounting system have the capability to record cost sharing ("match") seperately for each Federal award, and maintain documentation to support recorded match or cost share? | Yes |
| 17. | Does the applicant entity's accounting system have the capability to accurately track employee actual time spent performing work for each federal award, and to accurately allocate charges for employee salaries and wages for each federal award, and maintain records to support the actual time spent and specific allocation of charges associated with each applicant employee? | Yes |
| 18. | Does the applicant entity's accounting system include budgetary controls to preclude the applicant entity from incurring obligations or costs that exceed the amount of funds available under a federal award (the total amount of the award, as well as the amount available in each budget cost category)? | Yes |
| 19. | Is applicant entity familiar with the "cost principles" that apply to recent and future federal awards, including the general and specific principles set out in 2 C.F.R. Part 200? | Yes |
| 20. | Does the applicant entity's property management system(s) maintain the following information on property purchased with federal award funds (1) a description of the property; (2) an identification number; (3) the source of funding for the property, including the award number; (4) where holds title; (5) acquisition date; (6) acquisition cost; (7) federal share of the acquisition cost; (8) location and condition of the property; (9) ultimate disposition information? | Yes |
| 21. | Does the applicant entity maintain written policies and procedures for | Yes |

Exhibit 12
Page 23 of 34

| | procurement transaction that - (1) are designed to avoid unnecessary or duplicative purchases; (2) provide for analysis of lease versus purchase alternatives; (3) set out a process for soliciting goods and services, and (4) include standards of conduct that address conflicts of interest? | |
|---|---|---|
| 22. a) | Are the applicant entity's procurement policies and procedures designed to ensure that procurements are conducted in a manner that provides full and open competition to the extent practicable, and to avoid practices that restrict competition? | Yes |
| 22. b) | Does the applicant entity's procurement policies and procedures require documentation of the history of a procurement, including the rationale for the method of procurement, selection of contract type, selection or rejection of contractors, and basis for the contract price? | Yes |
| 23. | Does the applicant entity have written policies and procedures designed to prevent the applicant entity from entering into a procurement contract under a federal award with any entity or individual that is suspended or debarred from such contracts, including provisions for checking the "Excluded Parties List" system (www.sam.gov) for suspended or debarred sub-grantees and contractors, prior to award? | Yes |
| 24. (a) | Does the applicant entity maintain a standard travel policy? | Yes |
| 24. (b) | Does the applicant entity adhere to the Federal Travel Regulation (FTR)? | Yes |
| 25. | Does the applicant entity have written policies, procedures, and/or guidance designed to ensure that any subawards made by the applicant entity under a federal award - (1) clearly document applicable federal requirements, (2) are appropriately monitored by the applicant, and (3) comply with the requirements in 2 CFR Part 200 (see 2 CFR 200.331)? | Yes |
| 26. | Is the applicant entity aware of the differences between subawards under federal awards and procurement contracts under federal awards, including the different roles and responsibilities associated with each? | Yes |
| 27. | Does the applicant entity have written policies and procedures designed to prevent the applicant entity from making a subaward under a federal award to any entity or individual that is suspended or debarred from such subawards? | Yes |
| 28. | Is the applicant entity designated ?high risk? by a federal grant-making agency outside of DOJ? (High risk includes any status under which a federal awarding agency provides additional oversight due to the applicant's past performance, or other programmatic or financial concerns with the applicant.) | No |
| (a) | Name(s) of the federal awarding agency: | - |
| (b) | Date(s) the agency notified the applicant entity of the "high risk" designation: | - |
| (c) | Contact information for the "high risk" point of contact at the federal agency: | - |
| | Phone: | - |

Exhibit 12
Page 24 of 34

|  | Email: | - |
|---|---|---|
| (d) | Reason for "high risk" status, as set out by the federal agency: | - |
| Cert. | Name: | Michael Schmidt |
|  | Date: | 03-22-2018 |
|  | Title: | Executive Director |
|  | Other: | - |
|  | Phone: | 5033784830 |
| Close this window | | |

Exhibit 12
Page 25 of 34

## DISCLOSURE OF LOBBYING ACTIVITIES

Complete this form to disclose lobbying activities pursuant to 31 U.S.C. 1352
(See reverse for public burden disclosure.)

