DANIEL D. MAULER
Trial Attorney
U.S. Department of Justice
Civil Division – Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone:  (202) 616-0773
Facsimile:  (202) 616-8470
E-mail: dan.mauler@usdoj.gov

COUNSEL FOR DEFENDANTS

DONALD J. TRUMP, President of the
United States; WILLIAM P. BARR, Attorney
General of the United States; UNITED
STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **THE STATE OF OREGON**, *et al.,* | |
| *Plaintiffs*, | Civil Action No. 6:18-cv-01959-MC |
| v. | |
| **DONALD J. TRUMP**, President of the United States,, *et al.,* | |
| *Defendants.* | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 1

I.    The Challenged Conditions are Modest and Encourage Reasonable
      Cooperation Between Law Enforcement Agencies.......................................... 1

II.   The Challenged Byrne JAG Conditions are Valid............................................ 3

      A.    The Plaintiffs fail to explain what "placing special conditions" and
            "determining priority purposes" mean in Section 10102(a)(6). ................... 4

      B.    The Sections 1373/1644 Certification Condition is statutorily authorized.............. 6

      C.    Sections 1373 and 1644 are constitutional under *Murphy v. NCAA.* ........................ 7

      D.    The Challenged Conditions are in Accordance with the Spending Clause. ............. 11

            1.    The Challenged Conditions are related to the purposes of
                  the Byrne JAG Program..................................................................... 12

            2.    The Challenged Conditions are clear and unambiguous................................ 14

      E.    The Information-Reporting and Public-Disclosure Conditions in the
            Fiscal Year 2018 Byrne JAG Program are Valid. ............................................ 16

            1.    Plaintiffs fail to challenge either of these FY 18 conditions in
                  Counts I, II, or III of the Amended Complaint............................................ 16

            2.    The Information-Reporting and Public-Disclosure Condition
                  are Statutorily-Authorized.................................................................. 17

III.  Any Injunction Should Be Limited to the Plaintiffs. ..................................... 19

      A.    The Plaintiffs fail to show that they need relief that reaches other parties. ............. 19

      B.    A Nation-wide or Program-wide Injunction is Inappropriate. .............................. 20

CONCLUSION....................................................................................................... 21

## TABLE OF AUTHORITIES

### Cases

*Adams v. Dole,*
  927 F.2d 771 (4th Cir. 1991) .......................................................................... 5

*Alliance for Open Society Intern., Inc. v. U.S. Agency for Intern. Development,*
  651 F.3d 218 (2d Cir. 2011) ......................................................................... 12

*American Sur. Co. of N.Y. v. Marotta,*
  287 U.S. 513 (1933) ....................................................................................... 5

*Arizona v. United States,*
  567 U.S. 387 (2012) ....................................................................................... 8

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
  548 U.S. 291 (2006) ..................................................................................... 14

*Barbour v. Wash. Metro. Area Transit Auth.,*
  374 F.3d 1161 (D.C. Cir. 2004) ................................................................... 12

*Benning v. Georgia,*
  391 F.3d 1299 (11th Cir. 2004) .................................................................... 15

*Bogues v. United States,*
  703 F. Supp. 2d 318 (S.D.N.Y. 2010) .......................................................... 18

*California ex rel. Becerra v. Sessions,*
  284 F. Supp. 3d 1015 (N.D. Cal. 2018) ......................................................... 9

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ....................................................................... 20

*California v. Barr,*
  No. 3:18-cv-05169-WHO (N.D. Cal.) ......................................................... 20

*Charles v. Verhagen,*
  348 F.3d 601 (7th Cir. 2003) ....................................................................... 15

*City & Cty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ..................................................................... 20

*City of Chicago v. Sessions,*
  No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) ............................ 20

*City of Providence v. Barr,*
  No. CA-18-437-JJM-LDA (D.R.I.) .............................................................. 20

*Duvall v. Att'y Gen. of the U.S.*,
  436 F.3d 382 (3d Cir. 2006) .................................................................................... 13

*Eringer v. Principality of Monaco*,
  No. CV 10-1803 GAF (EX), 2011 WL 13134271 (C.D. Cal. Aug. 23, 2011) ............................. 18

*Freilich v. Bd. of Dirs. of Upper Chesapeake Health, Inc.*,
  142 F. Supp. 2d 679 (D. Md. 2001) .......................................................................... 10

*Freilich v. Upper Chesapeake Health, Inc.*,
  313 F.3d 205 (4th Cir. 2002) .................................................................................. 10

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ........................................................................................... 20

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ................................................................................................. 9

*Koslow v. Pennsylvania*,
  302 F.3d 161 (3d Cir. 2002) .................................................................................... 12

*Los Angeles v. Barr*,
  No. 2:18-cv-07347-R-JC (C.D. Cal.) ........................................................................ 20

*Madison v. Virginia*,
  474 F.3d 118 (4th Cir. 2006) .................................................................................. 14

*Mayweathers v. Newland*,
  314 F.3d 1062 (9th Cir. 2002) ................................................................................ 12

*Murphy v. National Collegiate Athletic Association*,
  138 S. Ct. 1461 (2018) ........................................................................................ 7, 8

*Nat'l Fed'n of Indep. Bus. v. Sebelius ("NFIB")*,
  567 U.S. 519 (2012) ............................................................................................. 8, 9

*New York v. United States*,
  505 U.S. 144 (1992) ............................................................................................... 12

*Oregon v. Trump*,
  No. 6:18-cv-01959-MC (D. Or.) ............................................................................. 20

*Padilla v. Kentucky*,
  559 U.S. 356 (2010) ............................................................................................... 13

*Printz v. United States*,
  521 U.S. 898 (1997) ............................................................................................... 10

