**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CITY OF LOS ANGELES,
                        *Plaintiff-Appellee*,

v.

WILLIAM P. BARR, Attorney
General; ALAN R. HANSON, in
his official capacity as Acting
Assistant Attorney General of
the Office of Justice Programs;
RUSSELL WASHINGTON, in his
official capacity as Acting
Director of the Office of
Community Oriented Policing
Services; UNITED STATES
DEPARTMENT OF JUSTICE,
                        *Defendants-Appellants*.

No. 18-55599

D.C. No.
2:17-cv-07215-R-JC

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted August 30, 2018
Pasadena, California

Filed July 12, 2019

Before:  Kim McLane Wardlaw, Jay S. Bybee,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Dissent by Judge Wardlaw

---

# SUMMARY[*]

## Federal Spending / Immigration

The panel reversed the district court's summary judgment in favor of the City of Los Angeles in an action challenging the U.S. Department of Justice ("DOJ")'s use of certain factors in determining scores for applicants to a competitive grant program – the Community Oriented Policing Services (COPS) grant program – that allocates a limited pool of funds to state and local applicants under the Public Safety Partnership and Community Policing Act (the "Act"), enacted as part of the Violent Crime Control and Law Enforcement Act.

DOJ gave additional points to an applicant that chose to focus on the illegal immigration area (instead of other focus areas), and gave additional points to an applicant who agreed to the Certification of Illegal Immigration Cooperation – in which the applicant agreed to ensure Department of Homeland Security personnel had access to the applicant's detention facilities to meet with an alien, and to provide notice to DHS regarding scheduled release of an alien in

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

custody.  Los Angeles submitted an application under the Act but was not awarded any funding; it chose "building trust and respect" as its focus area and declined to submit the Certification.

As initial matters, the panel held that the appeal was not moot because although there was no longer a live controversy regarding the 2017 grant program, the situation was capable of repetition yet evading review.  The panel also held that Los Angeles had Article III standing to bring the appeal.  The panel concluded that Los Angeles's slight competitive disadvantage due to its policy of not assisting the federal government on immigration-related issues was sufficient to give Los Angeles standing in this action.

The panel rejected Los Angeles's argument that DOJ's practice of giving additional consideration to applicants that choose to further the two specified federal goals violated the Constitution's Spending Clause.  Because DOJ's scoring factors encouraged, but did not coerce, an applicant to cooperate on immigration matters, the panel also rejected Los Angeles's claims that DOJ's use of the factors infringed on state autonomy in a manner that raised Tenth Amendment concerns.

The panel held that DOJ did not exceed its statutory authority in awarding bonus points to applicants that selected the illegal immigration focus area or that agreed to the Certification.  Specifically, the panel first held that DOJ's understanding that illegal immigration presents a public safety issue has been acknowledged by the Supreme Court.  Second, DOJ's determination that the techniques of community policing may be used to address this public safety issue was entirely reasonable.  Finally, because Congress did not directly address the precise question at

issue, the panel must defer to DOJ's interpretation as long as it is reasonable.

The panel held that DOJ did not act arbitrarily and capriciously under the Administrative Procedure Act when it decided to give points for adopting the illegal immigration focus and submitting the Certification.

Judge Wardlaw dissented from the majority's holding that DOJ's diversion of COPS grant funding from community policing to civil immigration enforcement was lawful. Judge Wardlaw would hold that DOJ exceeded its delegated powers to administer the COPS grant program, and she would, therefore, affirm the district court's order permanently enjoining DOJ from including the illegal immigration focus area and Cooperation Certification on its COPS grant applications and from using these considerations as preferences in awarding COPS grants.

## COUNSEL

Jesse Panuccio (argued), Brad Hinshelwood, Katherine Twomey Allen, Daniel Tenny, and Mark B. Stern, Appellate Staff; Nicola T. Hanna, United States Attorney; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

David M. Zionts (argued), Benjamin L. Cavataro, and Ivano M. Ventresca, Covington & Burling LLP, Washington, D.C.; Neema T. Sahni, Mónica Ramirez Almadani, and Mitchell A. Kamin, Covington & Burling LLP, Los Angeles, California; Michael Dundas, Deputy City Attorney; Valerie L. Flores, Managing Senior Assistant City Attorney; Leela A. Kapur, Executive Assistant City Attorney; James P.

Clark, Chief Deputy City Attorney; and Michael N. Feuer, City Attorney; Office of the City Attorney, Los Angeles, California; for Plaintiff-Appellee.

Matthew J. Piers, Caryn C. Lederer, and Chirag G. Badlani, Hughes Socol Piers Resnick & Dym Ltd., Chicago, Illinois; Daniel B. Rice, Joshua A. Geltzer, and Mary B. McCord, Institute for Constitutional Advocacy and Protection, Georgetown University Law Center, Washington, D.C.; for Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders.

## OPINION

IKUTA, Circuit Judge:

In 1994, Congress enacted the Violent Crime Control and Law Enforcement Act (VCCLEA), Pub. L. No. 103-322, 108 Stat. 1796, to provide a range of federal assistance to state and local law enforcement. The Public Safety Partnership and Community Policing Act of 1994, Pub. L. No. 103-322, 108 Stat. 1807 (the Act), which was enacted as part of the VCCLEA, authorizes the Department of Justice (DOJ) to administer a competitive grant program that allocates a limited pool of funds to state and local applicants whose applications are approved by the Attorney General.

In 2017, Los Angeles applied for a grant, but failed to score highly enough to earn one. It challenges the use of two of the many factors DOJ uses in determining the scores for each applicant. Because DOJ's use of these two factors in evaluating applicants for a competitive grant program did not violate the Spending Clause of the U.S. Constitution, art. I, § 8, cl. 1, did not exceed DOJ's statutory authority, and did

not violate the Administrative Procedure Act, we reverse the district court's grant of summary judgment in favor of Los Angeles.

## I

The Act's grant program, codified at 34 U.S.C. §§ 10381 to 10389, gives broad discretion to DOJ to allocate grants and administer the grant program for the purposes set forth in § 10381(b). Section 10381(b) authorizes twenty-three different purposes, each generally linked to the goal of enhancing the crime prevention function of state and local law enforcement through working with the community. DOJ is authorized to "promulgate regulations and guidelines to carry out" the grant program, 34 U.S.C. § 10388, and may prescribe the required form and content of grant applications through regulations or guidelines, *id.* § 10382(b). By statute, the application must contain eleven broad categories of information, including an assessment of the impact of the proposed initiative on other aspects of the criminal justice system. *See id.* § 10382(c). Each application must also "identify related governmental and community initiatives which complement or will be coordinated with the proposal" and "explain how the grant will be utilized to reorient the affected law enforcement agency's mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing." *Id.* § 10382(c)(4), (10).

The statute permits DOJ to give "preferential consideration, where feasible," on specified grounds, including whether the application proposes hiring and rehiring additional career law enforcement officers, where a non-Federal contribution will cover more than the required

25 percent of the program cost. *Id.* § 10381(c)(1).[1] The statute was amended in 2015 to allow DOJ to give preferential treatment to a state that has enacted certain laws designed to combat human trafficking. *See id.* § 10381(c)(2), (3); Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, §§ 601, 1002, 129 Stat. 227, 259–60, 266–67.

Congress has regularly made appropriations for grants administered under this statute. DOJ has determined that Congress intended these appropriations to be used for two of the twenty-three purposes set forth in § 10381, namely "to rehire law enforcement officers who have been laid off as a result of State, tribal, or local budget reductions for deployment in community-oriented policing," 34 U.S.C. § 10381(b)(1), and "to hire and train new, additional career law enforcement officers for deployment in community-oriented policing across the Nation," *id.* § 10381(b)(2).[2]

---

[1] The Act includes other technical requirements for awarding grants. For instance, each state that applies or that contains an applying entity must receive, together with any grantees in the state, at least .5 percent of a fiscal year's total allocation for the grant program. 34 U.S.C. § 10381(f). Second, allocated funds must be divided equally between small (fewer than 150,000 people) and large (more than 150,000 people) jurisdictions. *Id.* § 10261(a)(11)(B). Third, a grant cannot account for more than 75 percent of a recipient program's costs, although the Attorney General can waive this requirement. *Id.* § 10381(g).

[2] Contrary to the dissent, Dissent at 33 n.1, 43, Congress has set aside funds that could be expended for any of § 10381's purposes. Appropriations bills have directed funds "for community policing development activities in furtherance of [§ 10381's purposes]" and "for the collaborative reform model of technical assistance in furtherance of [§ 10381's purposes]," Consolidated Appropriations Act, Pub. L. 115-31, Div. B, Tit. II, 131 Stat. 135, 207 (2017), as well as for the hiring and rehiring of additional career law enforcement officers.

DOJ has exercised its broad discretion under the Act by developing a combined guidelines and application form for parties that wish to apply for a grant to hire or rehire officers for community-oriented policing. *See* COPS Office Application Attachment to SF-424 (referred to hereafter as "Application Guidelines"). The Application Guidelines define "community policing" as "a philosophy that promotes organizational strategies that support the systematic use of partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime." Community policing strategies may include "ongoing collaborative relationships" with local and federal agencies, as well as "systematically tailor[ing] responses to crime and disorder problems to address their underlying conditions."

The Application Guidelines set out a series of questions and instructions that allow an applicant to explain why it is seeking a grant and why it is best qualified to receive one. Among other things, an applicant must explain its need for federal assistance, provide information about its fiscal health, agree to comply with various provisions of federal law, and provide additional information and assurances of various kinds. An applicant must also specify its law enforcement and community policing strategy, including a "crime and disorder problem/focus area." The Application Guidelines direct the applicant to choose one of eight focus areas: "illegal immigrations," "child and youth safety focus," "drug abuse education, prevention and intervention," "homeland security problems," "nonviolent crime problems and quality of life policing," "building trust and respect," "traffic/pedestrian safety problems," and "violent crimes problems." The Application Guidelines provide examples of the type of problems included in each focus area. For the

homeland security focus area, for instance, the Application Guidelines state, "Please specify your critical infrastructure problem; for example, addressing threats against facilities, developing and testing incident response plans, etc." For the illegal immigration focus area, the Application Guidelines state, "Please specify your focus on partnering with the federal law enforcement to address illegal immigration for information sharing, [§] 287(g) partnerships,[3] task forces and honoring detainers."[4]

DOJ evaluates, scores, and ranks the submitted applications, then awards grant funds to the highest scoring applicants.[5] The scoring process is designed to allocate

---

[3] A § 287(g) partnership is a written agreement between the Attorney General and a state or a local jurisdiction, under which "an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1).

