IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

THE STATE OF OREGON; KATE BROWN,
Governor; ELLEN ROSENBLUM, Attorney
General; and THE CITY OF PORTLAND,

        Plaintiffs,

   v.

DONALD J. TRUMP, President of the United
States, in his official capacity; WILLIAM P.
BARR, Attorney General of the United States,
in his official capacity; and THE UNITED
STATES OF AMERICA,

        Defendants.

   No. 6:18-cv-01959-MC

   **OPINION AND ORDER**

_____

**MCSHANE, Judge:**

     The present dispute touches upon many of the same principles and tensions which have

animated our Republic's legal and political discourse since its founding. The President of the

United States and his Attorney General seek to advance their policy priorities by pressuring states

and localities to comply with two immigration-related laws and by withholding federal funds from

jurisdictions which refuse to assist immigration authorities. The laws at issue, 8 U.S.C. §§ 1373

and 1644, prohibit states and localities from enacting rules which prevent their employees from

sharing a person's immigration status with federal officials. The State of Oregon and the City of

Portland, both of which have been targeted, believe that Sections 1373 and 1644 are

unconstitutional intrusions upon their legislative independence. They also believe that the funding

conditions imposed by the Attorney General are contrary to the intent of Congress. The case comes

before the Court on Defendants' Motion to Dismiss and Plaintiffs' Motion for Summary Judgment. Because Sections 1373 and 1644 violate the Tenth Amendment, and Defendants otherwise lack the authority to withhold the disputed funds, Plaintiffs' motion is GRANTED in part.

## BACKGROUND

### I.   The Byrne JAG Program

The present conflict centers on the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program"). *See* Pub. L. No. 109-162, § 1111, 1119 Stat. 2960, 3094 (2006) (codified as amended at 34 U.S.C. §§ 10151-10158). The Byrne JAG Program is a federal grant program administered by the Office of Justice Programs, a subdivision of the United States Department of Justice. *See* 34 U.S.C. §§ 10101-10102, 10141, 10151. The purpose of the Byrne JAG Program is to support state and local criminal justice efforts by providing an additional source of funding for personnel, equipment, training, and other needs. *Id.* § 10152(a)(1). States and localities may use Byrne JAG funds to support criminal justice initiatives in several different areas, including law enforcement, prosecution, crime prevention, corrections, drug treatment, technology, mental health, and victim and witness services. *See id.* §§ 10152(a)(1), 10153(a).

Under the Byrne JAG Program, grants are distributed directly to states and localities according to a formula, the variables of which are derived from a jurisdiction's population and violent crime statistics. 34 U.S.C. § 10156. To receive and draw upon a Byrne JAG award, a jurisdiction must apply to the Attorney General in the form and manner prescribed by statute, *see id.* §§ 10153, 10155, and comply with all lawful conditions outlined in the grant solicitation and award documents, *see, e.g.*, Schmidt Decl. Exs. 1, 11, ECF No. 22; Defs.' Req. for Judicial Notice in Supp. Mot. Dismiss ("RJN") Exs. E, F, ECF No. 15. A jurisdiction, once awarded its statutory share of funds, may also make subawards to local governments and community organizations. 34

U.S.C. § 10152(b). Although funds appropriated by Congress for the Byrne JAG Program must be allocated according to the statutory formula, the Attorney General retains some discretion to reserve and redistribute certain funds. *See id.* §§ 10156(f), 101057.

II.  <u>History of Participation</u>

The State of Oregon had, until 2017, received Byrne JAG funds every year since the program's creation in 2005. Schmidt Decl. ¶ 6; Nordeen Decl. ¶ 2, ECF No. 25; *see also* RJN Ex. A. During that time, the State of Oregon used its more than $26 million in Byrne JAG funds to support, among other things, programs for mental health treatment, technology improvement, and drug treatment and enforcement. Schmidt Decl. ¶ 9. With respect to the contested FY 2017 award, the State of Oregon plans to use its funds to support specialty courts designed to address root causes of criminal activity and provide statewide assistance to local crime victims. Schmidt Decl. ¶¶ 12, 15, Ex. 4 at 2, 7-8, 16-17. With respect to the contested FY 2018 award, the State of Oregon plans to use its funds to support specialty court programs which target non-violent felony offenders in an integrated, systemic approach to reduce drug use and recidivism while increasing public safety. Schmidt Decl. ¶ 22, Ex. 12 at 1-2, 8-14, 20-21.

Similarly, the City of Portland had, until 2017, received Byrne JAG funds every year since the program's creation in 2005. Nordeen Decl. ¶ 2; *see also* RJN, Ex. B. During that time, the City of Portland used its Byrne JAG funds to, among other things, purchase bulletproof vests and special-threat plates, acquire tactical medical kits, install Global Positioning Systems, and add two Victim Advocates to the Portland Police Bureau's Sex Crimes Unit. Nordeen Decl. ¶ 3. In addition, the City of Portland has historically distributed funds to subrecipients Multnomah County and the City of Gresham, which have used those funds to, among other things, support a Neighborhood Deputy District Attorney, purchase police equipment, and add a full-time Parole

and Probation Officer. Nordeen Decl. ¶ 4. The City of Portland plans to support similar initiatives with the contested FY 2017 and FY 2018 funds. Nordeen Decl. Exs. 2, 5.

III. FY 2017 and FY 2018 Funding Conditions

Starting in 2017, the Attorney General imposed three new immigration-related conditions on the receipt of Byrne JAG funds. *See generally* Schmidt Decl. Exs. 1-3; Nordeen Decl. Ex. 1; RJN Ex. D. The conditions are included in the FY 2017 state and local solicitations promulgated by the Department of Justice and, more importantly, the award agreements adopted by grantees. *See, e.g.*, Schmidt Decl. Ex. 1; Nordeen Decl. Ex. 1; RJN Ex. D. As relevant here, a jurisdiction must formally agree to each condition prior to drawing upon an award of FY 2017 Byrne JAG funds. *See, e.g.*, RJN Ex. D ¶ 1. The FY 2017 conditions can be summarized as follows:

- **Notice Condition**: A grantee must provide 48 hours' "advance notice"—or as much advance notice as is "practicable"—of the "scheduled release date and time" of any alien in the jurisdiction's custody if the jurisdiction receives a "formal written request" from the United States Department of Homeland Security ("DHS"). RJN Ex. D ¶ 55; *see also* Schmidt Decl. ¶¶ 13-15, Exs. 1-3; Nordeen Decl. Exs. 1, 4.

- **Access Condition**: A grantee must allow DHS personnel to "access" any detention facility which it maintains and "meet with individuals who are (or are believed . . . to be) aliens" and "inquire as to their right to be or remain in the United States." RJN Ex. D ¶ 55; *see also* Schmidt Decl. ¶¶ 13-15, Exs. 1-3; Nordeen Decl. Exs. 1, 4.

- **Compliance Condition**: A grantee must certify that it complies with 8 U.S.C. § 1373. RJN Ex. D ¶ 54; *see also* Schmidt Decl. ¶¶ 13-15, Exs. 1-3; Nordeen Decl. Exs. 1, 4. Section 1373 provides that no "State[] or local government entity or official may . . . prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status . . . of any individual." 8 U.S.C. § 1373(a).

In 2018, the Attorney General again imposed immigration-related conditions on the receipt of Byrne JAG funds. *See generally* Schmidt Decl. Ex. 11; Nordeen Decl. Ex. 4; RJN Exs. E, F. Two of those conditions are substantively indistinguishable from the Notice and Access Conditions described above. RJN Ex. E ¶¶ 45-46; *see also* Schmidt Decl. ¶ 22, Ex. 11 at 1, 35-37,

42-43; Nordeen Decl. Ex. 4 at 36-37, 42-43. A third condition merely expands the Compliance Condition to include 8 U.S.C. § 1644—a statute which is functionally equivalent to Section 1373—and to require that jurisdictions describe any "laws, policies, or practices related to whether, when, or how employees may communicate with DHS or [Immigration and Customs Enforcement]." Schmidt Decl. Ex. 11 at 27-28, 52; *see also* Nordeen Decl. Ex. 4 at 52; RJN Ex. E ¶ 47. But a fourth and final FY 2018 condition imposes a new restriction on grantees' conduct:

- **Disclosure Condition**: A grantee must not publicly disclose "federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice" or any "alien who has come to, entered, or remains in the United States" in violation of federal law. RJN Ex. E ¶ 44.[1]

As with FY 2017 Byrne JAG awards, grantees must formally agree to each of the immigration-related conditions prior to drawing upon their FY 2018 funds. *See, e.g.*, RJN Exs. E, F. Thus, even if a jurisdiction receives a notice of award from the Department of Justice, it may not draw upon those funds until it agrees to the conditions listed in the award document. *See* RJN Ex. E ¶ 1 ("Failure to comply with any one or more of these award requirements . . . may result in the Office of Justice Programs . . . withhold[ing] award funds, disallow[ing] costs, or suspend[ing] or terminat[ing] the award."); *see also* Schmidt Decl. Ex. 11 at 1; Nordeen Decl. Ex. 4 at 1.

IV.  FY 2017 and FY 2018 Awards

Plaintiffs applied in August 2017 for a FY 2017 Byrne JAG award and in August 2018 for a FY 2018 Byrne JAG award. *See* Schmidt Decl. ¶¶ 15, 22, Exs. 4, 11; Nordeen Decl. ¶¶ 6, 12,

---

[1] When Defendants issued the FY 2018 solicitations, they originally indicated that grantees *might*, as a condition of Defendants disbursing awarded funds, be required to first certify compliance with 8 U.S.C. § 1324(a). *See* Schmidt Decl. Ex. 11 at 37 ("Although the specific terms of . . . [any] conditions [included in FY 2018 awards made pursuant to this solicitation] are what will govern the awards, included among such conditions will be some that, generally speaking, will require the recipient (and any subrecipient) that accepts the award to do some or all of the following."); Nordeen Decl. Ex. 4 at 36 (same). The certification could occur at some point between submission of an application and acceptance of any awarded funds. *See* Schmidt Decl. Ex. 11 at 1, 35-36; Nordeen Decl. Ex. 4 at 1, 35. The language regarding compliance with Section 1324, however, was dropped in FY 2018 award documents and replaced with the current wording of the Disclosure Condition. *See, e.g.*, RJN Ex. E ¶ 44. That is the operative condition.