Approved by OMB
0348-0046

| 1. Type of Federal Action: | 2. Status of Federal Action: | 3. Report Type: |
|---|---|---|
| **b** a. contract<br>    b. grant<br>    c. cooperative agreement<br>    d. loan<br>    e. loan guarantee<br>    f. loan insurance | **a** a. bid/offer/application<br>    b. initial award<br>    c. post-award | **a** a. initial filing<br>    b. material change<br>**For Material Change Only:**<br>    year _____ quarter _____<br>    date of last report _____ |

| 4. Name and Address of Reporting Entity: | 5. If Reporting Entity in No. 4 is a Subawardee, Enter Name and Address of Prime: |
|---|---|
| ☑ Prime    ☐ Subawardee<br>            Tier _____, *if known*:<br>Criminal Justice Commission<br>885 Summer St NE<br>Salem, Oregon  97301<br><br>**Congressional District,** *if known*: | <br><br><br><br><br><br>**Congressional District,** *if known*: |

| 6. Federal Department/Agency:<br>U.S. Department of Justice, Bureau of Justice Assistance | 7. Federal Program Name/Description:<br>Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY2018 State Solicitation<br><br>CFDA Number, *if applicable*: 16.738 |
|---|---|

| 8. Federal Action Number, *if known*: | 9. Award Amount, *if known*:<br>$ 2,092,704.00 |
|---|---|

| 10. a. Name and Address of Lobbying Registrant<br>   (*if individual. last name. first name. MI*):<br>N/A | b. Individuals Performing Services (*including address if different from No. 10a*)<br>   (*last name. first name. MI*):<br>N/A |
|---|---|

| 11. | Information requested through this form is authorized by title 31 U.S.C. section 1352. This disclosure of lobbying activities is a material representation of fact upon which reliance was placed by the tier above when this transaction was made or entered into. This disclosure is required pursuant to 31 U.S.C. 1352. This information will be reported to the Congress semi-annually and will be available for public inspection. Any person who fails to file the required disclosure shall be subject to a civil penalty of not less that $10,000 and not more than $100,000 for each such failure. | Signature:  Michael Schmidt<br><br>Print Name:  Michael Schmidt<br><br>Title:  Executive Director<br><br>Telephone No.: (503) 378-4830        Date: 8/20/2018 |
|---|---|---|

| Federal Use Only: | Authorized for Local Reproduction<br>Standard Form LLL (Rev. 7-97) |
|---|---|

Exhibit 12
Page 26 of 34

## INSTRUCTIONS FOR COMPLETION OF SF-LLL, DISCLOSURE OF LOBBYING ACTIVITIES

This disclosure form shall be completed by the reporting entity, whether subawardee or prime Federal recipient, at the initiation or receipt of a covered Federal action, or a material change to a previous filing, pursuant to title 31 U.S.C. section 1352. The filing of a form is required for each payment or agreement to make payment to any lobbying entity for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with a covered Federal action. Complete all items that apply for both the initial filing and material change report. Refer to the implementing guidance published by the Office of Management and Budget for additional information.

1. Identify the type of covered Federal action for which lobbying activity is and/or has been secured to influence the outcome of a covered Federal action.

2. Identify the status of the covered Federal action.

3. Identify the appropriate classification of this report. If this is a followup report caused by a material change to the information previously reported, enter the year and quarter in which the change occurred. Enter the date of the last previously submitted report by this reporting entity for this covered Federal action.

4. Enter the full name, address, city, State and zip code of the reporting entity. Include Congressional District, if known. Check the appropriate classification of the reporting entity that designates if it is, or expects to be, a prime or subaward recipient. Identify the tier of the subawardee, e.g., the first subawardee of the prime is the 1st tier. Subawards include but are not limited to subcontracts, subgrants and contract awards under grants.

5. If the organization filing the report in item 4 checks "Subawardee," then enter the full name, address, city, State and zip code of the prime Federal recipient. Include Congressional District, if known.