*Reno v. Condon,*
    528 U.S. 141 (2000) ................................................................................................. 9, 10

*San Francisco v. Barr,*
    No. 3:18-cv-05146-WHO (N.D. Cal.) ........................................................................ 20

*South Dakota v. Dole,*
    483 U.S. 203 (1987) .......................................................................................... 7, 8, 14

*Town of Chester v. Laroe Estates, Inc.,*
    137 S. Ct. 1645 (2017) ............................................................................................... 20

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ............................................................................................... 20

*Virginia Soc'y for Human Life, Inc. v. FEC,*
    263 F.3d 379 (4th Cir. 2001) ..................................................................................... 20

*Williams v. Taylor,*
    529 U.S. 362 (2000) ..................................................................................................... 4

## Statutes

8 U.S.C. § 1226 ............................................................................................................... 13

8 U.S.C. § 1227 ........................................................................................................ 11, 13

8 U.S.C. § 1228 ............................................................................................................... 11

8 U.S.C. § 1231 ............................................................................................................... 13

8 U.S.C. § 1357 ............................................................................................................... 11

8 U.S.C. § 1373 ........................................................................................................ 6, 15

18 U.S.C. § 1913 ............................................................................................................. 16

26 U.S.C. § 5853 ............................................................................................................. 19

28 U.S.C. § 510 ................................................................................................................. 4

31 U.S.C. § 1352 ............................................................................................................. 16

34 U.S.C. § 10102 ................................................................................................... 12, 17

34 U.S.C. § 10152 ..................................................................................................... 3, 12

34 U.S.C. § 10153 ..................................................................................................... 1, 13

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF MOTION TO DISMISS

34 U.S.C. § 10154 ........................................................................................ 18

34 U.S.C. § 10156 ........................................................................................ 19

34 U.S.C. § 10202 .......................................................................................... 6

34 U.S.C. § 10251 .......................................................................................... 2

34 U.S.C. § 1231 .......................................................................................... 13

41 U.S.C. § 4712 .......................................................................................... 16

Pub. L. No. 89-554 (1966) ............................................................................. 4

**Regulations**

27 C.F.R. § 479.90 ....................................................................................... 19

**Other Authorities**

Merriam-Webster's Collegiate Dictionary (10th ed. 1998) ............................ 18

S. Rep. No. 104-249 (1996) ........................................................................... 11

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF MOTION TO DISMISS

# INTRODUCTION

In Plaintiffs' Combined Motion for Summary Judgment and Response to Defendants' Motion to Dismiss (ECF No. 21) ("Pls.' Memo."), the State of Oregon and City of Portland continue to claim entitlement to federal law-enforcement grants while simultaneously ignoring the statutorily-authorized conditions that accompany those grants, thus frustrating the operations of federal law enforcement. Specifically, Plaintiffs continue to argue that they can unilaterally refuse to share information with the federal government about criminal aliens in their custody, while at the same time, the federal government must ignore Plaintiffs' behavior in its funding decisions. Plaintiffs' desire to have it both ways should be rejected by this Court, as those claims fail both as a constitutional and statutory matter. Defendants therefore oppose Plaintiffs' Motion for Summary judgment, for the reasons set forth in Defendants' Memorandum of Law in Support of their Motion to Dismiss (ECF No. 14) ("Defs.' Memo."), and for the reasons set forth below.

# ARGUMENT

## I.    The Challenged Conditions are Modest and Encourage Reasonable Cooperation Between Law Enforcement Agencies.

In their recent brief, Plaintiffs paint the challenged conditions as over-reaching federal intrusion into local law enforcement. Plaintiffs' portrait ignores that the Byrne JAG program is a *voluntary* grant program. It is *not* mandatory. No one forces applicants to apply for Byrne JAG grants. If Plaintiffs are unhappy with the conditions attached to federal law enforcement grants, they are free to forgo the money.[1]

---

[1] It does not follow that if an applicant foregoes Byrne JAG funding, then important programs will cease to operate. This is so because Byrne JAG funds can only supplement existing programs that states are already funding. *See* 34 U.S.C. § 10153(a)(1) (requiring "certification that Federal funds made available under this part will not be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of Federal funds, be made available for law enforcement activities"). Thus, the Plaintiffs' programs can be no worse off than they were without the funds.

In fact, the challenged conditions are extraordinarily modest requirements that fall well within the Department's statutory authority. The notice condition requires that the grantee have a policy of notifying DHS of the scheduled release date of an alien in criminal custody, after receiving a formal request for notification from DHS. The access condition requires that the grantee have a policy of allowing federal agents to meet with incarcerated aliens inside prisons in order to inquire about the aliens' rights to remain in the United States just as that courtesy is typically extended to other law enforcement agencies wishing to visit prisoners.  The Sections 1373/1644 certification conditions require the grantees to certify that they do not have policies that block voluntary communication with federal immigration enforcement agencies.

Upon accepting these conditions, applicants simply agree that their actions will not impair the federal government's law-enforcement activities against suspected or convicted criminal aliens. The structure of the Immigration and Nationality Act ("INA") contemplates that States and localities may prosecute and incarcerate for criminal offenses aliens who may be removable and, indeed, aliens as to whom a removal order has already issued, but that federal custody of such aliens will only commence upon their release from state or local custody. It is crucial to this cooperative law-enforcement framework that States and localities respond to requests for release-date information and permit federal agents to engage in voluntary interviews before releasing aliens from custody; the grant conditions are simply a modest effort to further that purpose, using authority lawfully delegated by Congress.