[4] An "immigration detainer" is issued by the Department of Homeland Security (DHS) to advise another law enforcement agency that DHS seeks custody of an alien for arrest and removal, and serves as "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). Upon DHS's request, a law enforcement agency "shall maintain custody of the alien for a period not to exceed 48 hours," excluding weekends and holidays, "in order to permit assumption of custody by" DHS. *Id.* § 287.7(d).

[5] According to DOJ, it "does not disclose the number of points assigned to any particular answer, because disclosing the scoring system could skew the application process and subject that process to manipulation."

federal assistance to programs, focuses, or conduct that DOJ deems to best further statutory purposes and federal goals. Consistent with the statutory criteria, DOJ gives points to applicants that best demonstrate "a specific public safety need" and show an "inability to address the need without Federal assistance," 34 U.S.C. §§ 10382(c)(2), (c)(3), and to applicants that best "explain how the grant will be utilized to reorient the affected law enforcement agency's mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing," *id.* § 10382(c)(10). DOJ also gives points to applicants in jurisdictions with higher crime rates and comparatively lower fiscal health. Additionally, DOJ scores applicants on how their proposals relate to that year's federal goals. In various years, DOJ has awarded points for applicants that gave work to military veterans, that adopted specified management practices (such as making regular assessments of employee satisfaction, exercising flexibility in officer shift assignments, and operating an early intervention system to identify officers with specified personal risks), or that experienced certain catastrophic events, such as a terror attack or school shooting. In 2017, DOJ gave additional points to applicants that focused on the federal priority areas of violent crime, homeland security, and control of illegal immigration. Also in 2017, an applicant could elect to receive additional points by submitting a "Certification of Illegal Immigration Cooperation" (the "Certification") in which the applicant agrees that (1) the applicant will implement rules, regulations, or practices that ensure DHS personnel have access to the entity's correctional or detention facilities in order to meet with an alien, and (2) the applicant will implement rules, regulations, policies, or practices to ensure that the entity's correctional or detention facilities provide notice "as early as practicable (at least 48 hours, where

possible) to DHS regarding the scheduled release" of an alien in custody.

As usual, in the 2017 grant cycle, DOJ received more requests for funding than it was able to grant. Congress allocated roughly $98.5 million for grants, but applicants requested almost $410 million. From a total applicant pool of 90 large jurisdictions and 1,029 small jurisdictions, DOJ awarded grant funds to 30 of the large jurisdictions and 149 of the small jurisdictions. An applicant did not need to select the illegal immigration focus or submit the Certification to receive funds. Of the seven applicants that chose illegal immigration as a focus area, only one large jurisdiction and one small jurisdiction received an award. Of the successful applicants, only 19 of the 30 large jurisdictions and 124 of the 149 small jurisdictions received bonus points for submitting the Certification. Los Angeles submitted an application but was not awarded any funding. It chose "building trust and respect" as its focus area and declined to submit the Certification.

In September 2017, Los Angeles filed a complaint seeking to enjoin DOJ's practice of awarding points to applicants that selected the illegal immigration focus area and to applicants that completed a Certification related to illegal immigration. Los Angeles argues that these two elements of DOJ's scoring system are unlawful because they (1) violate constitutional principles of separation of powers and exceed DOJ's lawful authority, (2) violate the Spending Clause, and (3) are arbitrary and capricious under the Administrative Procedure Act. The district court agreed with Los Angeles on each of these claims. The court entered a permanent injunction against the challenged practices, and DOJ appealed.

II

Although Los Angeles claims it was injured by DOJ's use of two scoring elements in its 2017 grant cycle, that cycle has long since been completed. Therefore, we must determine whether this appeal is moot, and if not, whether Los Angeles has standing to bring its claims.

We first conclude that the appeal is not moot. Article III limits the jurisdiction of federal courts to actual cases and controversies. U.S. Const. art. III, § 2, cl. 1. Because there is no longer a live controversy regarding the 2017 grant program, the appeal would ordinarily be moot. Nevertheless, the Supreme Court has held that an appeal is not moot in "exceptional situations" when it is "capable of repetition, yet evading review." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). Here, the case meets the requirements to avoid mootness. First, "the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration," *id.* (alteration in original) (quoting *Spencer*, 523 U.S. at 17), because any one grant cycle is too short to provide for meaningful review. In 2017, for instance, fewer than three months passed between DOJ's announcement of the scoring factors and the grant awards. Second, "there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Id.* (alteration in original) (quoting *Spencer*, 523 U.S. at 17). Los Angeles is reasonably likely to apply for a DOJ grant in the future, and has done so in the previous two consecutive years. Los Angeles also submitted a declaration of its intent to apply for a grant in the 2018 cycle. Although DOJ states it has not yet determined "how immigration-related factors will be handled in the FY 2018 application," it has not agreed to stop giving bonus points for

such factors in the future.  Even if it had, voluntary cessation of the practice does not deprive us of power to hear the case "unless it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur."  *Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018) (internal quotation marks and citation omitted).  No such assurances are present here.

We also conclude that Los Angeles has standing to bring this appeal.  Los Angeles states it "has made a longstanding decision that it can best protect public safety by not participating in federal civil immigration enforcement."  It also states that its police department has a longstanding policy that "restricts an officer from initiating a police action with the objective of discovering a person's immigration status, and also prohibits arrests based solely on civil immigration status."  As a result of these policies, Los Angeles declined to select the illegal immigration focus and declined to submit the Certification.  Accordingly, Los Angeles claims that when it applied for a grant, it was disadvantaged relative to other applicants that were able to choose the illegal immigration focus area or complete the Certification, and this inability to compete on an even playing field constitutes a concrete and particularized injury. *See Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 506 (9th Cir. 1988); *Preston v. Heckler*, 734 F.2d 1359, 1365 (9th Cir. 1984) ("[W]hen challenged agency conduct allegedly renders a person unable to fairly compete for some benefit, that person has suffered a sufficient 'injury in fact.'" (quoting *Glacier Park Found. v. Watt*, 663 F.2d 882, 885 (9th Cir. 1981))); c*f. Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978) (holding that plaintiff suffered an injury when he could not compete for all places in his entering medical school class).  While DOJ states that Los Angeles would not have received funding regardless of

whether DOJ awarded bonus points for the illegal immigration focus area or the Certification, Los Angeles need not prove that it would have received funding absent the challenged considerations. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Further, Los Angeles argues that such injury is directly traceable to DOJ's use of the challenged scoring elements. Should a court bar DOJ from using these scoring factors, Los Angeles contends, applicants that are willing to choose the illegal immigration focus area or to sign the Certification would no longer have that advantage over Los Angeles. *See Bullfrog Films*, 847 F.2d at 507–08.

Los Angeles's claim of injury is thin. Los Angeles does not argue it was prevented by law from selecting an illegal immigration focus or from agreeing to the Certification; it merely chose not to do so. Moreover, Los Angeles's decision not to select the illegal immigration focus did not itself put it at a competitive disadvantage. An applicant can choose only one focus area, and Los Angeles could have equalized the focus area bonus points by choosing the homeland security or violent crime focus area, both of which also received additional points, rather than choosing the "building trust and respect" focus area. (DOJ did not offer applicants equal points for conduct comparable to agreeing to the Certification, however.)

Despite the weakness of Los Angeles's argument, a plaintiff need show only a slight injury for standing. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973). We conclude that Los Angeles's slight competitive disadvantage due to its policy of not assisting the federal government on

immigration-related issues is sufficient to give Los Angeles standing in this action.

## III

Before turning to the merits of Los Angeles's claims, we first note the limited nature of the dispute. As noted above, in administering a federal grant program and scoring the applications it receives, DOJ gives additional points to an applicant that chooses to focus on the illegal immigration area (instead of other focus areas) and gives additional points to an applicant who agrees to the Certification. Choosing the illegal immigration area and submitting the Certification are not conditions of receiving a grant, and numerous applicants received grants without doing so. Likewise, numerous applicants who chose the illegal immigration focus area or submitted the Certification did not receive a grant. The question before us, therefore, is whether DOJ's scoring practice of giving these additional points is unconstitutional or exceeds DOJ's authority in administering the grant program.

### A

We begin with Los Angeles's argument that DOJ's practice of giving additional consideration to applicants that choose to further the two specified federal goals violates the Spending Clause. The Spending Clause provides that Congress has the power "to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. This power gives Congress the ability "to grant federal funds to the States, and [Congress] may condition such a grant upon the States' 'taking certain actions that Congress could not require them to take.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576 (2012) ("*NFIB*") (quoting *Coll. Sav. Bank v. Fla.*

*Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999)).

Although Congress has broad power to attach conditions to the receipt of federal funds, the power is not unlimited. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). First, "the exercise of the spending power must be in pursuit of the general welfare." *Id.* (internal quotation marks omitted). "In considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress." *Id.*

Moreover, if Congress decides to impose conditions on the allocation of funds to the states, it "must do so unambiguously . . . , enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* (alteration in original) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). In *Pennhurst*, the plaintiffs argued that a federal-state grant program should be reinterpreted as retroactively imposing significant costs on states that received those funds. 451 U.S. at 20. In rejecting that reinterpretation, the Court held that legislation allocating funds to states in return for states accepting specified conditions is analogous to a contract between Congress and the states. *Id.* at 17. "The legitimacy of Congress'[s] power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* Congress goes too far when it surprises states with "post acceptance or 'retroactive' conditions." *Id.* at 25. Therefore, the Court declined to reinterpret the "contract" between Congress and the states as retroactively imposing such unexpected and burdensome conditions. *Id.*

Nor can the federal government attach conditions to the receipt of federal funds if "the financial inducement offered

by Congress might be so coercive as to pass the point at which pressure turns into compulsion," *Dole,* 483 U.S. at 211 (internal quotation marks omitted).  In *South Dakota v. Dole*, Congress attempted to induce states to adopt a minimum drinking age of twenty-one years by threatening to cut five percent of federal highway funding to those states that failed to do so.  *Id.* at 211.  The Court held this was only "relatively mild encouragement to the States," and therefore "a valid use of the spending power."  *Id.* at 211–12.  By contrast, the threat to eliminate all of a state's existing Medicaid funding if the state opted out of the Affordable Care Act's expansion in health care coverage was "much more than 'relatively mild encouragement'—it [was] a gun to the head," and therefore was an impermissible use of Congress's spending power.  *NFIB*, 567 U.S. at 581. Accordingly, Congress may offer conditional funding only if the "State has a legitimate choice whether to accept the federal conditions in exchange for federal funds."  *Id.* at 578.