Exs. 2, 5.  Based on the statutory formula, the State of Oregon expected to receive $2,034,945 for FY 2017 and $2,092,704 for FY 2018, Schmidt Decl. Ex. 13 at 1, Ex. 14 at 1, while the City of Portland expected to receive $385,515 for FY 2017 and $391,694 for FY 2018, *see* Nordeen Decl. ¶ 11, Ex. 2.  Defendants anticipated issuing Byrne JAG award notifications by September 30, 2017 for FY 2017 grantees and September 30, 2018 for FY 2018 grantees.  *See* Schmidt Decl. Ex. 1 at 31, Ex. 11 at 35; Nordeen Decl. Ex. 1 at 29, Ex. 4 at 35

As represented at oral argument, however, the State of Oregon did not receive notice of its FY 2017 or FY 2018 Byrne JAG awards until July 2019.  That delay was the result of concerns within the Department of Justice that at least one Oregon law, Or. Rev. Stat. § 181A.820, prevents the State of Oregon from satisfying the Notice, Access, and Compliance Conditions.  *See* Schmidt Decl. ¶¶ 17-18, Exs. 6-9.  Section 181A.820 provides in relevant part that "[n]o law enforcement agency of the State of Oregon or any political subdivision of the state" may use "agency moneys, equipment, or personnel" to "detect[] or apprehend[]" persons whose only transgression is the violation of "federal immigration laws."[2] Although the State of Oregon recently received its FY 2017 and FY 2018 awards, the Department of Justice's view of Section 181A.820 is seemingly unchanged.  The State of Oregon, as such, cannot accept or draw upon the funds without risking penalties.  *See, e.g.*, Schmidt Decl. Ex. 3 (stating that the Department of Justice will, among other actions, "claw back" funds from jurisdictions which violate the challenged conditions).

The City of Portland is in a similar position.  Although the City of Portland received its FY 2017 Byrne JAG award on October 10, 2018, Defendants only issued the award pursuant to a

---

[2] Defendants also raised concerns about Or. Rev. Stat. § 180.805.  *See* Schmidt Decl. ¶¶ 17-18, Exs. 6-9.  Section 180.805, which is similar to Section 181A.820, prohibits any "public body" from disclosing a person's address, workplace, telephone number, or other information "for the purpose of enforcement of federal immigration laws."  Or. Rev. Stat. § 180.805(1).  Unlike Section 181A.820, however, Section 180.805 expressly provides that its terms only apply insofar as they are consistent with the requirements of federal law.  *Id.*

preliminary injunction in *City of Evanston v. Sessions*, No. 18-cv-4853 (N.D. Ill. Aug. 9, 2018). Defendants have yet to issue the City of Portland its FY 2018 Byrne JAG award. Nordeen Decl. ¶ 14. Despite multiple inquiries from the City of Portland, the Department of Justice has offered no explanation for the ten-month delay. Nordeen Decl. Exs. 6-7. As a political subdivision of the State of Oregon, however, the City of Portland is subject to Section 181A.820. Its Police Bureau is also bound by an internal rule, Directive 810.10, which mirrors Section 181A.820 and prohibits personnel from "enforcing or assisting in the enforcement of federal immigration laws." RJN Ex. G at 2; *see also* Nordeen Decl. ¶ 17. Thus, even if Defendants were to issue a FY 2018 award to the City of Portland, it would be unable to accept or draw upon those funds without risking penalties for perceived violations of the Notice, Access, and Compliance Conditions.

V.  Conflicting Policy Priorities

Defendants maintain that the contested conditions and statutes—and, by implication, the pressure on Plaintiffs to repeal their allegedly incompatible laws and policies—are essential to a properly functioning system of federal immigration laws. *See* Defs.' Mot. Dismiss 1, ECF No. 14. They point in particular to the extensive intergovernmental coordination and cooperation contemplated by the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101-1537. *See* Defs.' Mot. Dismiss 6-9. As relevant here, that cooperation and coordination includes, among other things, the decision to allow state and local governments to prosecute and punish illegal aliens who commit crimes before allowing the federal government to take immigration measures against those same persons. *See* 8 U.S.C. § 1231; *see also id.* § 1226(c)(1) (mandating that immigration detention for removal proceedings begin only "when the alien is released" from state or local criminal detention). Defendants believe that this and other features of the INA are only practicable if state and local governments provide information and access to immigration authorities.

Plaintiffs, however, believe that the health, welfare, and public safety of their residents is best served by refraining from the enforcement and administration of federal immigration laws. *See* Shah Decl. Exs. 1-4; Nordeen Decl. ¶¶ 16-17, Ex. 8. That determination, they explain, is reflected in the laws and policies targeted by Defendants. *See* Shah Decl. Exs. 1-4; Nordeen Decl. ¶¶ 16-17, Ex. 8. According to Plaintiffs, those laws and policies are instrumental to ensuring that all members of their communities feel safe cooperating with and obtaining the assistance of law enforcement agencies. *See* Shah Decl. ¶¶ Exs. 1-4; Nordeen Decl. ¶¶ 16-17, Ex. 8. In particular, Plaintiffs believe that, when state and local officials are associated with federal immigration enforcement, vulnerable victims and witnesses are less likely to come forward and report crimes, creating a danger to all members of their communities. *See* Shah Decl. Exs. 1-4; Nordeen Decl. ¶¶ 16-17, Ex. 8. Plaintiffs have, as such, declined to change their laws and policies in the face of funding pressures from the President and his Attorney General.

VI. Procedural History of the Lawsuit

The State of Oregon initiated the present action on November 9, 2018. Shortly thereafter, the City of Portland joined in the suit and, together, the State of Oregon and the City of Portland submitted an amended complaint on November 21, 2018. In their First Amended Complaint ("FAC"), ECF No. 3, Plaintiffs challenge Defendants' authority to impose the Notice, Access, and Disclosure Conditions. They also bring a facial constitutional challenge to Sections 1373 and 1644, the statutes on which the Compliance Condition is based. To remedy their injuries, Plaintiffs seek declaratory, injunctive, and mandamus relief. On March 5, 2019, Defendants filed a Motion to Dismiss. In response, on April 8, Plaintiffs filed a Motion for Summary Judgment, ECF No. 21. After briefing and oral argument, both motions are now before the Court.

**STANDARDS**

I.    <u>Motion to Dismiss Under Rule 12(b)(1)</u>

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) tests the subject matter jurisdiction of a federal court. Under the U.S. Constitution, this Court is without jurisdiction to resolve any claim which is not ripe for review, *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 579 (1985), or which a plaintiff lacks standing to assert, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). At a constitutional minimum, standing requires a plaintiff to show that she has "suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury can be traced to the challenged action and is likely to be redressed by a favorable decision." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (internal quotation marks and citations omitted). Similarly, a claim is ripe within the meaning of Article III if it presents "concrete legal issues" in the context of "actual cases, not abstractions." *United Pub. Workers v. Mitchell*, 330 U.S. 75, 89 (1947) (internal quotation marks and citations omitted). The party invoking federal jurisdiction bears the burden of establishing both requirements. *Lujan*, 504 U.S. at 561.

II.    <u>Motion to Dismiss Under Rule 12(b)(6)</u>

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow a court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678. When considering a motion to dismiss, a court must accept all allegations of material fact as true and construe those facts in the light most favorable to the

non-moving party, *Burget v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000), but it is "not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555. If a complaint is dismissed, the court must grant the plaintiff leave to amend unless it "determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

III.   Motion for Summary Judgment Under Rule 56(a)

A district court must award summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could affect the outcome of the case and an issue is "genuine" if a reasonable jury could find in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citation omitted). When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the movant carries her burden, then the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (internal quotation marks omitted) (citing Fed. R. Civ. P. 56(e)). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient" to avoid summary judgment. *Liberty Lobby, Inc.*, 477 U.S. at 255.

## DISCUSSION

Plaintiffs challenge the Notice, Access, Compliance, and Disclosure Conditions on three main grounds. First, Plaintiffs argue that Defendants are without constitutional or statutory authority to impose the Notice, Access, and Disclosure Conditions upon recipients of Byrne JAG funds and that the promulgation of those conditions therefore infringes on the power vested in

Congress under the Spending Clause of the U.S. Constitution. Second, Plaintiffs contend that, insofar as the Compliance Condition is premised on a valid congressional delegation of condition-making authority, that authority cannot include the conditioning of funds on compliance with statutes which violate the Tenth Amendment. Finally, Plaintiffs argue that, even if they possess the statutory authority to impose all four of the challenged conditions, Defendants run afoul of limitations inherent in the Spending Clause. Defendants contest each of Plaintiffs' legal arguments and move to dismiss the FAC on standing and ripeness grounds. Because the standing and ripeness requirements of Article III are jurisdictional, the Court addresses them first.

I.  Justiciability: Standing and Ripeness

Defendants argue that the Court is without jurisdiction to resolve the present dispute. *See* Fed. R. Civ. P. 12(b)(1). They contend both that Plaintiffs lack standing to bring their claims and that their claims are not ripe for judicial review. With respect to each theory, Defendants argue that Plaintiffs have yet to suffer a concrete injury as a result of Defendants' challenged conduct and that any otherwise cognizable injuries are contingent upon future events. Defendants also take issue with Plaintiffs' prayer for an injunction against all *future* immigration-related conditions on Byrne JAG funds—including those not presently before the Court—and argue that Plaintiffs cannot demonstrate an actual or imminent injury from conditions which do not yet exist. In response, Plaintiffs argue that they are suffering from an ongoing financial and budgetary injury as a result of Defendants' refusal to disburse Byrne JAG funds without the challenged conditions. Alternatively, they argue that, by imposing the conditions and moving to enforce Sections 1373 and 1644, Defendants are presently attempting to interfere with both the exercise of Plaintiffs' sovereign police powers and their rights under federal law.[3]

---

[3] In their FAC, Plaintiffs further suggest that they have standing under the *parens patriae* doctrine and based on Defendants' public threats of prosecution against state and local officials who refuse to actively assist federal

Under Article III of the U.S. Constitution, the "judicial Power" of federal courts is limited to "Cases" and "Controversies." U.S. Const. art. III, §§ 1-2. One component of this constitutional limitation is that a federal court may not "decide the merits of [a] dispute" unless the plaintiff demonstrates that she has "standing" as to each of her claims and requested forms of relief. *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). To have Article III standing, a plaintiff must show that (1) she has suffered an "injury-in-fact," (2) her injury is "fairly traceable" to the actions of the defendant, and (3) her injury is likely to be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (internal quotation marks and citations omitted). An injury-in-fact is one which stems from a "legally protected interest" and is both "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560. A threat of "future injury" may satisfy the injury-in-fact requirement if the "threatened injury is certainly impending" or there is a "substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). As the Ninth Circuit recently reiterated, a plaintiff "need only show a slight injury for standing." *City of Los Angeles v. Barr*, No. 18-55599, 2019 WL 3049129, at *5 (9th Cir. July 12, 2019) (citation omitted).