6. Enter the name of the Federal agency making the award or loan commitment. Include at least one organizational level below agency name, if known. For example, Department of Transportation, United States Coast Guard.

7. Enter the Federal program name or description for the covered Federal action (item 1). If known, enter the full Catalog of Federal Domestic Assistance (CFDA) number for grants, cooperative agreements, loans, and loan commitments.

8. Enter the most appropriate Federal identifying number available for the Federal action identified in item 1 (e.g., Request for Proposal (RFP) number; Invitation for Bid (IFB) number; grant announcement number; the contract, grant, or loan award number; the application/proposal control number assigned by the Federal agency). Include prefixes, e.g., "RFP-DE-90-001."

9. For a covered Federal action where there has been an award or loan commitment by the Federal agency, enter the Federal amount of the award/loan commitment for the prime entity identified in item 4 or 5.

10. (a) Enter the full name, address, city, State and zip code of the lobbying registrant under the Lobbying Disclosure Act of 1995 engaged by the reporting entity identified in item 4 to influence the covered Federal action.

    (b) Enter the full names of the individual(s) performing services, and include full address if different from 10 (a). Enter Last Name, First Name, and Middle initial (MI).

11. The certifying official shall sign and date the form, print his/her name, title, and telephone number.

According to the Paperwork Reduction Act, as amended, no persons are required to respond to a collection of information unless it displays a valid OMB Control Number. The valid OMB control number for this information collection is OMB No. 0348-0046. Public reporting burden for this collection of information is estimated to average 10 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Management and Budget, Paperwork Reduction Project (0348-0046), Washington, DC 20503.

Exhibit 12
Page 27 of 34

U.S. DEPARTMENT OF JUSTICE
OFFICE OF JUSTICE PROGRAMS

**Edward Byrne Justice Assistance Grant Program FY 2018 State Solicitation**

**Certifications and Assurances
by the Chief Executive of the Applicant Government**

On behalf of the applicant "State" named below, in support of that State's application for an award under the FY 2018 Edward Byrne Justice Assistance Grant ("JAG") Program, and further to 34 U.S.C. § 10153(a), I certify to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1. I am the chief executive of the applicant State named below, and I have the authority to make the following representations on my own behalf as chief executive and on behalf of the applicant State. I understand that these representations will be relied upon as material in any OJP decision to make an award, under the application described above, to the applicant State.

2. I certify that no federal funds made available by the award (if any) that OJP makes based on the application described above will be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities.

3. I assure that the application described above (and any amendment to that application) was submitted for review to the governing body of the State (e.g., the State legislature), or to an organization designated by that governing body, not less than 30 days before the date of this certification.

4. I assure that, before the date of this certification— (a) the application described above (and any amendment to that application) was made public; and (b) an opportunity to comment on that application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure made such an opportunity available.

5. I assure that, for each fiscal year of the award (if any) that OJP makes based on the application described above, the applicant State will maintain and report such data, records, and information (programmatic and financial), as OJP may reasonably require.

6. I have carefully reviewed 34 U.S.C. § 10153(a)(5), and, with respect to the programs to be funded by the award (if any), I hereby make the certification required by section 10153(a)(5), as to each of the items specified therein..

7. I have examined the certification entitled "State or Local Government: FY 2018 Certification of Compliance with 8 U.S.C. §§ 1373 & 1644" executed by the chief legal officer of the applicant government with respect to the FY 2018 JAG program and submitted in support of the application described above, and I certify that I have no reason to believe that certification to be false or otherwise incorrect.

8. I have examined the certification entitled "State or Local Government: FY 2018 Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a), 1357(a), & 1366(1) & (3)" executed by the chief legal officer of the applicant government with respect to the FY 2018 JAG program and submitted in support of the application described above, and I certify that I have no reason to believe that certification to be false or otherwise incorrect.