As discussed above and in Defendants' opening brief, the grant conditions at issue in this case seek to advance the federal government's legitimate interest in the orderly enforcement of the nation's immigration laws, with respect to individuals who have themselves been either prosecuted, charged, or otherwise detained under state criminal law.  The federal government, it goes without saying, routinely enforces any number of law enforcement purposes and priorities through a variety

of means apart from direct criminal prosecution, including civil proceedings and administrative actions, and, indeed, the payment of grant funds.  Nowhere, either as a matter of logic or law, is there a requirement that a federal law enforcement interest can only be furthered where the activity in question is guaranteed to end in federal criminal prosecution. Moreover, the term "criminal justice" is defined broadly under the Byrne JAG statute.  *See* 34 U.S.C. § 10251(a)(1).  There, Congress defined it to mean *more* than simply prosecuting individuals for violations of criminal law.  Rather, it includes "activities pertaining to crime prevention, control, or reduction" in addition to the mere "enforcement of the criminal law."  *Id.*  Here, the challenged conditions focus on identifying criminal aliens.  Once removed, a criminal alien has no opportunity to re-offend, which controls, prevents, and reduces crime.  Thus, the challenged conditions fall squarely within this definition of "criminal justice."

Indeed, the propriety of the challenged conditions is underscored by the provisions in the Byrne JAG statute that authorize the Attorney General to reasonably require "programmatic" information about the funded program, 34 U.S.C. § 10153(A)(4), and to demand "appropriate coordination" with "affected" agencies, *id.* § 10153(A)(5)(C).  Notice of an alien's release from local custody constitutes reasonable information about the law-enforcement and corrections programs funded by the grants. *See id.* § 10152(a)(1). And access to an alien in local custody constitutes appropriate coordination with federal immigration authorities affected by those programs' custody over the alien.

## II.    The Challenged Byrne JAG Conditions are Valid.

In support of their motion to dismiss, the Defendants explained why the access and notice conditions are authorized by statute and do not violate the separation of powers.  *See* Defs.' Memo., at 23-28.  Similarly, the Defendants previously explained why Sections 1373 and 1644 are consistent with the Tenth Amendment.  *See id.* at 17-23.  Those arguments are equally sufficient to defeat

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF MOTION TO DISMISS

Plaintiffs' summary judgment motion on those same conditions.  Below, Defendants address any

remaining arguments that were raised in Plaintiffs' summary judgment motion.

   **A.  The Plaintiffs fail to explain what "placing special conditions" and
        "determining priority purposes" mean in Section 10102(a)(6).**

The AAG imposed the challenged conditions under his authority to, among other things,

"exercise such other powers and functions as may be vested in [the AAG] pursuant to [Chapter 101 of

Title 34] or by delegation of the Attorney General, including *placing special conditions* on all grants, and

*determining priority purposes* for formula grants." 34 U.S.C. § 10102(a)(6) (emphasis added).  As discussed

in the Defendants' opening brief, Congress added the language regarding special conditions and

priority purposes in the same statute that created the current version of the Byrne JAG program in

2006.  *See* Defs.' Memo., at 9-10.  Plaintiffs, however, seek to read this new authority out of the statute,

urging that the provision grants only those powers that "may be vested . . . by statute or by the

Attorney' General's delegation of a power that he holds." Pls.' Memo., at 35 (internal quotation marks

omitted).

Congress' 2006 amendment must mean *something,* however, and Plaintiffs' reading would

render the amendment meaningless.  The canon against surplusage is a "cardinal principle of statutory

construction that we must give effect, if possible, to every clause and word of a statute."  *Williams v.

Taylor*, 529 U.S. 362, 404 (2000) (internal quotation marks omitted).  The best that Plaintiffs can do is

to argue that this language merely permits the AAG to exercise powers delegated by the Attorney

General.  But the Attorney General *already* is statutorily-authorized to delegate his authority to other

officers within the Department of Justice:  "The Attorney General may from time to time make such

provisions as he considers appropriate authorizing the performance by any other officer, employee, or

agency of the Department of Justice of any function of the Attorney General."  28 U.S.C. § 510.

Moreover, Section 510 *preexisted* the 2006 amendments to the Byrne JAG statute by forty years.  *See*

Pub. L. No. 89-554, § 4(c), 80 Stat. 612 (1966).  Thus, under Plaintiffs' reading, the 2006 Byrne JAG

amendments do nothing other than what the decades-old language of Section 510 already permits.

Plaintiffs' interpretation thus renders Congress' express addition of the "including" clause superfluous in two ways. First, Congress would not have needed to clarify that the AAG could impose "special conditions" and determine "priority purposes" for grants if other provisions of Chapter 101 specifically vested that authority in the AAG or if the Attorney General had delegated that authority to the AAG. Second, the authority to impose "special conditions" and determine "priority purposes" does not exist elsewhere in Chapter 101, Title 34, or Title 28 (which, among other things, specifies the functions of the Attorney General). Thus, under Plaintiffs' logic, the only thing Congress theoretically could have been trying to accomplish when it amended § 10102(a)(6) was to specify that *if* it *later* enacted statutes authorizing the Attorney General or AAG to impose "special conditions" and determine "priority purposes," it would be permissible for the AAG to exercise that authority.

But, of course, that hypothetical-authority interpretation is completely implausible. Instead, as the legislative history makes clear, the "including" clause "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. 109-233, at 101 (2005). While Plaintiffs would like to artificially cabin the reach of the "including" clause, their interpretation is at odds with both the legislative history and the long-acknowledged grammatical fact that the term "including" can instead mean "and" or "in addition to." *See, e.g., Adams v. Dole*, 927 F.2d 771, 775-77 (4th Cir. 1991); *see also American Sur. Co. of N.Y. v. Marotta*, 287 U.S. 513, 517 (1933) ("'include' is frequently, if not generally, used as a word of extension or enlargement").