Further, Congress may not impose conditions on federal grants that "are unrelated 'to the federal interest in particular national projects or programs.'"  *Dole*, 483 U.S. at 207–08 (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978) (plurality opinion)).  This standard is not demanding—the conditions need only "bear some relationship to the purpose of the federal spending." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (quoting *New York v. United States*, 505 U.S. 144, 167 (1992)).  In *Dole*, for instance, the requirement that states adopt a minimum drinking age was sufficiently related to the payment of federal highway funds.  Rejecting the dissent's argument that the restriction had too "attenuated or tangential [a] relationship to highway use or safety," *Dole*, 483 U.S. at 215 (O'Connor, J., dissenting), the Court held that the age restriction was "directly related to one of the

main purposes for which highway funds are expended—safe interstate travel," *id.* at 208 (majority opinion). Indeed, the Court has never struck down a condition on federal grants based on this relatedness prong.

Finally, Congress may not require states to engage in actions that are themselves unconstitutional. *Id.* at 210–11.

As even this brief description of the limitations on Congress's spending power makes clear, the applicable Spending Clause principles do not readily apply to an allocation of grant funds through a competitive grant process, such as the program in this case.[6] As a threshold matter, DOJ does not propose to withdraw significant federal funds from a state or local jurisdiction unless they comply with specified federal requirements. *Cf. NFIB*, 567 U.S. at 579–80; *Dole*, 483 U.S. at 205. Nor does DOJ propose to reinterpret the terms of a grant retroactively to impose costly new responsibilities on a recipient. *Cf. Pennhurst*, 451 U.S. at 25. Nor does DOJ offer a financial inducement for an applicant to cooperate on illegal immigration issues that is so coercive that it is tantamount to compulsion. *Cf. NFIB*, 567 U.S. at 579–80. Rather, an applicant is free to choose one of many focus areas, and numerous applicants obtained funding without selecting illegal immigration or signing the

---

[6] Our analysis requires us to bridge one gap in existing Spending Clause precedent—that the principles of *Dole* and *NFIB* apply to agency-drawn conditions on grants to states and localities just as they do to conditions Congress directly places on grants. In both *Dole* and *NFIB*, Congress had written the challenged conditions directly into the statutes authorizing the grants. Here, conversely, Congress delegated the task of specifying these conditions to DOJ. We see no reason why the addition of an agency middleman either expands or contracts Congress's power to "provide for the . . . general Welfare," U.S. Const. art. I, § 8, cl. 1, and thus analyze DOJ's conditions under the principles of *Dole* and *NFIB*.

Certification. Nor did DOJ impose surprise or ambiguous conditions on recipients of the funds, *cf. Pennhurst*, 451 U.S. at 25; the immigration-related conditions were clearly presented in the Application Guidelines and Certification.

At most, DOJ's decision to give additional points to applicants that select an illegal immigration focus or that agree to the Certification encourages applicants to focus on these federal priorities. Because an applicant is free to select other prioritized focus areas or not to apply for a grant at all, such a subtle incentive offered by DOJ's scoring method is far less than the coercion in *Dole*, which directly reduced the amount of funds allocated to a state, and which the Court held was consistent with Spending Clause principles.[7]

Finally, cooperation relating to enforcement of federal immigration law is in pursuit of the general welfare, and meets the low bar of being germane to the federal interest in providing the funding to "address crime and disorder problems, and otherwise . . . enhance public safety," VCCLEA § 1701(a), "one of the main purposes for which" the grant is intended, *Dole*, 483 U.S. at 208. As explained in more detail below, DOJ has reasonably determined that cooperation on illegal immigration matters furthers the

---

[7] Because DOJ's scoring process does not coerce an applicant or authorize the federal government to exercise any control over state or local law enforcement, it does not violate 34 U.S.C. § 10228(a), which states: "Nothing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." *Id.* § 10228(a). We reject Los Angeles's argument to the contrary.

purposes of the Act. *See infra* at 22–27. Accordingly, we reject Los Angeles's Spending Clause argument.

## B

Because DOJ's scoring factors encourage, but do not coerce, an applicant to cooperate on immigration matters, we also reject Los Angeles's claims that DOJ's use of the factors infringes on state autonomy in a manner that raises Tenth Amendment concerns. Los Angeles's reliance on *Gregory v. Ashcroft*, 501 U.S. 452 (1991), and *Virginia Department of Education v. Riley*, 106 F.3d 559 (4th Cir. 1997) (en banc) (per curiam), is meritless. *Gregory* held that the federal Age Discrimination in Employment Act did not prohibit Missouri from enforcing its law requiring state judges to retire at age 70. 501 U.S. at 473. According to the Court, while Congress has the power to override a state age requirement, it would have to use unmistakably clear statutory language to do so, because such a question "is a decision of the most fundamental sort for a sovereign entity." *Id.* at 460. The Fourth Circuit applied a similar presumption in *Riley*, holding that the Individuals with Disabilities Education Act did not clearly establish that Congress intended to condition Virginia's receipt of federal funds on the state's provision of "private educational services to each of the State's 126 disabled students who had been expelled for reasons wholly unrelated to their disabilities." 106 F.3d at 560. Here, contrary to Los Angeles's argument, DOJ's decision to give points to applicants that submit the Certification and agree to give DHS personnel access to the applicant's correctional or detention facilities to meet with alien detainees, or to give DHS notice before an alien detainee is released, does not override state laws and therefore does not give rise to any Tenth Amendment concern.

## IV

We now turn to Los Angeles's argument that DOJ exceeded its statutory authority in awarding bonus points to applicants that selected the illegal immigration focus area or that agreed to the Certification.

When Congress has "explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984). "Such legislative regulations are given controlling weight unless they are arbitrary, capricious or manifestly contrary to the statute." *Id.* at 844. This standard is "deferential and narrow"; there is a "'high threshold' for setting aside agency action." *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 554 (9th Cir. 2016) (quoting *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067, 1070 (9th Cir. 2010)). As long as a "reasonable basis exists for the decision"—meaning the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made"—we presume the action is valid. *Id.* (internal quotation marks omitted). Moreover, when Congress has explicitly given an agency the substantive authority to prescribe standards, the agency's promulgations are "entitled to more than mere deference or weight"; rather, they are entitled to "legislative effect." *Schweiker v. Gray Panthers*, 453 U.S. 34, 44 (1981) (quoting *Batterton v. Francis*, 432 U.S. 416, 425–26 (1977)).

This highly deferential standard is applicable here. As noted above, the Act gives DOJ broad authority to "promulgate regulations and guidelines to carry out" the Public Safety and Community Policing subchapter, 34 U.S.C. § 10388, authorizing the creation and

implementation of a competitive grant program, and to "prescribe by regulation or guidelines" the form of an application and the information it will require, *id.* § 10382(b). Because Congress authorized DOJ to fill gaps through its promulgation of the Application Guidelines and implementation of the grant program, we give DOJ's inclusion of an illegal immigration focus area and use of the Certification controlling weight unless they are manifestly inconsistent with the statute or lack any reasonable basis, "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Glacier Fish Co. v. Pritzker*, 832 F.3d 1113, 1121 (9th Cir. 2016) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)).

DOJ's inclusion of immigration-related scoring factors as a component of its implementation of its grant program is well within DOJ's broad authority to carry out the Act. At the threshold, the Application Guidelines' inclusion of the illegal immigration focus area, which asks an applicant to "specify your focus on partnering with federal law enforcement to address illegal immigration for information sharing, [§] 287(g) partnerships, task forces and honoring detainers," is not "manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. Nothing in the Act precludes DOJ from allocating federal funds to state or local governments to focus on problems raised by the presence of illegal aliens within their jurisdictions.[8]

---

[8] In addition to listing the immigration focus area, the Application Guidelines list multiple other focus areas, including violent crime, traffic and pedestrian problems, and "quality of life policing." While the Act does not expressly mention any of these focus areas, its gives DOJ broad discretion to identify and rank such a range of goals. Given DOJ's

Rather, DOJ's determination "that illegal immigration enforcement is a public safety issue and that this issue can be addressed most effectively through the principles of community policing that [DOJ] promotes—including through partnerships and problem-solving techniques," is entirely consistent with the broad scope of the Act. First, DOJ's understanding that illegal immigration presents a public safety issue has been acknowledged by the Supreme Court. *See Arizona v. United States*, 567 U.S. 387, 397–98 (2012). While "it is not a crime for a removable alien to remain present in the United States," *id.* at 407, the Court has recognized that in some jurisdictions, such as Arizona's "most populous county," aliens who have entered the country illegally "are reported to be responsible for a disproportionate share of serious crime," *id.* at 397–98. The Court has noted that "[a]ccounts in the record suggest there is an 'epidemic of crime, safety risks, serious property damage, and environmental problems' associated with the influx of illegal migration across private land near the Mexican border." *Id.* at 398. Congress has likewise expressed concern about "increasing rates of criminal activity by aliens." *Demore v. Kim*, 538 U.S. 510, 518 (2003).