The "Case" or "Controversy" limitation of Article III also mandates that a plaintiff's claim be "ripe" for judicial review. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 579 (1985). The ripeness inquiry aims to ensure that any "harm asserted has matured sufficiently to warrant judicial intervention." *Warth*, 422 U.S. at 499 n.10 (citations omitted). A claim is ripe within the meaning of Article III if it presents "concrete legal issues" in the context of "actual cases, not abstractions." *United Pub. Workers*, 330 U.S. at 89 (internal quotation marks and

---

immigrations authorities in their efforts to enforce federal immigration laws. FAC ¶¶ 21, 25. Since Plaintiffs satisfy the standing requirement based on the theories outlined above, and because Plaintiffs do not discuss their alternative theories in the briefs, the Court declines to reach the other potential bases for Article III standing.

citations omitted). In evaluating ripeness, the core Article III inquiry is whether a claim "involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks and citation omitted). To that end, the "constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2009); *see also Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1234 (10th Cir. 2004) ("Standing and ripeness are closely related in that each focuses on whether the harm asserted has matured sufficiently to warrant judicial intervention.").

Here, the Court agrees with Plaintiffs, as well as every other court to have examined similar standing and ripeness challenges, that Plaintiffs have standing to pursue their claims and that those claims are ripe for judicial review. *See City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 966 (N.D. Cal. 2018) (finding that the plaintiffs had "demonstrated Article III standing to challenge the conditions" and that their claims were "ripe for review"); *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1026-31 (N.D. Cal. 2018) (finding the same but addressing only the Compliance Condition); *City & Cty. of San Francisco v. Sessions*, No. 17-cv-04642-WHO, 2018 WL 6267848, at *1 (N.D. Cal. Mar. 5, 2018) (same); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 271, 279-80 (E.D. Pa. 2018) (addressing ripeness but not expressly reaching the issue of standing); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 865-66 (N.D. Ill. 2018) (same); *cf. also City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1235-38 (9th Cir. 2018) (rejecting the defendants' ripeness and standing arguments in pre-enforcement challenge to an executive order which conditioned federal funds on compliance with Section 1373); *Cty. of Santa Clara v. Trump*,

275 F. Supp. 3d 1196, 1208-11 (N.D. Cal. 2017) (same); *City of Seattle v. Trump*, No. 17-497-RAJ, 2017 WL 4700144, at *5-7 (W.D. Wash. Oct. 19, 2017) (same).

With respect to standing, Plaintiffs identify at least two injuries-in-fact. The first injury is financial in nature. Defendants continue to withhold the award and/or release of Plaintiffs' FY 2017 and FY 2018 Byrne JAG funds based on the challenged conditions. Plaintiffs have operated without these funds for nearly two years. They are actively faced with the choice of either self-funding their proposed initiatives, forgoing those initiatives, or "chang[ing] their policies." *City & Cty. of San Francisco*, 897 F.3d at 1236. This interruption in the flow of promised federal funds is a cognizable injury-in-fact. *Organized Vill. of Kake v. United States Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015) (en banc) ("[A] loss of funds promised under federal law . . . satisfies Article III's standing requirement."); *cf. also E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1243 (9th Cir. 2018) (holding that "even a small reduction" in government funds to a private organization is a cognizable injury). Although Defendants contend that Plaintiffs' injuries "rest[] upon contingent future events" because Defendants have yet to withhold or claw back any specific funds, the Ninth Circuit has made clear that standing is available even for states and localities with policies which "arguably would qualify for grant withdrawal" under contested federal directives. *City & Cty. of San Francisco*, 897 F.3d at 1236. And rightly so: Plaintiffs' funding shortfalls and budgetary uncertainty are neither speculative nor hypothetical; they are real and ongoing harms.

Plaintiffs' second injury stems from infringements upon their sovereign interests.[4] A state or locality has standing to challenge interference with its operational and governance decisions. *See, e.g.*, *New York v. United States*, 505 U.S. 144, 187-88 (1992) (exercising jurisdiction based

---

[4] The City of Portland's sovereign interests derive from the State of Oregon's decision to vest the city with a portion of its own sovereign police powers. *See, e.g.*, *Jacobson*, 197 U.S. at 25 ("[T]he state may invest local bodies called into existence for the purposes of local administration with the authority in some appropriate way to safeguard the public health and the public safety."). Defendants do not differentiate between the City and State in their briefs.

on sovereign injury from federal commandeering); *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982) (noting that states have standing to challenge federal laws which hinder their "sovereign power" to "create and enforce a legal code"); *see also Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 50 n.17 (1986) (finding "no question" that a state's sovereignty is "diminished" and standing therefore exists when federal law alters the state's ability to "structure its relationship with its employees").  The challenged statutes and conditions not only appear to conflict with Plaintiffs' laws and policies but aim to force or pressure Plaintiffs to change the same.  Plaintiffs, to that end, challenge Defendants' conduct based not on the derivative interests of their citizens or an abstract interest in the rule of law; rather, they bring the present action to vindicate their own sovereign powers and rights as accorded by Congress and the Tenth Amendment.  Because the challenged statutes and conditions are presently undermining Plaintiffs' "exercise of . . . sovereign power to create and enforce a legal code," as well as interfering with at least one aspect of relations with their employees, Plaintiffs have standing.

The same facts support the ripeness of Plaintiffs' claims.  As noted above, the instant dispute "presents concrete legal issues"—not "abstractions"—framed within the context of an "actual case[]."  *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1123 (9th Cir. 2009) (internal quotation marks and citations omitted).  Plaintiffs challenge a final agency determination that FY 2017 and FY 2018 Byrne JAG funds are subject to the challenged conditions.  *See City of Chicago*, 321 F. Supp. 3d at 865 ("Chicago . . . does not challenge the Attorney general's not-yet-finalized decision whether to *award* the funds, but rather the decision to attach the [c]onditions to the grant in the first instance."); *City of Philadelphia*, 309 F. Supp. 3d at 280 (same).  Those conditions, as well as Sections 1373 and 1644, are presently causing budgetary shortfalls and actively impinging upon Plaintiffs' sovereign prerogatives and federal rights.  Plaintiffs must

"choose between accepting the award with the [c]onditions or forgoing the award in favor of maintaining [their] policy preferences." *City of Chicago*, 321 F. Supp. 3d at 855. The requested relief is directed at these ongoing harms and does not require the Court to speculate as to "uncertain or contingent future events that may not occur as anticipated." The Ninth Circuit easily found as much in a case challenging a presidential directive merely *threatening* to withhold future Byrne JAG awards. *See City & Cty. of San Francisco*, 897 F.3d at 1236-39.[5]

Nevertheless, the Court agrees with Defendants that Plaintiffs lack standing to seek an injunction against all future "conditions relating to federal immigration laws and policy." FAC at 32. Plaintiffs cannot show any injuries from conditions which do not yet exist. As the Supreme Court has made clear, speculation or "subjective apprehension" about future harm is insufficient to support standing. *Friends of the Earth v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 184 (2000) (internal quotation marks and citation omitted). Instead, "[o]nce a plaintiff has been wronged, he is entitled to [seek] injunctive relief only if he can show that he faces a real or immediate threat that he will again be wronged in a similar way." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010) (internal quotation marks and citation omitted); *see also Susan B. Anthony List*, 573 U.S. at 158 ("An allegation of future injury may suffice if . . . there is a substantial risk that the harm will occur." (internal quotation marks and citation omitted)). Plaintiffs are entitled to seek prospective relief from the *existing* conditions because their injuries are ongoing and there is a substantial risk that Defendants will continue to renew the same or similar conditions. It is pure

---

[5] Although Defendants issued an award notification to the City of Portland pursuant to a preliminary injunction in *City of Evanston v. Sessions*, No. 18-cv-4853, slip op. at 11 (N.D. Ill. Aug. 9, 2018), *stay lifted by United States Conference of Mayors v. Sessions*, No. 18-2734, slip op. at 2 (7th Cir. Aug. 29, 2018), they continue to fight the issuance of a permanent injunction in *City of Evanston* and have indicated to the City of Portland that they may enforce the challenged conditions if the preliminary injunction in *City of Evanston* is dissolved or reversed on appeal. The City of Portland's challenge to the FY 2017 conditions is therefore not moot. *See Vitek v. Jones*, 445 U.S. 480, 486-87 (1980) (holding that a defendant's voluntary cessation of challenged conduct does not render a claim moot if cessation results from the issuance of an injunction).

speculation, however, that Defendants will impose different conditions in the future and that Plaintiffs' laws or policies would conflict with them. Until such conditions are imposed, or at least threatened, Plaintiffs lack standing to seek declaratory or injunctive relief from the same.

II.     Conditioning of Byrne JAG Funds

Moving to the merits, Plaintiffs challenge each of the FY 2017 and FY 2018 conditions imposed on the receipt of Byrne JAG funds. They argue that Defendants are without statutory or constitutional authority to impose the Notice, Access, and Disclosure Conditions and that Sections 1373 and 1644—the statutes on which the Compliance Condition is based—violate the Tenth Amendment and therefore cannot form the basis for any funding condition. In assessing Plaintiffs' claims, the Court first addresses the level of deference, if any, owed to Defendants' statutory interpretations under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The Court next examines Defendants' claimed statutory authority to impose the Notice, Access, and Disclosure Conditions. Since Defendants rely upon different statutory provisions to justify their promulgation of the Disclosure Condition and the Notice and Access Conditions, the Court addresses the Disclosure Condition separately. Finally, the Court assesses whether Sections 1373 and 1644 violate the Tenth Amendment and render the Compliance Condition invalid.[6]

**A. Deference to Defendants' Statutory Interpretations**

Prior to examining the parties' dueling statutory interpretations, the Court first considers whether Defendants' interpretations are entitled to any level of deference. Typically, a reviewing court must give effect to an agency's reasonable interpretation of any statute which it is tasked with administering. *Chevron*, 467 U.S. at 842-45. That general rule, however, is subject to an important limitation: an agency's interpretation is entitled to no deference if Congress has clearly

---

[6] Because the Court finds that Defendants lack the delegated authority to impose the Notice, Access, Compliance, and Disclosure Conditions, it need not reach Plaintiffs' alternative Spending Clause argument.

spoken to the question at issue. *Id.* at 842. Instead, when a statute is unambiguous as to a specific matter, such that "the intent of Congress is clear," a court must "give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. When reviewing an agency's interpretation, a court must therefore first employ the "traditional tools of statutory construction" to determine whether "Congress had an intention on the precise question at issue." *Id.* at 843 n.9. If it did, then "that is the end of the matter" and no deference is owed to the agency. *Id.* at 843.