---

Signature of Chief Executive of the Applicant "State"          Date of Certification

---

Printed Name of Chief Executive          Title of Chief Executive

---

Name of Applicant State

**Rev. August 16, 2018**

Exhibit 12
Page 28 of 34

## U.S. DEPARTMENT OF JUSTICE
## OFFICE OF JUSTICE PROGRAMS

**State or Local Government:  FY 2018 Certification of Compliance with 8 U.S.C. §§ 1373 & 1644**

On behalf of the applicant government entity named below, and in support of its application, I certify to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

(1)  I am the chief legal officer of the State or local government of which the applicant entity named below is a part ("the jurisdiction"), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP).  I understand that OJP will rely upon this certification as a material representation in any decision to make an award to the applicant entity.

(2)  I have carefully reviewed 8 U.S.C. §§ 1373(a) & (b), and 1644, including the prohibitions on certain actions by State and local government entities, -agencies, and -officials regarding information regarding citizenship and immigration status. I also have reviewed the provisions set out at (or referenced in) 8 U.S.C. § 1551 note ("Abolition ... and Transfer of Functions"), pursuant to which references to the "Immigration and Naturalization Service" in 8 U.S.C. §§ 1373 & 1644 are to be read, as a legal matter, as references to particular components of the U.S. Department of Homeland Security.

(3)  I (and also the applicant entity) understand that the U.S. Department of Justice will require States and local governments (and agencies or other entities thereof) to comply with 8 U.S.C. §§ 1373 & 1644, with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2018 OJP program under which this certification is being submitted (the "FY 2018 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2018 OJP Program.

(4)  I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (cf. 34 U.S.C. § 10251(a)(2)). Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (i.e., one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or -agency.

(5)  I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning the following (which, for the specific purpose of paragraph 5, shall not be understood to include any "program or activity" of any subrecipient at any tier):—

    (a)  the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program; and

    (b)  any prohibitions or restrictions potentially applicable to the "program or activity" sought to be funded under the FY 2018 OJP Program that deal with sending to, requesting or receiving from, maintaining, or exchanging information of the types described in 8 U.S.C. §§ 1373(a) & (b), and 1644, whether imposed by a State or local government entity, -agency, or -official.

(6)  As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any prohibition or any restriction that would apply to the "program or activity" to be funded in whole or in part under the FY 2018 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that deals with either— (1) a government entity or -official sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. §§ 1373(a) & 1644; or (2) a government entity or -agency sending to, requesting or receiving from, maintaining, or exchanging information of the types (and with respect to the entities) described in 8 U.S.C. § 1373(b).

 

_____    _____
Signature of Chief Legal Officer of the Jurisdiction    Printed Name of Chief Legal Officer

_____    _____
Date of Certification    Title of Chief Legal Officer of the Jurisdiction

_____
Name of Applicant Government Entity (i.e., the applicant to the FY 2018 OJP Program identified below)

*FY 2018 OJP Program:*  **Byrne Justice Assistance Grant (JAG) Program: State**

Rev. August 16, 2018

Exhibit 12
Page 29 of 34

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

**State or Local Government:  FY 2018 Certification Relating to
8 U.S.C. §§ 1226(a) & (c), 1231(a), 1324(a), 1357(a), & 1366(1) & (3)**

On behalf of the applicant government entity named below, and in support of its application, I certify to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1. I am the chief legal officer of the State or local government of which the applicant entity named below is a part ("the jurisdiction"), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP). I understand that OJP will rely upon this certification as a material representation in any decision to make an award to the applicant entity.

2. I have carefully reviewed each of the following sections of title 8, United States Code:

   a. § 1226(a) & (c) (authorizing arrest and detention of certain aliens and providing that the federal government "shall take into custody" certain criminal aliens "when the alien is released");

   b. § 1231(a) (providing that a 90-day "removal period" during which the federal government "shall" detain and then "shall" remove an alien incarcerated by a State or local government, or by the federal government, from the United States generally "begins" no later than "the date the alien is released from detention or confinement; and providing that the federal government may not "remove an alien [including "an alien in the custody of a State (or a political subdivision of a State)"] who is sentenced to imprisonment until the alien is released from imprisonment");

   c. § 1324(a) (forbidding any "person," in "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," to "conceal[], harbor[], or shield[] from detection, or attempt[] to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation" or to "engage in any conspiracy to commit any of the preceding acts ... or aid[] or abet[] the commission of any of the preceding acts");

   d. § 1357(a) (authorizing immigration officers, "anywhere in or outside the United States" (see 8 C.F.R. § 287.5(a)), to "interrogate any alien or person believed to be an alien as to his right to be or remain in the United States"); and

   e. § 1366(1) & (3) (requiring the Attorney General annually to submit to Congress "a report detailing ... (1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense; [and] (3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal").