Moreover, Plaintiffs' approach fails to recognize that this authority has been used ever since 2006 to place a variety of conditions on grants, without any indication of congressional concern, and calls into question Defendants' authority to impose *any* special conditions on the Byrne JAG grants,

not just conditions that Plaintiffs happen to dislike or seek to challenge at this time.  For example, under Plaintiffs' reading, prior special conditions such as information-technology requirements, (*see* Defendants' Request for Judicial Notice (ECF No. 15) ("Defs.' RJN"), Exhibit D, at ¶¶ 29-30 (Byrne JAG FY 17 Award to City of Portland); protections for human-research subjects (*id.* at ¶ 31); restrictions on the purchase of certain military-style equipment (*id.* at ¶¶ 45-50); requirements regarding body-armor purchases (*id.* at ¶ 41); and training requirements (*id.* at ¶ 34), would all be similarly impermissible, although Plaintiffs fail to meaningfully address this consequence of their reading of the statute.  None of these special conditions has ever been questioned by Congress or challenged as ultra vires by a grant recipient, including the Plaintiffs.  Similarly, although certain conditions relating to body armor were codified in 2016, *see* 34 U.S.C. § 10202(c)(1)(B), (C), that occurred *only after* the AAG imposed them as special conditions in 2012.  And the AAG has imposed an "American-made" requirement for body-armor purchases, which Congress has not chosen to codify.  Defs.' RJN, Ex. D, at ¶ 41 (Byrne JAG FY 17 Award to City of Portland). Plaintiffs cannot account for the AAG's past adoption of these special conditions, none of which caused any concern.  Indeed, Plaintiffs provide no explanation or limiting principle to explain the congressional acquiescence, or justify why the remaining conditions are valid under their preferred reading of the statute, while those challenged in this lawsuit are not.

### B.  The Sections 1373/1644 Certification Condition is statutorily authorized.

As discussed in Defendants' opening brief, Byrne JAG applications must include "[a] certification, made in a form acceptable to the Attorney General" that "the applicant will comply with all provisions of [the Byrne JAG Program] and all other applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D).  In accordance with the prior Administration's determination that 8 U.S.C. § 1373 is an "applicable Federal law[]" for purposes of the statutorily required certification, beginning in FY 2017, OJP has required that grant applicants explicitly certify compliance with § 1373 as part of their

Byrne JAG applications. The § 1373 certification condition is consistent with the statutory text. In the context of the Byrne JAG statute, the phrase "applicable Federal laws" covers laws that apply to Byrne JAG applicants and are constitutionally applied as grant conditions. Section 1373 indisputably applies to Plaintiffs—subsection (a) applies to any "State" or "local government entity or official," and subsection (b) applies to any "person or agency."

### C.  Sections 1373 and 1644 are constitutional under *Murphy v. NCAA.*

Plaintiffs argue that the Supreme Court's recent decision in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), effectively renders Section 1373 unconstitutional. *See* Pls.' Memo., at 22-29. These arguments fail.

As a threshold—but dispositive—matter, both the Tenth Amendment generally, and the *Murphy* decision specifically, are wholly inapposite here, where Plaintiffs are challenging conditions on a *voluntary federal grant*. It is well-established that "a perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *South Dakota v. Dole*, 483 U.S. 203, 210 (1987). Indeed, the statute addressed in *Murphy*—the Professional and Amateur Sports Protection Act of 1992 ("PASPA")—has nothing to do with the sharing of information for immigration enforcement purposes. Rather, it required states to themselves regulate sports betting in the manner Congress wished. *See Murphy*, 138 S. Ct. at 1478. As the Supreme Court noted, PASPA could not be "understood as a regulation of private actors," but instead prohibited state authorization of sports gambling. *Id.* at 1481. Section 1373, by contrast, is just one small piece of a broader immigration regulatory scheme under the INA, which makes it distinguishable from PASPA. In other words, gambling regulation falls within the traditional police powers of a state, which is a far cry from immigration enforcement—a plenary power of Congress.

Instead, the only pertinent constitutional question presented is whether the grant conditions

are a valid exercise of the Spending Clause power.[2]  In that context, the federal government "may offer funds to the States, and may condition those offers on compliance with specified conditions. These offers may well induce the States to adopt policies that the Federal Government itself could not impose."  *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 537 (2012) (citation omitted).  Because a state may "adopt the simple expedient of not yielding to what she urges is federal coercion," *Dole*, 483 U.S. at 210, by declining to participate in the Byrne JAG Program, the Spending Clause—not the Tenth Amendment—provides the proper rubric for analyzing Plaintiffs' claims.  Simply put, Plaintiffs' commandeering theory has no purchase here.

Two specific examples from *Murphy* illustrate this well.  First, the *Murphy* Court discussed the Airline Deregulation Act of 1978 as an example of permissible federal preemption of state statutes. *See Murphy*, 138 S. Ct. at 1480.  That Act lifted prior federal regulations of airlines, but Congress wanted to ensure that the States would not undue federal deregulation with regulation of their own. *See id.*  Therefore, the Act provided that "'no State or political subdivision thereof . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any [covered] air carrier.'"  *Id.* (*quoting* 49 U.S.C. App. § 1305(a)(1) (1988)).  The Supreme Court then explained why this statute did not impermissibly regulate the States:

> This language might appear to operate directly on the States, but it is a mistake to be confused by the way in which a preemption provision is phrased.  As we recently explained, we do not require Congress to employ a particular linguistic formulation when preempting state law.  And if we look beyond the phrasing employed in the Airline Deregulation Act's preemption provision, it is clear that this provision operates just like any other federal law with preemptive effect.  It confers on private entities (*i.e.,* covered carriers) a federal right to engage in certain conduct subject only to certain (federal) constraints.