Second, DOJ's determination that the techniques of community policing may be used to address this public safety issue is entirely reasonable. As DOJ explains, community policing is an important crime-fighting technique that officers use along with others to address various law-enforcement and community safety goals. The

---

authority to administer the grant program along these lines, the dissent's argument that immigration enforcement cannot be a permissible focus area because the Act makes no mention of immigration enforcement, Dissent at 42, is meritless.

public safety issues that arise from illegal immigration can be addressed through collaborative interactions and information flow between law enforcement and the community, just as with any other sort of public safety issue, such as those arising from "violent crime problems" and other focus areas. If a jurisdiction selects an illegal immigration focus due to community concerns, it is reasonable to consider that officers may be more effective in addressing such issues if they act pursuant to § 287(g) partnerships, which allow state or local officers to perform immigration officer functions, *see* 8 U.S.C. § 1357(g)(1).[9] Nothing in the Act precludes such cooperation; rather, the Act requires applicants to "identify related governmental and community initiatives which complement or will be coordinated with the proposal," 34 U.S.C. § 10382(c)(4), and to explain how officers' use of community-oriented policing techniques will be coordinated with such initiatives.

---

[9] Los Angeles argues that § 287(g) partnerships cannot be part of a federally funded initiative because 8 U.S.C. § 1357(g)(1) requires § 287(g) partnerships to be undertaken "at the expense of the State or political subdivision." *See also* Dissent at 55 (stating that a local officer's participation in a § 287(g) partnership "*must* be 'at the expense of the State or political subdivision'" (emphasis added) (quoting 8 U.S.C. § 1357(g)(1))). Los Angeles and the dissent misunderstand both § 1357(g)(1) and the grant program. Section 1357(g)(1) clarifies only that states and localities are not entitled to federal reimbursement for work carried out in a § 287(g) partnerships. *See* 8 U.S.C. § 1357(g)(1) (stating that an officer or employee of the state or subdivision who is qualified to perform certain functions of an immigration officer "may carry out such function at the expense of the State or political subdivision"). The statute does not forbid the use of federal funds to assist a state or local entity that has entered into such a partnership. Moreover, DOJ has made clear that grant funds may be used only to hire or rehire officers, not for any state or local expenses of a § 287(g) agreement.

Nor does the Act's community-policing focus limit DOJ to considering only those factors directly related to interaction with the community. Obviously, an officer's responsibilities involve a broad array of tasks, including administrative tasks like sharing information with relevant federal agencies or honoring detainers. Just as DOJ considers a jurisdiction's fiscal health and crime rate, as well as a jurisdiction's attention to other federal priorities like the mental health of officers, giving work to military veterans, and responding to catastrophic events like school shootings, it can also consider a jurisdiction's attention to the federal priority of illegal immigration through the Certification. A jurisdiction's willingness to provide notice that a detained removable alien will be released from custody, or to provide facility access so that federal officials can interview removable aliens while in custody, is consistent with the Act's purpose to enhance public safety, *see* VCCLEA § 1701(a), through means including both community-oriented policing and attention to intelligence, anti-terror, or homeland security duties. *See* 34 U.S.C. §§ 10381(b)(1)–(2), (4).

Finally, DOJ's broad definition of community-oriented policing in the Application Guidelines as "a philosophy that promotes organizational strategies that support the systematic use of partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime," clearly encompasses all DOJ's scoring factors, including partnering with federal law enforcement to address illegal immigration for information sharing, [§] 287(g) partnerships, task forces, and honoring detainers. The Act does not define "community-oriented policing" or delineate what sorts of strategies are sufficiently "community-oriented." *See Brand X*, 545 U.S. at 980–81.

Therefore, because Congress has not "directly spoken to the precise question at issue," we must defer to DOJ's interpretation so long as it is reasonable, that is, so long as it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress'[s] expressed intent." *Glacier Fish*, 832 F.3d at 1120–21 (first quoting *Chevron*, 467 U.S. at 842; then quoting *Rust v. Sullivan*, 500 U.S. 173, 184 (1991)).[10] This is true even if the agency's interpretation is "not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (emphasis in original).

---

[10] The dissent offers a lengthy political history of community-oriented policing, and asserts that Congress incorporated the dissent's view of the term "community-oriented policing" in the statute. Dissent at 35–40, 52 n.39. But Congress enacts statutory text, not political history, and the contours of "community-oriented policing" are not "unambiguously expressed by the statutory language." *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 93 (2007). "Policing" that is "oriented" toward the "community" can describe a broad set of policing techniques. These techniques may include direct police interactions with the community in some circumstances. But the statute does not limit community-oriented policing to such strategies, and other techniques may be better suited to address the community's priorities, such as public safety issues related to illegal immigration. As the dissent acknowledges, problem solving—"the process through which the specific concerns of communities are identified and through which the most appropriate remedies to abate these problems are found"—is a key component of community-oriented policing, Dissent at 37–38, and a range of different remedies may be valid for furthering the statute's public safety goals. In light of the statute's broad purposes, we conclude "the language of the statute is broad enough to permit" DOJ's reasonable definition of community-oriented policing. *Zuni Pub. Sch. Dist.*, 550 U.S. at 100.

Here, DOJ's interpretation is permissible, because it reasonably construes the statutory language ("community-oriented" and "policing") and is consistent with the statute's purposes, which go far beyond interactions between law enforcement and the community. The general purpose of the Act is to enhance the crime prevention functions of state and local law enforcement and to enhance public safety through interacting with and working with the community. *See* 34 U.S.C. § 10381(b); *see also* VCCLEA § 1701(a) (stating that it is among the Act's purposes "to increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety").[11]

The dissent argues that DOJ's interpretation and implementation of the Act may reflect the administration's policy goals, and these goals may change from time to time. Dissent at 59 & n.48. We agree that an administration's policy goals may influence the selection of factors warranting additional consideration for awarding competitive grants. But Congress contemplated such a result

---

[11] Although unnecessary to our analysis, the legislative history of the Act supports DOJ's broad interpretation of community-oriented policing. While facilitating increased interaction between law enforcement and members of the community was one focus of community-oriented policing as described in the legislative history, *see* H.R. Rep. No. 103-324, at 6 (1993), the Judiciary Committee report on the bill also notes intent to reduce law enforcement's reliance on reactive policing and renew law enforcement's ability "to anticipate and prevent crime by use of community-oriented, problem solving techniques," *id.* DOJ's definition of community-oriented policing incorporates the focus on community interaction with the additional goal of supporting proactive policing that involves "analyzing crime and disorder problems, working with the community on a search for alternative solutions, implementing solutions, and evaluating their effectiveness." *Id.* at 7.

when it enacted a statute that left substantial gaps for the implementing agency to fill. Where Congress affords an agency such discretion, we ask only whether the agency's interpretation was reasonable. *See Glacier Fish*, 832 F.3d at 1120. Whether an interpretation serves an administration's policy goals has no bearing on that inquiry. *See Dep't of Commerce v. New York*, No. 18-966, slip op. at 24 (U.S. June 27, 2019) ("[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities.").

Los Angeles and the dissent also contend that DOJ exceeded its authority by including the option of the illegal immigration focus area and considering whether an applicant submitted the Certification because DOJ is constrained by § 10381(c), which states that the "Attorney General may give preferential consideration, where feasible, to an application" from "an applicant in a state" that has certain human trafficking laws. Dissent at 53–54. According to this argument, DOJ's inclusion of an illegal immigration focus area in the Application Guidelines renders §§ 10381(c)(2) and (c)(3) "superfluous" because Congress would not have needed to enact §§ 10381(c)(2) and (c)(3) if DOJ had the authority to favor applicants based on efforts related to illegal immigration and other extraneous matters. Dissent at 53–54.

This argument lacks any support in the text or history of the Act. First, it is based on Los Angeles's baseless assumptions that (1) preferring applicants who focus on illegal immigration is the same as preferring states that have enacted specified human trafficking laws, and (2) DOJ could not prefer either without specific authorization from Congress. Nothing in the Act supports these assumptions.

First, as we have explained, an award of grant funds to states or localities that intend to focus on illegal immigration is well within the statute's scope, and DOJ has broad discretion to adopt such a focus area.  Second, while § 10381(c) encourages DOJ to give preferential consideration to states with specified human trafficking laws, the statute does not indicate whether DOJ would have lacked authority to do so before the enactment of § 10381(c).  More important, it is clear that nothing in that section limits DOJ's discretion to select additional factors to assist it in allocating grant funds.  *See id.* § 10382(b).  Had Congress intended to limit DOJ's discretion in ranking applications according to various criteria, which DOJ had been doing for years before Congress amended the Act to add § 10381(c), we would expect Congress to give some express indication of such an intent.  It did not do so.  Accordingly, we reject the argument that § 10381(c) has any bearing on DOJ's current methodology.

We conclude that DOJ did not exceed its statutory authority in including two scoring factors related to illegal immigration as part of its implementation of the grant program.

## V

Finally, Los Angeles argues that DOJ violated the APA because it failed to engage in reasoned decisionmaking and because its explanation for its policy is contrary to the evidence before it when it decided to give points for adopting the illegal immigration focus and submitting the Certification.

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions."  *Encino Motorcars, LLC*

*v. Navarro*, 136 S. Ct. 2117, 2125 (2016). The agency satisfies this requirement "when the agency's explanation is clear enough that its 'path may reasonably be discerned.'" *Id.* (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). The agency need provide only a "minimal level of analysis" to avoid its action being deemed arbitrary and capricious. *Id.* Although a reviewing court "must not rubber-stamp administrative decisions," it also "must not substitute its judgment for that of the agency." *Alaska Oil*, 815 F.3d at 554 (internal quotation marks omitted). Agency action may also be deemed arbitrary and capricious if the agency has "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

According to Los Angeles, DOJ's action was not based on empirical evidence establishing that cooperation between state and local authorities and federal authorities on illegal immigration addresses crime or public safety issues. Los Angeles points to studies it claims show that recidivism rates for illegal aliens are not disproportionate relative to the general population and to news articles describing studies that it claims show that sanctuary policies do not lead to increased crime rates. According to Los Angeles, DOJ ignored these studies and articles, and also failed to make a careful study of how community policing relates to civil immigration enforcement. Because DOJ adopted its two scoring factors without reviewing relevant evidence, Los Angeles argues, DOJ's scoring factors are arbitrary and capricious, and thus invalid under the APA.