Interestingly, Defendants make no attempt to persuade the Court that their interpretations are entitled to deference under *Chevron*. Whether an agency may forfeit *Chevron* deference is the subject of some debate. *See generally* Note, *Waiving Chevron Deference*, 132 Harv. L. Rev. 1520 (2019). The weight of authority suggests that an agency may forfeit or waive its right to any deference available under *Chevron*. *See, e.g.*, *Neustar, Inc. v. FCC*, 857 F.3d 886, 893-94 (D.C. Cir. 2017); *Commodity Futures Trading Comm'n v. Erskine*, 512 F.3d 309, 314 (6th Cir. 2008); *cf. also Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1054 n.8 (9th Cir. 2010) (assuming without deciding that *Chevron* deference applied based on a stipulation of the parties). The Supreme Court has also hinted in dicta that *Chevron* deference may be waived. *See Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 480 (1992) ("[I]t would be quite inappropriate to defer to an interpretation which has been abandoned by the policymaking agency itself."); *cf. also United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (explaining that Supreme Court dicta has "a weight that is greater than ordinary judicial dicta").

The issue is more than academic here. Article I of the Constitution "exclusively grants the power of the purse to Congress." *City & Cty. of San Francisco*, 897 F.3d at 1231 (citing U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl. 1). That power includes "condition[ing] the receipt of funds, by states and others, on compliance with federal directives." *Nevada v. Skinner*,

884 F.2d 445, 447 (9th Cir. 1989).  As the Ninth Circuit recently reaffirmed, the Executive Branch "does not have unilateral authority" to "thwart congressional will by canceling appropriations passed by Congress."  *City & Cty. of San Francisco*, 897 F.3d at 1232 (internal quotation marks and citations omitted); *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("[N]o provision in the Constitution . . . authorizes the President to enact, to amend, or to repeal statutes.").  To that end, the Executive Branch is without inherent power to "condition the payment of . . . federal funds on adherence to its political priorities."  *City of Chicago*, 888 F.3d at 283.  If the Executive Branch wishes to condition the receipt of federal funds, it may *only* do so pursuant to a specific delegation of spending authority by Congress.  *City & Cty. of San Francisco*, 897 F.3d at 1233-34.

As a result, much of the present dispute turns upon the interpretation of statutory provisions which Defendants believe embody broad delegations of spending authority.  Although several other courts have examined the same or similar claims, each has thus far been silent on the issue of deference.  The most likely explanation is that the courts—every one of which has rejected the interpretations offered by Defendants—employed the "traditional tools of statutory construction" and determined that Congress had a clear intent *not* to delegate the condition-making authority claimed by Defendants.  *Chevron*, 467 U.S. at 483 n.9.  Indeed, several courts have hinted at this rationale in passing.  *See, e.g.*, *City of Philadelphia v. Attorney Gen. of the United States*, 916 F.3d 276, 286 (3d Cir. 2019) (examining whether any of the statutory language is "ambiguous" and concluding that "it is not"); *City & Cty. of San Francisco*, 349 F. Supp. 3d at 945 (starting its inquiry with whether "Congress ha[d] directly spoken to the precise question at issue" (quoting *Chevron*, 467 U.S. at 842)); *cf. also City of Chicago*, 888 F.3d at 284-85 (holding that the clear "intent" of Congress was "*alone* sufficient to end the inquiry").  As discussed below, the Court agrees that Congress was, indeed, clear in its intent to withhold the condition-making authority

claimed by Defendants. There is no ambiguity in the contested provisions. It therefore follows that Defendants' interpretations are not entitled to deference under *Chevron*.

The same conclusion follows for a second reason. An agency's interpretation is entitled to "*Chevron*-style deference" only if it carries the "force of law." *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (citations omitted). To carry the force of a law, not only must Congress have delegated rulemaking authority to an agency, the agency must have exercised that authority when interpreting an ambiguous statute. *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). An agency interpretation may carry the force of law if it is reached through a "means less formal than 'notice and comment' rulemaking," *Barnhart v. Walton*, 535 U.S. 212, 221 (2002), but such instances are generally limited to resolving "interstitial" ambiguities and accompanied by a "thorough[ ]" explanation, *Fox v. Clinton*, 684 F.3d 67, 78 (D.C. Cir. 2012). Here, although the Byrne JAG statute allows the Attorney General to "issue rules," Defendants do not suggest that he exercised that authority. The challenged conditions, moreover would fundamentally alter the Byrne JAG Program and appear only in solicitations, press releases, and award letters which "offer[] little more than uncited, conclusory assertions of law." *Fox*, 646 F.3d at 78. Thus, even if the contested provisions were ambiguous—which they are not—the agency's interpretations would be entitled to respect only insofar as they have "the power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Since, as discussed below, Defendants' interpretations are unpersuasive and contrary to the clear intent of Congress, they are entitled to no deference.[7]

---

[7] The availability of *Chevron* deference is what distinguishes the present case from the Ninth Circuit's recent decision in *City of Los Angeles v. Barr*. Under the statute challenged in *Barr*, 34 U.S.C. §§ 10381-10389, Congress had created a competitive grant program and delegated "broad authority" for the Attorney General to "fill gaps" in the statute, *Barr*, 2019 WL 3049129, at *9. At issue was simply whether, in the exercise of this inherent and undisputed authority, the Attorney General had permissibly interpreted the types of factors which he could consider in assigning points to an application. *Barr*, 2019 WL 3049129, at *5, *9-11. That view of the grant program made sense: when there are more applicants than appropriated funds for grants, the Attorney General—absent specific instructions from Congress—must somehow distinguish between applicants. The parties in *Barr* were, as such, only arguing about whether the term "community policing" evidenced a clear congressional intent to prevent the Attorney General from

### B. Statutory Authorization for the Notice and Access Conditions

Plaintiffs challenge the Notice and Access Conditions as an unauthorized exercise of the congressional spending power. They argue that, because Congress has never delegated to Defendants a broad discretionary authority to condition the receipt of Byrne JAG funds, Defendants' efforts to impose the Notice and Access Conditions usurp the powers granted to Congress under the Spending Clause of the U.S. Constitution. Defendants respond that Plaintiffs' separation of powers concerns are inapposite because Congress has delegated to them virtually unbounded authority to condition the award of Byrne JAG funds. That power necessarily includes the ability to impose the Notice and Access Conditions. Defendants maintain that this delegated authority can be found either in two provisions of the Byrne JAG statute itself, *see* 34 U.S.C. § 10153(a)(4)-(5), or in an external provision outlining the duties and functions of the Assistant Attorney General for the Office of Justice Programs, *see* 34 U.S.C. § 10102(a)(6).

The Court agrees with Plaintiffs, as well as every other court to have examined the issue, that Defendants lack the delegated authority to impose the Notice and Access Conditions. *See City of Philadelphia v. Attorney Gen. of the United States*, 916 F.3d 276, 284-91 (3d Cir. 2019) ("Congress has not empowered the Attorney General to enact the Challenged Conditions."); *City*

---

using immigration as one of many scoring factors and, if it did not, whether doing so was based on a reasonable interpretation of the term under *Chevron*. *Id.* at *9-11.

The Byrne JAG statute, by contrast, does not create a competitive grant program—Congress appropriates money which *must* be divided, if not necessarily distributed, among all of the states according to a formula—and the powers of the Attorney General to administer the program and withhold funds is carefully circumscribed. *See* 34 U.S.C. §§ 10151-10158. Accordingly, at issue in the present case is not whether the Attorney General permissibly interpreted a piece of his undisputed discretionary authority to choose among grant applicants; rather, it is whether he possesses the unbounded discretion to not award or disburse Byrne JAG funds in the first instance. More so than with a single non-dispositive factor used as part of a larger scoring scheme for a competitive grant program, the authority to completely withhold a grant to which each state is statutorily assigned a share—regardless of whether it applies for the grant—is an authority of substantial economic and political significance. The Supreme Court, however, "expect[s] Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation omitted). As discussed below, Congress did not do so in the Byrne JAG statute and, to the contrary, clearly intended to withhold such authority as evidenced by the text and structure of the statute and its surrounding provisions.

*of Chicago v. Sessions*, 888 F.3d 272, 283-87 (7th Cir. 2018) ("[T]he Attorney General lacked the authority to impose the notice and access conditions on receipt of the Byrne JAG grants."); *City & Cty. of San Francisco*, 349 F. Supp. 3d at 945-49 (finding that the Attorney General is without authority to "impose the notice and access conditions"); *City of Chicago v. Sessions*, 321 F. Supp. 3d at 873-74 ("[N]either Byrne JAG nor any other statute grants the Attorney General the authority to impose [the] conditions . . . ."); *New York v. United States Dep't of Justice*, 343 F. Supp. 3d 213, 227-31 (S.D.N.Y. 2018) (holding that 34 U.S.C. § 10102(a)(6) "does not provide authority for imposing any of the challenged conditions"); *City of Philadelphia*, 309 F. Supp. 3d at 280-81 (same); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 615-17 (E.D. Pa. 2017) (same).

As an initial matter, the Court notes, and Defendants do not contest, that the Byrne JAG Program is a formula grant program. *See* 34 U.S.C. § 10156 (detailing the Byrne JAG grant-distribution formula); *see also City of Chicago*, 888 F.3d at 285 ("[T]he Byrne JAG grant . . . is a formula grant rather than a discretionary grant."); *City of Philadelphia*, 916 F.3d at 290 (same); *City & Cty. of San Francisco*, 349 F. Supp. 3d at 945 (same). This means that Congress has already "determine[d] who the [grant] recipients are and how much money each shall receive." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989). Importantly, formula grants are generally "not awarded at the discretion of a state or federal agency" but rather in accordance with the "statutory formula." *Id.* at 1088; *see also City of Chicago*, 888 F.3d at 285 ("[A] formula grant . . . is structured so that the funds are allocated based on a carefully defined calculation . . . ."); *City of Philadelphia*, 916 F.3d at 280 (explaining that funds for formula grants are "distributed among all grantees based on a statutorily fixed formula"). Although the label Congress has chosen for the Byrne JAG Program is not dispositive—Congress may still have expressly delegated to

Defendants the power to condition funds—it helps to frame and contextualize Defendants' arguments. *See* Kenneth J. Allen, *Federal Grant Practice* §§ 16:3 to 16:5 (2019).