3. I (and also the applicant entity) understand that USDOJ will require States and local governments (including State and local government entities, -agencies, and -officials), with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2018 OJP program under which this certification is being submitted (the "FY 2018 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2018 OJP Program, not to violate, or to aid or abet any violation of, 8 U.S.C. § 1324(a), and not to impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a) or relating to 8 U.S.C. § 1366(1) & (3) or 8 U.S.C. § 1226(a) & (c).

4. I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (cf. 34 U.S.C. § 10251(a)(2)). Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (i.e., one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or -agency.

5. I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning the following (which, for the specific purpose of paragraph 5, shall not be understood to include any "program or activity" of any subrecipient at any tier):

   a. the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program; and

   b. any laws, rules, policies, or practices potentially applicable to the "program or activity" sought to be funded under the FY 2018 OJP Program that implicate any of the requirements relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a), 1324(a), 1357(a), & 1366(1) & (3) that are described in paragraph 2 of this certification, whether imposed by a State or local government entity, -agency, or -official.

6. As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any law, rule, policy, or practice that would apply to the "program or activity" to be funded in whole or in part under the FY 2018 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that would or does—(1) violate, or aid or abet any violation of, 8 U.S.C. § 1324(a); (2) impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a); or (3) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1226(a) or (c), 8 U.S.C. § 1231(a), or 8 U.S.C. § 1366(1) or (3).

_____          _____
Signature of Chief Legal Officer of the Jurisdiction          Printed Name of Chief Legal Officer

_____          _____
Date of Certification          Title of Chief Legal Officer of the Jurisdiction

_____
Name of Applicant Government Entity (i.e., the applicant to the FY 2018 OJP Program identified below)

*FY 2018 OJP Program:*  **Byrne Justice Assistance Grant (JAG) Program: State**

Rev. August 16, 2018

Exhibit 12
Page 30 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Additional Attachments: Disclosure of Pending Applications
Application Attachment 8

---

Applicant name:        State of Oregon Criminal Justice Commission

The Applicant does not have pending applications (nor is listed as a subrecipient on pending applications) submitted within the last 12-months for federally funded grants or cooperative agreements that request funding to support the same project being proposed in this application to the Office of Justice Programs (OJP) and that would cover any identical cost items outlined in the budget submitted as part of this application.

Exhibit 12
Page 31 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Additional Attachments:  Applicant Research and Evaluation Integrity
Application Attachment 9

Applicant name:        State of Oregon Criminal Justice Commission

The Oregon Criminal Justice Commission (CJC) and Oregon Statistical Analysis Center (SAC)
reasonably believe that no potential personal or organizational conflicts of interest exist.  CJC
and SAC have established reputations locally and nationwide for conducting objective research.
The CJC Commission provides an additional oversight body to approve research design, scope,
contracts, and final evaluations and reports.  The commission is comprised of geographically
diverse criminal justice practitioners appointed by the Governor, as well as one state senator and
state representative.  This provides an impartial forum to address actual or apparent conflicts of
interest in addition to other research bias that may cast doubt on the validity of a project.

Currently, CJC is running two randomized controlled trials (RCT) and two quasi-experimental
studies.  During Oregon's 2018 Legislative Session, CJC has been tasked with additional
statewide studies including the distribution and effect public funds used for alcohol and drug
treatment and racial profiling by law enforcement in traffic stops.

Exhibit 12
Page 32 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Additional Attachments: Applicant Information Regarding Communication with DHS and/or
ICE
Application Attachment 10

Applicant name:        State of Oregon Criminal Justice Commission

1.  *Does your jurisdiction have any laws, policies, or practices related to whether, when, or how your employees may communicate with DHS or ICE?*

ORS 180.805 imposes some limits on sharing information for the purposes of federal immigration enforcement. In addition, although ORS 181A.820 does not actually address communication with ICE, Alan Hanson of USDOJ asked about that statute in November of 2017.