---

[2] Defendants demonstrate that the challenged immigration conditions do not violate the Spending Clause below, at Argument § II(E).

*Murphy*, 138 S. Ct. at 1480 (internal citation and quotation marks omitted).  In a second example, the

*Murphy* Court cited favorably to *Arizona v. United States*, 567 U.S. 387 (2012), for "how this works":

> Noting that federal statutes "provide a full set of standards governing alien registration," we concluded that these laws "reflect[ ] a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." What this means is that the federal registration provisions not only impose federal registration obligations on aliens but also confer a federal right to be free from any other registration requirements.

*See Murphy*, 138 S. Ct. at 1481 (*quoting Airzona*, 567 U.S. at 401) (internal citation omitted).

The Supreme Court's reasoning in *Murphy* is analogous to the Section 1373 context.

Congress has plenary power to regulate immigration.  In the exercise of this power, Section 1373

confers upon entities or individuals a federal right to engage in certain conduct (the voluntary

transmission of information to federal immigration authorities) subject only to certain federal

constraints.  *See* 8 U.S.C. § 1373(a).  Just like the Airline Deregulation Act, it would be a mistake to

view Section 1373 as operating directly on the States.

To the extent, however, that the Plaintiffs could proceed with an attack on Section 1373 as

an independent statutory mandate, that attack fails on its own merits.  As an initial point, "[t]he

Government of the United States has broad, undoubted power over the subject of immigration and

the status of aliens." *Arizona*, 567 U.S. at 394 (citation omitted).  "As long as it is acting within the

powers granted it under the Constitution, Congress may impose its will on the States" and "may

legislate in areas traditionally regulated by the States." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

And courts "begin with the time-honored presumption that [a statute] is a constitutional exercise of

legislative power." *Reno v. Condon*, 528 U.S. 141, 148 (2000) (citation omitted).

Moreover, protecting the transmission of information to federal authorities does not

"compel the State[] to enact or administer a federal regulatory program" or to "act on the Federal

Government's behalf." *NFIB*, 567 U.S. at 575, 620; *cf. California ex rel. Becerra v. Sessions*, 284 F. Supp.

3d 1015, 1035 (N.D. Cal. 2018) (noting that "[n]o cited authority holds that the scope of state

sovereignty includes the power to forbid state or local employees from voluntarily complying with a federal program"). The Supreme Court has explained elsewhere that its precedents on "commandeering" do not apply in the same way when access to information is at issue—a principle that *Murphy* does not in any way undermine. Simply put, the Constitution does not prohibit federal enactments that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[] the States as the owners of data bases." *Reno*, 528 U.S. at 151; *see also, e.g., Printz v. United States*, 521 U.S. 898, 918 (1997) (recognizing that statutes "which require only the provision of information to the Federal Government[] do not involve . . . the forced participation of the States' executive in the actual administration of a federal program."); *id.* at 936 (noting that the commandeering principle is not properly understood as reaching "purely ministerial reporting requirements," such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice.") (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)); *see also, e.g., Freilich v. Bd. of Dirs. of Upper Chesapeake Health, Inc.*, 142 F. Supp. 2d 679, 697 (D. Md. 2001) ("This Court has found no case" holding that a statutory command to report information for a federal data bank "commandeers the state."), *aff'd sub nom. Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir. 2002).

The distinction drawn by this line of cases reflects the sound principle that an information-access requirement like Section 1373 does not "regulate the States' sovereign authority to regulate their own citizens," *Murphy*, 138 S. Ct. at 1479 (citation omitted), but rather ensures federal access to information regarding regulated individuals that is needed *for the federal government to regulate* those individuals.[3] As explained above, the INA provides that a federal immigration officer "shall have

---

[3] In this respect, *Murphy* did not call into question any aspect of *Arizona*—and indeed, cited the decision favorably with respect to the settled understanding that the federal government's broad immigration authority permits Congress to "foreclose any state regulation in the area," 138 S. Ct. at

power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). The INA also provides that certain classes of aliens, including certain criminal aliens, shall be removed from the United States upon the order of the Attorney General or the Secretary of Homeland Security, *see*, *e.g.*, *id.* at §§ 1227(a), 1228. Simply put, federal officials cannot carry out these fundamental statutory duties without knowing where those persons are located. Indeed, the legislative history of Section 1373 indicates that the statute was intended to counteract passive resistance to sharing information. *See*, *e.g.*, S. Rep. No. 104-249, at 19-20 (1996) (noting that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, *the Federal regulation of* immigration and the achieving of the purposes and objectives of the [INA]") (emphasis added). Thus, because Section 1373 merely secures information needed to carry out the federal removal scheme—in which the federal government takes full responsibility for regulation of and enforcement against individuals—it does not present any legitimate concern regarding a deflection of political responsibility. On the other hand, Section 1373 *does* ensure that the federal government can carry out its statutory responsibilities to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" and to remove the alien "upon the order of the Attorney General" after completion of criminal sentences. 8 U.S.C. §§ 1227(a), 1228, 1357(a)(1). Thus, both the purpose and the effect of Section 1373 and the challenged grant conditions are to ensure that the federal government has the information it needs to "regulate individuals, not States." *Murphy*, 138 S. Ct. at 1476 (citation omitted).

### D. The Challenged Conditions are in Accordance with the Spending Clause.

Plaintiffs argue that the challenged conditions in the Byrne JAG Program violate the

---

1481 (quoting *Arizona*, 567 U.S. at 401). *Murphy* thus supports defendants' argument that States may not employ conflicting practices that interfere with the federal immigration scheme.