We disagree.  Under the APA, an agency must give adequate reasons for its decision, and DOJ has done so here. DOJ has reasonably determined that "illegal immigration enforcement is a public safety issue [that] can be addressed most effectively through the principles of community policing."  And because the Certification "relate[s] to non-citizens who are being detained and who have committed crimes or are suspected of having committed crimes," DOJ reasonably concluded that "[w]orking with the federal government to enforce the federal immigration laws against aliens who have committed crimes or are suspected of having committed crimes makes communities safer."  As the Supreme Court has noted, "increasing rates of criminal activity by aliens" and federal immigration authorities' failure to remove "deportable criminal aliens" have been the subject of congressional concern.  *Demore*, 538 U.S. at 518.

Moreover, the studies and articles cited by Los Angeles do not undercut DOJ's conclusion that removing aliens who are convicted or suspected of crimes makes communities safer.  At most, the studies and articles provide some evidence that the recidivism rate for removable aliens who engaged in criminal activities is comparable to the recidivism rate for U.S. citizens and aliens who are not removable; such studies do not bear on whether addressing illegal immigration enforcement through community-oriented policing can make communities safer.[12]

---

[12] *See, e.g.*, Bianca E. Bersani, *An Examination of First and Second Generation Immigrant Offending Trajectories*, 31 Just. Q. 315, 335 (2014); Jennifer S. Wong, Laura J. Hickman & Marika Suttorp-Booth, *Examining Recidivism Among Foreign-Born Jail Inmates: Does Immigration Status Make a Difference over the Long Term?*, 16 Global Crime 265, 280–81 (2015).

Accordingly, there is no basis for Los Angeles's argument that DOJ acted counter to the evidence before it.

Los Angeles may believe that addressing illegal immigration is not the most effective way to improve public safety, but the wisdom of DOJ's policy is not an element of our arbitrary and capricious review. We may not "substitute [our] judgment for that of the agency." *State Farm*, 463 U.S. at 43. And DOJ "need not demonstrate to [our] satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better[.]" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

We conclude that DOJ's policy decision has a "rational connection" to the goal of enhancing public safety and was not counter to the evidence before the agency, and therefore is not arbitrary and capricious. *Alaska Oil*, 815 F.3d at 554.

\*\*\*

In sum, DOJ's use of the two scoring factors is well within its statutory discretion, is not arbitrary and capricious, and complies with the constitutional restrictions imposed on congressional action under principles of federalism and the Spending Clause.

**REVERSED.**

WARDLAW, Circuit Judge, dissenting:

A quarter of a century ago, in 1994, the United States Congress passed the Public Safety Partnership and Community Policing Act (the Act), which established the Community Oriented Policing Services (COPS) grant program. Congress's purpose was to increase the number of "cops on the beat" and to enhance officers' interaction within their communities to improve communication and cooperation; that is, to create "community partnerships" between police officers and the communities they serve. Congress specified twenty-three "purposes for which grants may be made" but *to date* has appropriated funds for only two of those purposes: (1) to rehire officers who were laid off due to budgetary concerns for deployment in community-oriented policing, and (2) to hire and train new additional officers for deployment in community-oriented policing. Thus, since authorizing grants for community-oriented policing, a term well understood by Congress in 1994 to connote partnering with the community, Congress's sole appropriations have been to fund deployment of more officers on the streets.[1]

Congress funds states and localities that deploy community-oriented policing through the COPS grant program. It delegated the administration of the COPS grant program to the Department of Justice (DOJ). In 1994, Attorney General Janet Reno created the COPS Office within DOJ to handle applications and the awards of grants

---

[1] The majority opinion is simply inaccurate on this point. *See* Majority Op. at 7 n.2. It is only for the COPS Hiring Program—the grant program at issue here—that Congress has ever appropriated funds for the community-oriented policing purposes delineated in 34 U.S.C. § 10381(b)(1) and (2).

to cities and states for community-oriented policing. Through its entire existence, the COPS grant program has been administered with this congressional purpose in mind.

That is, until 2017, when DOJ decided to usurp the COPS funds for its own immigration policy directives. As part of a broader effort to divert federal funds from congressionally authorized purposes to the Trump Administration's efforts to press state and local police into federal immigration enforcement, Attorney General Jefferson B. Sessions III imposed new preferences for obtaining COPS grant awards that effectively substitute "federal law enforcement" for "community" in the "community partnerships" Congress sought to fund through the Act. Congress did not contemplate general policing when devoting funds for community-oriented policing, and it certainly did not contemplate federal immigration enforcement when it attempted to reduce crime by adding "cops on the beat."

Because the term "community-oriented policing" had in 1994 and has through today a commonly understood meaning that excludes federal immigration enforcement functions, the new federal immigration preferences are, as the district court held, *ultra vires* as a matter of law. I therefore respectfully dissent from the majority's holding that DOJ's diversion of COPS grant funding from community policing to civil immigration enforcement is lawful.[2]

---

[2] I agree with the majority and the district court that the City of Los Angeles has standing and that the case is not moot under the "capable of repetition yet evading review" exception.

# I.

## A.  History of Community-Oriented Policing in the United States

To comprehend just how antithetical to the concept of community-oriented policing DOJ's new federal immigration considerations are, one must have an understanding of what community partnership means, the history and development of the principles it embraces, and the history of the COPS grant program itself. Community-oriented policing is "a collaboration between the police and the community that identifies and solves community problems."[3]  This policing strategy, which emerged in the 1970s, is rooted in the principle that "the police are the public and the public are the police."[4]  In the 1960s and 1970s, unstable social conditions, scandals, and recessions led to cuts in the ranks of police departments across the country, driving the need for policing reform.[5]  Despite

---

[3] Bureau of Justice Assistance, U.S. Dep't of Justice, Understanding Community Policing: A Framework for Action vii (1994) [hereinafter 1994 Monograph].

[4] *Id.* at 5–7 (quoting Sir Robert Peel's remarks upon establishing the London Metropolitan Police).

[5] Gayle Fisher-Stewart, Int'l City/Cty. Mgmt. Ass'n, Community Policing Explained: A Guide for Local Governments 3 (2007) [hereinafter 2007 Local Government Guide] (report created with COPS Office support); George L. Kelling & Mark H. Moore, *The Evolving Strategy of Policing*, Perspectives on Policing, Nov. 1988, at 8–9 (citation omitted) (publication of National Institute of Justice, U.S. Department of Justice, and the Program in Criminal Justice Policy and Management, John F. Kennedy School of Government, Harvard University); Michael Norman, *One Cop, Eight Square Blocks*, N.Y.

tactical use of automobiles for crime-preventive patrol and rapid response to calls for service, the 1960s had ushered in an era of rising crime and fear.[6] The civil rights and antiwar movements further challenged the legitimacy of police and police tactics.[7] Police were inadequately equipped to serve their socially and culturally diverse communities.[8] The public's "erosion of confidence" in the police translated into a significant loss of political and financial support.[9]

Recognizing the inability of existing police practices to curb rising civil disorder and crime, police administrators, civic leaders, and politicians sought to remedy frayed police-community relations and reform how law enforcement related to the communities it served.[10] These reforms emphasized community contribution and support to legitimize police activity—and to create a partnership between the community and the police to meet public safety goals.[11]

---

Times Mag. (Dec. 12, 1993), https://nyti.ms/29jx5SU (last visited May 22, 2019).

[6] Kelling & Moore, *supra* note 5, at 8.

[7] *Id.*

[8] 1994 Monograph, *supra* note 3, at 6.

[9] Kelling & Moore, *supra* note 5, at 9.

[10] *See* 1994 Monograph, *supra* note 3, at 7; *see also* 2007 Local Government Guide, *supra* note 5, at 3.

[11] *See* Kelling & Moore, *supra* note 5, at 11–12.

The hallmark of community-oriented policing is a return to a historical policing mainstay: foot patrol, or, "cops on the beat."[12]  Government reports, academic studies, and news articles consistently formulate community-oriented policing as a strategy based on building trust between police and the communities they serve through direct interaction with individuals within the communities.[13]  As a 1994 DOJ monograph on community policing explained:

> The foundations of a successful community policing strategy are the close, mutually beneficial ties between police and community members.  Community policing consists of two complementary core components, *community partnership* and *problem solving*.  To develop community partnership, police must develop positive relationships with the community, must involve the community in the quest for better crime control and prevention, and must pool their resources with those of the community to address the most urgent concerns of community members.  Problem solving is the process through which the specific concerns of communities are identified and through

---

[12] *Id.* at 10; Norman, *supra* note 5.

[13] *See, e.g.*, 1994 Monograph, *supra* note 3, at 13–17; Kelling & Moore, *supra* note 5, at 12; Office of Cmty. Oriented Policing Servs., U.S. Dep't of Justice, Community Policing Defined 1 (2014); U.S. Gen. Accounting Office, GAO/GGD-96-4, Community Policing: Information on the "COPS on the Beat" Grant Programs 1 (1995) [hereinafter 1995 GAO Report].

which the most appropriate remedies to abate these problems are found.[14]

More "cops on the beat" proved enormously politically popular and, more importantly, measurably contributed to public safety.[15]  Studies conducted throughout the 1970s suggest that foot patrol "reduced fear, increased citizen satisfaction with police, improved police attitudes toward citizens, and increased the morale and job satisfaction of police."[16]  Significantly, the foot patrol experiments of this decade suggested that the more information police learned directly from community members, the better police could effectively combat crime.[17]

By the 1980s, most law enforcement agencies had adopted community-oriented policing practices.[18]  Around 1980, DOJ began to support community-oriented policing efforts through various implementation and research grants.[19]  Many police departments participated in "demonstration projects" in the early 1980s, "reflecting an

---

[14] 1994 Monograph, *supra* note 3, at 13.

[15] Kelling & Moore, *supra* note 5, at 10.

[16] Id.

[17] Id.

[18] 2007 Local Government Guide, *supra* note 5, at 3.