The text and structure of the Byrne JAG statute, as well as its place within the broader statutory scheme governing Justice System Improvement, make clear that Congress did not intend to delegate the authority claimed by Defendants. *See Negusie v. Holder*, 555 U.S. 511, 542 ("[We] must begin with the plain meaning of the statute."); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 ("In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."). As the Third Circuit recently observed, Defendants only halfheartedly advance the argument that authorization for the Notice and Access Conditions can be found in the text of the Byrne JAG statute itself. *City of Philadelphia*, 916 F.3d at 284. That is because, on its face, the statute indisputably does not authorize the Attorney General to place conditions on the recipients of Byrne JAG funds or withhold funds allocated under the statutory formula. *See generally* 34 U.S.C. §§ 10151-10158; *see also City of Philadelphia*, 916 F.3d at 284 ("Such authorization is nowhere to be found in the text of the statute."); *City of Chicago*, 888 F.3d at 284 ("[No] provision in the Byrne JAG statute authorizes the imposition of the conditions."). Defendants do not suggest otherwise.

Defendants instead contend that, given the lack of an express delegation, Section 10153(a) should be construed as impliedly delegating the claimed authority. Section 10153(a) requires Byrne JAG applications to include both "[a]n assurance that . . . the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require" and "[a] certification that . . . there has been appropriate coordination with affected agencies." 34 U.S.C. § 10153(a)(4), (5)(C). Defendants maintain that the "reporting" requirement authorizes the Notice Condition and that the "coordination" requirement

authorizes the Access Condition. The Court disagrees. *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." (citation omitted)); *United States v. Bass*, 404 U.S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance"); *Solid Waste Agency of N. Cook Cty. v U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) (same).

Defendants' interpretation would do violence to the plain meaning of both provisions. By its terms, the reporting requirement applies only to "programmatic and financial" information. 34 U.S.C. § 10153(a)(4). These are limiting terms which only encompass "information regarding the handling of federal funds and the programs to which those funds are directed." *City of Philadelphia*, 916 F.3d at 285. The provision is not, as Defendants suggest, a general information-sharing requirement and its terms are not broad enough to cover information unrelated to programs funded by the grant. Similarly, the coordination requirement only makes sense if it applies to a jurisdiction's coordination with agencies who will participate in a granted-funded program. After all, the provision is part of a grant scheme which encourages, and sometimes requires, states to pass funds through to local governments, with whom coordination would be necessary. *See, e.g.*, 34 U.S.C. § 10156(c)(2), (d), (f); *see also id.* § 10153(a)(6)(A) (requiring states to submit a "Statewide plan . . . which shall be designed *in consultation with local governments*" (emphasis added)). That reading is corroborated by the provision's use of the past tense—there must "*ha[ve] been*" coordination with "affected agencies," not *ongoing* coordination with federal agencies on matters unrelated to the use of Byrne JAG funds. *Id.* § 10153(a)(5)(C) (emphasis added).

The unbounded authority claimed by Defendants also stands in stark contrast to the narrow grants of ministerial and supervisory authority expressly provided for in the statute. *See City of*

*Chicago*, 888 F.3d at 283-84 (detailing the Attorney General's express grants of authority and concluding that none approach the purported authority to "impose conditions that require states or local governments to assist in immigration enforcement"); *City of Philadelphia*, 916 F.3d at 285 (same). The provisions cited by Defendants, for instance, are nested under a principle clause which permits the Attorney General to control the "form" of applications. 34 U.S.C. § 10153(a). The neighboring clauses, like the provisions relied upon by Defendants, principally relate to applicants' coordination with localities, 34 U.S.C. § 10153(a)(2)-(3), (6)(A)-(B), data on applicants' program outcomes, *id.* § 10153(a)(6)(C)-(E), applicants' compliance with other applicable laws, *id.* § 10153(a)(5)(D), and the truthfulness of applicants' representations, *id.* § 10153(a)(5). As a formula-driven program, these *pro forma* certification and evaluation requirements are not criteria on which the Attorney General may make sweeping decisions about funding levels. To the contrary, the Attorney General is only authorized to issue awards "*in accordance with the formula established under section 10156 of this title.*" *Id.* § 10152(a)(1) (emphasis added).

The instances where the Attorney General may depart from that presumption and "withhold or re-allocate" funds were carefully delineated by Congress. *City of Philadelphia*, 916 F.3d at 287. The Attorney General may, for example, re-allocate funds to "address . . . precipitous or extraordinary increases in crime" or "mitigate significant programmatic harm resulting from operation of the formula." 34 U.S.C. § 10157(b). This discretion is extremely limited: any re-allocation is not to exceed "5 percent" of the "total amount made available" by Congress. *Id.* Similarly, the Attorney General may withhold up to four percent of a grantee's Byrne JAG funds for failing to participate in the National Instant Criminal Background Check System, *see id.* § 40914(b)(1), or "not more than . . . 10-percent" of those funds for failing to report the number of persons who die in state and local custody, *id.* § 60105(c)(2). As the Third Circuit noted, "[a]ll

other delegations of this sort are similarly circumscribed." *City of Philadelphia*, 916 F.3d at 286 (citing 34 U.S.C. § 20927(a) (mandating ten-percent penalty for a grantee's failure to comply with the Sex Offender Registration and Notification Act); *id.* § 30307(e)(2) (mandating five-percent penalty for a grantee's failure to comply with the Prison Rape Elimination Act)).

The apparent reluctance of Congress to delegate greater discretion makes sense given the detailed formula it provided. *See* 34 U.S.C. § 10156. It would be "anomalous" for Congress to have painstakingly detailed the funding scheme for Byrne JAG grants, narrowly defined the role and authority of the Attorney General, and then delegated by implication an unbounded authority which would trump all of the other provisions. *Gonalez v. Oregon*, 546 U.S. 243, 262 (2006) ("It would be anomalous for Congress to have so painstakingly described the Attorney General's limited authority . . . , but to have given him, just by implication, [an even broader] authority."); *see also Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."); *City of Philadelphia*, 916 F.3d at 286 ("If Congress had already given the Attorney General this sweeping authority to withhold all funds for any reason, it would have no need to delineate numerous, specific circumstances under which [he or she] may withhold limited amounts of funds.").

Perhaps recognizing the shortcomings of their Section 10153 argument, Defendants direct the Court to Section 10102—a provision outside of the Byrne JAG statute. Section 10102, located in a separate subchapter, 34 U.S.C. §§ 10101-10111, lays out the "Duties and Functions" of the Assistant Attorney General for the Office of Justice Programs. As relevant here, Section 10102 provides that the Assistant Attorney General "shall . . . exercise such powers and functions as may

be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants, and determining priority purposes for formula grants*." 34 U.S.C. § 10102(a) (emphasis added). Defendants contend that the italicized language is a stand-alone delegation of authority which allows the Assistant Attorney General to impose virtually any condition on Byrne JAG funds.

Defendants' interpretation of the provision is once again at odds with the plain meaning of its text. The syntax of the text—namely its use of a subordinate clause preceded by the word "including"—is dispositive. "In both legal and common usage, the word 'including' is ordinarily defined as a term of illustration, signifying that what follows is an example of preceding principle." *Arizona State Bd. for Charter Schools v. United States Dept. of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006) (citations omitted). Here, the independent clause modified by "including" lists the two sources from which the Assistant Attorney General "shall" derive his or her power: authorities expressly described elsewhere in the chapter and delegations from the Attorney General. *See* 34 U.S.C. § 10102(a)(6). This means that the Assistant Attorney General "has the power to place special conditions on grants *only* to the extent such power has been vested in him or her" elsewhere in the chapter or by delegation of the Attorney General. *City of Philadelphia*, 916 F.3d at 287. Because the Court already determined that the authority claimed by Defendants is not included as part of either the Byrne JAG statute or any other part of the United States Code, Defendants' position is "untenable." *City of Chicago*, 888 F.3d at 285.

Two additional aspects of the provision's text and structure evidence that Congress never intended Section 10102 to be a carte blanche delegation of authority. First, as several courts have noted, "special conditions" is a term of art referring to high-risk grantees. *See, e.g.*, *City of Philadelphia*, 280 F. Supp. 3d at 617; *see also* Kenneth J. Allen, *Federal Grant Practice* §§ 25:1

to 25:13 (2019).  Indeed, when Congress enacted the current version of Section 10102(a)(6), the Department of Justice's own regulations described "special conditions" as those intended for "high-risk grantees" who might struggle to meet existing grant requirements.  28 C.F.R. § 66.12(a) (2006).  Defendants therefore ask too much of the "special conditions" language.  Second, moving to the structure of the provision, each of the five subsections preceding Section 10102(a)(6) deals exclusively with the Assistant Attorney General's reporting and coordination duties.  *See* 34 U.S.C. § 10102(a)(1)-(5).  "The principle of *noscitur a sociis*—'a word is known by the company it keeps'—is helpful here."  *City of Philadelphia*, 916 F.3d at 288 (citing *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015)).  A final catch-all provision in a list of ministerial powers would be a strange place indeed for Congress to hide the broad authority claimed by Defendants.  Congress, as the Supreme Court has made clear, "does not alter the fundamental details of a regulatory scheme in vague or ancillary provisions—it does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001).

Defendants nevertheless argue that the Court's reading would render the "special conditions" and "priority purposes" language surplusage.  They maintain that, because the language was added to the first clause as part of an amendment, Congress must have intended to confer "distinctive and meaningful power."  The Court disagrees.  Although the clause does little work, it still functions as an exemplification of the types of power the Assistant Attorney General may possess by delegation—potentially useful given the breadth of justice improvement programs over which the Attorney General has authority.  *See* 34 U.S.C. §§ 10101-10726.  More to the point, Defendants' suggested reading would render entire swaths of the Byrne JAG statute—the actual statute at issue here—unnecessary surplusage.  *See Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1178 (2013) ("The canon against surplusage is strongest when an interpretation would render

superfluous another part of the same statutory scheme.").  As discussed above, "[i]f Congress had already given the Attorney General th[e] sweeping authority to withhold all funds for any reasons, it would have no need to delineate numerous, specific circumstances under which the Attorney General may withhold limited amounts of funds."  *City of Philadelphia*, 916 F.3d at 286.