2.  *Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meets the description in question 1?*

   • *If yes to either:*

      o  *Please provide a copy of each law or policy;*

Copies of ORS 180.805 and ORS 181A.820 are enclosed.

      o  *Please describe each practice; and*

      o  *Please explain how the law, policy, or practice complies with section 1373.*

ORS 180.805 was specifically drafted to comply with federal law. The statute does not prohibit or in any way restrict any individual from sharing information about citizenship or immigration status – which is the scope of information governed by 8 USC sec. 1373. The restrictions that are included in ORS 180.805 apply only to other types of information that are not mentioned by 8 USC sec. 1373. The statute also *allows* public officials to decline to provide citizenship or immigration status information. But it in no way requires that. Because 8 USC sec. 1373 does

Exhibit 12
Page 33 of 34

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance
Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State Solicitation;
State of Oregon Criminal Justice Commission
Additional Attachments:  Applicant Information Regarding Communication with DHS and/or
ICE
Application Attachment 10

not actually require disclosure – it merely forbids prohibiting or restricting disclosures – this provision is also consistent with 8 USC sec. 1373.

ORS 181A.820 has Oregon law since 1987. To our knowledge it has never been deemed inconsistent with 8 USC sec. 1373. It states that Oregon law enforcement agency cannot use resources "for the purpose of detecting or apprehending persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws." In other words, it prevents state criminal justice resources from being used on matters that are purely federal immigration. But none of its provisions purport to prohibit or restrict individual officers from sharing citizenship or immigration status with DHS/ICE.

Exhibit 12
Page 34 of 34

**Fiscal Year (FY) 2017 State Edward Byrne Memorial Justice Assistance Grant (JAG) Allocations**

| State/Territory | Final Fiscal Year (FY) 2017 Allocation* |
|---|---|
| Alabama | $3,231,682 |
| Alaska | $806,598 |
| American Samoa | $378,451 |
| Arizona | $3,519,618 |
| Arkansas | $2,071,265 |
| California | $17,701,281 |
| Colorado | $2,727,564 |
| Connecticut | $1,711,049 |
| Delaware | $859,011 |
| District of Columbia | $1,444,081 |
| Florida | $10,711,104 |
| Georgia | $5,163,636 |
| Guam | $633,781 |
| Hawaii | $840,284 |
| Idaho | $1,052,504 |
| Illinois | $6,511,233 |
| Indiana | $3,354,545 |
| Iowa | $1,842,828 |
| Kansas | $1,920,766 |
| Kentucky | $2,074,995 |
| Louisiana | $3,158,335 |
| Maine | $930,974 |
| Maryland | $3,377,828 |
| Massachusetts | $3,453,006 |
| Michigan | $5,588,676 |
| Minnesota | $2,631,245 |
| Mississippi | $1,818,783 |
| Missouri | $4,055,745 |
| Montana | $937,196 |
| Nebraska | $1,167,043 |
| Nevada | $2,134,288 |
| New Hampshire | $1,022,619 |
| New Jersey | $4,047,274 |
| New Mexico | $1,620,065 |
| New York | $8,879,161 |
| North Carolina | $4,825,588 |
| North Dakota | $467,690 |
| No. Mariana Islands | $209,054 |
| Ohio | $5,561,821 |
| Oklahoma | $2,412,962 |
| Oregon | $2,034,945 |
| Pennsylvania | $6,643,201 |
| Puerto Rico | $2,268,919 |
| Rhode Island | $767,114 |
| South Carolina | $3,252,622 |
| South Dakota | $881,685 |
| Tennessee | $4,790,791 |
| Texas | $13,133,950 |
| Utah | $1,526,866 |
| Vermont | $476,496 |
| Virgin Islands | $633,781 |
| Virginia | $3,353,534 |
| Washington | $3,277,891 |
| West Virginia | $1,201,229 |
| Wisconsin | $2,797,292 |
| Wyoming | $547,137 |
| **Totals:** | **$174,443,083** |