Spending Clause.  *See* Pls.' Memo., at 38-39.  *See also* Am. Compl., at ¶¶ 95-104.  This contention is wrong, and Defendants are entitled to dismissal of these claims.

> **1. The Challenged Conditions are related to the purposes of the Byrne JAG Program.**

First, any "relatedness" inquiry required by the Spending Clause does not pose a difficult hurdle.  To the contrary, this "low-threshold" inquiry "is a far cry from . . . an exacting standard for relatedness." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002).  "Congess's power under the Spending Clause is broad," and it is "well settled that Congress is entitled to further policy goals indirectly through its spending power that it might not be able to achieve by direct regulation." *Alliance for Open Society Intern., Inc. v. U.S. Agency for Intern. Development*, 651 F.3d 218, 230 (2d Cir. 2011). Thus, in *Dole*, the Supreme Court upheld conditioning the receipt of federal highway funds on the loosely-related requirement that a State adopt a minimum drinking age.  *See* 483 U.S. at 208-09; *see also New York v. United States*, 505 U.S. 144, 167 (1992) (stating that only "some relationship" is necessary between spending conditions and "the purpose of the federal spending."); *Koslow v. Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002) (explaining that there need only be a "discernible relationship" between a condition imposed pursuant to the Spending Clause and the "federal interest in a program it funds"). As the D.C. Circuit has observed, the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds." *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

The grant conditions at issue here easily satisfy this "low-threshold" relatedness inquiry. *Mayweathers*, 314 F.3d at 1067.  The Byrne JAG Program's organic statute specifies that program funds are designed to provide resources "for criminal justice," to support programs including law enforcement, prosecution, crime prevention, and corrections.  34 U.S.C. § 10152(a)(1).  These goals are also reflected in the responsibilities of the AAG, which involve "disseminat[ing] information" and "*maintain[ing] liaison with* . . .  State governments in matters relating to criminal justice."  34 U.S.C. §

10102(a)(1), (2) (emphasis added).  The conditions also comport with the Byrne JAG purposes of ensuring that grantees undertake "appropriate coordination with affected agencies," *id.* § 10153(A)(5)(C), and "report such data . . . and information (programmatic and financial) as the Attorney General may reasonably require," *id.* § 10153(A)(4).

Further, as noted above, immigration enforcement, which the conditions promote, undoubtedly intersects with the Byrne JAG Program's criminal justice purposes, including the removal of previously-convicted offenders.   *See* 8 U.S.C. § 1227(a)(2); *supra* at 25.  Indeed, "[a] primary goal of several recent overhauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes."  *Duvall v. Att'y Gen. of the U.S.*, 436 F.3d 382, 391 (3d Cir. 2006); *see Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (observing that "deportation or removal . . . is now virtually inevitable for a vast number of noncitizens convicted of crimes") (citation omitted). Once removed, a criminal alien who has committed a removable offense—for example, an aggravated felony, domestic violence, child abuse, or certain firearm offenses—is no longer present in this country with the potential to re-offend.

As explained above, the INA repeatedly contemplates cooperation among state and local officers and federal officials on immigration enforcement, particularly with respect to criminal aliens.  Furthermore, given that the INA contemplates the federal detention of certain aliens upon their release from state or local custody, *see* 8 U.S.C. § 1226(c), the conditions can be understood as seeking to ensure that a state or local grantee's law enforcement activities do not impair the law enforcement activities of the federal government with respect to the same population—namely, aliens who have committed crimes.  Congress has mandated that aliens who have committed certain criminal offenses be taken into federal custody pending removal proceedings "when the alien is released" from state custody.  *Id.* § 1226(c)(1).  With respect to incarcerated aliens subject to a final removal order, the INA establishes a "removal period" of 90 days that begins with the date of the

alien's release.  8 U.S.C. § 1231(a)(1)(A), (B).  It is important to this cooperative law enforcement framework that states and localities respond to requests for release date information, give federal agents access to detainees in their custody, and avoid restricting communication of information regarding immigration status to DHS.

### 2.  The Challenged Conditions are clear and unambiguous.

Another limitation on the spending power is that when the federal government "desires to condition the States' receipt of federal funds, it must do so unambiguously . . . , enable[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted).  The challenged conditions satisfy this requirement.

It is well-established that the Spending Clause authority is "broad," and empowers Congress to "set the terms on which it disburses federal money to the States[.]" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *see also, e.g., Dole*, 483 U.S. at 206 (noting that Congress has "repeatedly employed the [spending] power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.") (citations omitted). While it is beyond cavil that the Spending Clause confers "broad" authority, that authority is nonetheless subject to certain discrete limitations, including that any terms attached to the receipt of federal funds must be "unambiguous[]," and thus enable the potential recipient to "exercise [its] choice" to participate (or not) in the program "knowingly, cognizant of the consequences of [its] participation." *Dole*, 483 U.S. at 203 (citations omitted); *see also, e.g., Madison v. Virginia*, 474 F.3d 118, 124 (4th Cir. 2006) (the Spending Clause is a "'permissible method of encouraging a State to conform to federal policy choices,' because 'the ultimate decision' of whether to conform is retained by the States – wh[ich] can always decline the federal grant.") (quoting *New York*, 505 U.S. at 168)).  The conditions easily satisfy the clear-notice requirement.