[19] 1995 GAO Report, *supra* note 13, at 1.

innovative period for the development of practical application of the community policing paradigm."[20]

Over the 1980s and early 1990s, community-oriented policing continued to gain momentum and wider acceptance by law enforcement agencies.[21] It is estimated that by 1992, 50% of police departments in cities with populations of 50,000 or more had adopted some form of community policing.[22] A 1994 survey found that 80% of police chiefs and over 50% of sheriffs questioned stated that their departments had already adopted community policing or desired to adopt it in the future.[23]

On December 20, 1993, President Clinton announced an award of approximately $50 million in grants to 74 cities to hire 658 more police officers "to put more police on the street and expand community policing."[24] Describing these

---

[20] Willard M. Oliver & Elaine Bartgis, *Community Policing: A Conceptual Framework*, 21 Policing: Int'l J. Police Strategy & Mgmt. 490, 490 (1998).

[21] *See* Norman, *supra* note 5.

[22] Oliver & Bartgis, *supra* note 20, at 490.

[23] Id.

[24] *Community Policing Grants Announcement*, C-SPAN (Dec. 20, 1993), https://www.c-span.org/video/?53243-1/community-policing-grants-announcement (last visited May 22, 2019); *Policing Hiring Supplement Program*, Bureau of Justice Assistance Fact Sheet (Bureau of Justice Assistance, U.S. Dep't of Justice), Nov. 1995, at 2, https://www.ncjrs.gov/pdffiles/polhirng.pdf (last visited May 22, 2019); *see also* Sharon LaFraniere et al., *FY 1994*, Wash. Post (Apr. 9, 1993), https://www.washingtonpost.com/archive/politics/1993/04/09/fy-1994/f62d729a-d631-44cf-8a2c-c4d90b96f44f/?utm_term=.d4d4d6569379 (last visited May 22, 2019) ("Clinton proposes [in his FY 1994 budget]

first 74 awards of the Police Hiring Supplement Program[25] as a "down payment" on a goal to hire 100,000 police officers across the country, President Clinton remarked, "we know community policing works."[26]    Mayor Richard Riordan of Los Angeles campaigned on a pledge to put thousands more police officers on the street, and his newly elected administration secured on behalf of Los Angeles one of the first 74 awards, receiving $4 million to train and pay 54 new recruits.[27]    By May 1994, DOJ had awarded $100 million more to 176 jurisdictions to hire or rehire 1,365 officers.[28]

## B. The Public Safety Partnership and Community Policing Act of 1994

Against this backdrop, Congress passed the Act to establish the COPS grant program.  Pub. L. No. 103-322, §§ 10001–10003, 108 Stat. 1796, 1807–15 (codified as

---

spending $50 million on 'community policing' programs that strike to get officers out of patrol cars and more in touch with neighborhoods.").

[25] DOJ distributed funds for the Police Hiring Supplement Program from the Supplemental Appropriations Act of 1993, Pub. L. No. 103-50, 107 Stat. 241.  *See* David Teasley & JoAnne O'Bryant, Cong. Res. Serv., 97-196 GOV, *The Community Oriented Policing Services (COPS) Program: An Overview* 3 (2003).

[26] Community Policing Grants Announcement, *supra* note 24.

[27] *NBC Today Show: Los Angeles Gets Federal COPS Grant—But Is It Enough?* (NBC television broadcast Dec. 21, 1993) (referencing Mayor Richard Riordan's campaign promise to put 3,500 new officers on the street).

[28] *Policing Hiring Supplement Program*, *supra* note 24, at 2.

amended at 34 U.S.C. §§ 10381–10389). Enacted as part of the Violent Crime Control and Law Enforcement Act of 1994, the Act authorized grants for community-oriented policing: techniques that "strengthen the relationship between the police and the people they serve, fostering trust and increasing accountability." H.R. Rep. No. 103-324, at 7 (1993). As a House Report stated, "[t]he newest development in law enforcement techniques is also one of the oldest—police officers walking a beat." *Id.* at 6. The Act's express purposes include "substantially increas[ing] the number of law enforcement officers interacting directly with members of the community ('cops on the beat')" and "provid[ing] additional and more effective training to law enforcement to enhance their problem solving, service, and other skills needed in interacting with members of the community."[29] § 10002, 108 Stat. at 1807. As reported out of the House Judiciary Committee, the bill was enacted "to allow grants to increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety." H.R. Rep. No. 103-324, at 1.

The Act rested on Congress's findings that community-oriented policing would enhance public safety: "community-oriented policing ('cops on the beat') enhances communication and cooperation between law enforcement

---

[29] The other two stated purposes are to "encourage the development and implementation of innovative programs to permit members of the community to assist State, Indian tribal government, and local law enforcement agencies in the prevention of crime in the community" and to "encourage the development of new technologies to assist State, Indian tribal government, and local law enforcement agencies in reorienting the emphasis of their activities from reacting to crime to preventing crime." *Id.*

and members of the community; such communication and cooperation between law enforcement and members of the community significantly assists in preventing and controlling crime and violence, thus enhancing public safety." 103 Cong. Rec. 23,376, 23,475 (1994). Similarly, the House Judiciary Committee Report noted three purposes for the COPS grants: "to increase police presence, to enhance *police-community cooperation* in addressing crime and disorder, and otherwise to enhance public safety." H.R. Rep. No. 103-324, at 9 (emphasis added).

Consistent with the Act's statutory purposes, Congress authorized the Attorney General to "make grants . . . to increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety." § 10003, 108 Stat. at 1808 (inserting new sections 1701 to 1709 into title I of the Omnibus Crime Control and Safety Streets Act of 1968). In October 1994, Attorney General Janet Reno established the COPS Office to distribute and monitor congressional appropriations for statutorily authorized programs, including the COPS Hiring Program grant program.[30]

Nothing in the congressional record nor the Act itself remotely mentions immigration or immigration enforcement as a goal. And nothing in the Act discusses "federal partnerships" for civil immigration enforcement. In the quarter-century of the Act's existence, Congress has not once denoted civil immigration enforcement as a proper purpose for COPS grants.

---

[30] Teasley & O'Bryant, *supra* note 25, at 3. The COPS Hiring Program is one of six grant programs the COPS Office administers.

### C.  COPS Hiring Program Grants

The Act, codified at 34 U.S.C. §§ 10381 to 10389, delegates to the Attorney General the authority to (1) "carry out a single grant program" under which he makes grants for twenty-three congressionally determined purposes, with permission to extend preferential consideration under three specified circumstances, 34 U.S.C. § 10381(a), (b), (c); (2) "prescribe by regulation or guidelines" information contained in applications for COPS grants, *id.* § 10382(b); and (3) oversee the ministerial processes involved in administering, monitoring, and evaluating funded projects, *id.* §§ 10385–10386.  Congress periodically updates the statutory purposes for COPS Office grants.  *See, e.g.*, Law Enforcement Mental Health and Wellness Act of 2017, Pub. L. No. 115-113, 131 Stat. 2276, 2276 (2018) (codified at 34 U.S.C. § 10381(b)(23)) (adding "peer mentoring mental health and wellness pilot programs" as a purpose for COPS grants).  These statutory provisions underscore Congress's stated purposes in passing the Community Policing Act of 1994.  *See* § 10002, 108 Stat. at 1807.

For COPS Hiring Program grants, Congress has appropriated funds to solicit applications and award grants for hiring or rehiring "law enforcement officers for deployment in community-oriented policing."  34 U.S.C. § 10381(b)(1)–(2).  In the history of the grant program, Congress has only ever appropriated funds for these two purposes.  That is, Congress has yet to authorize funding for the remaining twenty-one purposes for which the COPS Office may make grants.

As Congress directed, jurisdictions must apply to the Attorney General to receive COPS funding.  *Id.* § 10382(a). Congress empowered the Attorney General to prescribe the application's form and contents but also mandated several

explicit application requirements. *Id.* § 10382(b), (c). Grant applicants must, for example, "demonstrate a specific public safety need" and "explain how the grant will be utilized to reorient the affected law enforcement agency's mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing." *Id.* § (c)(2), (10). Grant applicants must also identify a "crime and disorder problem/focus area" that officers hired with COPS Hiring Program funding would address "to ensure that [applicants] satisfy the requirements for COPS Office funding" and "to ensure that ultimately the additional grant-funded officers . . . will initiate or enhance [an] agency's capacity to implement community policing strategies and approaches."

Each year, the COPS Office scores and ranks each submitted application to determine which applications to fund. The electronic COPS Hiring Program application system assigns a specific (and undisclosed) number of points for each answer an applicant jurisdiction provides. The Office categorizes each question on the application as falling into the "fiscal health," "crime," or "community policing" categories; generally, answers in the "fiscal health" category account for 20% of the final score, answers to "crime" questions for 30%, and answers to "community policing" questions for 50%.

COPS grants are competitive; congressional appropriations have been historically inadequate to fund the amount of grant requests. Accordingly, since the fiscal year 2011 application cycle, the COPS Office has determined priority focus areas for the COPS Hiring Program and awarded bonus points to applications that focus on that year's priority areas. The bonus points give a competitive advantage to the applicant. Jurisdictions also receive bonus

points if catastrophic events have affected their law enforcement agencies. Furthermore, Congress permitted the Attorney General to "give preferential consideration, where feasible" specifically to applications that commit to contributing more than 25% of the grant to hiring and rehiring officers. *Id.* § 10381(c)(1). Congress also permitted the Attorney General to accord preferential consideration to applications from states with safe harbor laws for human trafficking victims—that is, for this limited factor *unrelated* to COPS grant purposes. *See id.* § 10381(c)(2)–(3). DOJ usually announces the awards by September 30 of each year.

## D.  Federal Funding in the Trump Administration

The Trump Administration was openly determined to deprive jurisdictions with so-called "sanctuary" policies of federal funds. Five days after his inauguration, President Trump attempted to withhold federal funding from "sanctuary" jurisdictions by executive order in an effort to deliver on his campaign promise to "end the sanctuary cities that have resulted in so many needless deaths."[31] *See* Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) ("Enhancing Public Safety in the Interior of the United States"). Section 9(a) of the executive order directs "the Attorney General and the Secretary" to "ensure that jurisdictions that willfully refuse to comply with 8 U.S.C.