Lastly, Congress knew how to provide for condition-making authority over grant funds and did so in a neighboring subchapter.  *See* 34 U.S.C. § 10446(e)(3) ("In disbursing grants [to combat violence against women] under this subchapter, the Attorney General may impose reasonable conditions on grant awards . . . .").  It also knew how to create discretionary and competitive grant programs and, once again, did so in neighboring parts and subchapters.  *See, e.g.*, *id.* §§ 10171-10191 (establishing "discretionary grant[]" programs for the Bureau of Justice Assistance); *id.* §§ 10381-10389 (establishing a competitive grant program for community policing funds).  It would defy reason for the Court to find that the Byrne JAG statue does implicitly what other analogous statutes do explicitly.  That conclusion is further supported by the fact that, on at least two occasions, Congress has rejected legislation which would have imposed immigration-related conditions on Byrne JAG funds.  *See* Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2(b)(2) (2015); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3(b) (2015).  Although the Ninth Circuit generally cautions against relying upon failed legislation, *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 857 (2018), it recently found such evidence persuasive in the context of another conditional-funding dispute, *see City & Cty. of San Francisco*, 897 F.3d at 1234.[8]

---

[8] Defendants also argue that they have an historical practice of attaching conditions to Byrne JAG funds.  There are two problems with that argument.  First, unlike those challenged here, none of the conditions cited by Defendants are "blanket requirements with which the grantee must comply under all circumstances; rather their applicability is conditioned on whether federal funds are used in a particular area."  *City of Philadelphia*, 916 F.3d at 290 (citation omitted).  Second, even if the conditions previously imposed by the Attorney General were analogous to those presently in dispute, "an agency may not bootstrap itself into an area in which it has no jurisdiction by repeatedly violating its statutory mandate."  *SEC v. Sloan*, 436 U.S. 103, 119 (1978) (citation omitted).

In sum, the Court finds that Defendants are without the delegated authority to impose the Notice and Access Conditions and that, by doing so, Defendants infringed upon the authority reserved to Congress under the Spending Clause of the U.S. Constitution.

## C. Statutory Authorization for the Disclosure Condition

Plaintiffs likewise challenge the Disclosure Condition as an unauthorized exercise of the congressional spending authority. Their argument is substantially the same as that raised with respect to the Notice and Access Conditions. In response, Defendants reassert their view that Section 10102(a)(6) includes a delegation of virtually unchecked condition-making authority over Byrne JAG funds. That argument is foreclosed by the Court's prior analysis. Defendants, however, point to an additional statutory provision as delegating the necessary authority to impose the Disclosure Condition. That provision, 34 U.S.C. § 10102(a)(2), warrants separate attention. Defendants also raise a distinct procedural argument: that Plaintiffs failed to challenge the Disclosure Condition in their FAC and thus cannot raise it on summary judgment. Specifically, they argue that Plaintiffs made only "passing references" to the Disclosure Condition and omitted any mention of the substantive basis for their challenge in the three "claims for relief."

With respect to the procedural issue, Defendants' argument misconstrues contemporary pleading standards. The "[f]ederal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief'; they do not countenance dismissal of a complaint for imperfect statement of the *legal theory* supporting the claim asserted." *Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014) (emphasis added) (citing Fed. R. Civ. P. 8(a)(2)). Indeed, contrary to Defendants' implicit suggestion, notice pleading does not require a plaintiff to set forth "causes of action, statutes, or legal theories." *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008). Plaintiffs in the present case alleged adequate facts to put Defendants on notice that they intended to

challenge the Disclosure Condition as one of several unauthorized funding requirements. *See* FAC ¶¶ 75-79. To that end, they specifically outlined the terms of the Disclosure Condition and asked that the Court "[e]njoin Defendants" from conditioning Byrne JAG funds on compliance with "*any* . . . conditions relating to federal immigration laws or policy." FAC at 32 (emphasis added). That request, at the very least, encompassed all extant conditions named in the FAC. Defendants do not contend that Plaintiffs have failed to put forward evidence in support of their allegations or that the issues on summary judgment go beyond pure disputes of law.[9]

Defendants' substantive arguments fare no better. Section 10102(a)(2), which neighbors the already-discussed Section 10102(a)(6), provides that the Assistant Attorney General "shall . . . maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice." 8 U.S.C. § 10102(a)(2). Defendants—now scraping the bottom of the proverbial barrel—argue that, because the Assistant Attorney General's duty to "maintain liaison" would require him to form a "close connection" with state officials, that same duty necessarily includes the power to wholly condition Byrne JAG funds on the confidentiality of shared information because doing so ensures that everyone can work "safely and effectively

---

[9] In any event, even if the FAC were deficient as to the Disclosure Condition, Defendants were clearly aware of the claim because they raised it *sua sponte* in their response to Plaintiffs' Motion for Summary Judgment and acknowledged that Plaintiffs had previously made "passing references" to the Disclosure Condition. Defendants, in fact, submitted documents reflecting the Disclosure Condition, *see* RJN Ex. E ¶ 44, Ex. F ¶ 44, and knew that Plaintiffs intended to challenge as broad a swath of immigration-related conditions as constitutionally permissible under Article III, *see* Defs.' Mot. Dismiss 15-17. When, as here, the evidentiary record is fully developed on summary judgment, the defendant was at least constructively aware of the plaintiff's intent to challenge a particular action, the issue is purely one of law, and the parties are able to fully present their legal arguments, requiring an amended pleading would provide no benefit to the parties or the Court. *See, e.g.*, *Cummings v. City of Akron*, 418 F.3d 676, 681 (6th Cir. 2005) ("Here, regardless of the fact that [Plaintiff] failed to raise unlawful entry in his complaint, Defendants were clearly on notice of [his] unlawful entry claim."); *Renkel v. United States*, 456 F.3d 640, 642 n.2 (6th Cir. 2006) (allowing a claim which was first raised in opposition to a motion to dismiss because the issue was "purely one of law"); *Carter v. Ford Motor Co.*, 561 F.3d 562, 568 (6th Cir. 2009) ("Sometimes, as we have recognized, a claim raised in response to a summary judgment motion provides sufficient notice to the opposing party." (citations omitted)); *Moore v. City of Harriman*, 272 F.3d 769, 774 (6th Cir. 2001) (en banc) ("Subsequent filings in a case may rectify deficiencies in the initial pleadings."); *cf. also Johnson v. Hanada*, No. 06-cv-1206-BR, 2009 WL 73867, at *3-5 (D. Or. Jan. 8, 2009) (applying the "course-of-proceedings" test to an action under 42 U.S.C. § 1983).

together."  In other words, Defendants believe that completely withholding funds from grantees who do not promise to protect immigration-related information is an implicit corollary to the Assistant Attorney General's undefined duty to ensure that everyone works well together.

There are several problems with that interpretation.  The first is that it is unsupported by the text of the provision itself.  Defendants hang their hat entirely on the dictionary definition of "liaison."  *See Merriam-Webster's Collegiate Dictionary* (10th ed. 1998) (defining "liaison" as a "close bond or connection" or "a person who establishes and maintains communication for mutual understanding and cooperation").  There is, however, no portion of that definition which even hints at a punitive aspect to the act of liaising, let alone a discretionary authority to completely dissolve relations when one side does not abide by the wishes of the other.  In fact, based on the definition offered by Defendants, that would seem to be antithetical to the relation-building function of a liaison.  The remainder of the text is also silent as to any specific powers the Assistant Attorney General might wield in carrying out his liaison duties and Defendants cite no authority to suggest that "liaison[s]" are generally understood to have implied powers.  In the end, Defendants once again ask too much of a pedestrian fragment of text—there is simply no portion of Section 10102(a)(2) which explicitly or implicitly provides the claimed authority.[10]

The structure of Section 10102 also weighs against Defendants' interpretation.  As already discussed, each of the other provisions in Section 10102 deal exclusively with the Assistant Attorney General's reporting and coordination duties.  *See* 34 U.S.C. § 10102(a)-(b); *see also City of Chicago*, 888 F.3d at 285 (characterizing Section 101012 in the same way); *City of Philadelphia*, 916 F.3d at 288 (same).  These are glorified ministerial responsibilities.  The challenged condition,

---

[10] On Defendants' strained reasoning, it seems that virtually any condition—including the Notice and Access Conditions, as well as any other information sharing requirement—could be justified by the Attorney General's need to foster inter-governmental "cooperation" and "trust" as part of his duty to "maintain liaison" with grantees.

by contrast, requires Plaintiffs to guard against all disclosures which could "indirect[ly]" impact immigration enforcement and makes the Assistant Attorney General "the *sole* arbiter" of whether conduct violates that requirement. *City & Cty. of San Francisco v. Sessions*, 372 F. Supp. 3d 928, 944 (N.D. Cal. 2019) (emphasis added). That type of authority is neither contemplated by the text nor implied by the structure of Section 10102. Indeed, Section 10102(a)(2)—an otherwise unremarkable provision nested within a larger list of mundane responsibilities—would again be an odd location for Congress to house such an authority. *See Yates*, 135 S. Ct. at 1085 (holding that courts should "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words" (citation omitted)); *see also Whitman*, 531 U.S. at 468 ("Congress does not alter the fundamental details of a regulatory scheme in vague or ancillary provisions . . . .").

Finally, the condition-making power claimed by Defendants is at odds with the Byrne JAG statute and its relation to other portions of the chapter. As already discussed, instances when the Attorney General may "withhold or re-allocate" Byrne JAG funds were carefully delineated by Congress. *City of Philadelphia*, 916 F.3d at 287. When Congress wanted grantees to engage in or refrain from certain types of conduct—even information sharing—it provided for specific and measured penalties. *See, e.g.*, 34 U.S.C. § 40914(b)(1) (imposing up to a four-percent penalty if a grantee abstains from the National Instant Criminal Background Check System); *id.* § 60105(c)(2) (imposing up to a ten-percent penalty if a grantee fails to report the number of persons who die in state and local custody). If Congress had shared the same concerns about grantees disclosing immigration-related information, it could have enacted analogous penalties. But it did not. *See also* 34 U.S.C. § 10228(a) ("Nothing in this chapter . . . shall be construed to authorize any . . . employee of the United States to exercise any direction, supervision, or control over any police force or . . . criminal justice agency of any State or any political subdivision thereof.").