Exhibit 13
Page 1 of 2

**Fiscal Year (FY) 2017 State Edward Byrne Memorial Justice Assistance Grant (JAG) Allocations**

| State/Territory | Final Fiscal Year (FY) 2017 Allocation* |
|---|---|
| *The Allocations listed may include either a reduction for FY 2017 Sex Offender Registration and Notification Act (SORNA) non-compliance or a SORNA bonus allocation for FY 2016 SORNA compliance as well as a reduction for FY 2017 Prison Rape Elimination Act (PREA) non-compmliance and/or a PREA bonus allocation for FY 2017 PREA compliance.* *Please refer to the SORNA web page (http://www.ojp.gov/smart/sorna.htm), JAG Frequently Asked Questions (https://www.bja.gov/Funding/JAGFAQ.pdf) and/or PREA FAQs (https://www.bja.gov/Programs/JAG-PREA-FAQ.pdf) for more information.* | |

Exhibit 13

Page 2 of 2

**Fiscal Year (FY) 2018 State Edward Byrne Memorial Justice Assistance Grant (JAG) Allocations**

| State/Territory | Final Fiscal Year (FY) 2018 Allocation* |
|---|---|
| Alabama | $3,400,421 |
| Alaska | $815,182 |
| American Samoa | $383,260 |
| Arizona | $3,607,168 |
| Arkansas | $2,127,260 |
| California | $18,056,180 |
| Colorado | $2,796,761 |
| Connecticut | $1,639,401 |
| Delaware | $864,967 |
| District of Columbia | $1,444,126 |
| Florida | $10,709,491 |
| Georgia | $5,547,889 |
| Guam | $642,192 |
| Hawaii | $846,920 |
| Idaho | $1,069,834 |
| Illinois | $6,575,575 |
| Indiana | $3,407,724 |
| Iowa | $1,827,803 |
| Kansas | $1,926,777 |
| Kentucky | $2,007,262 |
| Louisiana | $3,187,811 |
| Maine | $929,808 |
| Maryland | $3,404,927 |
| Massachusetts | $3,445,701 |
| Michigan | $5,641,464 |
| Minnesota | $2,795,809 |
| Mississippi | $1,820,514 |
| Missouri | $4,154,107 |
| Montana | $924,597 |
| Nebraska | $1,188,367 |
| Nevada | $2,228,738 |
| New Hampshire | $1,021,404 |
| New Jersey | $4,007,716 |
| New Mexico | $1,638,940 |
| New York | $8,818,775 |
| North Carolina | $4,922,903 |
| North Dakota | $473,633 |
| No. Mariana Islands | $211,828 |
| Ohio | $5,646,257 |
| Oklahoma | $2,528,614 |
| Oregon | $2,092,704 |
| Pennsylvania | $6,443,262 |
| Puerto Rico | $2,207,085 |
| Rhode Island | $778,980 |
| South Carolina | $3,238,477 |
| South Dakota | $885,216 |
| Tennessee | $4,787,157 |
| Texas | $13,448,181 |
| Utah | $1,554,587 |
| Vermont | $482,496 |
| Virgin Islands | $642,192 |
| Virginia | $3,576,759 |
| Washington | $3,334,947 |
| West Virginia | $1,226,097 |
| Wisconsin | $2,831,938 |
| Wyoming | $545,080 |
| Total: | $176,763,266 |

*The Allocations listed may include either a reduction for FY 2018 Sex Offender Registration and Notification Act (SORNA) non-compliance or a SORNA bonus allocation for FY 2017 SORNA compliance as well as a reduction for FY 2018 Prison Rape Elimination Act (PREA) non-compmliance and/or a PREA bonus allocation for FY 2018 PREA compliance.

*Please refer to the SORNA web page (http://www.ojp.gov/smart/sorna.htm), JAG Frequently Asked Questions (https://www.bja.gov/Funding/JAGFAQ.pdf) and/or PREA FAQs (https://www.bja.gov/Programs/JAG-PREA-FAQ.pdf) for more information.

Exhibit 14
Page 1 of 1