These conditions clearly state what conduct is required, so that grantees can "exercise their

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF MOTION TO DISMISS

choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207

(citation omitted).  They require grantees (1) to give "agents of the United States acting under color

of federal law" access to correctional facilities "to meet with individuals who are (or are believed by

such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United

States," (2) to notify DHS, upon "formal written request" and "as early as practicable," before "the

scheduled release date and time for a particular alien in such facility," and (3) "[o]ngoing compliance

8 U.S.C. 1373."  Defs.' RJN, Ex. D, ¶ 53 (FY 17 Grant Award to City of Portland).  The award

documents also specify that nothing in these conditions requires a grantee to detain "any individual

in custody beyond the date and time the individual would have been released in the absence of this

condition;" that the conditions impose no requirements regarding any requests by federal

immigration authorities to detain aliens; and that the notice condition requires only as much advance

notice as "practicable."  *Id.* at ¶ 55(1)(B), (4)(B).  Moreover, to the extent any uncertainty might

remain, the FY 2017 Byrne JAG award letter invited any prospective grantee with a question about

any requirement of the solicitation to contact OJP's Response Center (customer service center) by

telephone or email.  *See* Defs.' RJN, Ex. D, at 1.  A prospective grantee could also contact the

appropriate "Grant Manager"—that is, a specific, named OJP employee assigned to work with

jurisdictions within a specified geographical area.  *Id.*; BJA Programs Office Contact Information,

*available at* https://www.bja.gov/About/Contacts/ ProgramsOffice.html (last visited May 12,

2019).[4]

     Further, any arguable marginal uncertainty regarding the outer boundaries of the grant

conditions would not render these conditions unconstitutionally ambiguous.  Indeed, "the exact

nature of [grant] conditions may be largely indeterminate, provided that the existence of the

---

[4] The BJA is the component of OJP that administers the Byrne JAG Program.

conditions is clear, such that States have notice that compliance with the conditions is required."

*Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted); *see, e.g.*, *Benning v. Georgia*, 391

F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its intent to attach federal

conditions to Spending Clause legislation, it need not specifically identify and proscribe in advance

every conceivable state action that would be improper.") (citation omitted).  Moreover, Plaintiffs do

not complain about the clarity of any other Byrne JAG conditions, such as those requiring

compliance with restrictions on lobbying under 18 U.S.C. § 1913 and 31 U.S.C. § 1352, *see* Defs.'

RJN, Ex. D, ¶ 19, compliance with "federal appropriations statutes" generally, *id.* at ¶ 20; reporting

of evidence of violations of the False Claims Act, *id.* at ¶ 21; and compliance with prohibitions on

reprisal under 41 U.S.C. § 4712, *id.* at ¶ 23.  The problem in this case is not that DOJ has failed to

provide Plaintiffs with notice of the modest immigration conditions attached to Byrne JAG grants,

thus allowing Plaintiffs to knowingly refuse them.  Instead it is that, having received clear notice,

Plaintiffs seek to take the money while blithely ignoring the conditions on which it is offered.

Neither the Spending Clause nor its interpreting law, however, give Plaintiffs this option to have it

both ways.

      **E.  The Information-Reporting and Public-Disclosure Conditions in the Fiscal
          Year 2018 Byrne JAG Program are Valid.**

          **1.  Plaintiffs fail to challenge either of these FY 18 conditions in Counts I, II,
               or III of the Amended Complaint.**

      In their Amended Complaint, the Plaintiffs make passing references to two new conditions

found in the Fiscal Year 2018 Byrne JAG program.  *See* Am. Compl., ¶¶ 77, 79.  The first condition

asks grantees to provide information on whether they are subject to laws that impact their

employees' communication with federal immigration enforcement agents (*see id.* at ¶ 77, and

hereinafter referred to as the "Information-Reporting condition"), while the second prohibits a

grantee from disclosing law enforcement sensitive information in an effort to frustrate federal

immigration enforcement actions.  *See id.* at ¶ 79 (an referred hereinafter as the "Public-Disclosure" condition).  Plaintiffs then make passing references to these sections in their Memorandum, but otherwise, do not elaborate substantive arguments against these conditions.  *See* Pls.' Memo., at 13-14.

The Plaintiffs fail to challenge these two conditions in Counts I, II, or III of their Amended Complaint.  Count I focuses only upon Sections 1373 and 1644, arguing that they violate the Tenth Amendment.  *See* Am. Compl., ¶¶ 85-94.  Count II attacks only the Access and Notice conditions as supposedly a violation of the Spending Clause.  *See id.* at ¶¶ 95-104.  Count III seeks mandamus relief.  *See id.* at ¶¶ 105-108.  None of the three counts otherwise discuss or incorporate the Information-Reporting or Public-Disclosure conditions.  And the Plaintiffs make only a passing reference to both conditions in their summary judgment motion but do not engage them substantively.  *See* Pls.' Memo., at 13-14.  Therefore, the Plaintiffs have not sufficiently challenged these two conditions.  As such, the Court's analysis on these two conditions must stop here.

### 2. The Information-Reporting and Public-Disclosure Condition are Statutorily-Authorized.

If, however, the Court does choose to reach the merits of the Information-Reporting and Public-Disclosure conditions, both are valid and justified for multiple reasons.  They are valid under the Spending Clause for the same reasons described above.  And they are also justified as "special conditions" put in place to achieve the Department's "priority purposes," as permitted by Section 10102(a)(6), and as also described above.

But these two conditions are also justified by additional statutory authority:  Congress authorized the Assistant Attorney General for OJP to "maintain liaison with . . . State governments in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2).  The authority to "maintain liaison" is alone sufficient for the public-disclosure condition.  Operational security – the confidentiality of law enforcement operations – is essential to law enforcement operations.  Law enforcement officials

at different levels of government must be able to share information, without a concern that a public official at another level might publicize it.