---

[31] Philip Bump, *Here's What Donald Trump Said in His Big Immigration Speech, Annotated*, Wash. Post (Aug. 31, 2016), http://wapo.st/2cg2kS9?tid=ss_tw&utm_term=.146ecbf7c567 (last visited May 23, 2019); *see also* Office of the Press Sec'y, *President Donald J. Trump Taking Action Against Illegal Immigration*, White House (June 28, 2017), http://www.whitehouse.gov/the-press-office/2017/06/28/president-donald-j-trump-taking-action-against-illegal-immigration (last visited May 23, 2019) (quoting the President's August 31, 2016, remarks).

1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary." *Id.* at 8801. Within three months, a federal district court preliminarily enjoined Section 9(a), a decision made permanent that fall. *See County of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom. City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017). Our court agreed that the President's attempt to wrest for his policy goals the power of the purse vested exclusively in Congress violated the U.S. Constitution's separation of powers. *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231–35 (9th Cir. 2018).

In March 2017, Attorney General Jefferson B. Sessions III ordered a review of all DOJ activities, including all grant programs such as the COPS grant program. Memorandum from Jefferson B. Sessions III, U.S. Attorney Gen., to Heads of Dep't Components & U.S. Attorneys, Supporting Federal, State, Local and Tribal Law Enforcement (Mar. 31, 2017).[32] According to the March 2017 memorandum, this review would ensure that all DOJ activities "fully and effectively promote[d]" several "principles" to advance the DOJ mission statement. *Id.* at 2. One principle declared that "[c]ollaboration between federal and local law enforcement is important, and jurisdictions whose law enforcement agencies accept funding from the Department are expected to adhere to the Department's grant conditions as well as to all federal laws." *Id.*

---

[32] https://www.justice.gov/opa/press-release/file/954916 (last visited May 23, 2019).

This review resulted in major changes to COPS Office programs. For example, Attorney General Sessions's directive reduced the COPS Collaborative Reform Initiative for Technical Assistance, which DOJ created to help reform beleaguered police departments, from a program that investigated and suggested reforms to police departments to a mere grant-making body. *See* Press Release, U.S. Dep't of Justice, Department of Justice Announces Changes to the Collaborative Reform Initiative (Sep. 15, 2017).[33] And, in July 2017, Attorney General Sessions limited the award of grants under the Edward Byrne Memorial Justice Assistance Grant (Byrne JAG) Program, which awards funding for local criminal justice efforts through a statutory formula, *see* 34 U.S.C. § 10152, to only those jurisdictions that "allow federal immigration access to detention facilities, and provide 48 hours notice before they release an illegal alien wanted by federal authorities." Press Release, U.S. Dep't of Justice, Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs (July 25, 2017).[34] To date, every court to consider the challenges to immigration enforcement conditions the Trump DOJ imposed on the

---

[33] https://www.justice.gov/opa/pr/department-justice-announces-changes-collaborative-reform-initiative (last visited May 23, 2019); *see also* Mary Kay Mallonee & Eli Watkins, *DOJ Scaling Back Program to Reform Police Departments*, CNN Pol. (Sep. 15, 2017), https://www.cnn.com/2017/09/15/politics/doj police-program/index.ht ml (last visited May 23, 2019).

[34] http://www.justice.gov/opa/pr/attorney-general-sessions-announces-immigration-compliance-requirements-edward-byrne-memorial (last visited May 23, 2019).

Byrne JAG grants has soundly rejected them as unconstitutionally exceeding DOJ's statutory authority.[35]

Turning to the COPS Hiring Program grants, DOJ decided, for the first time in the fiscal year 2017 application cycle, to award bonus points to jurisdictions that committed to "partnering with the federal law enforcement to address illegal immigration." Applicants could earn these bonus points by partnering with the federal government in two ways. First, they could select "illegal immigration" as the focus area on their applications.[36] This focus area required jurisdictions to detail how newly hired officers would cooperate with federal immigration authorities through "information sharing, 287(g) partnerships, task forces and honoring detainers."

These means of "partnering with the federal law enforcement" were well understood methods of federal

---

[35] *See City of Philadelphia v. Attorney Gen.*, 916 F.3d 276, 284–91 (3d Cir. 2019); *City of Chicago v. Sessions*, 888 F.3d 272, 283–87 (7th Cir.), *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018); *New York v. Dep't of Justice*, 343 F. Supp. 3d 213, 227–31 (S.D.N.Y. 2018), *appeal docketed sub nom. City of New York v. Whitaker*, No. 19-275 (2d Cir. Jan. 28, 2019); *City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 945–48, 954–55 (N.D. Cal. 2018), *appeal docketed sub nom. City & County of San Francisco v. Whitaker*, No. 18-17308 (9th Cir. Dec. 4, 2018); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 874–76 (N.D. Ill. 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 321 (E.D. Pa. 2018), *aff'd in part, vacated in part sub nom. City of Philadelphia v. Attorney Gen.*, 916 F.3d 276 (3d Cir. 2019).

[36] The other fiscal year 2017 focus areas were: "child and youth safety focus," "drug abuse education, prevention, and intervention," "homeland security problems," "nonviolent crime problems and quality-of-life policing," "building trust and respect," "traffic/pedestrian safety problems," and "violent crime problems."

deployment of local police officers in civil immigration enforcement. With "information sharing," state and local police share arrest data with the Federal Bureau of Investigation (FBI). *See* Cristina Rodríguez, *Enforcement, Integration, and the Future of Immigration Federalism*, 5 J. on Migration & Hum. Security 509, 519 (2017). Pursuant to 8 U.S.C. § 1722, the FBI then shares that information with the Department of Homeland Security (DHS), which compares the arrest data to that in its own databases to determine whether an individual in state or local custody is removable. *Id.* A "287(g) partnership" authorizes the Attorney General in limited circumstances to enter into a formal agreement for state or local officers to act as immigration officers, "subject to the direction and supervision of the Attorney General." 8 U.S.C. § 1357(g)(1), (3); *see also Arizona v. United States*, 567 U.S. 387, 408–09 (2012). The "task force" model of 287(g) agreements "makes immigration status checks part of state or local police work in the field." Hiroshi Motomura, Immigration Outside the Law 79 (2014); *see also Arizona*, 567 U.S. at 410–13. Finally, "honoring detainers" asks state and local law enforcement to comply with DHS requests to advise the agency of when individuals in their custody would otherwise be released, so that DHS can arrange to assume custody. *See* 8 C.F.R. § 287.7(a); *see also City & County of San Francisco*, 897 F.3d at 1241 n.7.

Second, two months *after* the 2017 applications were due, DOJ announced a bonus consideration: applicants could submit a "Certification of Illegal Immigration Cooperation" (Cooperation Certification), which required a jurisdiction's highest-ranking law enforcement official and government executive to certify that the jurisdiction had already or would "implement rules, regulations, policies, and/or practices that" provide DHS (1) "access to any of the governing

body's correctional or detention facilities in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or to remain in the United States" (the "access" requirement) and (2) "advance notice as early as practicable . . . to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien" (the "notice" requirement). Announcing the Cooperation Certification option, Attorney General Sessions explained that local and state law enforcement agency cooperation with federal authorities "make[s] all of us safer by helping remove dangerous criminals from our communities." Press Release, U.S. Dep't of Justice, Department of Justice Announces Priority Consideration Criteria for COPS Office Grants (Sep. 7, 2017).[37] At no point has DOJ indicated that the "illegal immigration" focus area and Cooperation Certification (together, the "federal immigration preferences") are in any way related to community-oriented policing.

In fiscal year 2017, the COPS Office received 1142 applications requesting $409,028,743 in funding. Los Angeles requested $3.125 million to hire 25 officers for the city's Community Safety Partnership Program. It neither selected "illegal immigration" as its focus area nor submitted a signed Cooperation Certification. One out of the 90 large applicant jurisdictions and 6 out of the 1029 small applicant jurisdictions selected "illegal immigration" as a focus area. Approximately 39% of the large jurisdictions and 47% of the small jurisdictions submitted the Cooperation Certification.

---

[37] https://www.justice.gov/opa/pr/department-justice-announces-priority-consideration-criteria-cops-office-grants (last visited May 23, 2019).

The COPS Office denied Los Angeles's application on November 28, 2017.  The week before, on November 20, 2017, the COPS Office awarded $98,503,539 to 179 jurisdictions for the fiscal year 2017 application cycle.  Attorney General Sessions personally announced the 2017 awards.  He recognized that eighty percent of the grantees "have agreed to cooperate with federal immigration authorities in their detention facilities" and "applaud[ed grantees'] commitment to the rule of law and to ending violent crime, including violent crime stemming from illegal immigration."

Aside from abstract allusions to public safety, DOJ has never articulated how the federal immigration preferences relate to community-oriented policing.  This is no doubt because enforcement of federal immigration policy is entirely unrelated to community-oriented policing, as amici current and former prosecutors and law enforcement leaders[38] point out.  And this is why DOJ's imposition of the illegal immigration focus area and Cooperation Certification was enjoined by the district court: by imposing conditions that are unrelated—indeed, antithetical—to the goals of community-oriented policing, DOJ exceeded its delegated powers to administer the COPS grant program.

## II.

DOJ exceeded its statutory authority specifically by giving preference to jurisdictions willing to partner with federal immigration enforcement authorities.  Its decision to

---

[38] The amici include current and former assistant U.S. attorneys, DOJ attorneys, district attorneys, police department chiefs, state's attorneys, and sheriffs.

implement both the illegal immigration focus area and the Cooperation Certification is foreclosed by the text, structure, and purpose of the Community Policing Act.[39] *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 359 (1986). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *Id.* at 374. Here, the Act both prescribes the directives the Attorney General must follow and circumscribes the discretion he may exercise in executing the COPS grant program. "When Congress limits the purpose for which a grant can be made, it can be presumed that it intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985) (per curiam). When agencies "act improperly . . . what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). The federal immigration preferences flout the clear congressional purpose of COPS grants—to promote partnership between local law enforcement and the communities they serve—by instead favoring partnerships between local police and federal

---

[39] The majority goes astray by finding no meaning in Congress's use of the term "community-oriented policing" and then deferring under *Chevron* to DOJ's Orwellian effort to define "community-oriented policing" to include "partnering with federal law enforcement to address illegal immigration." *Chevron* deference is particularly unwarranted here because we can discern congressional intent "through the use of the traditional techniques of statutory interpretation." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1237 (9th Cir. 2001) (quoting *Chem. Mfrs. Ass'n v. Nat. Res. Def. Council, Inc.*, 470 U.S. 116, 152 (1985)); *see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). As the Supreme Court made clear in *Chevron*, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9.

immigration authorities.  *See* 34 U.S.C. § 10381(b)(1)–(2); H.R. Rep. No. 103-324, at 7.