As with the Notice and Access Conditions, the Court finds that Defendants are without the delegated authority to impose the Disclosure Condition and that, by doing so, they infringed upon the authority reserved to Congress under the Spending Clause of the U.S. Constitution.

### D. Tenth Amendment and the Compliance Condition

Finally, Plaintiffs challenge two federal statutes, 8 U.S.C. §§ 1373 and 1644, pursuant to the Tenth Amendment. Plaintiffs argue that, because Congress directly restricted the legislative freedom of their respective policymaking bodies, both provisions are facially invalid under the anti-commandeering doctrine. The result, they contend, is that Defendants lack the statutory authority to impose the Compliance Condition because, even if Defendants could condition funds on compliance with "other applicable Federal laws," 34 U.S.C. § 10105(6), unconstitutional laws cannot be "applicable" laws. Defendants respond that the anti-commandeering doctrine does not apply to voluntary grant programs like the one at issue here. In the alternative, they argue that Sections 1373 and 1644 are constitutional because they are laws of general applicability (i.e., they evenhandedly regulate both states and private parties) and, even if they were not, because they fall within a purported information-gathering exception to the anti-commandeering doctrine.[11]

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend X. This "truism," *United States v. Darby*, 312 U.S. 100, 124 (1941), merely confirms that the enumerated powers of Congress are not without limits and that "all other

---

[11] Plaintiffs seemingly accept Defendants' view that the "applicable Federal laws" language encompasses every federal law applicable to a state or locality rather than only those laws which expressly apply to federal grants. The Court therefore assumes without deciding that Defendants' interpretation is correct. Since Plaintiffs bring an independent constitutional challenge to Sections 1373 and 1644 in addition to their derivative challenge based on the Compliance Condition, the Court need not consider whether it could avoid the constitutional issue by construing the "applicable Federal laws" language more narrowly. *See, e.g.*, *City & Cty. of San Francisco*, 349 F. Supp. 3d at 953-55 (finding that, although it was a "close call," the term "applicable" is intended to refer only to "laws related to grant applications" (citation omitted)); *New York*, 343 F. Supp. 3d at 230-31 (same).

legislative power is reserved for the States," *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018). A corollary to this confirmation of "dual sovereignty," *Printz v. United States*, 521 U.S. 898, 919 (1997), is the anti-commandeering doctrine—the principle that Congress may not "require the States to govern according to [its] instructions," *New York v. United States*, 505 U.S. 144, 162 (1992). The doctrine "represents the recognition" that Congress lacks "the power to issue direct orders to governments of the States." *Murphy*, 138 S. Ct. at 1476. As the Supreme Court recently confirmed, the anti-commandeering doctrine applies with equal force to federal statutes which tell states to "enact" certain types of laws and federal statutes which tell states to "*refrain*" from enacting certain types of laws. *Id.* at 1478 (emphasis added).

Here, the Court agrees with Plaintiffs, as well as every other court to have considered the issue after *Murphy*, that Sections 1373 and 1644 violate the Tenth Amendment. *See City & Cty. of San Francisco*, 349 F. Supp. 3d at 949-53 ("I find that Section 1373 is unconstitutional."); *City of Chicago*, 321 F. Supp. 3d at 866-73 ("Section 1373 is unconstitutional and cannot stand."); *New York*, 343 F. Supp. 3d at 232-38 ("[Section] 1373[], in so far as it applies to states and localities, is facially unconstitutional under the anticommandeering doctrine of the Tenth Amendment."); *see also City of Philadelphia*, 309 F. Supp. 3d at 286-88 (denying the defendants' motion to dismiss an as-applied Tenth Amendment challenge to Section 1373); *City of Philadelphia*, 280 F. Supp. 3d at 651 (declining to base a preliminary injunction on the Tenth Amendment, but observing "that the effect of Section 1373 compliance may be to thwart policymakers' ability to extricate their state or municipality from involvement in a federal program" (citation omitted)).

As an initial matter, the voluntary nature of the Byrne JAG Program cannot save Sections 1373 and 1644 from Tenth Amendment scrutiny. Defendants are correct to note that the Spending Clause allows Congress and, when authorized, the Executive Branch to impose conditions on the

receipt of federal funds. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576 (2012). That authority permits the federal government to reward states and localities who decide to voluntarily act or refrain from acting in ways which the government could not directly compel. *Id*. Although Defendants argue that they are merely asking Plaintiffs to accept conditions which mirror the terms of Sections 1373 and 1644, they are in fact asking Plaintiffs to *directly* comply with those statutes because any authority to condition Byrne JAG funds is limited to enforcing other "applicable" laws. *See* 34 U.S.C. § 10153(a)(5)(D). In turn, Plaintiffs challenge Sections 1373 and 1644 to both show that the provisions cannot be "applicable" laws under the Byrne JAG statute and, separately, to halt the provisions' continued intrusion upon their sovereign powers. Indeed, both statutes "are extant federal law[s]" with which Plaintiffs "must comply, completely irrespective of whether or not [they] accept[] Byrne JAG funding." *City of Chicago*, 321 F. Supp. 3d at 867. The statutes therefore cannot escape scrutiny under the anti-commandeering doctrine.

Sections 1373 and 1644, in turn, fail under a straightforward application of anti-commandeering principles. As discussed above, both provisions provide that states and localities "may not" enact rules which "in any way restrict[]" their officials from sharing a person's citizenship or immigration status with federal authorities. 8 U.S.C. §§ 1373(a)-(b), 1644. In doing so, Sections 1373 and 1644 "issue direct orders to state legislatures." *Murphy*, 138 S. Ct. at 1478. That is, each provision "dictates what a state legislature may and may not do." *Id*. Although Defendants suggest that the provisions should survive constitutional scrutiny because they direct Plaintiffs to "*refrain* from enacting" certain types of legislation, the Supreme Court has made clear that any distinction between action and inaction is "empty" and fails to recognize that the same "basic principle . . . applies in either event." *Id*. (emphasis added). Because Sections 1373 and

1644 "require the states to govern according to [the] instructions" of Congress, it necessarily follows that they violate the Tenth Amendment. *New York*, 505 U.S. at 162.

Defendants attempt to avoid that conclusion by characterizing Sections 1373 and 1644 as "valid preemption provision[s]," but they are "no such thing." *Murphy*, 138 S. Ct. at 1479. Under the Supremacy Clause of the U.S. Constitution, "federal law is supreme in the case of conflict with state law." *Id.* That "rule of decision," however, only holds true if the federal provision at issue "imposes restrictions or confers rights on *private actors*." *Id.* at 1479-80 (emphasis added) (citation omitted). Although some valid preemption provisions may be phrased as limitations on the enactment of state and local legislation, a preemption provision may never "operate directly on the States." *Id.* Instead, the essential characteristic of a valid preemption provision— "regardless of the language sometimes used by Congress"—is *always* that it "regulates the conduct of private actors, not the States." *Id.* at 1480-81. Here, Sections 1373 and 1644 are not only drafted as directives to states and localities, they also "operate" as tools of federal control over state and local legislative bodies. *Id.* In particular, the provisions create no rights or restrictions applicable to *private* actors; rather, by their terms, Sections 1373 and 1644 affect only state and local government "entit[ies]" and "official[s]." 8 U.S.C. §§ 1373, 1644. "Thus, there is simply no way to understand the provision[s] . . . as anything other than . . . direct command[s] to the States." *Murphy*, 138 S. Ct. at 1481.

Defendants attempt to distinguish the present case by arguing that Plaintiffs are actively thwarting the enforcement of federal immigration laws. That argument "is a red herring." *City of Chicago*, 888 F.3d at 282. "[N]othing in this case involves any affirmative *interference* with federal law enforcement at all, nor is there any interference whatsoever with federal immigration authorities." *Id.* (emphasis in original). Instead, "[t]he only conduct at issue here is the refusal of

local law enforcement to aid in civil immigration enforcement." *Id.* Although a state or locality's decision to refrain from assisting in federal enforcement may frustrate the efforts of immigration authorities, "[s]tanding aside does not equate to standing in the way." *United States v. California*, 314 F. Supp. 3d 1077, 1105 (E.D. Cal. 2018). States and localities have "the right, pursuant to the anticommandeering rule, to refrain from assisting with federal [enforcement] efforts." *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019). It makes no difference, as Defendants maintain, that Sections 1373 and 1644 pertain to restrictions a state or local government may affirmatively place on its officials. A government may only operate through its officials and any statute permitting federal intervention into a state or local government's control over its officials would obliterate the ability of state and local governments to abstain from federal programs. That is precisely the type of affront to state sovereignty which the Tenth Amendment forbids.

Finally, Defendants argue that Sections 1373 and 1644 fall within an information-sharing carveout to the anti-commandeering doctrine. But there is no such carveout. The authority relied upon by Defendants is based entirely on dicta from *Printz* and does not encompass the type of statute at issue here. *See Printz*, 521 U.S. at 917-18 (noting that some federal laws "require only the provision of information," but emphasizing that they "are not before us"). Unlike the statutes described in *Printz*, Sections 1373 and 1644 are "more than just . . . information-sharing provision[s]," *New York*, 343 F. Supp. 3d at 236, which require local officials to engage in "purely ministerial reporting," *Printz*, 521 U.S. at 936 (O'Connor, J., concurring). They instead "prevent state and local policymakers from enacting a wide range of information-governance rules," *New York*, 343 F. Supp. 3d at 236, and force them "to stand aside and allow the federal government to conscript the time and cooperation of local employees," *City of Chicago*, 321 F. Supp. 3d at 873. As the Supreme Court emphasized in *Murphy*, the anti-commandeering doctrine applies "not only

to state officers with policymaking responsibility but also to those assigned more mundane tasks." 138 S. Ct. at 1477.  Sections 1373 and 1644 therefore violate the Tenth Amendment.