A liaison is defined as "a close bond or connection" or "a person who establishes and maintains communication for mutual understanding and cooperation." *See Liaison*, Merriam-Webster's Collegiate Dictionary (10th ed. 1998). Thus, the AAG is responsible for maintaining "a close bond or connection" between federal and state criminal justice authorities who elect to receive grant funds and for facilitating "mutual understanding and cooperation" among such authorities who participate in grant programs. This clearly encompasses, at minimum, protecting the confidentiality of federal law enforcement information provided to state and local agencies. *Cf. Eringer v. Principality of Monaco*, No. CV 10-1803 GAF (EX), 2011 WL 13134271, at *5 (C.D. Cal. Aug. 23, 2011) (stating that plaintiff's contract for "maintaining liaison" between the Principality and foreign intelligence agencies entailed "regularly shar[ing] sensitive intelligence information"), *aff'd*, 533 F. App'x 703 (9th Cir. 2013). The challenged conditions enable federal, state, and local law enforcement officials to work together effectively and safely – that is, to "maintain liaison."

The information-reporting condition is also justified by the express statutory requirement to submit a Byrne JAG application "in such form as the Attorney General may require," 34 U.S.C. § 10153(a). This confirms OJP's authority to require applicants to include certain information about any laws or policies regarding communication with federal immigration authorities. And the authority to dictate the "form" of an application necessarily encompasses the authority to "disapprove any application," 34 U.S.C. § 10154, that fails to comply with the required form. That authority necessarily encompasses requiring that certain information be included in an application rather than only setting forth its "structure." *Cf. Bogues v. United States*, 703 F. Supp. 2d 318, 329 (S.D.N.Y. 2010) (authority to dictate "form" and "manner" of application encompasses authority to determine when a new application must be submitted to continue the status granted pursuant to

earlier application).  After all, the purpose of an application form is to collect information to determine whether to grant or deny the application; therefore, determining the "form" of an application necessarily includes deciding what information to seek.  Indeed, many federal regulations enacted pursuant to an agency's authority to determine the "form" of an application set forth the information required in the application.  *See, e.g.*, 26 U.S.C. § 5853(c) (authorizing Secretary of the Treasury to determine "form and manner" of application to exempt certain firearms transfers from tax); 27 C.F.R. § 479.90 (setting forth content of application for tax-exempt firearms transfer and procedure for claiming exemption).

## III.    Any Injunction Should Be Limited to the Plaintiffs.

Finally, the Plaintiffs' seek a permanent injunction against use of the challenged conditions in the Byrne JAG Program overall, without regard to the identity of the applicant or grantee.  *See* Pls.' Memo., at 41-43.  Plaintiffs lack standing to seek such an injunction on behalf of parties not properly before this Court.

### A.  The Plaintiffs fail to show that they need relief that reaches other parties.

Before Plaintiffs can be awarded relief that reaches parties not before the Court, they must show that they need such relief to be made whole.  Plaintiffs fail to make this showing.

The Byrne JAG grant program is structured as *formula* grant program.  *See* 34 U.S.C. § 10156(a), (d).  As such, the amount of Plaintiffs' grants are not affected by what other grant recipients receive.  Despite this, the Plaintiffs make a brief throw-away argument (set forth in a single paragraph) that suggests that a "nationwide injunction is necessary to affording complete relief to Plaintiffs, who seek to compete for Byrne JAG funding on a level playing field with all other applications."  Pls.' Memo., at 43.  The Plaintiffs fail to offer any more elaboration than this. Because of the formula nature of the Byrne JAG program, the Plaintiffs are mistaken that their grant amounts will be affected by other grants.  Therefore, assuming that the Plaintiffs are even entitled to

injunctive relief, no injunction reaching beyond the current Plaintiffs is necessary to make them whole.

### B. A Nation-wide or Program-wide Injunction is Inappropriate.

As the Supreme Court has observed many times, a plaintiff "must establish standing separately for each form of relief sought," *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017), and a "plaintiff's remedy must be limited to the inadequacy that produced [its] injury in fact," *Gill v. Whitford,* 138 S. Ct. 1916 (2018); *see City of Chicago v. Sessions*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) (vacating nationwide aspect of injunction); *accord California v. Azar*, 911 F.3d 558, 582-84 (9th Cir. 2018) (reversing nationwide preliminary injunction as abuse of discretion); *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1243-45 (9th Cir. 2018) (vacating and remanding nationwide injunction).  Moreover, as an equitable matter, nationwide injunctions "take a toll on the federal court system – preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."  *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) (noting tendency of nationwide injunctions to "thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue").  Indeed, many of the issues presented herein regarding the FY 2017 and FY 2018 Byrne JAG Program are, in fact, pending in multiple other cases throughout the country, *e.g, Los Angeles v. Barr*, No. 2:18-cv-07347-R-JC (C.D. Cal.); *City of Providence v. Barr*, No. CA-18-437-JJM-LDA (D.R.I.); *San Francisco v. Barr*, No. 3:18-cv-05146-WHO (N.D. Cal.); *California v. Barr*, No. 3:18-cv-05169-WHO (N.D. Cal.), and a program-wide injunction by this Court would risk conflicting with any orders entered by other district courts.

## **CONCLUSION**

For the reasons set forth above, the Court should deny Plaintiffs' motion for summary

judgment and grant the Defendants' motion to dismiss the Amended Complaint.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BILLY J. WILLIAMS
United States Attorney

JOHN TYLER
Assistant Director

*/s/ Daniel D. Mauler*
DANIEL D. MAULER
Virginia State Bar No. 73190
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20001
Tel: (202) 514-8095
Fax: (202) 616-8470
E-mail: dan.mauler@usdoj.gov
*Counsel for Defendants*