Congress did not authorize COPS grants for anything other than placing additional state and local cops on the beat to promote community partnerships.  34 U.S.C. § 10382 authorizes DOJ to evaluate the applications of law enforcement agencies competing for limited grant funding, but in exercising this discretion, DOJ must adhere to Congress's express purpose of promoting local and state law enforcement agencies' efforts to "interact[] directly with members of the community."  § 10002, 108 Stat. at 1807; *see also* 34 U.S.C. § 10381(b)(1)–(2); *cf. Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Agencies may play the sorcerer's apprentice but not the sorcerer himself.").  For example, grant applications must require law enforcement agencies to "explain how the grant will be utilized to reorient the affected law enforcement agency's mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing."  34 U.S.C. § 10382(c)(10).  Congress also specifically permitted the Attorney General to give "preferential consideration" to applicants in only three specified circumstances, none of which is related to immigration.  *Id.* § 10381(c).  For example, section 10381(c)(2) and (3) specifically encourages states and localities to adopt a federal policy priority—treating human trafficking victims leniently— otherwise unrelated to the goal of promoting community- oriented policing.  The clear import of this section demonstrates Congress's intention to authorize DOJ to accord preference beyond community-oriented policing only where it expressly authorizes DOJ to do so.[40]  If, as DOJ

---

[40] Congress well understood the problems of illegal immigration when it enacted the Community Policing Act.  In fact, title XIII of the

urges, the agency has unfettered discretion to impose additional preferences, subsection (c) has no meaning. *See Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 965–66 (9th Cir. 2013).

The illegal immigration focus area impermissibly extends preferences to partnerships between local police and federal immigration authorities, contravening the Act's identified purpose of "law enforcement officers interacting directly with members of the community." § 10002, 108 Stat. at 1807. The current COPS grant application instructions require jurisdictions that select the illegal immigration focus area to "specify your focus on partnering with the federal law enforcement to address illegal immigration for information sharing, 287(g) partnerships, task forces and honoring detainers." It is telling that in no other focus area on the application is the applicant required to explain how it would use the grant to partner with the federal government as opposed to partnering with the community it serves. Furthermore, whereas the "illegal immigration" focus area mandates specific commitment to four conjunctive avenues of cooperation with federal immigration enforcement, all other focus areas allow for wide discretion by applicants to propose program ideas implementing those areas. For example, the "drug abuse education, prevention, and intervention" focus area instructs applicants to "specify your focus on education, prevention, and intervention to combat drug use and abuse; *for example*,

---

Violent Crime Control and Law Enforcement Act of 1994 (of which the Community Policing Act comprises title I) addresses "criminal aliens and immigration enforcement." *See* §§ 130001–130010, 108 Stat. at 2023–31. Nonetheless, Congress chose to omit illegal immigration in the Community Policing Act.

marijuana, heroin, prescription opioids, *etc.*" (Emphases added).

Congress never contemplated that COPS funds would be used to finance state or local police officers performing the function of federal immigration officers, as certifying "section 287(g) partnerships" would suggest. *See* 8 U.S.C. § 1357(g)(1). Under § 1357 itself, local police officers operating under an agreement to carry out the functions of federal immigration officers must be "at the expense of the State or political subdivision." *Id.* Congress could not have contemplated the absurdity of the Attorney General awarding grants to fund the section 287(g) partnerships that states were statutorily bound to pay for themselves. And it's difficult to see how awarding a grant for state or local police to act as federal immigration officers furthers the congressional purpose of community-oriented policing.[41]

The required focus on "honoring detainers" is no less problematic. Detainers, federal immigration enforcement requests for local jurisdictions to use their own funds to detain individuals in their custody after the individuals' scheduled release, foist upon local police federal policy priorities that have nothing to do with community-oriented policing. *See* 8 C.F.R. § 287.7; *City & County of San*

---

[41] It is the majority opinion that distorts the plain language of § 1357(g)(1), which reads: "the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law."

*Francisco*, 897 F.3d at 1241 n.7.  DOJ offers no explanation plausibly connecting detainer requests to "enhanc[ing] *police-community* cooperation."  H.R. Rep. No. 103-324, at 9 (emphasis added).

The Cooperation Certification is likewise *ultra vires*. DOJ argues that the federal immigration preferences are a permissible exercise of DOJ's authority under § 10381(b)(1) and (2) because "illegal immigration enforcement is a public safety issue" that "can be addressed most effectively through the principles of community policing that [the COPS Hiring Program] promotes."  But providing federal immigration authorities advance notice of detainees' release and access to local jails, as the Cooperation Certification demands, is completely untethered to "the principles of community policing" authorizing the COPS grant program.  *See* 34 U.S.C. § 10381(b)(1)–(2).  It may be that illegal immigration enforcement is a public safety issue, but, as the City of Los Angeles argues, demanding that local police partner with federal immigration enforcement could well erode the trust and mutual respect on which community policing depend, to the *detriment* of public safety.  A 2017 Pew Research Center survey reported that two-thirds of Hispanic immigrants and about half of all Hispanic adults in the United States worry "a lot" or "some" about the deportation of themselves or someone close to them.[42]  With this rising fear of federal immigration enforcement, police officers have reported a concomitant decline in crime reporting.  As of April 2017, for example, reports in Los

---

[42] *Latinos and the New Trump Administration*, Pew Research Ctr.: Hispanic Trends (Feb. 23, 2017), http://www.pewhispanic.org/2017/02/23/latinos-and-the-new-trump-administration/ (last visited May 23, 2019).

Angeles of sexual assault among Latinos dropped 25% and reports of domestic violence by 10% compared to the year prior.[43] Chief of the Los Angeles Police Department Charlie Beck explained that these downturns were likely due to fear of the federal government.[44] Unreported and therefore unpunished crimes lead to "greater numbers of perpetrators at large," posing a clear threat to community safety.[45] In fact, a 2012 COPS Office study identified federal immigration enforcement as detrimental to "local trust-building" because immigrant communities "may attribute immigration raids or other federal immigrant enforcement activities to local police and, therefore, mistrust community policing efforts."[46]

---

[43] Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation.*, N.Y. Times (Apr. 30, 2017), https://nyti.ms/2pifXFC (last visited May 23, 2019) (reporting "a sharp downturn in reports of sexual assault and domestic violence among Latinos throughout the country [since the 2016 presidential election that] many experts attribute . . . to fears of deportation"); *see also* James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), https://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html (last visited May 23, 2019).

[44] Medina, *supra* note 43.

[45] Rafaela Rodrigues et al., Nat'l Immigrant Women's Advocacy Project, Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey 103 (2018), http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf (last visited May 23, 2019).

[46] Pradine Saint-Fort et al., Engaging Police in Immigrant Communities: Promising Practices from the Field 4 (Oct. 2012),

The Seventh Circuit has similarly recognized that the Cooperation Certification's notice and access requirements could result in under-reported crime and thereby undermine public safety:

> [P]ersons who are here unlawfully—or who have friends or family members here unlawfully—might avoid contacting local police to report crimes as a witness or a victim if they fear that reporting will bring the scrutiny of the federal immigration authorities to their home. . . .     [T]he reluctance to report . . . could be magnified in communities where reporting could turn a misdemeanor into a deportation.  And the failure to obtain . . . cooperation could both hinder law enforcement efforts and allow criminals to freely target communities with a large undocumented population, knowing that their crimes will be less likely to be reported.

*City of Chicago*, 888 F.3d at 280.

All policing is ultimately designed with public safety in mind.  But, all policing is not community-oriented policing, which fosters partnership between the police and their communities, not the partnerships between police and federal immigration enforcement that the federal immigration preferences require.  Because such a focus is directly at odds with, and arguably undermines the very

https://goo.gl/ZGQfJA (last visited May 23, 2019) (funded by and published in partnership with the COPS Office).

purpose of, the Act and the COPS grant program, the Attorney General exceeded his authority by adding them as preferences for grant awards.[47]

### III.

The COPS grant program was enacted to increase the number of "cops on the beat" who would enter into partnership with their communities, furthering trust and respect, with the ultimate goal of public safety. DOJ may have imposed the federal immigration preferences because it shares that goal of public safety, but that is where the mutuality between the Community Policing Act and DOJ's immigration enforcement policy ends. The preference for applicants who abandon community partnerships in favor of federal immigration partnerships is directly contrary to the language, structure, history, and purpose of the Act. By enacting the COPS grant program, Congress did not authorize DOJ to coopt local and state officers into carrying out the current or any other presidential administration's agenda, unrelated to community-oriented policing.[48]

---

[47] Because I would hold that the DOJ's imposition of the federal immigration preferences is *ultra vires*, my analysis does not reach the spending clause or Administrative Procedure Act violations. Whichever of the three violations we consider, however, the fundamental point is the same: Congress did not authorize the Attorney General to act with unfettered discretion in imposing conditions for COPS grants unrelated to community-oriented policing.

[48] As the district court noted, DOJ's "broad interpretation of [its] authority carries extraordinary implications. If the Attorney General can favor applicants based on any factors relevant to public safety, he enjoys nearly limitless discretion to select grant awardees in ways not even tangentially related to community policing." Today's political agenda is to increase federal immigration enforcement; tomorrow's may be to increase enforcement of federal gun registration and licensing. Both are

Cooperation between local police and federal immigration enforcement oppugns the police-community partnership the COPS Hiring Program was created to promote. I would therefore affirm the district court's order permanently enjoining DOJ from including the illegal immigration focus area and Cooperation Certification on its COPS grant applications and from using these considerations as preferences in awarding COPS grants.

---

related to public safety; neither is related to community-oriented policing.