As unconstitutional laws, Sections 1373 and 1644 "automatically drop[]" from the pool of "applicable" laws on which funding conditions may be based.  *City of Chicago*, 321 F. Supp. 3d at 875; *cf. also Branch v. Smith*, 538 U.S. 254, 281-81 (2003) (finding that the phrase "as state law requires" does not include unconstitutional state laws because such laws are a "legal nullity"). This means that the Compliance Condition fails for the same reason as the Notice, Access, and Disclosure Conditions: its promulgation is an unauthorized exercise of the congressional spending power.  *See City of Chicago*, 321 F. Supp. 3d at 876 (explaining that the Compliance Condition "does not fail" because it violates the anti-commandeering doctrine; rather, it fails "because the authority on which it depends . . . has been stripped away").  Defendants, moreover, cannot remedy this infirmity simply by transferring the substance of Sections 1373 and 1644 into stand-alone funding conditions because, as discussed above, there are presently no open-ended delegations of spending authority which could independently support such conditions.  Thus, not only are both provisions facially unconstitutional and unenforceable against Plaintiffs, the Compliance Condition itself is invalid under separation of powers principles.[12]

---

[12] Defendants also argue that the Attorney General's power to dictate the "form" of an application necessarily includes the power to ask applicants and grantees if they have laws or policies which could prevent their employees from communicating with federal immigration authorities.  34 U.S.C. § 10153(a).  The authority to dictate the "form" of an application, however, does not include an ability to dictate its "substance." *New York*, 343 F. Supp. 3d at 230 (citation omitted); *see also Form*, *Black's Law Dictionary* (10th ed. 2014) (defining "form" as "[t]he outer shape, structure, or configuration of something, as distinguished from its substance or matter").  As already discussed, the Attorney General is empowered to require that Byrne JAG applicants submit "programmatic and financial" information, but neither of those terms encompass information about laws unrelated to an applicant or grantee's handling of federal funds or the programs to which those funds are directed.  34 U.S.C. § 10153(a)(4).  It would make little sense for Congress to have described the types of information which the Attorney General may require if the Attorney General was already empowered—a few lines earlier within the same subsection—to condition Byrne JAG funds on the submission of virtually any information.  *See Marx*, 133 S. Ct. at 1178 ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

III.   Appropriate Relief

Plaintiffs seek declaratory, injunctive, and mandamus relief.  Defendants contest only the nationwide scope of the requested injunction and the propriety of mandamus relief.  They do not object to Plaintiffs' request for a declaration as it relates to the FY 2017 and FY 2018 conditions.  As such, Plaintiffs may rely upon the Court's analysis in Part II as satisfaction of its request for a declaration or, in the alternative, include a more concise restatement of the Court's conclusions in a proposed form of order.  The parties' remaining arguments are addressed below.

**A.  Permanent Injunction**

Plaintiffs argue that they are entitled to a permanent injunction with nationwide effect.  Defendants do not contest that Plaintiffs are entitled to permanent injunctive relief but argue that any such relief should be limited to the parties in the case.  A plaintiff seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156 (2010).  Plaintiffs satisfy each element.

As to the first two elements, Plaintiffs have demonstrated irreparable constitutional injuries which cannot adequately be remedied with monetary damages.  *See Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."), *rev'd on other grounds*, 562 U.S. 134 (2011); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) ("We have stated that an alleged constitutional infringement will often alone constitute irreparable harm." (internal quotation marks and citation omitted)).  In the absence of an injunction, Plaintiffs

would not only face the continued operation of unconstitutional statutes and funding conditions, they would be forced to either change their policies, forgo critical law enforcement funds, or risk federal sanctions. *See, e.g.*, *City of Philadelphia*, 309 F. Supp. 3d at 340-41 (discussing irreparable harm). Plaintiffs would, under any of these circumstances, risk public safety by eroding trust with immigrant communities or abandoning critical law enforcement initiatives funded by the Byrne JAG Program. *See, e.g.*, *City of Chicago*, 321 F. Supp. 3d at 877-78 ("Trust once lost is not easily restored, and as such, is an irreparable harm for which there is no adequate remedy at law.").

As to the third element, Defendants do "not even attempt[] to argue that the injunction causes [them] any burden at all." *City & Cty. of San Francisco*, 897 F.3d at 1244. Indeed, unlike the Hobson's choice faced by Plaintiffs, Defendants are free to continue enforcing federal immigration laws and must "simply pay money that Congress has already appropriated." *City of Philadelphia*, 309 F. Supp. 3d at 341. Finally, as the to the fourth element, an injunction would serve the public interest by thwarting Defendants' encroachment upon powers constitutionally reserved to Congress and the states. *See New York*, 343 F. Supp. 3d at 244; *see also Gordon v. Holder*, 721, F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest."). An injunction would also "bring[] clarity to all parties and to citizens dependent on public services," a result which "cannot" disserve the public interest. *City & Cty. of San Francisco*, 349 F. Supp. 3d at 970; *see also City of Philadelphia*, 309 F. Supp. 3d at 341-42 (finding that the public interest is "better served" if grantees are not forced to choose between Byrne JAG funding and "losing hard-fought goodwill amongst the immigrant community" (citation omitted)). Plaintiffs and their political subdivisions are therefore entitled to a permanent injunction against the challenged statutes and funding conditions.[13]

---

[13] At oral argument, Plaintiffs requested that any injunction, even one without nationwide effect, also run to the benefit of political subdivisions of the State of Oregon. Under the Byrne JAG statute, a political subdivision may be a direct

That injunction, however, must be limited to Plaintiffs and their political subdivisions. It is hornbook law that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). "Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown." *City & Cty. of San Francisco*, 897 F.3d at 1244 (citation omitted). Here, Plaintiffs will receive complete relief from an injunction limited to the boundaries of this District. As already discussed at length, the award and size of Byrne JAG grants is non-discretionary and based on a detailed formula. *See* 34 U.S.C. § 10156. Plaintiffs are at no disadvantage if other jurisdictions consent to the challenged conditions; to the contrary, the value of their grants may actually increase if other states refuse funds. *Id.* § 10156(f). There is simply no evidence linking Plaintiffs' injuries to the nationwide operation of the offending statutes and conditions.[14] *See City & Cty. of San Francisco*, 897 F.3d at 1244. As such, based on the record presently before it, the Court finds that a nationwide injunction is unnecessary to remedy Plaintiffs' specific harms and accord them complete relief. *See New York*, 343 F. Supp. 3d at 245.

## B. Writ of Mandamus

Finally, Plaintiffs argue that they are entitled to a writ of mandamus compelling Defendants to disburse their Byrne JAG funds without the challenged conditions. In response, Defendants

---

grantee or a subgrantee of Byrne JAG funds. 34 U.S.C. § 10156(c)-(d). Those funds, whether by direct grant or subgrant from the State of Oregon, come with the same conditions attached. In turn, "[t]he political subdivisions experience the same injuries described earlier, which necessarily flow to the [State of Oregon] by virtue of the subdivisions' position within [its] geographic boundaries and political systems." *New York*, 343 F. Supp. 3d at 245 n.28. That injury is only "compounded insofar as the [state] must . . . monitor compliance" with any subgrants it makes to political subdivisions within its borders. *Id.* As such, to accord Plaintiffs complete relief, the permanent injunction applies both to the State of Oregon and the political subdivisions within its borders. *See id.*; *California ex. rel. Becerra v. Sessions*, No. 17-cv-04701-WHO, 2018 WL 6069940, at *1 (N.D. Cal. Nov. 20, 2018) (extending permanent injunction of challenged conditions to "any California state entity" and "any California political subdivision).

[14] On this point, the Court respectfully disagrees with the Seventh Circuit. *See City of Chicago*, 888 F.3d at 292-93 ("[T]he structure of the Byrne JAG program itself supports the district court's determination to impose a nationwide injunction because the recipients of the grant are interconnected.").

contend that mandamus relief would be inappropriate because ordering the disbursement of funds would interfere with their lawful discretion under the Byrne JAG statute and because Plaintiffs' injuries are adequately remedied by the permanent injunction. A federal court may "compel an officer or employee of the United States or any agency therefor to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. This is an "extraordinary remedy" and only available if: "(1) the individual's claim is clear and certain; (2) the official's duty is nondiscretionary, ministerial, and so plainly described as to be free from doubt[;] and (3) no other adequate remedy is available." *Kildare v. Saenz*, 325 F.3d 1078, 1084 (9th Cir. 2003). Plaintiffs satisfy each element.

First, Plaintiffs' claims are clear and certain. Sections 1373 and 1644 plainly violate the Tenth Amendment and there is no colorable argument that Defendants have the delegated authority to impose the challenged conditions. Second, as previously described at length, the award and size of Byrne JAG grants is nondiscretionary. Although the Attorney General is empowered to dictate the "form" of an application and enforce the Byrne JAG statutes unambiguous reporting, coordination, and programmatic requirements, *see* 34 U.S.C. §§ 10153-10154, he may not withhold funds if an applicant or grantee satisfies those objective criteria. There is, moreover, no evidence to suggest that Plaintiffs fail to meet any of the criteria. Finally, no other adequate remedy is available to Plaintiffs. *See In re A Community Voice*, 878 F.3d 779, 786 (9th Cir. 2017) (citation omitted). Defendants maintain that there is no deadline by which they must award and disburse Byrne JAG funds. On that view, they are under no obligation to award or disburse Plaintiffs' funds even if Plaintiffs otherwise satisfy the statutory criteria. Defendants may simply sit on the funds without taking any final action. An injunction barring reliance on the challenged conditions would not protect against such conduct. And yet, as described in Part I, Plaintiffs'

budgetary and programmatic injuries grow with each passing day. Plaintiffs are therefore entitled to a writ of mandamus compelling distribution of their FY 2017 and FY 2018 funds.

## CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss, ECF No. 14, is DENIED and Plaintiffs' Motion for Summary Judgment, ECF No. 21, is GRANTED in part. Within 14 days, the parties shall confer on a proposed form of judgment and a proposed form of order with specific language for a permanent injunction, writ of mandamus, and, if desired, a declaration. The proposed form of order and proposed form of judgment shall be submitted within 21 days of this Opinion and Order. If the parties cannot agree on proposed language for either document, each shall submit its own version, with Defendants' proposed language shown in redline. The parties shall also submit a joint statement of no more than 10 pages explaining any disagreements.[15]

IT IS SO ORDERED.

DATED this 7th day of August, 2019.

/s/ Michael J. McShane
Michael J. McShane
United States District Judge

---

[15] Defendants also submitted a request for judicial notice. *See* Defs.' Req. for Judicial Notice in Supp. Mot. Dismiss, ECF No. 15. Plaintiffs filed no opposition to that request. Since the exhibits are matters of public record and not subject to reasonable dispute, Defendants' request is GRANTED. *See* Fed. R. Evid. 201(b).